# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| INCLUSIVE LOUISIANA; MOUNT TRIUMPH BAPTIST CHURCH; RISE ST. JAMES, by and through their members<br><br>*Plaintiffs*,<br><br>vs.<br><br>ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION,<br><br>*Defendants.* | Civil Action No. 2:23-cv-00987<br>Section D/1<br>Judge Wendy Vitter<br>Magistrate Judge Janis van Meerveld |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**1

**JURISDICTION AND VENUE**9

**PARTIES**9

**FACTUAL BACKGROUND**12

I.ST. JAMES PARISH: PAST IS PROLOGUE.12

II.THE LAND USE SYSTEM IN ST. JAMES PARISH TODAY ORIGINATED WITH COLONIAL DEVELOPMENT OF THE TERRITORY AND DEPENDED ON A BRUTAL SYSTEM OF SLAVERY.15

A.European Settlers and, Later, White Citizens Given Land, Assistance15

B.Code Noir 1724 / Black Code 180616

C.The Violence of Sugarcane Plantations18

D.Freedom Delayed for Those in St. James Parish20

III.THE CIVIL WAR ENDED FORMAL CHATTEL SLAVERY AND ONLY MOMENTARILY INTERRUPTED THE IMBALANCE OF POWER AND CONTROL OVER LAND AND FREEDPEOPLE.23

A.Land Given to, Then Taken Away from Freedpeople23

B.New Black Codes, 1865: "Slavery is reestablished"28

C.The Reconstruction Constitution of 1868: A Brief Moment of Hope for Freedom and Political Autonomy34

D.The Rise of White Terrorism and the End of Reconstruction37

E.Constitution of 1879: Former Enslavers and Insurrectionists Retake Political Control of the State and Parish41

F.'Crystallizing' White Supremacy in the Constitution of 189843

G.Racialized Control of Land in St. James Parish46

IV.1921 CONSTITUTION CONTINUES JIM CROW DISENFRANCHISEMENT OF BLACK VOTERS AND VESTS LOCAL GOVERNMENTS WITH AUTHORITY OVER LAND USE.48

A.1950s – 1970s: Unregulated Industry Begins Amassing in Still-Segregated St. James Parish50

B.1980s and 1990s: Evidence Mounts of Disproportionate Impacts of Heavy Industry on Black Communities in St. James Parish58

C.  2003: Parish Authorities Defend Their Land Use Practices in the Face of Mounting Evidence of Discriminatory Practices and Impacts in Siting of Heavy Industry in Black Communities_____70

V.  2014: ST. JAMES PARISH COUNCIL ADOPTS A LAND USE PLAN THAT PROTECTS TOURIST PLANTATIONS, CATHOLIC CHURCHES, AND THE MAJORITY WHITE PARTS OF THE PARISH, AND PLANS THE END OF HISTORIC BLACK COMMUNITIES._____74

A.  The First Land Use Plan Adopted in St. James Parish Is a Racial Cleansing Plan_____74

B.  Facilities Turned Away from Majority White Parts of the Parish_____82

C.  Heavy Industrial Facilities Steered to Majority Black Parts of the Parish___90

VI. DEVASTATING HEALTH IMPACTS OF HEAVY INDUSTRY ON BLACK COMMUNITIES IN ST. JAMES PARISH._____108

A.  Black Communities in St. James Parish Are Overburdened with Industrial Facilities and Face Significantly Higher Health Risks_____108

B.  Toxic Air Pollutants Emitted Within St. James Parish's 4th and 5th Districts Pose Severe Health Risks_____110

C.  Plaintiffs Suffer from Severe Health Impacts As a Result of the Parish's Land Use Practices_____113

VII.  UNMARKED ANCESTRAL CEMETERIES HAVE BEEN DESECRATED BY HEAVY INDUSTRY, AND MORE ARE UNDER THREAT_____115

A.  There Are Hundreds of Unmarked Cemeteries in St. James Parish of People Once Enslaved There_____116

B.  St. James Parish's Land Use Decisions and Practices Are Worsening and Deepening One of the Core Harms of Slavery_____120

C.  Cemeteries Hold Religious, Historical, and Personal Significance to Plaintiffs_____132

CLAIMS FOR RELIEF_____135

RELIEF REQUESTED_____146

## PRELIMINARY STATEMENT

### Background

1.        Plaintiffs, Inclusive Louisiana, Mount Triumph Baptist Church, and RISE St. James, bring this civil rights, environmental justice, and religious liberty lawsuit in order to seek to end a discriminatory and harmful land use system in St. James Parish that has its roots in slavery and its afterlife.[*] That system is now the cause of an environmental and public health emergency directly threatening them and the majority Black residents also residing there.

2.        Members of Plaintiff organizations are descendants of people who were enslaved on the plantations that flourished in St. James Parish, and descendants also of those who endeavored to make a life for themselves and their families after slavery was legally abolished – despite the continued brutality and exploitation following the end of Reconstruction. Generations of their families endured violent backlashes to their promised liberation and their pursuit of political, social, and economic equality – through white supremacist violence and terrorism, the Black Codes, Jim Crow, and a steady stream of governmental and private efforts to suppress their political and economic empowerment that persist to this day.

3.        Despite the promise of full liberation embodied in the Thirteenth Amendment, of equality and due process guaranteed by the Fourteenth Amendment, and of political enfranchisement set in the Fifteenth Amendment, the segregated and racialized land use system of St. James Parish is directly traceable to land use methods necessary to the system of chattel slavery and the subsequent periods of violence, dispossession, and residential segregation white people carried out during the post-Reconstruction periods of neo-slavery and Jim Crow.  Today

---

[*]     Saidiyah Hartman, Lose Your Mother: A Journey Along the Atlantic Slave Route 6 (2008). Drawing from Hartman's description of the "afterlife of slavery," the afterlife encompasses all the ways in which Black people are "still imperiled and devalued by a racial calculus and a political arithmetic that were entrenched centuries ago." It manifests as "skewed life chances, limited access to health and education, premature death, incarceration, and impoverishment."

in St. James Parish, Plaintiffs Black residents comprise the majority populations in the 5th District which in 2020 was 89% Black, and the 4th District, which was 52% Black. In 2010, the 5th District was 87% Black, and the 4th District was 61% Black. Indeed, Plaintiffs' members live in the areas their enslaved ancestors labored – on brutal sugarcane plantations.

4.      As a result of the vestiges of the slavery in Louisiana and in St. James in particular, Plaintiffs' members reside in some of the most polluted, toxic – and lethal – census tracts in the country, situated within a stretch of land along the Mississippi now widely known as "Cancer Alley."  The Defendants, obviously mindful of this historically segregated land distribution, have intentionally chosen to allow at least *twenty* enormous industrial facilities in the majority Black 4th and 5th Districts, while explicitly sparing white residents from the risk of environmental harm. Defendants have continued to do so despite the persistent pleas of Plaintiffs and other Black community members, and despite the fact that the Parish is constitutionally vested with the authority and responsibility to protect the health and safety of its communities against the cumulative, concentrated levels of pollution in the affected residential areas that are the consequence of the Parish's racialized land use practices.

5.      Still, the Parish has granted *every* single request by heavy industrial corporations to locate their facilities in majority Black districts in the Parish while rejecting requests to locate them in or near white districts. Of the 11 facilities reporting to the EPA's Toxic Release Inventory, 4 facilities are located in the overwhelmingly Black 5th District and 5 facilities are located in the majority Black and segregated 4th District. Of the 24 industrial facilities known to Plaintiffs to have been allowed in the Parish, 20 are located in the 4th and 5th Districts. No new facilities have been allowed to locate in the majority white parts of the Parish in the last 46 years. The Land Use Plan adopted by the Parish in 2014, and amended in 2018, designated large swaths

of the 4th and 5th District as "Industrial," despite the heavy residential concentration in those Districts, and residential areas as "Existing Residential / Future Industrial," clearly signaling their planned demise. And the Land Use Plan set out buffer zones protecting Catholic churches, schools and tourist plantations from heavy industrial development in the white areas of the Parish, while providing no comparable buffer zone protection for Black churches and schools in the Parish.  Lacking the imagination to develop safer, smaller, and more durable forms of economic development, the Parish continues thus to trade in the health and safety of Black residents in exchange for the financial largess and tax benefits industrialization purportedly provides for the rest of the Parish.

6.      The Parish is not *totally* insensitive to the harms associated with heavy industrialization, as long as those harms are articulated by white residents. One white Parish council member representing the overwhelmingly white 3rd District spoke of protecting "our young people" by making sure "we can't put an industry next to them" – naturally and unselfconsciously referring to "our" white families he believed deserve health and safety. The Council also acceded to racialized NIMBYism, by conceding to white residents demands for a moratorium on the construction of a *solar* power farm in areas that one white resident described would be "in our backyard," because it might arguably diminish white residents' property values, even as solar power farms do not emit toxic pollutants.

7.      At the same time, the Parish has consistently ignored repeated demands by Plaintiffs and other Black community leaders for a moratorium ceasing licensing of heavy industrial construction – and the correspondingly lethal levels of pollution – in Black areas. Emblematic of the Parish's callous disregard for the value of Black Lives, is its 2019 approval of a land use application to build the Formosa Plastics plant – a 2400-acre chemical manufacturing

complex proposed for the 5th District and on the site of former Acadia and Buena Vista slave plantations, and about one mile from the Fifth Ward Elementary School and 1.5 miles from the historically Black communities of Welcome and Union. If completed, the Formosa plant would spew over 6,000 tons of Clean Air Act "criteria pollutants," 800 tons of toxic air pollutants, and 13 million tons of greenhouse gases annually; it would double air pollution emissions and expose residents to triple the level of carcinogenic chemicals.

8.      Even after Black residents pointed out to the Defendants the existence of a grave misrepresentation in Formosa's land use application and confirmed that the plant would in fact impose particularly serious risks to the Black elementary school and a Black church, the Parish refused to revoke or amend its approval of Formosa's application. As a founding member of Inclusive Louisiana, Barbara Washington, said to the Parish Council regarding the community's request for a moratorium on heavy industrial construction: "We come here to you all, pleading with you all, asking you all to stop letting industry locate near residential areas; y'all turn a deaf ear to us; you harden your hearts."

9.      The Defendants' land use system has caused and continues to cause devastating harms to Black communities in St. James Parish. The heavy industrial facilities spew highly dangerous air pollutants, including: *Particulate matter*, *Ethylene Oxide*, *Benzine*, *Formaldehyde*, *Asbestos*, *Styrene*, *Toluene*, *Ethyl Benzine*, *Amonia*, *Chlorine*, *Ethyl dichloride*, *Hydrogen sulfide, Nitrogen dioxide, Sulfur dioxide, Carbon Monoxide, and volatile organic chemicals*. On their own, each pollutant     is a known agent of disease, including cancer.  The danger to residents of St. James Parish is compounded substantially by their cumulative presence in the atmosphere.

10.     Defendants currently have no reliable way to determine the extent or impact of cumulative emissions of the facilities they have authorized.  But for example, based on EPA data, both the 4th and 5th District are in the 95th-100th percentile nationwide for Air Toxic Cancer Risk. Inclusive Louisiana founding member Gail LeBoeuf herself has cancer. Inclusive Louisiana founding member Barbara Washington reports that she personally knows approximately 50 people who have died of cancer, including her 57-year-old sister. Mount Triumph Pastor Harry Joseph reports that in 2017 he buried five cancer victims within a six-month period alone.  As Inclusive Louisiana founding member Myrtle Felton told the Parish Council, "We have suffered enough. We don't need anymore. The end result is death. All a Black neighborhood gets from a plant is death."

11.     More sickness, more death, more economic exploitation and more trauma will follow in these historically Black communities struggling for the liberation and safety of their communities much like their ancestors did.  It is, too, a legacy of slavery and white supremacy in Louisiana and St. James Parish specifically to disregard the political voice of Black communities and discount the physical, psychological, and emotional trauma imposed upon them for the profit and benefit of white communities. "[I]t is painful to see a land use map that so clearly signals the disregard of *our* lives and communities … clearing the way for more industry, more pollution, and more harm," wrote Sharon Lavigne, founder of Plaintiff Rise St. James, and Gail LaBoeuf, founding member of Plaintiff Inclusive Louisiana, in a 2019 letter to the St. James Parish Council requesting a moratorium on polluting industry.

12.     In addition to devastating health and environmental harms imposed by Parish policies and practices, the land use policies threaten innumerable cemeteries of formerly enslaved persons. Sugarcane plantations across the River Parishes enforced especially brutal

forms of labor upon enslaved persons, resulting in even higher mortality rates than in other states, including high mortality rates for children.  And those enslaved people were not free in death just as they were not free in life. They were typically buried in unmarked cemeteries usually at the back end of a plantation.  Though there has been no comprehensive assessment to locate these unmarked cemeteries of enslaved people, there is no doubt that they abound in St. James Parish. The State's lead archeologist guarantees that there are unmarked cemeteries of enslaved people on every former plantation in the Parish.

13.     Indeed, one of the lingering traumas of slavery is the inability of descendants to locate the gravesites of their ancestors. But, in those cases where cemeteries can be identified, that location bears profound cultural, historical, and religious significance for descendants.

14.     Inclusive Louisiana founding member LeBoeuf sees the protection of these unmarked cemeteries as necessary in order to "allow us to heal." Despite Plaintiffs' repeated demonstrations – with supporting documentation – that construction of facilities the Parish has already allowed will potentially desecrate cemeteries with deep spiritual significance to descendants, Defendants have refused to revoke or amend the Land Use Plan. Permitting heavy industry across the Parish, absent meaningful study, consideration, and protection of unmarked cemeteries will inevitably desecrate additional unmarked cemeteries, causing harm to Plaintiffs and other descendants and their spiritual and religious practices that depend on communing with ancestors. So, as Ms. LeBoeuf protested to the Parish Council: "it is self-evident that all our ancestors live with and through us. These 'slaves' . . . should be given the respect and gratitude and debt that they never, ever received in life."

**Nature of the Action**

15.     Plaintiffs bring this action under 42 U.S.C. § 1983, a civil statute enacted in 1871 as part of the Ku Klux Klan Act, designed to give people a remedy for deprivations of their constitutional rights by state actors such as Defendants.  Defendants are in violation of the Thirteenth Amendment because the St. James Parish land use system, which concentrates dangerous and extractive industrial facilities in predominantly Black areas, is a practice traceable as a "badge or incident" of slavery. Defendants are in violation of the Fourteenth Amendment's Equal Protection guarantee because land use decisions by St. James Parish have intentionally discriminated against Black residents, including Plaintiffs, by consistently and intentionally locating dangerous facilities in Black areas of the Parish, while expressly sparing white citizens. The Defendants are in violation of the Fourteenth Amendment's guarantee of substantive due process because they have intentionally caused a conscience-shocking level of danger to Plaintiffs' right to bodily integrity.  Defendants are also in violation of another Reconstruction era statute, 42 U.S.C. § 1982 – which protects Black residents' enjoyment of their right to property on equal terms as whites – as the St. James Parish land use practices intentionally continue to deplete property values of Black residents while protecting that of white residents.

16.     Plaintiffs also bring claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") because the Parish land use plan and its land use decisions place a "substantial burden" on the religious practice of Plaintiffs' members who, as descendants of enslaved persons, have a religious and spiritual connection to the cemeteries of their ancestors – a practice that is jeopardized by heavy industrial development, *see* 42 U.S.C. § 2000cc(a); and because land use decisions have been made in a religiously discriminatory manner that burdens Black Baptist Churches but spares white Catholic churches, *see* 42 U.S.C. § 2000cc(b)(2).

Plaintiffs also bring claims under the Louisiana Constitution which includes protection for Black residents to preserve and promote their cultural and historical heritage.

### Relief Sought

17.     Plaintiffs seek declaratory and injunctive relief against the Defendants. They are entitled to a judicial declaration that the Parish's land use system violates the Constitution, RLUIPA, and the Louisiana Constitution, and that two land use decisions are unlawful. Plaintiffs also seek an injunction that restrains Defendants from continuing their unconstitutional land use practices. The form the injunction must take should be commensurate with the historic nature and devastating physical and psychological extent of the harms Defendants have imposed primarily on Black residents: there should be a complete moratorium on future permitting or construction of industrial facilities throughout the Parish.

18.     And, because of the historic disenfranchisement of Black residents in St. James Parish the injunction should, consistent with a federal court's broad equitable powers, carry with it a range of affirmative measures to remediate the ongoing effects of the Parish's environmental racism, including as detailed in the Prayer for Relief: (1) the appointment of an Independent Monitor to design, oversee, and ensure compliance with a number of necessary testing, safety, and remediation efforts; (2) a committee of archeological, cultural, and religious experts to comprehensively chart the locations of, and recommend protective measures for, unmarked cemeteries; (3) a Community Board comprised of directly impacted community members to advise the Independent Monitor on additional remediation and restoration efforts that may be needed; (4) and a mediation process facilitated by transformative justice practitioners, to assist Defendants to understand and acknowledge the legacy of harm they have continued to impose on

Black residents, to recognize the dignity of the communities that are seeking justice, and that finally, in the words of Gail LeBoeuf, "allows us to heal."

\* \* \*

19.     In lamenting the legacies of violence, economic exploitation, and harm that slavery and its modern vestiges have imposed on his community, Pastor Joseph asked at a public hearing, "Why does it always have to be us?"  As he knows, it does not *have* to be.  He and the other Plaintiffs come to court to claim the guarantee of full emancipation, political enfranchisement, and equality promised to them and their ancestors 150 years ago.

## JURISDICTION AND VENUE

20.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202, 42 U.S.C § 2000cc *et seq.*, and 42 U.S.C. §§ 1982, 1983, which confer jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges, and immunities secured by the laws and Constitution of the United States, and the Religious Land Use and Institutionalized Persons Act.

21.     This court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

22.     Venue is proper in this District because the events and omissions giving rise to the claims occurred, and continue to occur, in this District, pursuant to 28 U.S.C. § 1391(b).

## PARTIES

23.     Plaintiff INCLUSIVE LOUISIANA is a non-profit, grassroots community advocacy organization, with deep beliefs in the Christian faith, based in St. James Parish dedicated to protecting the residents of St. James Parish and neighboring parishes from environmental harm caused by industrial pollution and to creating a fairer and more inclusive

society. Its founders and members are descended from people who were enslaved in the area, who they believe are buried in unmarked cemeteries in St. James Parish. They have resided in the Parish all their lives. Two of the founding members reside and own property in the 4th District in an area designated for future industrial development in the Parish's land use plan, where they have been surrounded by a chemical plant on one side, and a steel plant on the other. They live near a phosphate fertilizer complex that also has a radioactive acid waste lake, and which in February 2023 announced plans to expand its operations. Another founding member resided in the 4th District until 1999 and now resides approximately one mile away from an aluminum plant in Gramercy. All founding members have been exposed to heightened levels of carcinogens and other harmful pollutants and a dramatically increased risk of cancer and other diseases attendant to the heavy industrial sitings in those Districts, as a result of Defendants' discriminatory land use decisions. All members have lost loved ones to cancer and other diseases as a result of Defendants' discriminatory land use decisions. One founding member, Gail LeBoeuf, has been diagnosed with cancer.

24.     Plaintiff MOUNT TRIUMPH BAPTIST CHURCH, also known as "the little church with a big heart," was founded in St. James Parish in 1904 by people who had been emancipated from slavery.  Its pastor, Harry Joseph, sees the mission of the church congregation as being good servants and helping people in need, especially the sick. Pastor Joseph and some of the church's congregants are descended from people once enslaved in the area, and who they believe are buried in unmarked cemeteries in St. James Parish. The church's property is located in the 5th District, and it is now surrounded by oil tank farms on both sides and it sits directly across the Mississippi River, less than a mile away, from a phosphate fertilizer complex that also has a massive radioactive acid waste lake, and which in February 2023 announced plans to

expand its operations. Some of its congregants reside in St. James Parish including in the 5th District, where they have been exposed to heightened levels of carcinogens and other harmful pollutants, and a dramatically increased risk of cancer and other diseases attendant to the heavy industrial sitings in those Districts, as a result of the Defendants' discriminatory land use decisions.

25.     Plaintiff RISE ST. JAMES is a faith-based grassroots organization dedicated to environmental justice and ending the proliferation of petrochemical industries in St. James Parish. Its leaders are descended from people who were enslaved in the area, who they believe are buried in unmarked cemeteries in St. James Parish. RISE's members all attend church in St. James Parish and RISE begins and ends each of its meetings with prayer. Its headquarters are in the 5th District of St. James, its leaders have lived in the 5th District all their lives, and many of its members live in the 4th and 5th Districts. Its leaders and members have been exposed to heightened levels of carcinogens, and a dramatically increased risk of cancer and other diseases attendant to the heavy industrial sitings in those Districts as a result of Defendants' discriminatory land use decisions.

26.     Defendant ST. JAMES PARISH ("Parish") is a local government subdivision of the state of Louisiana. As such, under the Louisiana Constitution of 1974 Art. VI § 17, it has authority and control over land use, zoning, and historic preservation in the Parish. The Parish Government is headed by a President, who is Chief Executive Officer, and is responsible for carrying out the policies adopted by the Parish Council and for the administration, direction, and supervision of all parish departments, offices, agencies and special districts

27.     Defendant ST. JAMES PARISH COUNCIL ("Council") is the legislative body of St. James Parish government. Pursuant to its Home Rule Charter, the Parish Council is vested

with all legislative power in the Parish and may enact any ordinance necessary, requisite, or proper to promote, protect, and preserve the general welfare, safety, health, peace, and good order of St. James Parish not inconsistent with the Constitution of the State of Louisiana. In 2014, the Parish Council adopted its land use ordinance no. 14-03, amended in 2018 and 2022. Under the ordinance, any land use approval granted to a heavy industrial facility by the Planning Commission must be approved by the Council if appealed.

28.     Defendant ST. JAMES PARISH PLANNING COMMISSION ("Commission") is a municipal body established pursuant to Louisiana Revised Statutes Title 33 § 103 to oversee and implement local land use regulations and zoning under the Home Rule Charter. Under the Parish land use ordinance, no heavy industrial facilities can begin construction without approval by the Commission.

## FACTUAL BACKGROUND

*"History is not the past. It is the present. We carry our history with us. We are our history. If we pretend otherwise, we are literally criminals."*[1]

## I.     ST. JAMES PARISH: PAST IS PROLOGUE.

29.     St. James Parish is a political subdivision of the state of Louisiana. It is governed by a Parish President and Parish Council, and is divided into seven council districts.

30.     The Black population makes up a total of 50% of St. James Parish as a whole, while the 4th and 5th Districts of St. James Parish – where petrochemical sites are most concentrated – are overwhelmingly majority Black districts: the 5th District is 89% Black population and the 4th District is 52% Black. In 2010, the 5th District was 87% Black, and the

---

[1]     James Baldwin, I Am Not Your Negro (2017).

4th District was 61% Black. The 4th and 5th Districts are home to historically Black communities like Romeville in the 4th District and Freetown and Welcome in the 5th District.

31.     There are no incorporated towns in the 5th District and only one incorporated town in the 4th District. Unincorporated towns lack their own governance power and are governed by parish councils in which the town is located. As a result, the St. James Parish Council controls the vast majority of governance and land use decision-making in Plaintiffs' Districts.

32.     Prior to the Civil War, nearly all the land along the Mississippi River that now makes up St. James Parish was comprised of plantations that relied on an extensive, entrenched, and brutal system of slavery.

33.     After the Civil War, land that had been confiscated by Union forces was returned to the former plantation owners in the Parish. Freedpeople were left to settle and establish communities where they could, usually in narrow strips of land alongside the larger properties belonging to former enslavers, where they would also continue to provide labor for sugarcane or tobacco farming on the plantations.

34.     Most unincorporated towns that exist today were those communities created and founded by freedpeople on those strips of land at the edge of plantations after the Civil War.

35.     To date, there has been no official acknowledgment of and reckoning with the deep and lasting harms of slavery and its afterlife in St. James Parish. The Parish's official website today proclaims:

> It has been said that "you don't know where you're going until you know where you have been." St. James Parish has been through a beautiful and historic past, and we have been left with a legacy unmatched by any other parish. If our future is as successful as our past, then we have much to look forward to. Our forefather carved this parish from a

> wilderness on both banks of the river. Great plantations and
> small settlements grew out of that wilderness, bearing the
> beautiful names given to them by our forefather.[2]

36.    This version of St. James Parish's history willfully omits the cruelty, barbarity, and violence that Plaintiffs' forebears suffered as they "carved the parish from a wilderness" and built and sustained the "great plantations" given "beautiful names" by slaveowners.

37.     Nor did the violence and suppression end with the abolition of slavery. Chattel slavery metastasized into different forms of labor exploitation and bodily oppression, and the South's purportedly romantic "Lost Cause" narrative was ultimately accepted by the North for the sake of national unity, but at the expense of freedpeople; hence the off-cited understanding that the South "lost the war but won the [so-called] peace."

38.    The most well-known facet of neo-slavery and social and political control in Louisiana was the generations-long effort to completely disenfranchise Black persons – until deemed unconstitutional in 1963.  In addition, the land use system in St. James Parish is a parallel aspect of efforts to maintain a system of white supremacy. As Judge Wisdom explained in relation to voting, so too the land use system Plaintiffs seek to enjoin is "best understood as the latest, but perhaps not final, member[] of a long, logically connected series of socio-political events […] rooted in the State's historic policy and the dominant white citizens' firm determination to maintain white supremacy in state and local government."[3]

39.    Former plantation owners and enslavers in St. James Parish were clear and explicit in their efforts to reestablish "white supremacy" and political control and domination in

---

[2]    *See* website of St. James Parish, https://www.stjamesla.com/240/Parish-History.

[3]    *U.S. v. State of La.*, 225 F. Supp. 353, 363 (E.D. La. 1963), *aff'd sub nom. Louisiana v. U.S.*, 380 U.S. 145 (1965) (Wisdom, J.)

the Parish after the war – including through the exclusion of or restrictions on Black property ownership or wealth creation. As detailed below, their efforts were successful.

40.     The way those forces of white supremacy have played out in St. James Parish since slavery was abolished are a direct cause of the crisis faced by Plaintiffs today. The decisions and events of today cannot be divorced from those that preceded them, and require that this history be stated.

## II.     THE LAND USE SYSTEM IN ST. JAMES PARISH TODAY ORIGINATED WITH COLONIAL DEVELOPMENT OF THE TERRITORY AND DEPENDED ON A BRUTAL SYSTEM OF SLAVERY.

### A.     European Settlers and, Later, White Citizens Given Land, Assistance

41.     In an effort to encourage settlement, both France and Spain granted land titles to settlers in Louisiana.[4] Thousands of acres were distributed to settlers this way.[5]  The land that was "granted" was taken from the Chitimacha and Choctaw people who originally inhabited the area now known as St. James Parish.

42.     After the Spanish took over the colony in 1769, the government offered more inducements to new settlers, including land grants of five arpents (about 4.2 acres), maize, farming tools, and animals.[6] When those inducements failed to spur enough settlement, the Spanish Government began offering land grants and commercial privileges to American settlers who would convert to Catholicism and swear allegiance to Spain.[7]

---

[4]     *See* Louisiana State University Hill Memorial Library, *Historical Perspectives, 1682-1815, available at* https://exhibitions.blogs.lib.lsu.edu/?p=115&page=3#HP14.

[5]     Federal Writers' Project, The WPA Guide to Missouri,  at 72 (hereinafter "FWP") *available at* https://play.google.com/books/reader?id=BWLpCAAAQBAJ&pg=GBS.PT71&hl=en. *See also,* https://exhibitions.blogs.lib.lsu.edu/?p=115&page=3#HP14; Lillian C. Bourgeois, *Cabanocey: The History, Customs and Culture of St. James Parish,* Firebird Press, Gretna 1998.

[6]     *See, e.g.* Bourgeois, *supra* n. 5 at 102.

[7]     FWP, *supra* n. 5 at 72.

43.     Later, after Louisiana became a state and doubled the size of the United States, the U.S. government granted land ownership to white citizens under the 1830 Indian Removal Act, 4 Stat. 411, which mandated the forced removal of Indigenous peoples from their ancestral lands to lands west of the Mississippi River. Later, the Homestead Act of 1862, 12 Stat. 392, *et seq.*, was enacted to further expand U.S. territory westward and "spur economic growth."[8] The Act provided 160 acres of federal land to "citizens" who agreed to farm it.[9]

44.     As slavery was still legally in effect at the time the Act was passed and enslaved people were considered property, not citizens, people of African descent would not be beneficiaries of any of these government take-aways and handouts. In fact, just a few years before the Act, in the now-infamous *Dred Scott* decision, the U.S. Supreme Court had clarified that *any* person "whose ancestors were imported into this country, and sold as slaves," whether enslaved or free, could not be a "citizen" of the United States. *Dred Scott v. Sandford,* 60 U.S. 393, 404-05 (1857) (Taney, C.J.).

**B.     Code Noir 1724 / Black Code 1806**

45.     In 1724, early French colonists applied the Code Noir to the Louisiana territory in order to regulate the status, conduct, and treatment of enslaved people.[10] In addition to formalizing all of the cruel and inhuman hallmarks of ownership and domination of one human being by another, and violent punishments for violations thereof, the Code prohibited the practice of any religion other than Catholic.[11]

---

[8]     *See also*, The Civil War: The Senate's Story, *available at* https://www.senate.gov/artandhistory/history/common/civil_war/Homestead_Act.htm#:~:text=To%20help%20develop%20the%20American,western%20land%20to%20individual%20settlers.

[9]     Homestead Act of 1862, 12 Stat. 392.

[10]     Code Noir, 1724, *available at* https://www.loc.gov/item/2021667007; Translation available at: https://64parishes.org/wp-content/uploads/2013/10/LouisianaCodeNoirTranslation.pdf.

[11]     *Id*. at III.

46.     It also forbade gatherings of "slaves belonging to different masters" of any kind, "either by day or by night," including under the "pretext of a wedding," or for any other cause, anywhere.[12]

47.     In effect, elements of the Code Noir largely remained the practice under Spanish rule until the transfer of the territory back to France in 1801, and then from France to the United States in 1806.

48.     Toward the end of Spanish rule, in 1795, the territorial governor issued a decree that codified the then-existing expectations as to customs and practices regarding enslaved persons.[13] The Spanish decree still provided extreme punishments for enslaved people, including the acknowledgment they could be shot and killed without consequence when running away, even if unarmed. It also forbade gatherings of enslaved people belonging to other masters without permission of all the masters.[14]

49.     In 1806, a new – American – Black Code went into effect.

50.     The 1806 Black Code carried forward the severe restrictions on movement and conduct and also provided for vicious punishments, like its French and Spanish predecessors. It also formalized family separation in explicitly allowing for children ten and older to be sold and separated from their mothers.[15]  Many of the provisions of the Code Noir, the Spanish Decree, and the 1806 Black Code, would later be incorporated into the post-emancipation Black Codes – including the restrictions on movement and gatherings.

---

[12]    *Id.* at XIII.

[13]    A Decree for Louisiana Issued by the Baron of Carondelet, June 1, 1795, *available at* https://lasc.libguides.com/ld.php?content_id=21023775.

[14]    *Id.*

[15]    The Black Code of Louisiana, June 7, 1806, Sec. 9,  *available at* https://www.accessible-archives.com/2011/08/the-black-code-of-louisiana-1806/.

## C.     The Violence of Sugarcane Plantations

51.     In the early days of colonization, much of the land farmed in St. James Parish was for tobacco and indigo. In the early 1800s, plantation owners transitioned to sugarcane, which relied even more heavily on an extensive and brutal system of chattel slavery.

52.     The demands of sugar farming and production were so severe that the term "sold down the river" most often referred to being sent down the Mississippi to the sugar plantations in Louisiana, a fate to be avoided. Historians have noted that many Louisiana slaveholders especially "made it their policy to work the slaves to death and buy new ones instead of taking care of the old and sick."[16]

53.     As set out further below, as in life, so too was it in death: the enslaved had no choice – not in where they were buried, or how, or even whether loved ones could gather and mourn and honor the life of the departed. In order to maximize profitability and get as much farming out of the land as possible, plantation owners set aside for burial sites parts of their property that were the least usable and intrusive to the operations.[17] Today, in St. James Parish, some of these sacred burials sit underneath or on the property of heavy industrial facilities, and some have been destroyed altogether through industrial construction and development. Local, state, and national authorities have consistently failed to recognize their historical or cultural significance.

---

[16]     *See, e.g.,* W.E.B. Du Bois, Black Reconstruction in America: 1860-1880, Free Press (1935) at 453 *also available at:* https://cominsitu.files.wordpress.com/2019/02/w-e-b-du-bois-black-reconstruction-an-essay-toward-a-history-of-the-part-which-black-folk-played-in-the-attempt-to-reconstruct-democracy-2.pdf. *See also,* Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics* (2022) at 109 ("The low mortality rates among the elderly are due to the fact that few slaves survived to those ages.").

[17]     Coastal Environments Inc., *Cartographic Regression Analysis of Certain Tracts of Land Located in T.11 S. and 12S., R. 15 E. (Southeastern Land District West of the Mississippi River), St. James parish Louisiana,* Feb. 19, 2020, *available at* https://ccrjustice.org/sites/default/files/attach/2020/03/St.%20James%20Cemeteries%20(Reduced)%20(1).pdf.

54.     The manifold forms of violence, including severe physical punishments, pervasive sexual violence and exploitation,[18] and the brutality of family separation during slavery meant that those enslaved had to adapt to different forms and meanings of family and community to survive. And, in the face of such conditions even with the seeming impossibility of any escape, there were moments when people enslaved on sugarcane plantations in Louisiana took collective action to try to gain freedom. Each attempt was met with overwhelming force, and violent, vicious retaliation.[19]

55.     One of those attempts was the largest uprising of enslaved people in U.S. history and began on January 8, 1811, just a few miles downriver from St. James Parish in neighboring St. John the Baptist Parish. Led in part by Charles Deslondes, the son of a white man and an enslaved woman, who was an overseer at the Andry Plantation (today the Kid Ory House), the uprising eventually brought together between 200-500 enslaved people from neighboring plantations as they made their way, 26 miles along River Road, toward New Orleans, shouting "On to New Orleans" and "Freedom or Death."[20]

56.     After several days, the uprising was defeated by local militias and military. Deslondes was tortured to death without trial to send a message to other enslaved people. Approximately 95 other enslaved people believed to be taking part in the uprising were killed

---

[18]    *See* Andrea Livesey (2017), *Conceived in Violence: enslaved mothers and children born of rape in nineteenth-century Louisiana,* Slavery & Abolition: A Journal of Slave and Post-Slave Studies, 38:2, 373-391, 377, 387, DOI: 10.1080/0144039X.2017.1317033. The Works Progress Administration (WPA) conducted interviews in the 1930s of people who were formerly enslaved. Of the interviews that still exist of people enslaved in Louisiana, nearly 20 % spoke about rape or a white ancestor. Nearly 8 % reported that their own mother had been raped by a white man.

[19] *See* Albert Thrasher, On to New Orleans: Louisiana's Heroic 1811 Slave Revolt, Cypress Press: New Orleans, 1996. *See also,* Leon A. Waters, *Jan. 8, 1811: Louisiana's Heroic Slave Revolt,* San Francisco Bay View, July 1, 2013, *available at* https://www.zinnedproject.org/news/tdih/louisianas-slave-revolt/ and Maris Fessenden, *How a Nearly Successful Slave Revolt Was Intentionally Lost to History,* Smithsonian Magazine, Jan. 8, 2016, *available at* https://www.smithsonianmag.com/smart-news/its-anniversary-1811-louisiana-slave-revolt-180957760/.

[20]    Waters, *supra* n. 19.

during battle, some while being apprehended afterward, or later executed after trials presided over by slave-holding judges. Their heads were placed on spikes and displayed along the levee from Place D'Armes in New Orleans all the way back along River Road to Andry Plantation, a distance of almost 60 miles.[21]

57.     That was the vicious, violent reality enslaved people faced for daring to attempt to gain freedom in the River Parishes of Louisiana, and revealed what plantation owners and their political allies were capable of when it came to holding onto power and enforcing slavery.

58.     Less than 50 years later, descendants of this generation would again fight for their freedom after the outbreak of the Civil War in 1860. People who were born into slavery in St. James Parish - like William Winchester, Amos Butler, Harrison Thompson, John Dickerson, Philip Lewis Pierce, Lewis Philips, and William Caesar, joined the U.S. Colored Infantry, or Corps d'Afrique, and fought alongside other Union forces during the war.[22]

59.     By the time of the Civil War, an estimated 13 million people had been kidnapped and forced into slavery in the transatlantic slave trade, or died en route. In 1860, there were an estimated 3,952,838 people enslaved in the United States. 8,090 of them were in St. James Parish.[23]

**D.      Freedom Delayed for Those in St. James Parish**

60.     When President Abraham Lincoln issued the Emancipation Proclamation on January 1, 1863, he specifically excluded the enslaved population in St. James Parish, along with

---

[21]   *Id. See also,* Fessenden, *supra* n. 19.

[22]   *See, e.g.,* Regimental and Company Books of the 88th U.S. Colored Troops Infantry Regiment, National Archives *available at* https://catalog.archives.gov/id/6881491.

[23]   1860 Census available at https://www2.census.gov/library/publications/decennial/1860/population/1860a-16.pdf.

twelve other Union-controlled parishes, from its reach.[24] At one of the most significant moments of liberation in world history, enslaved people in St. James Parish were "left precisely as if this proclamation were not issued" by the terms of the proclamation itself.[25]

61. Lincoln traded, even if temporarily, the freedom of people enslaved in St. James Parish and the surrounding parishes in an attempt to incur the loyalty and support of their slaveholders. Lincoln's exchange was in furtherance of his "Ten-Percent Plan," which would require only 10% of a state's voters to pledge an oath of allegiance to the Union to be readmitted.

62. Despite this initial betrayal of the long-awaited pronouncement of their freedom, enslaved people in the territory and in St. James Parish sought ways to fight for their freedom, advocating to the Union general that he refuse to enforce slavery.

63. Union General Nathaniel P. Banks sought an impossible middle ground between enslavers and enslaved in the territories excluded from emancipation.[26] Under Banks' "compromise" approach, people enslaved in the territory would be compelled to work on the plantations to keep them going but would receive some amount of compensation for their labor.[27]

64. Even this timid attempt at a compromise did not satisfy the plantation owners in St. James Parish, who formed a committee of "loyal citizens and planters of the Parish of St. James" and submitted a counter-proposal to Gen. Banks.[28] Led by D. Tureaud, they argued that

---

[24]   Emancipation Proclamation, Jan. 1, 1863, *available at* https://www.archives.gov/exhibits/featured-documents/emancipation-proclamation/transcript.html.

[25]   *Id.* See also, https://www.theadvertiser.com/story/news/local/2021/06/19/lincolns-laboratory-how-emancipation-spread-across-south-louisiana/7616911002/ .

[26]   John C. Rodrigue, Freedom's Crescent: The Civil War and the Destruction of Slavery in the Lower Mississippi Valley, Cambridge University Press (2023) at 168-70.

[27]   *Id*.

[28]   Ira Berlin, Barbara J. Fields, Thaviola Glymph, Joseph P. Reidy, Leslie S. Rowland, Eds, Freedom: A Documentary History of Emancipation 1861-1867, Series I, Volume III, The Wartime Genesis of Free Labor: The Lower South, Cambridge University Press, 1986, at p. 410, Doc. No. 85. *See also*, Rodrigue, *supra* n. 26.

the so-called "voluntary system of labor" that Banks sought to impose could not be reconciled in those places "where slavery is maintained" pursuant to the Emancipation Proclamation,[29] because, they explained to him, "slavery is the obligation to labor for the benefit of the master, without the contract or consent of the servant," and further, that "[s]laves have no freedom of action, because they are wholly under the control of another."[30]

65.     The enslavers in St. James Parish proposed a solution to Banks that would allow him to skirt the law passed by the United States Congress that prohibited Union soldiers from returning "slaves to their owners."[31] Believing that the prohibition would not apply to civil authorities, the enslavers suggested restoring them their right to bear arms and authorizing the St. James Parish sheriff "to organize police guards or patrols in conformity with the ordinances of the Police juries," who could make "the Slaves" "return to and labor steadily on the plantations of their owners."

66.     They were not successful in their bid, but it merely meant that people enslaved in St. James Parish were compelled to labor, but received for the first time some small amount of remuneration.[32]

67.      It was not until September 1864 that those who had been enslaved in St. James Parish were officially freed when Louisiana adopted a constitution that formally abolished slavery as a precondition to entering back into the Union. [33]

---

[29]  *Id*.

[30]  *Id*.

[31]  *Id.*

[32]  Rodrigue, *supra* n. 26.

[33]  Louisiana Constitution of 1864 *available at* https://babel.hathitrust.org/cgi/pt?id=miun.aey0626.0001.001&view=1up&seq=173.

68.     The 1864 constitution also provided for free public schools for all children between six and 18, regardless of race, but did not extend the voting franchise to Black men.[34]

## III.   THE CIVIL WAR ENDED FORMAL CHATTEL SLAVERY AND ONLY MOMENTARILY INTERRUPTED THE IMBALANCE OF POWER AND CONTROL OVER LAND AND FREEDPEOPLE.

69.     Just prior to the Civil War, there were 188 landholders in St. James Parish, and enslaved people overwhelmingly outnumbered the Parish's white citizens.  According to the 1860 census, there were 8,090 enslaved people and 3,348 white people in the Parish.[35]  This was a ratio feared by whites, though one of their own making, and one that the white political establishment would spend the next 150 years working to overpower with violence, force, segregation, and disenfranchisement.

### A.     Land Given to, Then Taken Away from Freedpeople

70.     In 1865, shortly before Lincoln was assassinated, he signed into law legislation passed by Congress creating the Bureau of Refugees, Freedmen, and Abandoned Lands (the "Freedmen's Bureau" or "Bureau") to oversee the transition from slavery to freedom in the South.[36]  Among its many responsibilities, including family reunification and education, the Bureau was tasked with apportioning abandoned and confiscated plantations under federal control into up to forty-acre plots for distribution among freedmen.[37]

---

[34]   *Id.*

[35]   1860 census figures *available at* https://www2.census.gov/library/publications/decennial/1860/population/1860a-16.pdf.

[36]   An Act to Establish the Bureau for the Relief of Freedmen and Refugees, ch. 90, 13 Stat. 507 (1865) *available at* http://www.freedmen.umd.edu/fbact.htm.

[37]   *Id.*

71.     Most of the approximately 96,000 acres held by the federal government in Louisiana in early 1865, was located in the sugar region. Had the redistribution of this land gone as intended, it would have furnished property to approximately 2,400 families.[38]

72.     Hundreds of applications, representing thousands of freedmen across Louisiana, were submitted to the Bureau under the program[39] and arrangements were "already being made for the division of the abandoned and confiscable lands of Louisiana, to loyal refugees, and freedmen, in pursuance of the law of Congress, Act March 3, 1865," and military order pursuant thereto.[40]

73.     At least two such applications were filed by freedpeople in St. James Parish.

74.     George Smith applied for six acres connected with the Chappin Plantation. He reported that he had $30 in cash and would "plant corn and potatoes or vegetables." [41] James Gibb also applied for two acres on the Chappin Plantation. He reported that he had $20 in cash and wanted to plant corn and vegetables.[42]

75.     During the war, some freedmen in Louisiana undertook farming abandoned plantations in cooperative ventures[43] and others had been able to lease land for farming from the Bureau, some through associations they had formed.[44]

---

[38]   John. C. Rodrigue, Reconstruction in the Cane Fields: From Slavery to Free Labor in Louisiana's Sugar Parishes, 1862-1880, Louisiana State University Press (2001) at 61.

[39]   List of Applications *available at* Freedmen's Bureau Records - Louisiana | The Freedmen's Bureau Online, http://freedmensbureau.com/louisiana/index.htm. *See also*, Thomas Conway, The Freedmen of Louisiana: Final report of the Bureau of Free Labor, Department of the Gulf, to Major General E.R.S. Canby, commanding, Jul. 1, 1865, (hereinafter "Conway Final Report") *available at* https://tile.loc.gov/storage-services/service/rbc/rbaapc/31400/31400.pdf.

[40]   *Id.*

[41]   List of Applications for Government Lands by Freedmen in accordance with Circular No. 10 – Headquarters Bureau Refugees, Freedmen, Abandoned Lands, State of Louisiana, with detailed statement, *available at* http://freedmensbureau.com/louisiana/landapps htm.

[42]   *Id.*

[43]   Rodrigue, *supra* n. 38 at 61.

[44]   Conway Final Report, *supra* n. 39.

76.     According to Thomas Conway, the head of the Freedmen's Bureau in Louisiana, despite their "scanty means," "either individually or by associations," the freedmen were "working to good advantage" and "[t]hrough their savings and earnings for this and the past year, I expect to find enough of them to be able to cultivate through the coming year sixty thousand acres of land, lying chiefly on rivers or railroads, so as to give them the full benefit of the influences of trade, travel and commerce."[45]

77.     Pursuant to the law, at the end of the lease term, the government would give the land cultivated during the term to the refugee or freedmen.[46]  However, in September 1865, President Andrew Johnson, who succeeded Lincoln after his assassination and was himself a white supremacist slaveowner opposed to extending the vote to freedpeople, ordered that all bureau-controlled property be returned to its former owners once they received presidential pardons.[47] President Johnson was granting pardons at a quick pace and within a year, the Bureau had returned nearly all the land in its possession to the original owners.[48]

78.     In May of 1865, President Johnson had issued an amnesty proclamation which granted amnesty to all those who took an oath to defend the Constitution and the Union and obey all federal laws and proclamations regarding slavery, with 14 categories of exceptions for those who had served in civil or high-ranking military positions, wealthy property owners, etc.[49]

79.     Over the course of his term, President Johnson would continue to narrow the categories of exceptions of those entitled to pardons until, on Christmas day in 1868, he issued a

---

[45]   *Id.*

[46]   *Id.*

[47]   *See* Rodrigue, *supra* n. 38 at 62.

[48]   *Id.*

[49]   Amnesty Proclamation, May 29, 1865, *available at* https://www.nytimes.com/1865/05/30/archives/president-johnsons-amnesty-proclamation-restoration-to-rights-of.html.

proclamation granting "full pardon and amnesty to all persons engaged in the late rebellion."[50] Thus, the plantation slaveholders who continued to oppose emancipation, suffrage, and equality for African Americans escaped punishment for having waged a war against the United States to hold onto slavery, and thereby continue to commit a crime against humanity.

80.     Those who had been enslaved under this brutal system were suddenly left to find their own means of subsistence and survival, and try to make homes and communities where they could.

81.     The Passage of the Southern Homestead Act of 1866 did little to help freedpeople in Louisiana, though it was first seen as a hopeful alternative after the confiscated lands had been returned to enslavers. The Southern Homestead Act was intended to assist freedmen and "loyal" southerners in acquiring and settling public lands.[51]

82.      Major General Philip Sheridan, First Assistant Commissioner for the 5th military district, expressed concern about the possibility of violent retaliation by whites toward Black families who tried to settle peacefully on the lands.[52] He also described how difficult the land was to clear, settle, and farm without the necessary resources.[53]

83.     It is estimated that only about 50 Black families were able to complete the homesteading process in Louisiana that was also marked by bureaucratic disorganization.[54]

84.     In St. James Parish in 1872, several years after the Freedmen's Bureau returned the land back to pre-war owners, a group of formerly enslaved people managed to pool their

---

[50]   Proclamation Granting full pardon and amnesty to all persons engaged in the late rebellion, Dec. 25, 1868, *available at*  https://www.loc.gov/resource/rbpe.23602600/.

[51]   *See* The Civil War: The Senate's Story, *supra* n. 8.

[52]   Claude F. Oubre, *Forty Acres and a Mule": Louisiana and the Southern Homestead Act,* Louisiana History: the Journal of the Louisiana Historical Association, Spring 1976, Vol. 17, No.2, pp. 143-157, at 148.

[53]   *Id.* at 156.

[54]   *Id*.

resources and purchase property on the West Bank of the Mississippi River where they established the settlement of Freetown.

85.     Thirty-one people teamed up to buy plots of land that had been part of the Pedesclaux-Landry Sugar Plantation from an owner in financial straits.[55] The landowners included: J.C. Oliver, Celéstin Oliver, Jean-Baptiste Louis, Onzimé Louis, John León Louis, Jean Louis Jr., Joachim Paul, Victorin Moris, Narcisse Gibson, Édmond Johnson, Félix Moris, Ben Benjamin, Ursin Toussaint, Philippé Simms, Lindor Louis, Aaron Éllison, Sally Johnson, Mack Nelson, William Jackson, Alec Smith, Trazimon Communi, James Clay, Jean-Baptiste Phillippé, Joséph Scott, Constantin Boyd, Victor Jacob, Moses Lane, Paul Daniel, Théoville Pierre, Louis Joséph and Samuel Brown.[56]

86.     J.C. Oliver served as the Parish delegate to the Constitutional Convention of 1868, which extended the right to vote and the right to hold office to Black men until the Jim Crow constitution of 1898 was adopted to "crystallize white supremacy."[57]

87.     Oliver also later served as the first Black sheriff of St. James Parish from 1871-1872.[58]

---

[55] *Freetown marks the spot,* L'Observateur, March 31, 2015, available at https://www.lobservateur.com/2015/03/31/freetown-marks-the-spot/.

[56] *Id.*

[57] *Id. See also,* Journal of the Convention for Framing a Constitution for the State of Louisiana, *available at* https://archive.org/details/officialjournalo00loui/page/n5/mode/2up?view=theater.

[58] L'Observateur, *supra* n. 55. However, as of the date of this filing, he is not listed among the "Former Sheriffs of St. James Parish" on the current website of the St. James Parish Sheriff's Office. Neither is Victor Miles, who served as sheriff from 1875-1880. Rather, the history section of the office's website skips over the two Black sheriffs, and blames the "carpet-bagger government of the Post-Civil War period" of "unceasing harm to the citizens of this area for years by stealing their lands, collecting illegal taxes, neglecting maintenance on public facilities, misuse of education funds, etc." which led to the need for "a professionally educated, trained, dedicated, and fair law man." *See*, Website of St. James Parish, *available at* https://stjamessheriff.com/about-us/st-james-parish-law-enforcement-history/. *See also*, Bourgeois, n. 4 at 242.

88.     With the purchase of the property that would become Freetown, Sally James became the first Black female landowner in the Parish after the war. Mack Nelson was the parish's first Black constable and Alec Smith, who was formerly enslaved, served as the Parish's mail carrier.[59] The Freetown community established Sweet Beulah Baptist Church, the Freetown Intercessors' Garden, Webster and Lillian's Hide-a-Way Social Lounge, and Freetown Hall.[60] Freetown Hall still stands today, though the town itself has been reduced to two streets – surrounded by heavy industry on one side and land designated for heavy industrial development on the other.

89.     Just two years later and across the river from Freetown, in 1874, a formerly enslaved woman named Harriet Jones was able to purchase in installments a narrow, 34-acre strip of land on the river from owners of the Colomb Park Plantation near what is now known as Romeville, where members of Plaintiff Inclusive Louisiana reside, and where Pleasant Hill Baptist Church is located.

90.     Today, her great-great-great granddaughter Barbara Washington, one of the founding members of Plaintiff Inclusive Louisiana, and other family members, still reside on the property, which is surrounded by a steel plant on one side and a chemical company on the other, with other nearby parcels designated for industrial development as well.

**B.      New Black Codes, 1865: "Slavery is reestablished"**

91.     In 1865, the Louisiana Legislature was reclaimed by returning Confederate veterans and those opposed to suffrage of newly freedpeople.

---

[59]   L'Observateur, *supra* n. 55.

[60]   *Id.*

92.     According to complaints to President Johnson, there were reports that during elections to the Louisiana Legislature, returning Confederate soldiers were casting illegal ballots in New Orleans and wealthy landowners who had not yet received pardons by the President were casting votes in the rural parishes.[61] The result, according to former Governor Michael Hahn, was a legislature where all members but one were "avowed rebels."[62]

93.     In the fall of 1865, the returning Confederates in Louisiana adopted resolutions proclaiming "that this is a Government of white people, made and to be perpetuated for the exclusive benefit of the white race," and declared the Constitution of 1864 a "creature of fraud."[63] Emboldened by President Johnson's reactionary approach to Reconstruction and, like other southern states, the Legislature passed laws known as Black Codes which were designed to reassert power and control by white citizens over newly freedpeople, and ensure forced labor for the plantations.

94.     Michael Hahn, a Republican who served as civil governor from 1884 to early 1885, sounded an alarm to the United States Senate about the legislation he said was passed to serve the "pro-slavery oligarchy" such that enforcement of provisions of the codes ensured that "slavery is practically enforced."[64]  Hahn reported that another Union military officer, who would later become governor, advised a member of the Senate Reconstruction Committee that: "…[t]he Legislature comes with new enactments, in order to more effectually, if possible,

---

[61]   Report of Ex-governor Hahn on Louisiana Legislation Relating to Freedmen, April 12, 1866, ("Hahn report") *available at* https://archive.org/details/exgovernorhahnon00hahn/page/n5/mode/2up?q=apprentice.

[62]   *Id.*

[63]   *U.S. v. State of La.*, 225 F. Supp. at 364.

[64]   Hahn Report, *supra* n. 61.

destroy the friends of equal suffrage and equal rights. And thus without opposition or question re-enslave the colored people."[65]

95.     The Louisiana version of the Black Codes consisted of several laws intended to subjugate and control freedpeople.  Act No. 58 most closely resembled the previous condition of enslavement required all agricultural laborers to make labor contracts for the coming year within the first 10 days of January, in written contracts which would also bind all members of their families including children.[66] Once confirmed, the laborer "shall not be allowed to leave his place of employment until the fulfillment of his contract, unless by consent of his employer, or on account of harsh treatment, or breach of contract on the part of the employer."[67] If they did leave the place of employment "without cause or permission" they would be required to "forfeit all wages earned to the time of abandonment."[68]

96.      Act. No. 11 outlawed trespassing on plantations, which according to Hahn, was "intended to prevent freedmen from leaving the plantations on which they are employed, and from visiting each other; and to prevent white Union men, even ministers, from seeing or conversing with them."[69]

97.     Act. No. 12 increased the penalty for vagrancy to include forced labor and a return to work for the previous employer, in part by allowing a Justice of the Peace to set a bond, "which it would be impossible for the freedman to procure," and then to "'hire out' the latter for

---

[65]   *Id.*

[66]   Act 58, *available at* https://babel.hathitrust.org/cgi/pt?id=iau.31858018319990&view=1up&seq=419

[67]   *Id*.

[68]   *Id. See also*, Hahn, *supra* n. 61. *See also,* Du Bois, *supra* n. 16 at 168.

[69]   Du Bois*, supra* n. 16 at 168.

one year to a planter, or 'cause him to labor on the public works, roads, and levees.'"[70] This, according to Hahn, ensured that "slavery is practically enforced."[71]

98.    Act. No. 16 outlawed recruiting workers from their places of work, which according to Hahn, was "intended to revive the old slavery regulation that colored persons shall carry 'written certificates' or 'passes,' and to punish such 'Yankees' as may dare to employ" them and who has not obtained a written discharge from his employer.[72]

99.    Another provision required that all females under 18 and all males under 21 under "certain conditions" be apprenticed, which in practice meant allowing Black children to be taken from homes for labor by white employers.[73]

100.    In the wake of the passage of the new Black Codes, one Freedmen's Bureau agent in Louisiana wrote in November 1865, "Slavery is reestablished."[74]

101.    The head of the Freedman's Bureau in Louisiana, Thomas Conway, provided testimony to Congress about the local laws and about freedmen being hunted and targeted for arrest as vagrants "simply because they did not have in their pockets certificates of employment from their former owners or other white citizens."[75]

102.    Conway reported to Congress that during the summer of 1865 worship services attended by freedpeople were raided and the "worshipers were all carried off to jail."[76]

---

[70]    *Id*. Acts No. 10-12, 16, 1865 La. Acts 14-26.

[71]    *Id*.

[72]    *Id*.

[73]    C. Peter Ripley, Slaves and Freedmen in Civil War Louisiana, Louisiana State University Press (1976) at 192. *See also*, Hahn Report, *supra* n. 61.

[74]    *Id*.

[75]    Report of the Joint Committee on Reconstruction, at the First Session, Thirty-Ninth Congress (1866) ("Joint Committee Report"), at p. 79; Du Bois, *supra* n. 16 at 178.

[76]    *Id*.

103.    Indeed, the same thing was happening in St. James Parish.  In December 1865, 28 freedmen from St. James Parish, led by Pas Shepard, sent a petition to the Freedmen's Bureau headquarters describing how they had been prevented from attending church services by the Parish patrol, and warning the Bureau that there was "much danger of a serious disturbance here."[77]

104.    Conway also recounted that he was "frequently" visited by delegations of former Confederates in Louisiana who declared that the Emancipation Proclamation was invalid and who expected that "the Supreme Court would pronounce it invalid."[78] President Johnson later ordered that Conway be removed from his post as head of the Bureau in Louisiana and replaced by leadership more compliant with President Johnson's aims.[79]

105.    On June 16, 1866, the Fourteenth Amendment, granting formerly enslaved people national citizenship and mandating equal protection under the law, was submitted to the states for ratification, over the opposition of President Johnson.

106.    Writing earlier in 1865 with a stunning prescience, Conway advised his supervisors: "The freedmen will not engage in any insurrection against the State, or any portion of it. The white population have the character of insurgents exclusively to themselves in this portion of our country."[80]

107.    A month after Congress adopted the Fourteenth Amendment, an act of mass violence and racial terror by white forces that shocked and horrified the country took place in Louisiana. It would not be the last. On July 30, 1866, at the Mechanics Institution in New

---

[77]    Pas Shepard and Twenty seven Other Freedmen Petition to Headquarters, Freedmen's Bureau, December 25, 1865," in Letters Received, Assistant Commissioner, Louisiana, BRFAL. *See also*, Ripley, *supra* n. 73 at 193-94.

[78]    Joint Committee Report, *supra* n. 75.

[79]    Rodrigue, *supra* n. 38 at 33.

[80]    Conway Final Report, *supra* n. 39.

Orleans, local police, many of whom were Confederate veterans, together with white citizens, brutally and violently descended upon a peaceful gathering of Black supporters of the vote for freedmen. Reports vary on the number of Black supporters killed but a report issued by a Select Committee of the U.S. House of Representatives formed to investigate the massacre determined that 38 people were killed and approximately 150 wounded.[81]

108.    The U.S. House of Representatives set up a committee to investigate the incident and issue a report with its finding. The 596-page report concluded:

> [t]here has been no occasion during our national history
> when a riot has occurred so destitute of justifiable cause,
> resulting in a massacre so inhuman and fiend-like, as that
> which took place in New Orleans.[82]

109.    The report also concluded that the evidence proved that the massacre was planned and intentional "to disperse and to slaughter the members of the convention, and those persons, white and black, who were present and were friendly to its purposes, was mercilessly carried into full effect,"[83] and that it was one-sided: "[M]en were shot while waving handkerchiefs in token of surrender and submission; white men and black, with arms uplifted praying for life, were answered by shot and blow from knife and club."[84] The report warned that without new protections, "the whole body of" freedpeople would continue to be "hunted" and "slaughtered without mercy and with entire impunity from punishment."[85]

---

[81]    Report of the House Select Committee on New Orleans Riots, Feb. 11, 1867, *available at* https://louisiana-anthology.org/303_download/texts/congress--mechanics_riot/Report_of_the_Select_Committee_on_the_Ne.pdf.

[82]    *Id*. at 1.

[83]    *Id*.

[84]    *Id*. at 10.

[85]    *Id*. at 35.

### C.      The Reconstruction Constitution of 1868:  A Brief Moment of Hope for Freedom and Political Autonomy

110.    On February 6, 1867, the Louisiana Legislature voted to reject the Fourteenth Amendment, i.e. citizenship and equal protection for freedpeople.

111.    Later that year, Congress took more aggressive action to address the deepening crisis faced by freedpeople in the South when it became apparent President Johnson was not going to require any punishment of the southern states or high-ranking officials of the Confederate army or government, nor take any action to prevent the passage of Black Codes, or the increasing violence.

112.    In 1867, Congress passed the Military Reconstruction Acts which created five military districts, each headed by a general to serve as the highest authority in each of the five regions.[86]

113.    The acts placed a series of conditions on the states for their reentry to the Union. In particular, each state was required to draft a new constitution extending the franchise to freedmen and abolishing the Black Codes, and then submit the new constitutions to Congress for approval.

114.    The states were also required to ratify the Fourteenth Amendment.

115.    The military officials overseeing the districts were authorized to register voters – including the freedmen – and hold elections for delegates to the constitutional conventions to draft new constitutions.

---

[86]    *See* Thirty-ninth Congress, Sess. II, Ch. CLIII, March 2, 1867 (14 Stat. 428), amended by Fortieth Congress, Sess. I Ch. VI, March 23, 1867 (15 Stat. 2-5, c. 6); Fortieth Congress, Sess. I. Ch. XXX, July 19, 1867, (15 Stat. 14-16, c. 30); Fortieth Congress, Sess. II. Ch. XXV, (15. Stat. 41, c. 25), *available at* https://tile.loc.gov/storage-services/service/ll/llsl//llsl-c40/llsl-c40.pdf.

116.    In 1867, the first report of the Louisiana Board of Registration documented 84,527 registered Black voters and 45,189 white voters, when the population of males of voting age in 1860 was 92,502 Black and 94,711 white.[87]

117.    The military general overseeing the territory of Louisiana, convened a constitutional convention as required, which ensured the attendance and participation of Black delegates, as Confederate veterans and Democratic officeholders had been barred from voting for delegates to the convention.[88]

118.    The president of the convention and over half of the ninety-eight delegates were Black.[89]

119.    J.C. Oliver was the delegate elected to attend from St. James Parish.

120.    The resulting constitution of 1868 extended the right to vote and hold office to Black men, desegregated schools, prohibited discrimination in public accommodation and conveyances, adopted a bill of rights, and rejected literacy tests.[90]

121.    It also withheld the right to vote from all those who had participated directly or indirectly in the war on the Confederate side, because they were "estopped from claiming the right of suffrage, by abjuring their allegiance to the United States government, or by notoriously levying war against it, or adhering to its enemies, giving them aid or comfort… ."[91]  Such persons would only be allowed to vote or hold office if they swore and signed a certificate acknowledging that the "late rebellion" was "morally and politically wrong."[92]

---

[87]  *U.S. v. State of La.,* 225 F.Supp. at 364.

[88]  *Id*. at 365.

[89]  *Id*.

[90]  Louisiana Constitution of 1868 *available at* https://archive.org/details/constitutionadop1868loui/page/n4/mode/2up.

[91]  *Id*. at art. 98-99.

[92]  *Id*.

122.    In April, Louisiana voters voted to ratify the state constitution, by a total of 66,152 for and 48,739 against.[93] In St. James Parish, 2,105 Black voters and 53 white voters voted in favor of the constitution; while 3 Black voters and 220 white voters voted against it.[94]

123.    With the new electoral demographics in place, Black candidates were elected to the Louisiana Legislature, to Congress, to office of Lieutenant Governor and other high offices in the state.[95]

124.    Oscar Dunn, who was born enslaved, was elected Lieutenant Governor and later served as the first Black acting governor of a U.S. state, when he assumed the duties of office while Governor Henry Clay Warmoth was out of the state recuperating from injuries.[96] Dunn, who was widely seen as honest and incorruptible, began to publicly express concerns about the corruption of Warmoth, and soon after died under mysterious circumstances in 1871 at 45 years of age.[97]

125.    P.B.S. Pinchback filled out his term and later became the first, and to date the only, Black governor of the state when he was sworn in to fill the seat after Warmoth was impeached.[98]

---

[93]    Donald W. Davis, Ratification of the Constitution of 1868-Record of Votes, Louisiana History: The Journal of the Louisiana Historical Association, Vol. 6, No. 3 (Summer, 1965), at 303. *Available at* https://www.jstor.org/stable/4230854?read-now=1&seq=3#page_scan_tab_contents.

[94]    Donald W. Davis, Ratification of the Constitution of 1868-Record of Votes, Louisiana History: The Journal of the Louisiana Historical Association, Vol. 6, No. 3 (Summer, 1965), at p. 303. Available at https://www.jstor.org/stable/4230854?read-now=1&seq=3#page_scan_tab_contents.

[95]    *U.S. v. State of La.*, 225 F. Supp. at 366.

[96]    Du Bois, *supra* n. 16 at 469-70; *see also,* Channon Hodge, Oscar James Dunn, The First Black Lt. Governor in the U.S., CNN, March 3, 2021, *available at* https://www.cnn.com/2021/03/03/us/history-refocused-oscar-james-dunn-reconstruction/index.html.

[97]    Hodge *supra*.

[98]    *Id*.

### D.       The Rise of White Terrorism and the End of Reconstruction

126.     The backlash to emancipation and the growing political power of newly freed

citizens by white supremacist paramilitary groups was violent and swift. Louisiana was the site

of targeted murders, horrific massacres, and other acts of violence with national ramifications

that were carried out by white supremacist groups to intimidate Black voters, take their land, and

prevent their political empowerment.

127.     On March 9, 1867, a Freedmen's Bureau agent issued a report to his commanding

officer notifying him of "Murders and Outrages" committed in Louisiana since the end of the

war.[99] He reported that at least 70 freedmen had been killed by whites but that "[t]here can be no

doubt but that… many murders and outrages have been committed which will never be brought

to right and it is thought that the aggregate number of murders given above would be more than

doubled had all the cases been reported to the Agents of the Bureau."[100]

128.     The agent further reported that, "In no instance in any of the foregoing cases has a

white man been punished for killing or ill treating a freedman."[101]

129.     Three of the murders of freedmen listed in that report were in or near St. James

Parish: Briston Austin was shot by P.B. Marchand on October 31, 1865 in St. James Parish;

Abraham Allen was killed by Jules Guidry, a constable in Donaldsonville, on July 11, 1865; Ben

Walker was "found murdered in a cane field on P. Gidray's Plantation" on July 14, 1866, after

---

[99]    Miscellaneous Reports and Lists Relating to Murders and Outrages, Records of the Assistant Commissioner for the State of Louisiana, Bureau of Refugees, Freedmen and Abandoned Lands, 1865-1869, ("Murders and Outrages Reports") *available at* https://www.freedmensbureau.com/louisiana/outrages/outrages4.htm.

[100]    *Id.*

[101]    *Id.*

which Willis Cummins, another freedman who was alleged to be the murderer, was arrested and turned over to civil authorities, convicted and hung.[102]

130.    At the same time, white terrorist organizations like the Knights of the White Camellia and White League formed to support the "supremacy of the white race."[103] Their members committed atrocities around the state, such as the Opelousas Massacre in 1868,[104] the Colfax Easter Sunday Massacre in 1873,[105] the Coushatta Massacre in 1874,[106] and the Thibodaux Massacre in 1887.[107]

131.    This violence, and the threat thereof, formed a dark and terrifying backdrop to the political developments in the state and the Parish. Referring to the violence of the time, a Freedmen's Bureau agent in Donaldsonville, on the border of Ascension and St. James Parishes, reported at the time that "a vague feeling of impending danger is felt by many."[108]

---

[102]    *Id.*

[103]    Facing History & Ourselves, *Louisiana White League Platform (1874), available at* https://www.facinghistory.org/resource-library/louisiana-white-league-platform-1874; See also,Justin A. Nystrom, *White League: A paramilitary organization aligned with the Democratic Party, the White League played a central role in the overthrow of Republican rule and intimidation of African Americans in Louisiana during Reconstruction,* 64 Parishes, Oct. 12, 2020, available at  https://64parishes.org/entry/white-league.

[104]    Synopsis of Murders Committed in Parish of St. Landry, September and October 1868, Records of the Assistant Commissioner for the State of Louisiana, Bureau of Refugees, Freedmen and Abandoned Lands, 1865-1869, *available at* .https://www freedmensbureau.com/louisiana/outrages/stlandry.htm.

[105]    Congressional Record, House of Representatives, 44th Congress, 2d Session, Ex. Doc. No. 30, "The Use of the Army in Certain of the Southern States," *available at* http://files.usgwarchives.net/la/grant/military/colfaxr.txt. When a federal prosecutor attempted to prosecute the main instigators of the attack under the Enforcement Act of 1870, which was passed to prevent and punish civil rights violations of newly freed Black citizens, the U.S. Supreme Court took the opportunity to gut the effectiveness of the law in upholding the dismissal of the convictions. The Supreme Court's decision in *United States v. Cruikshank*, 92 U.S. 542 (1872), which is devoid of any description whatsoever of the carnage that gave rise to the case, essentially ended the enforcement of the law's criminal provisions, and emboldened white militias in Louisiana and elsewhere in the years to come as they helped consolidate white power.

[106]    Coushatta Massacre (1874), KnowLa, Encyclopedia of Louisiana, *available at* https://web.archive.org/web/20161220134131/http://www knowla.org/entry/759/.

[107]    Calvin Schermerhorn, The Thibodaux Massacre Left 60 African-Americans Dead and Spelled the End of Unionized Farm Labor in the South for Decades, Smithsonian Magazine, Nov. 21, 2017, *available at* https://www.smithsonianmag.com/history/thibodaux-massacre-left-60-african-americans-dead-and-spelled-end-unionized-farm-labor-south-decades-180967289/.

[108]    Rodrigue, *supra* n. 38 at 100.

132.    In the midst of this ongoing violence, Reconstruction would come to an abrupt halt in 1877. Its end was hastened by an attempted state coup in Louisiana in 1874, disputed state and federal elections, and an armed takeover by the White League in New Orleans.

133.    On September 14, 1874, in the ongoing turmoil resulting from the disputed gubernatorial election of 1872, a paramilitary force of over 8,000 members of the White League launched an all-out assault on the state capital, which was in New Orleans at the time.[109] They were able to occupy downtown New Orleans for three days, and install their preferred governor.[110] President Grant sent federal troops to regain the capital, and restored the government of William Kellogg.[111]

134.    The White League referred to the attempted coup d'etat as the "Battle of Liberty Place." None of the insurrectionists were ever prosecuted.  When conservative whites once again regained full control of the local and state government, they erected a monument to the incident in a prominent location on Canal Street in 1891, which remained in place until 2017 when it was removed by workers who had to have a police escort due to the threats from proponents of the monument.[112]

135.    Three years later, in 1877, there would be no federal intervention when White League forces once again descended on the state capitol to dislodge S.B. Packard, a Black

---

[109]    Louisiana State Museum Online Exhibits, *Reconstruction: A State Divided, available at* https://www.crt.state.la.us/louisiana-state-museum/online-exhibits/the-cabildo/reconstruction-a-state-divided/index; *see also* Gordon Chadwick, *Election Controversy and the Rise of the White League, Battle of Liberty Place,* New Orleans Historical, *available at*  https://neworleanshistorical.org/items/show/145?tour=8&index=0.

[110]    *Id.*

[111]    *Id.*

[112]    Avi Selk, *New Orleans removes a tribute to 'the lost cause of the Confederacy' — with snipers standing by,* The Washington Post, April 24, 2017, *available at* https://www.washingtonpost.com/news/post-nation/wp/2017/04/24/new-orleans-removes-a-tribute-to-the-lost-cause-of-the-confederacy-with-snipers-standing-by/.

candidate, and install their preferred candidate for governor, Francis Nicholls.[113] Their efforts to take power by force in Louisiana would ultimately be successful as part of the trade-off in the Compromise of 1877 to resolve the disputed presidential election of 1876 between Republican Rutherford B. Hayes and Democrat Samuel Tilden, in which southern Democrats reportedly agreed to recognize Hayes' victory on the condition that all remaining U.S. military forces be removed from Louisiana, South Carolina, and Florida, along with legislation to help industrialize the South.[114]

136.    On January 9, 1877, a 6,000-member contingent of the White League "marched on the Cabildo in New Orleans where Packard's troops were stationed."[115] President Grant was unwilling to take sides while the controversy played out in the presidential election, so he ordered the status quo be preserved. As a result, White League forces patrolled the streets of New Orleans for four months, until the compromise was struck and President Hayes removed federal troops from Louisiana and recognized Nicholls as governor in April 1877.[116]

137.    With federal troops gone, White League-backed officials took back power at all levels of local and state government.

138.    Different forms of violence emerged to subjugate and dominate Black populations around the state.

139.    St. James Parish was not spared the scourge of lynchings. These particular forms of murders are documented – to the extent they can be – in large part as a result of the work of Ida B. Wells in the late 19th and early 20th centuries, who reported at great personal risk using

---

[113]  *U.S. v. State of La.*, 225 F. Supp. at 368.

[114]  Woodward, C. Vann, Reunion and Reaction: The Compromise of 1877 and the End of Reconstruction. Boston: Little, Brown and Company (1966), at 169–171.

[115]  *U.S. v. State of La.,* 225 F. Supp. at 368.

[116]  *Id*.

the "statistics as gathered and preserved by white men, and which have not been questioned."[117] Later historians and researchers, and now a memorial established by the Equal Justice Initiative, built on Wells' work.[118]

140.   At least 4,742 people were lynched in the United States between 1882 and 1968.[119] At least 549 of those people were lynched in Louisiana between 1877 and 1950.[120] Six people were lynched in St. James Parish between 1893 and 1914.[121] Their names were: Robert Landry, January 20, 1893; George [no last name], January 20, 1893; Richard Davis, January 20, 1893; Gilbert Francis, February 28, 1896; Paul Francis, February 28, 1896; Sylvester Washington, May 8, 1914. [122]

### E.   Constitution of 1879: Former Enslavers and Insurrectionists Retake Political Control of the State and Parish

141.   With the White League-backed officials in place, the Legislature set about to reverse the progressive gains of the 1868 Constitution. The resulting Constitution of 1879 removed the sections requiring non-discrimination in public accommodations and other provisions favorable to Black citizens – with the exception of the provision extending the vote to

---

[117]  Ida B. Wells, A Red Record: Tabulated Statistics and Alleged Causes of Lynchings in the United States, 1892-1893-1894, at 8. *Available at* https://www.loc.gov/resource/mss11879.40021/?sp=8&st=image.

[118]  National Memorial for Peace and Justice Equal Justice Initiative, https://museumandmemorial.eji.org/memorial.

[119]  *Apologizing to Lynching Victims and Their Descendants,* Congressional Record, Vol. 151, Number 77, June 13, 2005, ("Congressional Apology") *available at* https://www.govinfo.gov/content/pkg/CREC-2005-06-13/html/CREC-2005-06-13-pt1-PgS6364-3 htm.

[120]  *Lynching in America: Confronting the Legacy of Racial Terror*, Equal Justice Initiative, at 40 table 1, *available at* https://eji.org/wp-content/uploads/2019/10/lynching-in-america-3d-ed-080219.pdf.

[121]  Congressional Apology, *supra* n. 119.

[122]  *Id.*

Black males, which by this point had to stay in as Louisiana had ratified the Fifteenth Amendment in 1869.[123]

142.    V. Dickerson and F.P. Poche were delegates to the convention from St. James Parish.[124]

143.    Poche came from a plantation-owning family and served in the Confederate army as a captain and turned to politics after the war. According to one of his peers, he dedicated himself to the "elimination of the carpet-bagger from the control of state affairs. He never rested until the last one was starved out of St. James Parish, which had been their special stronghold on account of the great negro majority." And, further, "[h]e identified himself with the democratic party, as the white man's party[.]"[125]

144.    After the convention, Poche served on the Louisiana Supreme Court from 1880-1890 and was a founding member of the American Bar Association.[126] His former home in Convent, Louisiana was placed on the National Register of Historic Places in 1980.[127]

145.    The 1879 Constitution paved the way for racist, segregationist laws like Louisiana's Separate Car Act of 1890, requiring "equal, but separate" railroad accommodations for white and non-white passengers. It also gave rise to a now-infamous decision from the U.S. Supreme Court – *Plessy v. Ferguson*, 163 U.S. 537 (1896).

---

[123]  Louisiana Constitution of 1879, *available at*
https://archive.org/details/constitutionsta00louigoog/page/n77/mode/2up.

[124]  *Id*. at 72, 74.

[125]  St. James Parish, Louisiana, Genealogy and History ("St. James Genealogy and History"), *available at* http://genealogytrails.com/lou/stjames/bios.html.

[126]  Felix Pierre Poche (1836-1895), Louisiana Supreme Court Justices 1813-Present, *available at* https://www.lasc.org/bicentennial/justices/Poche_Felix.html

[127]  Description of Judge Poche Plantation House, *available at* https://en.wikipedia.org/wiki/Judge_Poch%C3%A9_Plantation_House.

146.     In 1892, Homer Plessy, a mixed-raced man, was prosecuted for boarding a "whites only" train car of the East Louisiana Railroad at the station at Press and Royal Streets in New Orleans. He challenged the law as unconstitutional, but in *Plessy*, the Supreme Court upheld the ruling in a 7-1 decision, finding that the Louisiana law did not violate the equal protection clause of the Fourteenth Amendment, in part because segregation of the races is simply part of the "nature of things" and any perceived suggestion of racial stigma or repression is only because "the colored race chooses to put that construction upon it."

147.     *Plessy* thus placed the U.S. Supreme Court's stamp of approval on racist, segregationist laws for the next 60 years, until it was renounced by the Court in *Brown v. Board of Education*, 347 U.S. 482 (1954) with regard to education.

## F.     'Crystallizing' White Supremacy in the Constitution of 1898

148.     In 1898, another constitutional convention was convened with the express purpose of reasserting and institutionalizing "white supremacy" and disenfranchising Black voters in Louisiana. Now constrained by the constitutional requirements of the Fourteenth and Fifteenth Amendments, the white political establishment introduced facially neutral requirements into a constitution with the sole and clear aim of stripping Black citizens of political power.

149.     According to Judge Thomas Semmes, chair of the constitutional convention's judiciary committee and who also served as president of the American Bar Association at one point, "We met here to establish the supremacy of the white race…"[128] Another delegate avowed they had a mandate to "disenfranchise as many Negroes and as few whites as possible."[129]

---

[128]   *U.S. v. State of La.*, 225 F. Supp. at 371.

[129]   *Id*. at n. 44.

150.     In mandating literacy tests, poll taxes, and property ownership requirements, and by "grandfathering" in previously registered white male voters while filtering out previously registered Black male voters, another delegate declared they had accomplished "white manhood suffrage" throughout the State.[130]

151.     The new constitution was not put to the people for a vote as the act of the Legislature that called for the Convention provided that the Convention could declare the constitution adopted without referring it back to the people.[131]

152.     The delegates and other state officials boasted about their success with the new constitution, which would come to be known as the Jim Crow Constitution. One delegate rhetorically questioned: "Doesn't it let the white man vote, and doesn't it stop the negro from voting, and isn't that what we came here for?"[132]

153.     Then-Governor Murphy J. Foster, grandfather of future Governor Murphy J. (Mike) Foster, III, who served from 1996-2004, addressed the Legislature in the wake of the convention, proclaiming that "white supremacy" had been "crystallized" into the new constitution, and suggested that the enfranchisement of Black voters equated with election fraud:

> The white supremacy for which we have so long struggled at the cost of so much precious blood and treasure, is now crystallized into the Constitution as a fundamental part and parcel of that organic instrument, and that, too, by no subterfuge or other evasions. With this great principle thus firmly imbedded in the Constitution, and honestly enforced, there need be no longer any fear as to the honesty and purity of our future elections.[133]

---

[130]  *Id*. at 374.

[131]  Louisiana Constitution of 1898, *available at* https://babel.hathitrust.org/cgi/pt?id=hvd.hl47v7&view=1up&seq=5. *See also, U.S. v. Louisiana*, 225 at n. 54.

[132]  *U.S. v. State of La.,* 225 F. Supp. at 374.

[133]  *Id*.

154.    To give immediate effect to the disenfranchisement laid out in the new constitution, the legislature required a complete overhaul of voter registration and new registration of all voters.[134]

155.    Their efforts bore the intended fruit. In 1888, Black voters outnumbered white voters in Louisiana – 127,923 to 126,884. In St. James Parish, Black voters also outnumbered white voters, 2,802 to 1,211.[135]  By 1904, however, the number of Black voters in the state nosedived to just 1,342. That same year in St. James Parish, the number of registered Black voters dropped to *zero*. There were 927 registered voters in the Parish and all were white.[136] This translated into a decidedly minority rule in a Parish where the population in 1900 was 11,356 Black and 8,889 white, but where Black residents had been stripped of all political power.

156.    The numbers around the state continued to fall. By 1910, only 730 or less than .5% of adult Black males were registered to vote in Louisiana.[137] In 1940, the number had only risen to 897 in the state.[138]

157.    The delegates to the 1898 convention thus ushered in a form of apartheid long before that term emerged in South Africa and came to be understood as a crime against humanity.

---

[134]   *Id*.

[135]   Biennial Report of the Secretary of State of the State of Louisiana for 1888-1889 at 29, *available at* https://play.google.com/books/reader?id=8gNAAAAAYAAJ&pg=GBS.PP1&hl=en.

[136]   Report of the Secretary of State to His Excellency Newton C. Blanchard, Governor of the State of Louisiana, January 1, 1905, at p. xxxi, *available at* https://play.google.com/books/reader?id=8gNAAAAAYAAJ&pg=GBS.PP1&hl=en

[137]   *U.S. v. State of La.*, 225 F. Supp. at 374.

[138]   M. Isabel Medina, *The Missing and Misplaced History in* Shelby County, Alabama v. Holder - *Through the Lens of the Louisiana Experience with Jim Crow and Voting Rights in the 1890s*, 33 MISS. C. L. REV. 201, 205-207 (2014).

### G.     Racialized Control of Land in St. James Parish

158.     The Jim Crow constitution completely disenfranchised the Black population in Louisiana and put white landowners and politicians firmly in control of the direction of all levels of government for generations to come, deeply embedding and institutionalizing racism throughout.

159.     Over the next several decades they deployed grandfather clauses, white-only primaries, understanding clauses, literacy tests, poll taxes, and other means to disenfranchise Black voters, with the threat of violence always running in the background.[139]

160.     It would take generations before these methods of disenfranchisement would be found unconstitutional, which would then give rise to new ways of trying to suppress Black political empowerment and any hope of meaningful participation in decision-making about the direction of the communities in which Black people were trying to survive.

161.     In St. James Parish, at the end of Reconstruction, former enslavers were back in possession of their property, the legislative delegation was all white, and white local officials had taken back control of the parish government and law enforcement.

162.     Plantation owners or members of their families served on the police jury (the precursor to the Parish Council), and as sheriff, Parish President, and others, were movers and shakers in state politics. Bergondy La Pice of the Lauderdale Plantation served as Parish President in 1872. Adam Bourgeois, from a plantation-owning family, served as Parish President in 1874 and as sheriff in 1879; Jerome Louis Gaudet, whose family also owned a Plantation, served as Parish President in 1880, as well as in the state legislature and was a member of the convention of secession; Hector Himel of the Minnie Plantation served as president of the police

---

[139] *See, U.S. v. State of La.*, 225 F. Supp. at 375-76, for a history of disenfranchisement efforts up to 1963.

jury in 1892, and his brother, Nelson, of the St. Amelie Plantation, was a member of the police jury at the same time. F.O. Poche served as a delegate to the constitutional convention that ushered in segregation and later as a judge on the Louisiana Supreme Court.[140]

163.    Despite the serious obstacles, threats, and broken promises of land ownership, some freedpeople were able to join together and purchase narrow strips of land on the edges of some of the plantations in the Parish.

164.    This was the case with Freetown, founded next to the Landry-Pedesclaux Plantation, and with the property purchased by Harriet Jones next to the Colomb Park Plantation, where some of her descendants still live today, including great-great-great granddaughter Barbara Washington, founding member of Plaintiff Inclusive Louisiana. Gail LeBoeuf, founding member of Plaintiff Inclusive Louisiana also grew up in Convent in one of these small communities near the larger plantations, on property her family managed to purchase.

165.    This piecing off of small strips of property, or leasing cabins and houses on the plantations, was due in no small part to the fact that the plantation owners needed a nearby labor supply. Once these small strips of land were sold off or leased to Black families or associations, the much larger parcels remained with the plantation owners' families, and were farmed for sugarcane or in some cases tobacco.

166.    Some Black families were able to lease houses or cabins on plantations where they lived and worked, sometimes for shares of the crop, such as the family of Myrtle Felton, also a founding member of Plaintiff Inclusive Louisiana, who grew up next to a sugarcane plantation where her father worked. Mount Triumph Baptist Church Pastor Harry Joseph's father worked on the Brusley Plantation where he too farmed sugarcane.

---

[140]   St. James Genealogy and History, *supra* n. 125.

167.    This land pattern largely remained consistent through the intervening generations.

168.    For those who owned the small pieces of property on the edges of plantations, even in association with others, it was often the main source of economic security and stability in an environment that was otherwise hostile, and lacking in opportunity. Any property they owned was profoundly significant, and of irreplaceable value.

169.    Plaintiffs' members recall that when they were growing up in the 1950s and 60s, schools were segregated, public transportation was segregated, finances were severely limited, access to credit was non-existent for most, and life was not easy but people were able to grow their own food and look out for each other in tight-knit, segregated, communities.

170.    They founded churches and benevolent associations to pool resources to help members have access to healthcare, medicine, and money for funeral costs. The association halls were also places where they could safely gather for celebrations, dances, parties, and ceremonies. Some of these benevolent associations still exist today.

## IV.    1921 CONSTITUTION CONTINUES JIM CROW DISENFRANCHISEMENT OF BLACK VOTERS AND VESTS LOCAL GOVERNMENTS WITH AUTHORITY OVER LAND USE.

171.    In 1921, the Louisiana legislature amended the constitution again, and this time formally placed control over land use in the hands of local governments.

172.    The primary impetus for the constitutional convention in 1921 was that the U.S. Supreme Court had ruled that a grandfather clause similar to Louisiana's was unconstitutional.

173.    Unlike previous conventions, this one met in secret and no minutes of the proceedings were kept because, according to the chair of the Committee on Suffrage and

Elections, "there might be a subject coming up for discussion which we would not care to have preserved."[141]

174.    J.E. Doussan and Sigur Martin were the convention delegates from St. James Parish.[142]

175.    Martin owned the Grand Point sugar plantation and dealt in general merchandise and liquor in Paulina, St. James Parish.[143] Doussan was a doctor who served several terms as state senator.

176.    The delegates to the convention decided to replace the previous grandfather clause with the so-called "understanding" or "interpretation clause" first rolled out in Mississippi's white supremacist constitution, along with a "good character" requirement.[144] It also placed oversight of registrars for voters in the hands of "an *ex officio* board of registration composed of the governor, lieutenant governor, and speaker, a majority of whom were more likely to be white men."[145]

177.    Thus, state and local political leaders continued to maintain their lock on power and decision-making at all levels of government in Louisiana, including about land use and what would constitute economic development.

178.    In addition to updating the methods of voter disenfranchisement, the 1921 Constitution vested local governments with the authority to "zone their territory; create

---

[141]    *U.S. v. State of La.*, 225 F. Supp. at 375-76.

[142]    Louisiana Constitution of 1921 with signatories, *available at* https://archive.org/details/cu31924030492163/page/n164/mode/1up?view=theater.

[143]    Sigur Martin Papers, Louisiana and Lower Mississippi Valley Collections, Special Collections, Hill Memorial Library, Louisiana State University, *available at* https://www.lib.lsu.edu/sites/default/files/sc/findaid/0460.pdf.

[144]    *U.S. v. State of La.*, 225 F. Supp. at 376. *See also* Louisiana Constitution of 1921, *available at*: https://archive.org/details/cu31924030492163/page/n39/mode/2up?view=theater

[145]    *Id*. at 376.

residential, commercial and industrial districts, and to prohibit the establishment of places of business in residential districts." La. Const. of 1921, Art. 14, Sec. 29.

179.    That authority was reiterated and extended in the Constitution of 1974, which provided that a local government subdivision could, "(1) adopt regulations for land use, zoning, and historic preservation […] (2) create commissions and districts to implement those regulations; (3) review decisions of any such commission; and (4) adopt standards for use, construction, demolition, and modifications of areas and structures." La. Const. of 1974, Art. VI, Sec. 17.

180.    For the next 93 years, the local government in St. James Parish, still controlled by the white political establishment who in many cases had direct ties and allegiance to large plantation owners, chose to exercise its constitutional power by *not* enacting zoning or land use rules to classify areas for industrial use, so as not to limit or constrain the Parish's large landowners in the use of their property.

A.    **1950s - 1970s: Unregulated Industry Begins Amassing in Still-Segregated St. James Parish**

181.    Heavy industries began locating in St. James Parish in 1958. At the same time as industry began moving in, Jim Crow was still in effect at the state and parish level, segregation was still in place in St. James Parish, long after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), and Black communities in the Parish still struggled for some semblance of political power.

182.    It was not until 1958 that Oliver Cooper became the first Black man elected to the Police Jury after Reconstruction ended, and St. James Parish did not begin desegregating its

schools until 1967 when forced to do so by a federal court order.[146] The desegregation case remains open and the Parish is operating under a consent decree issued by the court in 2017.

183.     RISE St. James founder Sharon Lavigne remembers her father, Milton Cayette, Sr., who was then the President of the NAACP's local chapter, led the effort to integrate St. James Parish schools in 1966. After lobbying the school Superintendent, he accompanied seven young children and their mothers to integrate after desegregation was ordered. She also remembers her parents being concerned for their family's safety as a result, including threats to burn down her family's home. She recalls her father's truck being burned instead. Additionally, Mr. Cayette, Sr., a sugarcane farmer, could no longer bring his sugarcane to market in St. James Parish.

184.     It would not be until 1974 that the state constitution would formally enshrine the right to equal protection and non-discrimination. La. Const. of 1974, Art. I, Sec. 3.

185.     While Black communities in St. James Parish were still trying to gain a foothold in local decision-making, white landowners in the Parish would be selling off their large parcels of property at a profit to large industrial corporations with the approval, acquiescence, and sometimes assistance of Parish officials.

186.     Having no political power in the state and Parish, Black residents in the 4th and 5th Districts were placed in a situation they did not and could not have helped to create and against which they could not protect themselves.

187.     One siting decision in particular illustrates the magnitude and depth of this injustice through time: In 1966, the Parish Police Jury President Francis Waguespack, whose family has operated sugarcane farms, including those purchased after the Civil War on the St.

---

[146]   *Banks v. St. James Parish School Board,* No. 65-16173, United States District Court, Eastern District of Louisiana.

Joseph and Felicity plantations in Vacherie, and which are tourist attractions today, along with

Sheriff Gordon Martin met with officials of the Freeport Sulphur Co. to discuss plans to develop

a $50 million phosphoric acid complex in Convent.[147]



Photo by The Times Picayune Upriver Bureau, October 14, 1966. Original
Caption: "A $50 MILLION phosphate chemical complex to be built at Convent in
St. James Parish by Freeport Sulphur Co. is discussed by (from left, seated)
Raymond H. Felerabend, Freeport vice-president; Francis Waguespack,
president, St. James Parish Police Jury, and (standing) St. James Parish Sheriff
Gordon Martin. Construction is scheduled to start in mid-November."

188.    The company did end up locating in Convent, on the former Uncle Sam

Plantation, and it is now the site of a massive radioactive, highly acidic waste lake that is part of

the facility now run by the fertilizer company, Mosaic.[148]

---

[147]   St. Joseph and Felicity Plantations homepage, https://www.stjosephplantation.com/.

[148]   Travis Spalding, *Photos, video: A look at a 200-foot moving wall of gypsum that might cause an environmental
disaster*, The Advocate, Jan. 30, 2019, *available at*
https://www.theadvocate.com/baton_rouge/multimedia/photos/photos-video-a-look-at-200-foot-moving-wall-of-



Photo Phin Percy, Excerpt from *The Guardian*, Nov. 6, 2019

189.     Mosaic Uncle Sam is located in St. James Parish's 4th District, which in the year 1990 had a population that was 66% majority Black and today still has a majority Black population of 52%. The population living within 3 miles of the facility falls within the 96th percentile for Air Toxic Cancer Risk in Louisiana.

190.     The facility is within one mile of Plaintiff Mount Triumph Baptist Church and within 2 miles of the historic Black community of Romeville, where Ms. Felton and Ms. Washington, founding members of Plaintiff Inclusive Louisiana, live.

191.     The waste lake measures 960 acres and rises 200 feet high. In 2019, it was revealed that a sugarcane farmer adjacent to the site reported a land bulge of 2,000 feet long and

gypsum-that-might-cause-an/collection_5fc819ec-2503-11e9-9279-83cd2c4cb50a.html#1. *See also,* Lauren Zanolli, *'If there's a spill, it's a disaster': living next to a giant lake of radioactive waste*, The Guardian, Nov. 6, 2019, *available at* https://www.theguardian.com/us-news/2019/nov/06/louisiana-st-james-parish-lake-radioactive-industrial-waste-cancer-town-pollution-mosaic.

100 feet wide that was pushing on the north wall of the mound, raising concerns among nearby residents about a possible breach.

192.    In addition to the concerns about the waste lake, today, Mosaic Uncle Sam is permitted to emit over 3,800 tons of criteria pollutants[149] and more than 240 tons of toxic air pollutants annually. Specifically, the facility emits criteria pollutants including particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide ($NOx$), volatile organic compounds (VOCs), and carbon monoxide (CO).  Mosaic Uncle Sam emits significant amounts of the toxic air pollutants hydrofluoric acid, hydrogen sulfide, and sulfuric acid.[150]

193.    The company has been operating under a consent decree in an action brought by the EPA since 2015 after it was found to have been releasing sulfur dioxide and sulfuric acid mist in excessive amounts.[151]

194.    At a meeting of the Parish Council on February 15, 2023, the company announced plans to expand its operations at the Uncle Sam facility to make battery acid.

195.    The company also operates another facility just across the river in the 5th District, which today is 89% Black, which was also founded by Freeport and began operating in 1966 on the former Lauderdale Plantation.

196.    Now known as Mosaic Faustina, it is surrounded by a population that today is 66% Black within 3 miles who fall within the 94th percentile for Air Toxic Cancer risk in Louisiana, according to EPA's EJScreen mapping tool.

---

[149]   Criteria pollutants are particulate matter, photochemical oxidants (including ozone), carbon monoxide, sulfur oxides, nitrogen oxides, and lead, which are all designated in the Clean Air Act for monitoring and safety standards.

[150]   EDMS 2022 CAA Title VI permit

[151]   Zanolli, *supra* n. 148.

197.     Mosaic Faustina is permitted by federal and state agencies to emit more than 790 tons of criteria pollutants and more than 700 tons of toxic air pollutants annually. Prior to 2022, the facility was permitted to emit more than 1,780 tons of toxic air pollutants annually. Specifically, the facility emits criteria pollutants including particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide ($NOx$), volatile organic compounds (VOCs), and carbon monoxide (CO). Additionally, Mosaic discharges significant amounts of the toxic air pollutants ammonia, hydrofluoric acid, hydrogen sulfide, and total fluorides. Additionally, Mosaic Faustina has been flagged by EPA as a high priority Clean Air Act (CAA) violator. The facility has been non-compliant with the terms of its CAA permit for every quarter over the past three years and has faced a total of seven CAA enforcement actions by EPA over the past five years.

198.     Two more examples from this era illustrate the ongoing dangers and disproportionate impacts of these early decisions:

199.     NuStar Energy (NuStar), a petroleum storage terminal that has been in operation since 1968 on the site of the former LaPice Plantation, is located in St. James Parish's 5th District and is surrounded by a population that is 87% Black within 3 miles who fall within the 91st percentile for Air Toxic Cancer Risk in Louisiana. NuStar is located less than 600 feet from Plaintiff Mount Triumph Baptist Church, which has been at that location for over one hundred years.

200.     Today, NuStar is permitted to emit over 530 tons of criteria pollutants and more than 20 tons of toxic air pollutants annually. The facility emits criteria pollutants including particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide ($NOx$), volatile organic

compounds (VOCs), and carbon monoxide (CO), and significant amounts of the toxic air

pollutants benzene, hydrogen sulfide, n-hexane, sulfuric acid, toluene, and xylene.[152]



Pastor Harry Joseph in front of NuStar oil storage tanks located next to Mount Triumph Baptist Church and a neighborhood, which have been there for over 100 years. Photo by Julie Dermansky

201.    Additionally, on January 20, 2023, the EPA issued NuStar a Notice of Violation

for violation of the Clean Air Act, 42 U.S.C. § 7401 *et seq*., and violations of Title 33, Part III of

the Louisiana Administrative Code. That notice detailed repeated instances of non-compliance

and found that NuStar "failed, at all times, to maintain and operate the Facility … in a manner

consistent with good air pollution control practice for minimizing emissions" and "failed, at all

times, to keep the automatic bleeder vents closed."

---

[152]  EDMS 2021 CAA Title VI permit.

202.    In 2016, one or more of the surrounding facilities, which include NuStar, closed Burton Lane, the only alternate evacuation route available for nearby residents, including those in the historic community of Freetown, to reach Highway 3127 in the event of an emergency at one of the facilities along River Road, or hurricane, or other natural disaster. Despite protests from residents and requests to open it back up, the Parish has so far failed to do so or to ensure another alternate evacuation route.



Burton Lane was used by the public and was the only alternative evacuation route in the event of an emergency. Photo by Julie Dermansky

203.    In 1971, America's Styrenics ("AmSty"), a polystyrene plant, began operating. It is located in St. James Parish's 5th District on what had been part of the Lauderdale Plantation. According to EPA's EJScreen mapping tool, it is surrounded by a population that is 66% Black within 3 miles who today fall within the 94th percentile for Air Toxic Cancer Risk in Louisiana. Plaintiff RISE St. James founder Ms. Lavigne lives within this zone.

204.     AmSty is permitted to emit more than 2,500 tons of criteria pollutants and more than 122 tons of toxic air pollutants annually. These criteria pollutant emissions include particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide (NOx), volatile organic compounds (VOCs), and carbon monoxide (CO). The facility discharges significant amounts of toxic air pollutants, including benzene, ethylene benzene, styrene, and toluene.[153]

### B.     1980s and 1990s: Evidence Mounts of Disproportionate Impacts of Heavy Industry on Black Communities in St. James Parish

205.     The facilities in operation during the 50s and 60s in St. James Parish were largely unregulated when they first began operating because the state and federal agencies in place today to monitor them did not yet exist. The U.S. Environmental Protection Agency (EPA) was not established until 1970 and Louisiana did not have air pollutions regulations until 1972 and the Louisiana Department of Environmental Quality (LDEQ) did not come into being until 1984.

206.     By the 1980s, the health impacts of these industries had become glaring and undeniable, as was the disproportionate impact on Black residents.

207.     In 1979, St. James Parish adopted a Home Rule Charter and transitioned from a police jury form of governing body to a parish council. Since then, there have only been four parish presidents – two of whom served for a combined 32 years.

208.     The first, Paul Keller, served from 1980-1992. He was an engineer who had worked at the Atomic Energy Commission in Oak Ridge, Tennessee, and stated in 1980 that he "[felt] that government should be run like industry." Keller was followed by Dale Hymel, who came from a long line of prominent sugarcane farmers, and served as Parish President for twenty

---

[153]  EDMS Title V permit 2021.

years – from 1992-2012, a time during which the concerns about harms to the community and environmental racism in St. James Parish would come to a head.

209.    In the 1980s, two published reports identified race as the biggest indicator in the United States as to whether one lives near toxic waste.

210.    In 1983, the U.S. General Accounting Office issued a report which found a correlation between race and the siting of four hazardous waste disposal sites in the southeastern part of the country.[154] In 1987, the Commission for Racial Justice of the United Church of Christ released a study that looked at the issue nationwide and concluded that race was the single most significant indicator of where commercial toxic waste treatment, storage, and disposal occur.[155]

211.    The reports mirrored what Black communities in St. James Parish and elsewhere in the River Parishes had been experiencing. By 1988, the pollution and disparate racial impacts had become so severe that the approximately 80-mile Industrial Corridor between Baton Rouge and New Orleans had become known as "Cancer Alley."[156]

212.    In 1988, local residents joined with civil rights and environmental activists, and undertook the first civil rights march through Cancer Alley to raise the alarm about what was happening. The Great Louisiana Toxics March took place in November 1988 and went from parish to parish to raise awareness about the harms of heavy industry and its disproportionate burden on Black communities.

---

[154]   U.S. General Accounting Office, "Siting Of Hazardous Waste Landfills and Their Correlation With Racial and Economic Status Of Surrounding Communities," (1983), *available at* https://www.gao.gov/assets/rced-83-168.pdf.

[155]   United Church of Christ, Commission for Racial Justice, *Toxic Wastes and Race in the United States: A National Report on the Racial and Socioeconomic Characteristics with Hazardous Waste Sites* (1987), *available at* https://omeka.middlebury.edu/fyg/items/show/316.

[156]   Mary T. Schmich, *They March to Clean Up a State's Act*, Chicago Tribune, Nov. 20, 1988, *available at* https://www.chicagotribune.com/news/ct-xpm-1988-11-20-8802170889-story.html

213.    At the time, one of the examples of environmental racism they noted in St. James

Parish was the relocation of a facility from a predominantly white community to a predominantly

Black community in response to white resident protests when grain dust problems surfaced. [157]

They also noted the facility had not applied for permits in advance of the change in location.[158]

214.    By 1990, the 5th District had a population that was 86% majority Black. The 4th

District had a population that was 66% majority Black.

215.    In 1990, the Secretary of the Louisiana Department of Environmental Quality sent

a memorandum to all police jury and parish council presidents in the state, as well as mayors,

planning departments, the Police Jury Association, and the Louisiana Municipal Association,

reminding them of the fact that local governments have primary responsibility *for* and authority

*over* zoning and its implications for the environment.[159]

216.    The memorandum was sent to dispel "misunderstandings that the DEQ has the

sole responsibility for protecting the health and environment of local communities in industrial

zoning decisions: and, that these issues therefore are not a concern of local government."[160] The

DEQ advised local governments, including St. James Parish, of its position that state law clearly

mandated that "local government, has, through the planning process, the first responsibility for

protecting the health and environment of their citizens."[161] In fact, DEQ advised that state law

vested local governments with "a powerful" planning and siting mandate.[162]

---

[157]   Darryl Malek-Wiley, The Great Louisiana Toxics March, Blueprint for Social Justice, Vol. XLII-No. 2, Oct. 1988, *available at* https://www.academia.edu/38509502/1988_The_Great_Louisiana_Toxics_March_--_Blueprint_for_Social_Justice_Vol_XLII-No_2.pdf.

[158]   *Id*.

[159]   Memorandum from Louisiana Department of Environmental Quality, June 28, 1990.

[160]   *Id*.

[161]   Louisiana Department of Environmental Quality, *Position Paper: Local Governments' Authority Over Health and Environmental Issues,* June 26, 1990.

[162]   *Id*.

217.    The watershed reports about race and toxic waste sites, and other data that began emerging about other forms of toxic pollution and disparate racial impacts, along with growing advocacy by affected communities and civil rights groups, led to the creation of the Office of Environmental Justice at the EPA in 1992, and Environmental Justice Executive Order issued by then-President Clinton in 1994.

218.    Executive Order 12898 entitled "Federal Actions to Ensure Environmental Justice in Minority and Low-Income Populations," called for improved data collection on pollution and the disparate impacts on minority and low-income communities, as well as improved mitigation efforts and participation of impacted communities in all phases.

219.    Yet, even as the disparate racial impacts of pollution, as a result of decisions about industrial sitings, were finally being acknowledged and efforts were underway nationally to redress the problem, officials in the state and St. James Parish insisted on sticking to their same century-old playbook.

### a.  Shintech: A Community Rises Up

220.    The deepening concerns around the health and environmental crisis in St. James Parish would come to a head in 1996 when Shintech, a Japanese chemical company, announced plans to build a $700 million poly-vinyl chloride plant in the town of Convent.

221.    Then-Parish President Dale Hymel, who came from a long line of prominent white sugarcane farmers and large landholders in the Parish, worked in tandem with then-Governor Murphy J. ("Mike") Foster Jr., whose grandfather had heralded the crystallization of white supremacy in the 1898 constitution when he was governor and had helped form the White League, to actively assist the company to locate in Convent.

222.     They did so even though at that time, St. James Parish already had eighteen chemical plants, eleven of which were within a few miles of Convent – an area comprised of 84% minority residents who were already overburdened with industry.

223.     This was also despite the fact that local residents had been raising concerns about the pollution levels and disproportionate health impacts on Black residents, including through civil rights marches, and the fact that Parish officials had been reminded in 1990 that they bore primary responsibility and authority for protecting the environment and the health and well-being of Parish citizens.

224.     In 1995, just before Shintech emerged as a possible new addition to the already crowded industrial landscape in St. James Parish, industrial plants emitted over 250,000 pounds of toxic air pollution *per mile* into the Convent community, which amounted to 67 times the rate for the rest of St. James Parish – the third most polluted parish in the state at the time. This concentration of toxic air pollution exceeded Louisiana rates by 129 times, and the national average by 658 times.[163]

225.     On top of the permitted emissions, residents of the Convent area were burdened with persistent accidental toxic releases. Between 1994 and 1997 alone, 141 emergency toxic releases    were reported in the Convent area, averaging three per month.

226.     A 2003 U.S. Commission on Civil Rights (USCCR) Report also noted that in 1995, the average St. James Parish resident was exposed to 360 pounds of toxic air pollutant releases, whereas the average Louisiana resident was exposed to only 21 pounds – a shocking 18-fold disparity; 95% of the 300 people living within one mile of the proposed plant were Black

---

[163]   Oliver A. Houck, *Shintech: Environmental Justice at Ground Zero*, 31 Geo. Envtl. L. Rev. 455, 471 (2019). citing Environmental Justice Resource Center, *From Plantations to Plants: Report of the Emergency National Commission On Environmental And Economic Justice In St. James Parish,* Louisiana (1998), at Sec. 1-1.

and 49% of the households had incomes of less than $15,000.[164] Further in a 50-square-mile area surrounding the site of the facility, 80% of the 4,500 residents were Black, and 49% of the households earned less than $15,000 a year.

227.    If built, the Shintech plant in St. James Parish was expected to be the second-largest chemical facility in the world. It would have emitted three million tons of air pollution a year, more than a quarter of which would have been highly carcinogenic compounds including dioxin, ethylene dichloride, and vinyl chloride.

228.    EPA scientists characterized dioxin, the active ingredient of Agent Orange and a byproduct of vinyl chloride, as "by far the most potent carcinogen and 'the most potent reproductive toxin' yet evaluated by the Agency."[165]

229.    Months before any public notice of the Shintech proposal was issued, Governor Foster had privately assured Shintech of its approval, promising "a speedy, profitable and mutually beneficial" result and Parish President Hymel had also assured the company of his support.[166]

230.    Under Foster's administration, the DEQ cooperated with Shintech to conceal a report acknowledging that contamination found during Shintech's site assessment could "have a potential to present material risk of harm to public health and the environment" because such

---

[164]   U.S. Commission on Civil Rights, *Not in My Backyard: Executive Order 12,898 and Title VI as Tools for Achieving Environmental Justice,* Oct. 2003, at 39, ("U.S. Civil Rights Commission Report") *available at* https://www.usccr.gov/files/pubs/envjust/ej0104.pdf.

[165]   U.S. Environmental Protection Agency, Integrated Risk Assessment for Dioxins and Furans For Chlorine Bleaching in Pulp and Paper Mills, July 1990, at 1, *available at* shorturl.at/pwzY8.

[166]   Robert R. Kuehn, Denying Access to Legal Representation: The Attack on the Tulane Environmental Law Clinic, 4 WASH. U. J.L. & POL'Y 33 (2000) at 42. *see also,* Lolis Eric Elie, A Call from the Governor, TIMES-PICAYUNE (New Orleans), Sept. 4, 1998, at 1B.

information could have a "detrimental effect on both purchase price and community relations."[167]

231.    Foster's Secretary of Economic Development coordinated closely with company representatives and launched investigations into the St. James Parish citizens' group opposing Shintech as well as their legal representatives.[168]

232.    On the Parish side, St. James Parish President, Dale Hymel, wrote directly to Shintech's president to offer his "full support in making Shintech a proud part of St. James Parish and the State of Louisiana."[169]

233.    The St. James Parish Director of Operations sent Shintech representatives dossiers on the members of the Parish's Coastal Zone Management Advisory Committee and Planning Committee as well as other Parish officials, along with their personality profiles and their views on industry.[170] The dossier represented each of the Planning Commission's members – 18 men, 13 of whom were white – to Shintech as either pro-industry or "quiet and noncontroversial."[171]

234.    Evidence also emerged that Parish President Hymel received continuous communication from the company's public relations firm, including information about the activities of Shintech's opponents.[172]

---

[167]    Houck, *supra* n. 163 at 468 *citing* Chris Gray, *Contamination Was Kept Quiet, Opponents Say*, TIMES-PICAYUNE (New Orleans), Feb. 19, 1998 at A9.

[168]    *Id*. at 471.

[169]    Barbara Allen, Uneasy Alchemy: Citizens and Experts in Louisiana's Chemical Corridor Disputes, MIT Press (2003) at 85.

[170]    *See* J. Timmons Roberts and Melissa M. Toffolon-Weiss, Chronicles from the Environmental Justice Frontline, at 120, Cambridge University Press (2001).

[171]    Allen, *supra* n. 169.

[172]    Roberts and Toffolon-Weiss, *supra* n. 170 at 120.

235.   Parish employees also made it difficult for community members opposed to Shintech to obtain public records about the project, and one Parish employee admitted to destroying a document.[173]

236.   The local residents in Convent who stood to be impacted by the facility organized themselves into a group named St. James Citizens for Jobs and the Environment ("Citizens") to oppose the facility, founded and led by Pat Melancon, a white resident who also lived nearby, and Emelda West, a Black resident of Convent and aunt to Ms. Lavigne of Plaintiff RISE St. James.

237.   Citizens was comprised of everyday citizens, not professional activists – mothers and grandmothers led the fight.

238.   Pro-Shintech groups were organized with the support of the Community-Industry Relations office of the DEQ and touted the promises of jobs for Black residents at the facility even though local knowledge, as well as surveys, showed that very few jobs at the facilities went to local Black residents.

239.   The opposition to Shintech and the counter-opposition, which was supported by state and Parish officials and representatives of the company, were in fierce struggle over the future of St. James Parish for two years.

240.   In the midst of the Shintech controversy, the then Secretary of the Louisiana Department of Environmental Quality publicly reiterated the agency's earlier position from 1990 that local governments bore responsibility in the first instance for siting decisions and lamented a "woeful" lack of rules and local zoning regulations.[174]

---

[173]   *Id*. at 121.

[174] National Academy of Public Administration for the U.S. Environmental Protection Agency, *Addressing Community Concerns: How Environmental Justice Relates to Land Use Planning and Zoning,* July 2003, ("EPA

241.    Ultimately, the controversy ended abruptly when Shintech announced it was relocating its operations to Plaquemine, a town north of St. James Parish in Iberville Parish. The decision was forced after a long and sustained, highly contentious battle that left a community fractured, and fatigued.

242.    The U.S. Civil Rights Commission later noted that Shintech's eventual relocation to a more practical location "seemed to confirm suspicions that race played a role in the company's original decision to construct the facility in St. James Parish[.]"[175]

243.    Instead of listening to the concerns of area residents about the levels of pollution and disproportionate impacts on Black residents that had been repeatedly raised over the course of the Shintech battle – in addition to those raised long before – Parish President Hymel opted to continue leading the Parish toward more industrial development in these areas instead of less, and instead of looking for alternative forms of economic development.

244.    Hymel dismissed the health data and blamed the health problems of the Parish's Black residents not on the overwhelming presence of carcinogens filling the air, but on judgment of lifestyle issues – alcohol consumption, high-fat diets, and lack of proper medical care, lamenting that "industry gets blamed for a lot of health problems when some people are not taking care of their bodies, themselves."[176]

245.    After Shintech announced its decision, Hymel stated to the press, "I still stand behind industrial growth along the river. Just because Shintech is gone, that doesn't mean we're going to stop looking."[177]

NAPA Report"), at pp. 198-99, *available at* https://www.epa.gov/sites/default/files/2015-02/documents/napa-land-use-zoning-63003.pdf.

[175]   U.S. Civil Rights Commission Report, *supra* n. 164 at 39.

[176]   Robers, Toffolon-Weiss, *supra* n. 171 at 117.

[177]   Leonard Gray, *Shintech leaving St. James, heading to Plaquemine*, L'Observateur, Sept. 21, 1998, *available at* https://www.lobservateur.com/1998/09/21/shintech-leaving-st-james-heading-to-plaquemine/.

b.      **In Shintech's Wake**

246.    Ms. Washington, founding member of Plaintiff Inclusive Louisiana, lives in Romeville next to where Shintech would have been located, on property that was purchased in 1874 by her great-great-great-grandmother Harriet Jones, who had been enslaved on a nearby plantation.

247.    Ms. Washington remembers the controversy over Shintech, and inviting Citizens co-founder Ms. Emelda West to come and speak to members of Pleasant Hill Baptist Church, just up the street from where she lives, about the concerns. Ms. Washington felt she did not have the capacity at the time to get more deeply involved because she and her husband were raising a family and working, but appreciated what others were trying to do to protect their community in Romeville.

248.    The story, however, does not end there. More than a decade later, Parish officials found another company willing to take the place Shintech had given up on.

249.    Parish President Hymel was true to his word. Before he left the office of Parish President in 2012, a steel manufacturing company would begin construction on the site Shintech had abandoned 15 years earlier.

250.    Nucor Steel, which began construction of its facility in 2011, is located in St. James Parish's 4th District, next to Romeville, on what was formerly the Colomb Park Plantation. It is surrounded by a population that is 74% Black within 3 miles who fall within the 95th percentile for Air Toxic Cancer Risk in Louisiana.[178] It is located within 1 mile of the historically Black community of Romeville, where Plaintiff Inclusive Louisiana's founding members Ms. Washington and Ms. Felton live.

---

[178]   Data obtained through EJ Screen.

251.    In addition to the residences in Romeville, there is a church and cemetery – both of which are over 100 years old. Romeville residents, including Ms. Felton and Ms. Washington, are consistently exposed to and experience the health and other impacts of Nucor's emissions.

252.    Members of the community tried to oppose Nucor, but to no avail.

253.    Nucor Steel is permitted to emit more than 1,500 tons of criteria pollutants and more than 65 tons of toxic air pollutants annually. Specifically, Nucor's criteria pollutant emissions include particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide (NOx), volatile organic compounds (VOCs), and carbon monoxide (CO). Nucor emits significant amounts of the toxic air pollutants n-hexane, ammonia, sulfuric acid, and hydrogen sulfide.[179]



Barbara Washington, founding member of Plaintiff Inclusive Louisiana stands on the steps of her home in Romeville, with property purchased in 1874 by her ancestor, Harriet Jones, who had been enslaved on a nearby plantation, with Nucor Steel operating in the background. Photo: Julie Dermansky

---

[179]   EDMS Title V permit 2020.

254.     Additionally, Nucor Steel is flagged by EPA as a high priority Clean Air Act (CAA) violator. The facility has been non-compliant with the terms of its CAA permits for every quarter over the last three years, and has been the subject of four CAA enforcement actions in the past five years.

255.     In 2021, it was revealed that the company had been continuously releasing unpermitted excess amounts of sulfuric acid and hydrogen sulfide in the community from 2014-2018. It reached a settlement agreement with DEQ which only required it to pay $89,760.32 in fines.[180]

256.     At the time Nucor located to the north of Romeville, there was already a massive industrial facility to the south – Occidental Chemical ("Oxychem"); and Mosaic Uncle Sam, with additional harmful emissions and the radioactive waste lake just under 2 miles away.

257.     Situated on the other side of their neighborhood, Oxychem was originally constructed in 1981 on what had been the St. Michael Plantation. Oxychem utilizes modified asbestos to produce chlorine, sodium hydroxide, and hydrogen. The facility is permitted to emit over 530 tons of criteria pollutants and more than 8 tons of toxic air pollutants annually. Specifically, Nucor's criteria pollutant emissions include particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$), nitrogen oxide (NOx), volatile organic compounds (VOCs), and carbon monoxide (CO). Oxychem also emits significant amounts of the toxic air pollutants asbestos, 1-2-dichloroethane, chlorine, chloroethane, and n-hexane.

---

[180] *In the Matter of Nucor Steel Louisiana LLC,* Proceedings Under the Louisiana Environmental Quality Act, AI No. 157847, Settlement Tracking No. SA-MM-20-0019, *available at* https://deq.louisiana.gov/assets/docs/General/Settlement_Agreements/2021/Nucor0019_Final.pdf.

258.     Both Ms. Felton and Ms. Washington, who live just a couple of hundred feet from each other, have experienced respiratory ailments. Both Ms. Felton and Ms. Washington have lost members of their immediate families to cancer.

259.     Both assert that the location of these facilities has affected their property values and placed them in a catch-22 situation because they cannot afford to relocate, especially to homes with similar accommodations, as well as family history.

## C.     2003: Parish Authorities Defend Their Land Use Practices in the Face of Mounting Evidence of Discriminatory Practices and Impacts in Siting of Heavy Industry in Black Communities

260.     In 2000, the 5th District still had a population that was 86% majority Black and the 4th District had a 69% majority Black population.

261.     In 2003, the EPA commissioned a report ("EPA Report") that looked at how environmental justice relates to and is impacted by land use planning and zoning, and included a study of St. James Parish.[181]

262.     At that time, the EPA Report noted that the major industries in the Parish were petrochemical and agribusiness, with 14 major facilities that produced, transported, or distributed chemical or petroleum products, as well as an aluminum producer and two grain terminals.[182]

263.     Today, there are 11 facilities in St. James Parish that report air emissions to EPA's Toxic Release Inventory ("TRI"), nine of which are in the 4th and 5th Districts, which have historically been majority Black. This number does not include the numerous pipelines,

---

[181]   National Academy of Public Administration for the U.S. Environmental Protection Agency, *Addressing Community Concerns: How Environmental Justice Relates to Land Use Planning and Zoning,* July 2003, ("EPA NAPA Report") *available at* https://www.epa.gov/sites/default/files/2015-02/documents/napa-land-use-zoning-63003.pdf.
[182]   *Id*. at 102

storage tank facilities such as NuStar and Ergon near Plaintiff Mount Triumph Baptist Church, and other heavy industrial facilities like grain terminals.

264.   The EPA Report studied the context of the Shintech controversy, and noted that in 1997, when the company was seeking to locate there, St. James Parish ranked 27th in the nation for total toxics releases.[183] The Report further noted that in 2000, St. James Parish ranked higher than the national rate for lung and bronchial cancer deaths for males.[184] The Report also put Defendants on notice that between 1995-1999, the cancer rates for the Industrial Corridor – in which St. James Parish is situated – were significantly higher overall than the rest of the state of Louisiana and the United States, and that the rates for Black residents were significantly higher than for whites in each area, as were mortality rates.[185]

265.   The Report interrogated the reasoning behind the Parish's failure to enact resident-protecting zoning or land use rules in light of the concerns expressed by residents and which became more of a focus in the Shintech controversy.

266.   In an interview with report authors, Parish President Dale Hymel explained that the Parish was reluctant to enact land use rules because of the "belief that zoning infringes on individuals' ability to control privately owned property."[186]

267.   The report noted that some of the plantations that once existed in the Parish had been sold for development and were home to heavy industry.[187]

268.   Given the history and patterns of industrial development in St. James Parish, it was clear that the pattern and practice of non-zoning did not benefit all property owners equally.

---

[183]   *Id*. at 195.
[184]   *Id*. at 194.
[185]   *Id*. at 195.
[186]   *Id*.
[187]   *Id.* at 192.

Large white landowners and corporations who could sell their large tracts of land to petrochemical companies benefited from this approach; small, Black landowners with no resources to leave, were harmed by it.

269.    Further, in a direct contradiction, while reluctant to infringe on some "individuals' ability to control privately owned property," – i.e. individuals who own large profitable tracts of land usable for industrial development – the Parish Government did choose to impose restrictions on *residential* subdivisions, including an ordinance that required that plans for new residential subdivisions be submitted to the Parish Council and subjected to a process similar to passage of an ordinance, i.e. public hearings and approval by the Planning Commission and Parish Council.[188]

270.    The Report also noted that the local Parish government had been put on notice more than once by other state officials that the Parish bore responsibility for public health and the environment, and that they had to fully consider the environmental implications of facility siting decisions.[189]

271.    The EPA Report's description of the operations of the Parish also underscore how influential and significant the Parish President was in land use policy. As the political and administrative head of the Parish, President Hymel was responsible for appointing four directors of operations, finance, human resources, and emergency preparedness, as well as department heads in those areas. Hymel, along with the seven-member Parish Council, was also responsible for appointing the 10 members to the Planning Commission, and the 8 members of the Coastal

---

[188]    *Id.*

[189]    *Id.*

Zone Management Board. In addition, the Parish President was responsible for appointing 4 members to the 17-member Economic Development Board.

272.    The 2003 EPA Report concluded that the "government of St. James Parish does not identify environmental justice as either a problem or a priority…"[190] And, recognizing the structural features of the Parish governance that continued to develop racially discriminatory zoning decisions, the EPA Report recommended that:

> St. James Parish should adopt an environmental justice policy, embracing an appropriate definition of environmental justice and acknowledging that all citizens should receive fair treatment and have opportunities for meaningful involvement in processes that affect their health and welfare.[191]

273.    Despite yet another reminder of their responsibility and authority to protect the health and safety of Parish residents and concerns about the pollution levels and health impacts, the Parish, under the leadership of President Hymel, continued as he said it would, to encourage more industrial development along this stretch of river, such as Nucor near Romeville in 2011.

274.    While the 2003 EPA Report criticized St. James Parish for not identifying environmental justice as a priority, the reality was far worse for Black residents in St. James Parish. Subsequent actions by Parish officials would reveal not only deliberate indifference to the health, safety, and rights of Black residents. Far worse, they revealed an intention to erase these historic Black communities from the map completely.

---

[190]  *Id.* at 189.

[191]  *Id.* at 212.

**V.    2014: ST. JAMES PARISH COUNCIL ADOPTS A LAND USE PLAN THAT PROTECTS TOURIST PLANTATIONS, CATHOLIC CHURCHES, AND MAJORITY WHITE PARTS OF THE PARISH, AND PLANS THE END OF HISTORIC BLACK COMMUNITIES.**

**A.    The First Land Use Plan in St. James Parish Is a Racial Cleansing Plan**

275.    After operating for more than 93 years without a zoning ordinance or land use plan, on April 2, 2014, the Parish Council hurriedly adopted a land use plan ("Land Use Plan" or "Plan")[192] – in order to protect the interests of white residents.

276.    The Plan was created pursuant to the Parish's authority under La. Stat. Ann. §33:101 et seq., which provides in pertinent part, under §33:107, that parishes shall make plans that "best promote *health, safety*, morals, order, convenience, prosperity, and general welfare . . . including, among other things . . . adequate provision for light and *air*." (emphasis added)

277.    Notably, and as set forth in more detail below, this Plan was passed after it became clear that two companies were moving forward with plans to construct oil storage facilities near predominantly *white* parts of the Parish. The Parish Council would later aggressively use the existence of the 2014 Plan to turn these facilities away, even at the risk of being sued by the companies.

278.    The 2014 Plan codified and distilled into an ordinance what the Parish had long been doing in practice – steering industry to predominantly Black parts of the Parish and protecting predominantly white parts of the Parish.

279.    In 2014, based on the 2010 census, the 4th District was 61% Black, and the 5th District was 87% Black. The 5th District remains overwhelmingly majority Black at 89% today.

---

[192]   Ordinance 14-03, adopted by St. James Parish Council on April 2, 2014, *available at* https://library.municode.com/la/st._james_parish_council/ordinances/code_of_ordinances?nodeId=646035.

Although today, based on the 2020 census, the 4th District is 52% Black, Defendants enacted and amended the Land Use Plan between 2014 and 2018 with data from the 2010 census.

280.    The 2014 Plan designated large swaths of property in the 4th and 5th Districts as "industrial" even though they had previously always been identified as having ongoing agricultural use, demonstrating in the clearest possible terms an intent to continue populating the predominantly Black 4th and 5th Districts with more industry.[193] Most glaringly, the 2014 Plan also provided for two-mile buffer zones separating an industrial site from tourist plantations, schools, and Catholic churches – with most of the concentric buffers concentrated in the majority white part of the Parish.

281.    The 2014 Plan did not provide the same buffer zone protections to predominantly Black churches and active schools within the 4th and 5th Districts, including: Plaintiff Mount Triumph Baptist Church, Pleasant Hill Baptist Church, Buena Vista Baptist Church, Phillipian Baptist Church, St. Mary Catholic Church, Pilgrim Full Gospel Baptist Church, Mt. Calvary Baptist Church, Peaceful Zion Baptist Church, Burton Lane Church & Mt. Bethel Church, St. Paul Church, St. James High School, and the 5th District Elementary School, which later became St. Louis Math and Reading Academy.

282.    In 2014, Catholic churches in Louisiana were 77% white and 13% Black.[194] The churches left out of buffer zone protection in the 2014 Land Use Plan are all predominantly Black, and are almost all Baptist.

283.    Thus, while the 2014 Plan purported to preference and protect Catholic churches, which was unlawful to begin with, in reality it only protected predominantly white Catholic

---

[193]    *See* South Central Planning and Development Commission, St. James Parish Government Comprehensive Plan 2031, p. 87, *available at* https://www.scpdc.org/wp-content/uploads/St_James_Comp_Plan_2031_web.pdf.
[194]    Pew Research Center, *Catholics who are in Louisiana*, *available at* https://www.pewresearch.org/religion/religious-landscape-study/state/louisiana/religious-tradition/catholic/

churches, which made the discrimination compound – religious *and* racial – and thus doubly unlawful.

284.    The 2014 Plan also contained an ominous tell: it designated the residential areas in the predominantly Black 4th and 5th Districts as "Existing Residential/*Future Industrial*." The "Existing Residential/Future Industrial" designation was not applied to any districts other than the 4th and 5th majority Black Districts in St. James Parish.

285.     Two of Plaintiff Inclusive Louisiana's founding members, Barbara Washington and Myrtle Felton, live in an area of the 4th District designated as "Residential/Future Industrial."

286.    This new designation that seemingly came out of nowhere was an obvious confirmation that the Parish Council was planning for the end of these historic Black communities, and that the Plan was aimed at hastening their erasure from the Parish – that it was, in effect, a racial cleansing plan.

287.    The figure of the Land Use Plan below shows in off-white the "Existing Residential/Future Industrial" designation applied to the 4th and 5th majority Black districts. The black circles indicate the buffer zones protecting white Catholic churches, tourist plantations, and some schools.



The Land Use Plan map adopted by the Parish Council in 2014 created buffer zones around some "Plantations Schools and Churches" noting in the legend that churches referred to "Catholic Churches." It also introduced a category only in the 4th and 5th Districts of "Existing Residential/Future Industrial."

288.     However, as demonstrated in the image below, the Land Use Plan failed to apply any buffer zones to Baptist and Black churches or to schools in the majority Black parts of the 4th and 5th Districts. The map below lists the churches and schools left out of the buffer zones.



This image shows the Black and Baptist churches and Black schools left out of the buffer zones in Land Use Plan map adopted by the Parish Council in 2014. Mapping of additions by Justin Kray.

289.    The 2014 Plan also placed new restrictions on subdividing residential property within the newly minted "Residential/Future Industrial." These restrictions prohibit the subdivision and sale of residential property except to immediate family members. Thus, property owners in these majority Black Districts were saddled with limitations on their right to purchase, lease, sell, hold, and convey their property, while residents in majority white parts were not burdened in this way.

290.    Despite the glaring contradictions and without any sense of irony, the Council member from the 3rd District, which is overwhelmingly majority (84%) white, touted the need for a land use plan to help "keep our young people, our young residents in the community" and spoke of young families living in a restricted subdivision who "feel pretty secure their property is

gonna be valued from here on out, for twenty years plus that we can't put an industry next to them."[195]  "Our young people" naturally referred exclusively to the white families he believed deserving of health and safety.

291.    The 2014 Plan was thus both further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish, and, with the new "Existing Residential/Future Industrial" designation and subdivision restrictions – which unlike the 3rd District zoned to be free from hazardous industry – plotted further racially discriminatory land use policy. It thus added even more methods of discriminating against Black residents and depriving them of their rights to equal protection of the laws, and non-discrimination in the use and enjoyment of their property on equal terms of white citizens.

292.    The Parish Council attempted to put a legitimating gloss on the rushed adoption of the 2014 Plan by suggesting in the preamble to the resolution that it was based on a planning process undertaken by the South Central Planning & Development Commission (SCPDC) to develop the Parish's Comprehensive Plan 2031 (Plan 2031).[196]

293.    However, the two processes and the resulting documents are very different.

294.    The SCPDC is a non-profit entity that is not accountable to the citizens of the Parish and did not, indeed *could not*, hold noticed formal public hearings.

295.    The SCPDC began the process of developing Plan 2031 in March 2010 with a steering committee and undertook a series of consultations over the course of 18 months,

---

[195]  Proceedings of a Public Hearing Held by the St. James Parish Council in Conjunction with the Planning Commission, March 19, 2014 ("March 19, 2014 Public Hearing").

[196]  Ordinance 14-03, adopted by St. James Parish Council on April 2, 2014, *available at* https://library.municode.com/la/st._james_parish_council/ordinances/code_of_ordinances?nodeId=646035.

concluding its work in 2011 with a report about the process and a proposed Future Land Use Map.[197]

296.     Neither the 2011 report nor the map recommended two-mile buffer zones or "Existing Residential / Future Industrial" designations.[198]

297.     Despite attempts to seek information from public records requests, there is no record of how these designations and restrictions ended up in the 2014 Plan when it was first introduced by the Planning Commission in November 2013.

298.     Nor is there any official explanation as to why the Parish waited nearly two years after the SCPDC concluded its process, and then rushed to adopt a different plan and map in late 2013.

299.     After the Plan's introduction by the Parish Council, only two public meetings were held over a period of two weeks and there was no real opportunity for engagement with the proposed plan. At the meeting on March 19, 2014, in Vacherie, Council Chair Charles Ketchens advised those in attendance that it was not "a question and answer" session.[199]

300.     Amendments to the Land Use Plan were approved by the St. James Parish Council on May 3, 2018.[200] The amendments scrubbed the explicit buffer zones and references to plantations, schools, and Catholic churches from the Land Use Plan.[201] In spite of this cosmetic change, the Parish has continued the same pattern of decision-making as to land use as

---

[197]   St. James Parish Government Comprehensive Plan 2031, *available at* https://www.scpdc.org/wp-content/uploads/St_James_Comp_Plan_2031_web.pdf.

[198]   *Id*. at 88.

[199]   March 19, 2014 Public Hearing, *supra* n. 194.

[200]   *Id.*

[201]   Ordinance 18-02 adopted by the St. James Parish Council on  May 2, 2018, *available at* https://library.municode.com/la/st._james_parish_council/ordinances/code_of_ordinances?nodeId=890523.

that set out in the 2014 Plan, which had entrenched the discriminatory land use patterns and practices that existed previously.

301.    The amended Land Use Plan also changed the land use designation for the 5th District in St. James Parish from "Residential/Future Industrial" to "Residential Growth." However, it kept the designation of "Residential/Future Industrial" in the 4th District.[202]

302.    Two of Plaintiff Inclusive Louisiana's founding members, Ms. Washington and Ms. Felton, live in an area of the 4th District that is currently designated as "Residential/Future Industrial."

303.    Despite the attempt to tidy up the Plan of its obvious and facially discriminatory elements, the siting pattern and practice of the Parish Council has remained the same. The Parish has continued to adhere to and implement the same buffer zones protecting Catholic churches, schools, and tourist plantations in predominantly white parts of the Parish, while excluding predominantly Black and Baptist churches, and schools, from those protections, including in the predominantly Black 4th and 5th Districts.

304.    Additionally, the 2018 amendments to the Land Use Plan expanded the area designated for industrial development in the 5th District by encroaching on an area that in 2014 was designated for residential growth. As set out further below, that area included St. James High School. It also included an area where in 2015 a methanol plant had been granted approval by the Commission despite the fact that it would not have been an allowable use under the Land Use Plan at the time.

---

[202]    *Id.*

**B.      Facilities Turned Away from Majority White Parts of the Parish**

305.     As soon as it was adopted in 2014, Parish officials aggressively used the Land Use Plan to turn away companies that had already been proceeding with plans to construct oil storage facilities in predominantly white parts of the Parish before the Plan was adopted.

306.     Parish officials sought to protect these white communities even when faced with the real threat, and in one instance the consequence, of litigation by the companies.

**a.   Wolverine Terminals Corp.**

307.     On May 15, 2013, just months before the Land Use Plan was introduced for consideration by the Parish Planning Commission later in November 2013, Wolverine Terminals Corp. announced plans to build a crude oil terminal project in St. James Parish.[203] The location of the terminal would have been in Paulina in the 3rd District, which according to 2020 census data is 84% white and 13% Black, on land that was already home to an existing heavy industrial grain terminal.[204]

308.     Initially, the Parish Council supported the project, voting unanimously in May 2013 to support the company's application for tax benefits through the Louisiana Enterprise Zone / Quality Jobs Program.[205] However, that support ended abruptly when 3rd District residents began expressing their opposition.[206]

---

[203]   Press Release: Louisiana Office of Economic Development, *Wolverine Terminals Announced $30 Million Crude Oil Terminal Project in St. James Parish,* May 15, 2013, *available at* https://www.opportunitylouisiana.gov/led-news/news-releases/news/2013/05/15/wolverine-terminals-announces-$30-million-crude-oil-terminal-project-in-st.-james-parish.

[204]   Kate Stevens, *This vote makes it official: St. James Parish denies permit for $30 million Wolverine project,* The Advocate, Oct. 8, 2014, *available at* https://www.nola.com/news/communities/this-vote-makes-it-official-st-james-parish-denies-permit-for-30-million-wolverine-project/article_ac50d929-fd14-5f4f-8994-41993044e452.html.

[205]   *Id.*

[206]   *Id.*

309.     On November 20, 2013, at the same time the Parish began officially considering what would become the 2014 Land Use Plan, the St. James Parish Council passed a resolution opposing the proposed site for the Wolverine Terminal.[207]

310.     Several Council members recognized and thanked residents who showed up to oppose Wolverine, with one member "pledg[ing] his commitment to moving forward with the Master Plan to ensure that industrial developments are located in designated industrial areas" so they wouldn't have to go through this process again.

311.     The resolution requested that the Parish President and Economic Development Board "assist Wolverine Terminals in locating and selecting a more suitable site for their proposed facility within St. James Parish."[208]

312.     According to then-Parish President Timmy Roussel, Parish officials attempted to "redirect Wolverine" and even "incentivize" a different location.[209] According to Wolverine representatives, however, relocation was not "economically feasible" because other sites could not accommodate the barges and railcars they required.[210]

313.     The Parish President and some Council Members even spoke in opposition at a hearing conducted by the Department of Environmental Quality on April 29, 2014, and provided the agency with the Council resolution opposing the location.[211]

---

[207]   St. James Parish Council Resolution 13-176, adopted Nov. 20, 2013, *available at* https://edms.deq.louisiana.gov/app/doc/view?doc=9120612.

[208]   *Id.*

[209]   L'Observateur, *Wolverine's effort halted in St. James Parish,* Sept. 19, 2014, *available at* https://www.lobservateur.com/2014/09/19/wolverines-effort-halted-in-st-james-parish/.

[210]   Kate Stevens, *Fears about crude oil facility in St. James aired at hearing,* The Advocate, April 30, 2014, *available at* https://www.nola.com/news/communities/fears-about-crude-oil-facility-in-st-james-aired-at-hearing/article_b5916fbb-5dab-5345-9360-b8ec677d7506.html.

[211]   Transcript of Public Hearing Held on Convent, St. James Parish, April 29, 2014, *available at* https://edms.deq.louisiana.gov/app/doc/view?doc=9308886&ob=yes&child=yes.

314.    On September 17, 2014, the St. James Parish Council denied Wolverine's land use application as incompatible with the 2014 Land Use Plan and based on the opposition of residents to having an industrial site so close to their homes.[212] Among the reasons for denying the application, the Parish Council stated in the resolution that the company had not presented information about whether other sites located in Convent (a majority-Black area) would be appropriate for its proposed facility.[213] Thus, Parish officials made it clear they tried to steer Wolverine away from predominantly white Paulina and toward predominantly Black Convent.

315.    After the vote, residents who lived near the proposed site expressed understandable relief that they averted such a life-altering prospect, with one tearful opponent of the project telling media, "I'm just happy for my kids" and another saying, "It's unbelievable. There's no way to describe it. To go from thinking about selling everything you own to getting your life back."[214]

### b.  Petroplex International

316.    In 2007 Petroplex International, LLC ("Petroplex") purchased land on the west bank of the Parish in Vacherie, and in 2008 began the process for applying for several state and federal permits to develop a petroleum tank farm.[215]

317.    Part of the tank farm's operations would have been located in South Vacherie, which has a census tract of its own and a population that is 64% white.

---

[212]   Official Proceedings of the Council of the Parish of St. James, State of Louisiana, Taken at a Regular Meeting Held on Wednesday, Sept. 17, 2014, *available at* https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_09172014-44; *see also*, Stevens, *supra* n. 203.

[213]   Stevens, *supra* n. 203.

[214]   Kate Stevens, *St. James Council denies Wolverine request to build $30 million plant: Residents opposed proposed Paulina development,* The Advocate, Sept. 18, 2014, *available at* https://www.nola.com/news/article_c6f1de82-f101-522d-a310-831a62f6e3bf.html.

[215]   Petroplex Int'l v. St. James Parish, 158 F. Supp. 3d 537 (E.D. La. 2016).

318.    North Vacherie is located in the 6th District which, while having a population that is 79% Black, is cradled between districts that are overwhelmingly majority white – the 3rd District right across the river is 84% white, and the 7th District just south and west is 64% white. As a result, most of the 6th District was covered by multiple 2-mile buffers zones designated in the 2014 Land Use Plan.

319.    In June 2012, the company announced it had reached a "critical milestone" in the planning and development of its "state-of-the-art bulk liquids terminal facility" in St. James Parish.[216]

320.    On April 2, 2014, while Petroplex was entering the final phases of planning, the Parish Council adopted the 2014 Land Use plan, which changed the designation of the Petroplex property from industrial to residential and agricultural. This meant that the tank farm was no longer a permissible use in a residential area under the Land Use Ordinance.

321.    On April 23, 2014, at a special meeting of the Planning Commission to discuss Petroplex and another proposed facility, South Louisiana Methanol (SLM), the Petroplex application was tabled until a regular meeting of the Parish Council on May 7, 2014, after the Parish's attorney advised the Commission that the proposed facility was now a non-conforming use under the new Land Use Plan which had been adopted just three weeks earlier, and that the "land purchased by Petroplex was made after the land use map was presented to the Planning Commission and the public."[217]

---

[216]   Business Wire, *Petroplex Reaches Critical Milestone in the Development of a Bulk Liquids Terminal Facility in St. James Parish,* June 18, 2012, https://www.businesswire.com/news/home/20120618006488/en/Petroplex-Reaches-Critical-Milestone-in-the-Development-of-a-Bulk-Liquids-Terminal-Facility-in-St.-James-Parish.

[217]   Minutes of St. James Parish Planning Commission, April 23, 2014.

322.    However, a federal court later noted that the property had actually been purchased in 2007.[218]

323.    On May 7, 2014, the Parish Council adopted Resolution 14-84, permitting Petroplex to construct the facility, subject to certain conditions, which Parish officials would later aggressively enforce – in contrast to its approach to other facilities in majority Black parts of the Parish as set out below.[219] In his motion to adopt the resolution approving the facility, Council member Brass noted the criteria requiring the adoption "as a matter of constitutional imperative or other vested legal right superior to this ordinance."[220]

324.    Thus, because of Petroplex's vested legal rights in the property it had purchased in reliance on the lack of any land use plan previously, the Council believed it was compelled to approve the land use application. Under the resolution, Petroplex was required to begin construction of the facility no later than July 31, 2014. The Parish Council and Parish President would uncharacteristically and aggressively strictly enforce the terms of the resolution.

325.    At a Council meeting on November 5, 2014, Petroplex representatives provided an update on the status of the project, and asserted that it had begun construction as of July 31, 2014, and that they were fully in compliance with the resolution. The Parish's attorney advised the Council that he believed Petroplex was not in compliance with the resolution.[221]

326.    Media coverage of the meeting reported that some Parish Council members and the Parish's attorney stated that the company had "not erected a permanent facility by the

---

[218]  *Petroplex Int'l v. S.t James Parish*, *supra* n. 215     .

[219]  Official Proceedings of the Council of the Parish of St. James, State of Louisiana, Taken at a Regular Meeting Held on Wednesday, May 7, 2014, *available at*
https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_05072014-37.

[220]  *Id.*

[221]  Official Proceedings of the Council of the Parish of St. James, State of Louisiana, Taken at a Regular Meeting Held on Wednesday, Nov. 5, 2014, *available at*
https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_11052014-39.

resolution's agreed-upon construction guidelines or by the July 31 deadline."[222] This point was emphasized even though the resolution had only been adopted a little over two months prior.

327.    The Parish Council took aggressive action in enforcing the terms of the resolution. On December 3, 2014, the Parish President issued a "Notice of Violation and Stop Work Order" on the basis that Petroplex had not complied with the conditions of the resolution to begin construction.[223]

328.    The company requested that the Parish withdraw the stop-work order but the Parish refused.[224] The company then sued the Parish in federal court. However, the court ruled that Petroplex could not maintain the municipal zoning action in federal court and dismissed their related state law claims without prejudice to proceed in state court.

329.    The Parish's decision had major financial repercussions for the company, which ended up defaulting on the bank loan for the property. The land was later purchased by the Port of South Louisiana.[225]

c.    **Solar Moratorium**

330.    In 2021, solar power companies dared to propose two large-scale solar power farms in the St. James Parish community of Vacherie, at the intersection of La. 20 and La 3127. Again, Parish Officials put the brakes on the development.

---

[222]   Kate Stevens, *St. James council members take Petroplex to task over construction of new tank farm: Company says building work meets St. James Parish Council's requirements,* The Advocate, Nov. 12, 2014, available at https://www.nola.com/news/communities/article_61889606-2614-56b1-a811-a56698304d38.html.

[223]   Kate Stevens, *Petroplex attorney asks St. James president to withdraw stop-work order on Vacherie site,* The Advocate, Jan. 14, 2015, *available at* https://www.nola.com/news/communities/petroplex-attorney-asks-st-james-president-to-withdraw-stop-work-order-on-vacherie-site/article_56fd4b08-dbae-5a84-915d-02afa553e8bd.html

[224]   *Id.*

[225]   David J. Mitchell, *Port of South Louisiana advertises land held by port director, family; officials deny ethics conflict,* The Advocate, May 23, 2018, *available at* https://www.theadvocate.com/baton_rouge/news/port-of-south-louisiana-advertises-land-held-by-port-director-family-officials-deny-ethics-conflict/article_86168d26-5917-11e8-b138-dfc30de81059.html.

331.     As noted above, Vacherie is located in the Parish's 6th District, which, while majority Black, is surrounded by majority white populations, and includes the majority-white population of South Vacherie. Because of their proximity to majority white communities, Black populations in the 6th District have been enveloped and covered by the buffers protecting white parts of the Parish.

332.     The proposed projects faced public opposition from some residents of Vacherie, citing the project's aesthetic impacts, displacement of the agricultural economy, and decline property values in the community.

333.     One white resident opposing the farm dismissed the fact that the project would not add to the pollution, stating, "Nobody in this room is against solar panels. Nobody in this room is against green energy. You know what we don't want? We don't want it to be in our backyard."[226]

334.     Several Parish Council members urged a moratorium on solar farms in the Parish and for a third-party planning agency to conduct a study of the economic and environmental impacts of solar in St. James Parish.

335.     Initially, the full Council did not agree on the moratorium and the motion failed in July 2022.[227] When it was brought up again on August 17, 2022, the resolution passed.[228] The resolution amended the Land Use Plan on September 15, 2022, adding Ordinance No. 82-25(o)

---

[226]   Joshua Rosenberg, *St. James Parish approves solar farm moratorium,* The Lens, Aug. 18, 2022, *available at* https://thelensnola.org/2022/08/18/st-james-parish-approves-solar-farm-moratorium/

[227]   Anna McAllister, *St. James Parish council kills moratorium on solar far project, residents react,* WGNO, Ju. 21, 2022, *available at* https://wgno.com/news/local/st-james-parish-council-kills-moratorium-on-solar-farm-project-residents-react/

[228]   Official Proceedings of the Council of the Parish of St. James, State of Louisiana, Taken at a Regular Meeting Held on Aug. 17, 2022, *available at* https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_08172022-370.

which bars the approval of commercial solar facilities until economic and environmental impact studies commissioned by the Parish are complete.

336.    The Council engaged in lengthy and detailed discussions of the need for the moratorium, with one member even expressing concern about "who would be responsible for cleaning up the community after 20 years of having solar panels in our community."[229]

337.    The Council's concern and attention to detail in the consideration of a moratorium on a source of clean energy is remarkable and in stark contrast to their complete disregard and refusal to discuss a moratorium on heavy industry that Plaintiffs have been calling for since 2019.

338.    On September 13, 2019, Gail LeBoeuf, founding member of Plaintiff Inclusive Louisiana, and Sharon Lavigne, founder of Plaintiff RISE St. James, sent a letter to each of their Council members in the 4th and 5th Districts, respectively, requesting that they put the issue of a moratorium on the siting of new petrochemical facilities and expansions of existing facilities on the agenda of the Parish Council.[230]

339.    In their letter they pointed out the compelling and urgent reasons regarding the need for a moratorium – including the alarming rates of cancer and other illnesses associated with pollution from area industry and depreciation of *their* property values.

340.    The Council never took up the matter for discussion, or addressed it anyway, despite ongoing requests repeated at subsequent Council meetings and in the media.

341.    At the August 17th meeting where the Council adopted the moratorium on solar, Ms. Lavigne addressed the Council and its failure to even acknowledge the concerns of those

---

[229]   *Id.*

[230]   Letter to Council Members of the 4th and 5th Districts, Sept. 13, 2019, *available at* https://labucketbrigade.org/wp-content/uploads/2020/07/Request-from-RISE-St.-james-for-a-moratorium-for-new-land-use-applications.pdf.

who had been calling for a moratorium on harmful industry: "We need a moratorium on petrochemical facilities because this is Cancer Alley and people are dying. How many more have to die because of you all?"[231]

### C. Heavy Industrial Facilities Steered to Majority Black Parts of the Parish

342.     After the 2014 Land Use Plan went into effect, heavy industrial companies began lining up to locate in the 4th and 5th Districts of St. James Parish at an accelerated pace.

343.     In contrast to the standards to which they held the companies that sought to locate in predominantly white areas of the Parish, Parish authorities overlooked serious defects in the applications, or made allowances for companies who engaged in the same actions or conduct for which they took other companies to task when they were eying locations impacting white areas of the Parish.

344.     In all cases, Parish authorities refused to heed the repeated concerns of local residents opposed to locating more facilities in their communities already burdened with industry.

345.     Residents of the 4th and 5th Districts found themselves having to attend meeting after meeting of the Planning Commission and Parish Council over the course of the last ten years as one facility after another sought approval to operate near their homes.

346.     The Parish Council granted every single request from companies seeking to locate in majority Black parts of the Parish.

347.     The image below reveals the result of this pattern: the Parish has not allowed heavy industrial facilities in majority white parts of the Parish in over 46 years, and today, 20 out

---

[231] Rosenberg, *supra* n. 225.

of the 24 heavy industrial facilities approved by the Parish are located in the majority Black 4th and 5th Districts.



| Index | Facility | Index | Facility | Index | Facility |
|---|---|---|---|---|---|
| 1 | Valero Asphalt | 9 | Plains Marketing | 17 | Nucor Steel |
| 2 | Mosaic Faustina | 10 | Continental Cement | 18 | Oxychem |
| 3 | AmSty | 11 | Shell Convent | 19 | SunCoke |
| 4 | Ergon St James | 12 | Air Products & Chemicals | 20 | Mosaic Uncle Sam |
| 5 | NuStar | 13 | Coastal Bridge Co | 21 | ADM Grain |
| 6 | Marathon | 14 | Millenium Galvanizing | 22 | LA Sugar Refining |
| 7 | ExxonMobil | 15 | Yara Inc | 23 | Rain CII Carbon |
| 8 | LOCAP | 16 | Zen-Noh Grain | 24 | Atlantic Alumina |

348.    Below are just some examples of what residents in the 4th and 5th Districts have had to contend with over just the past decade:

### a.   South Louisiana Methanol (SLM)

349.    On February 28, 2013, South Louisiana Methanol (SLM) announced plans to build a $2.2 billion methanol plant between two historic Black communities – Welcome and Freetown – in the Parish's 5th District, under a mile away from Mount Triumph Baptist Church, and on the site of several former plantations: St. Amelie, St. Claire, St. Prisca, and J.S. Webre.

350.    The company then began entering into "Options to Purchase Real Property" in 2013, though they would not complete purchases of the properties until 2018.

351.    The facility would have encompassed 1,500 acres and produced over 2 million tons of methanol annually, which would have made it one of the largest such facilities in the world.

352.    It would have encircled the only public park in the 5th District.

353.    On June 5, 2013, the Parish Council unanimously adopted Resolution 13-103 supporting the company's application for tax credits through the Louisiana Enterprise Zone / Quality Jobs Program.

354.    On December 16, 2013, citizens of St. James Parish's 5th District signed a petition expressing opposition to the proposed facility. The petition raised concerns about toxic air and water pollution, groundwater impacts, adverse health consequences, and the risk of leaks, fires, and explosions.

355.    Despite the opposition from community members and concerns about the public park, at a special meeting on April 23, 2014, the Planning Commission unanimously approved

SLM's land use application for the project on the property in Welcome that included land designated "Existing Residential / Future Industrial."

356.    The company never began serious construction but kept seeking extensions of its air permits from LDEQ.

357.    On May 2, 2018, the Parish Council adopted the amended Land Use Plan, which changed the designation of the residential area in Welcome from "Existing Residential / Future Industrial" to "Residential Growth," which rendered the SLM project a non-conforming use.

358.    On May 21, 2018, SLM purchased the first parcel of property in St. James Parish, after the land use designation had changed. The Parish Council treated SLM's project as "grandfathered" in under the 2014 Land Use Plan, even though it had not purchased the property.

359.    This treatment was in contrast to the way the Parish Council treated the Wolverine project, where the company had leased land prior to the adoption of the 2014 Land Use Plan but was denied approval because it was a non-conforming use under the new Plan.

360.    Ultimately, SLM never commenced serious construction and its federal permit was suspended by the U.S. Army Corps of Engineers, and it is believed the company is planning to sell the property.

361.    Area residents fought for almost 10 years at every level of local, state, and federal government against this facility – with no help, and no thank-yous from their local representatives, in contrast to the welcome and gratitude Council members extended to white residents when they turned out to oppose Wolverine.

362.    At one hearing in 2020 where SLM again sought modifications of its air permit to expand its facility, over a dozen residents showed up to oppose it. Ms. Felton, founding member

of Plaintiff Inclusive Louisiana, testified, "We have suffered enough. We don't need anymore. The end result is death. All a Black neighborhood gets from a plant is death."[232]

363.    Ms. Lavigne of Plaintiff RISE St. James testified, "Our parish council can stop this. If this happens, it will expand into a residential area… it will destroy Welcome Park. Our children will not have a park because they will not be able to breathe the air."[233]

### b.  Bayou Bridge Pipeline

364.    On August 23, 2017, the Parish Council voted 4-3 to approve the land use application of Bayou Bridge Pipeline LLC (BBP).[234] The pipeline would be the southern end of the same network of pipelines connecting the Dakota Access Pipeline and was extremely controversial.

365.    It was slated to run 162 miles from Lake Charles and end in St. James Parish at Burton Lane near the NuStar facility between Hwy. 3127 and Hwy. 18.

366.    The end-point was also near Plaintiff Mount Triumph Baptist Church and the historic communities of Chatman Town and Freetown, as well as several churches, cemeteries, and residential neighborhoods.

367.    When Pastor Harry Joseph of Plaintiff Mount Triumph Baptist Church learned that the company would be pumping another 500,000 barrels of oil per day into the community, he knew more facilities were sure to follow.

368.    The addition of this new petrochemical infrastructure also raised more concern about the fact that Burton Lane had recently been closed off by industry and could no longer

---

[232]  Halle Parker, *St. James residents have 'suffered enough,' fight permit for methanol plant,* Nola.com, Nov. 24, 2020, *available at* https://www.nola.com/news/environment/st-james-residents-have-suffered-enough-fight-permit-for-methanol-plant/article_55080d30-2e7c-11eb-b65a-2f4c68e9bade.html

[233]  *Id.*

[234]  Official Proceedings of the Council of the Parish of St. James, State of Louisiana Taken at a Regular Meeting Held on Aug. 23, 2017, *available at* https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_08232017-119.

serve as an alternate evacuation route out of the area in the event of an accident at one of the facilities along River Road, or another emergency or natural disaster.

369.    As they did with every other facility that sought to locate in the 4th and 5th Districts at this time, residents showed up in force to oppose the project. At a meeting that was supposed to be an informational session between representatives of the company and area residents – convened and moderated by the Parish's Director of Operations Blaise Gravois – residents showed up in force and expressed their opposition and concerns. Gravois made it clear that the company was not there to answer questions.

370.    Residents raised concerns about the lack of a safe evacuation route:

> What about a safe evacuation route? I have nothing against pipelines or progress but this should've been addressed before anyone got a permit. We have a plant being built right now, what will happen when there is an accident or fire? Elderly and sick people live around here. I can crawl a little bit, but I'm old; I can't run. We need to know if we are getting a route, and once it's in place we need a plan.[235]

371.    Pastor Harry Joseph asked the question at the heart of this case, "Why does it always have to be us?"

372.    He continued to press the case:

> Nothing happens overnight, and I feel in my heart that someone in St. James has known about this project for a long time. At the meeting in Napoleonville, the pipeline people left and wouldn't answer questions. They don't want to hear what people are saying: that this community has been thrown under the bus too many times. We opposed the last plant and it still came. We keep seeing people on the east bank (where St. James' parish seat is located in Convent) making decisions about what happens on the west. It's time for us to educate ourselves, and fight for ourselves.

---

[235]  Meghan Holmes, *St. James residents oppose proposed pipeline,* The Louisiana Weekly, Aug. 14, 2017, *available at* http://www.louisianaweekly.com/st-james-residents-oppose-proposed-pipeline/.

> We are burying so many people dying of cancer in this
> district. People are suffering. You need to stop looking at
> the money going through the pipeline and look at the
> people living around the pipeline. Your pipeline is not the
> best thing, because you can't guarantee it. Look at the oil
> spills we have already had, and they said the same thing
> y'all are saying now.

373.     The Parish Council approved the land use application and the pipeline was built

into St. James Parish and began pumping more oil into the community. As Pastor Joseph

predicted, more facilities followed in its wake.

### c.  Wanhua

374.     In 2018, Wanhua Chemical US Operations (Wanhua) applied for a land use

permit from St. James Parish to operate and construct a facility on a 250-acre agricultural site in

Convent on the site of the former St. Michael Plantation.

375.     Wanhua's proposed site was in the 4th District in the town of Convent, and was

one mile from historic Romeville, where Plaintiff Inclusive Louisiana's founding members Ms.

Washington and Ms. Felton live, where Pleasant Hill Baptist Church is located, and next to the

property purchased in 1874 by Ms. Washington's great-great-great grandmother Harriet Jones,

who had once been enslaved. It would also sit alongside Nucor Steel and in close proximity to

OxyChem.

376.     The proposed facility would manufacture polyurethane using the chemical

compounds Methylene Diphenyl Diisocyanate and Ethylene Dichloride. It would emit, among

other things, phosphene gas for which there is no safe level of exposure.

377.     The Planning Commission heard public comments at meetings on February 25,

2019 and March 25, 2019.

378.     Plaintiffs' members alongside various community members commented to the

Parish in opposition to Wanhua's land use application.

96



Sharon Lavigne, founder of Plaintiff RISE St. James, addresses the Parish Council in opposition to Wanhua on July 24, 2019. Photo credit: Julie Dermansky

379.    Among those concerns raised were the severe public health and safety impacts to the community: the Wanhua facility would generate over 1 million pounds per year of hazardous waste; store up to 140,000 gallons of hazardous waste on site, including ignitable, corrosive, and reactive materials; and increase the risk of potential hazardous substance releases from spill or fire of stored materials.

380.    These comments also made clear that Wanhua's land use application omitted critical information necessary for the Planning Commission's full consideration of the project's risk and impact on the community.

381.    Specifically, Wanhua's land use application failed to: list public establishments, including parks, playgrounds, churches, schools, and community centers, within the projects' 2-

mile Impact Area, as required by St. James Parish Land Use Ordinance 17-21 §87-37(g)(3)(a); describe the quantity of anticipated hazardous substances at the site, as required by St. James Parish Land Use Ordinance 17-21§87-37(g)(3)(b); list corresponding hazard information for those substances listed in the application.

382.     Additionally, these comments emphasized the disproportionate burden of industrial operations already felt by the community. Approval of the Wanhua project would further sacrifice the community's cultural, historical, environmental, and aesthetic qualities.

383.     On May 14, 2019, the Parish Council and Planning Commission held two back-to-back private meetings with Wanhua representatives for Council and Commission members to receive information on the proposed facility.

384.     The Parish held these meetings explicitly to avoid having a quorum of the Council or Commission present at the same time. The Parish intentionally split these meetings in order to exclude the public and avoid the opportunity for participation from directly-impacted community members.

385.     Six days later, on May 20, 2019, the Planning Commission voted to approve Wanhua's land use permit.

386.     Founding member Ms. Washington of Plaintiff Inclusive Louisiana was among those urging the Commission to deny the application, telling them, "I have already lost people to cancer, including my sister."[236]

387.     At a public hearing before the Parish Council on the appeal of Wanhua's land use approval, Ms. Washington, again, was among those who addressed the Council, telling them,

---

[236]   Louisiana Bucket Brigade, Press Release: *St. James Parish Planning Commission Postpones Approval of New Wanhua Chemical Plant Slated for Location in Parish's Predominantly African American Community,* March 26, 2019, *available at* https://labucketbrigade.org/st-james-parish-planning-commission-postpones-approval-of-new-wanhua-chemical-plant-slated-for-location-in-parishs-predominantly-african-american-community/.

> We come here to you all, pleading with you all, asking you
> all to stop letting industry locate near residential areas.
> There are other things you can do. But every time we come
> here and voice our opinions, ya'll turn a deaf ear to us; you
> harden your hearts. [237]

388.    Ms. LeBoeuf, founding member of Plaintiff Inclusive Louisiana, also addressed

the Parish Council, and began the call for a moratorium on all such industry in the Parish,

because of the overburden on Black communities.

389.    On July 16, 2019, Pastor Harry Joseph of Plaintiff Mount Triumph Baptist Church

and Plaintiff RISE St. James joined with another local resident and environmental advocacy

organization to sue the Parish over violations of the Open Meetings Law. On July 24, 2019,

while the lawsuit against the Parish was pending and in response to an appeal of the Planning

Commission's approval of Wanhua's land use application, the St. James Parish Council

unanimously voted to send the matter back to the Planning Commission for further review.[238]

390.    On September 4, 2019, Wanhua withdrew its land use permit application citing

mounting costs to the project. Parish President Timmy Roussel lamented the company's decision

and the fact that the Parish would not be situating another chemical company near Romeville,

saying to the media, "Whenever you lose a good economic shot in the arm, you have concerns. I

would hate to see a bad mark on St. James Parish."[239]

---

[237]   Official Proceedings of a Public Hearing Held by the St. James Parish Council on Wednesday, July 24, 2019, available at https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_07102019-201.

[238]   Official Proceedings of the Council of the parish of St. James, State of Louisiana, Taken at a Regular Meeting Held on July 24, 2019, *available at* https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_07242019-203; *See also,* Meghan Holmes*, St. James Parish council sends chemical plant's land use permit back to planning commission, The Louisiana Weekly, Aug. 5, 2019, available at* http://www.louisianaweekly.com/st-james-parish-council-sends-chemical-plants-land-use-permit-back-to-planning-commission/

[239]   Paul Murphy, *Chinese company drops plans for new chemical plant in St. James Parish* WWLTV, Sept. 9, 2019, *available at* https://www.wwltv.com/article/news/local/chinese-company-drops-plans-for-new-chemical-plant-in-st-james-parish/289-2e2f83de-1ff1-4d4b-a30e-2ecedddd03ed.

### d. Formosa

391.    On June 25, 2018, Formosa Plastics submitted an initial land use application to the St. James Parish seeking approval of a 2,400-acre chemical manufacturing complex located in the 5th District, on the sites of the former Acadia and Buena Vista Plantations. The facility would have been one of the largest new plastics manufacturing facilities in North America and the largest new emitter of greenhouse gases in the state.

392.    The site of the planned complex is located about 1 mile from Fifth Ward Elementary School, 1 mile and approximately 1.5 miles from the majority Black communities of Welcome and Union, respectively.

393.    The proposed site is located less than 2 miles from Mount Calvary Baptist Church and Peaceful Zion Baptist Church.

394.    The proposed facility would emit more than 6,000 tons per year of EPA "criteria pollutants," 800 tons per year of toxic air pollutants, and 13 million tons per year of greenhouse gases. These pollutants include particulate matter, nitrogen dioxide, volatile organic compounds, carbon monoxide, benzene, formaldehyde, and 1,3-butadiene, as well as 15,400 pounds of ethylene oxide per year.

395.    The facility would nearly double the air pollutant emissions in St. James Parish, which already ranks among the most polluted areas nationally.

396.    One study completed by ProPublica estimates that the facility, if completed, would expose residents to more than triple the level of cancer-causing chemicals and would rank in the top 1% nationwide of plants in terms of concentrations of cancer-causing chemicals in its vicinity.

397.    On January 24, 2019, the St. James Parish Council approved Formosa's land use application set out in Resolution 19-07.[240]

398.    The approval was based on the Council's finding that "[t]he physical and environmental impacts of the proposal are within allowable limits, and are substantially mitigated by the physical layout of the facility, and the location of the site in proximity to existing industrial uses and away from residential uses."

399.    However, it was later learned that Formosa had made a series of misrepresentations in its application to the Parish about measures it claimed to have taken to reconfigure the physical layout in the site plan to mitigate harm to the nearby elementary school and church.

400.    In fact, as it turned out, the only change Formosa Plastics pointed to pre-dated its application to the Parish and actually worsened the threat to school children and churchgoers by placing a plant with the most potent carcinogenic emissions – Ethylene Oxide – *closer to* the school and church.

401.    When Plaintiffs' members learned of this serious danger to school children and churchgoers, they alerted the Parish Council and requested that the Council rescind the land use approval.[241]

402.    The Parish Council never responded to this request and never rescinded the land use approval.

---

[240]   Official Proceedings of the Council of the Parish of St. James, State of Louisiana, at a Regular Meeting Held on January 23, 2019, *available at* https://www.stjamesla.com/AgendaCenter/ViewFile/Minutes/_01232019-179.

[241]   Letter to St. James Parish Council Re: Formosa's Land Use Application, May 12, 2021, *available at* https://ccrjustice.org/sites/default/files/attach/2021/05/Final%20RISE%20Letter%20to%20St.%20James%20Parish%20Council_11May2021.pdf.



Inclusive Louisiana founding members Myrtle Felton, left, and Gail LeBoeuf carry a banner during a march protesting the Formosa facility and the siting of other new facilities in the Parish.

403.    Subsequently, the U.S. Army Corps of Engineers suspended the project's permit under the Clean Water Act for further review in the wake of a lawsuit brought by Plaintiffs' members and other organizations. Then, on August 18, 2021, the Corps ordered a full environmental impact assessment as a result of information received in order to "thoroughly review areas of concern, particularly those with environmental justice implications."[242]

---

[242]   Valerie Volcovici, *U.S. Army orders environmental review of Louisiana plastics project,* Reuters, Aug. 18, 2021, *available at* https://www.reuters.com/legal/litigation/us-army-orders-environmental-review-louisiana-plastics-project-2021-08-18/.

404.    The following year, on September 14, 2022, a state judge revoked air permits issued by LDEQ and chastised the agency for paying "lip service" to the requirements of "fair treatment" with regard to environmental justice concerns.[243] Formosa is appealing the ruling.

405.    Residents from the 4th and 5th Districts, including Plaintiffs, again turned out at all levels and stages to oppose the dangerous facility that would have such far-reaching impacts. And again, in St. James Parish, their concerns fell on deaf ears, with Parish officials easily approving the massive project.

406.    Still, they persevered for the multi-year long fight against the facility. They wrote letters to the editor, held livestreams, spoke with media, neighbors, and elected representatives. They also sought meetings with their Council members to urge them to turn Formosa away. Inclusive Louisiana founding member Ms. LeBoeuf even urged her Council member to think about the impacts globally as well as locally, in light of the concern about greenhouse gases and climate change.

407.    And they were at every Parish Planning Commission and Council meeting.

408.    Ms. Lavigne, founder of Plaintiff RISE St. James, argued to the Council yet again, telling them, "But it seems like you all like to push everything in the 5th District. Why? Because of the minorities and because of the blacks. I don't know what it would take for this council to stand with this community and stop granting permits to every company that desires to set up here."[244]

---

[243] Wesley Muller, *'Lip service': Judge blasts DEQ for approving Formosa project in St. James*, Louisiana Illuminator, Sept. 15, 2022, *available at* https://lailluminator.com/2022/09/15/lip-service-judge-blasts-deq-for-approving-formosa-project-in-st-james/.

[244] David J. Mitchell, *Formosa wins backing from St. James Council, but only if conditions on hiring, other matters finalized,* The Advocate, Dec. 19, 2018, available at https://www.theadvocate.com/baton_rouge/news/formosa-wins-backing-from-st-james-council-but-only-if-conditions-on-hiring-other-matters/article_3784c250-03d9-11e9-ae57-0b544888b55d.html.

409.    Local resident, Rita Cooper, told the Council, "There is no consideration for human life. No consideration, for human life."[245]

### e. Two New Facilities Approved with Inconsistent Land Use Designations: YCI Methanol and Ergon Expansion

410.    On March 25, 2015, the Commission approved the land use application of Yuhuang Chemical Industries Inc. ("YCI") Methanol to be located on top of St. James High School, where Plaintiff RISE St. James founder Sharon Lavigne was teaching at the time. It was also 2.7 miles from Plaintiff Mount Triumph Baptist Church, and on the site of the former Bonsecour Plantation.

411.    The approval directly conflicted with the Land Use Plan because the property was in an area that was designated for residential growth, not industrial development, and because the construction of the plant would be within two miles of – in fact directly on top of – a high school.

412.    The approval was granted by the Commission, not the Council, although section 86-37(e) of the St. James Parish Code of Ordinances requires that any non-allowable use must be first recommended by the Commission and then approved by the Council, and only if "there is a compelling public benefit, when the use is compatible with surrounding uses and adverse impacts of the use are inconsequential; or where required to as a matter of constitutional imperative or other vested legal right superior to this ordinance."

413.    Additionally, section 86-37(i) provides that "[w]ithin the two-mile radius areas depicted in the 'Plantations Schools and Churches 2Mi Buffer' map referred to in Sec. 86-37(a)(2), the Planning Commission shall affirmatively consider the public need for buffer zones

---

[245]    David J. Mitchell, *Major hurdle cleared for massive Formosa plant in St. James; Next step? Securing key permit,* The Advocate, Jan. 24, 2019, *available at* https://www.theadvocate.com/baton_rouge/news/article_48e31178-1f72-11e9-967e-9be0dd8a3a26.html.

in accordance with Sec. 86-37(j), and shall either condition its approval on the creation and maintenance of an appropriate buffer zone, or shall adopt a finding that such a buffer zone is not required."

414.    In May 2018, the St. James Parish Land Use Plan was amended such that the area that the YCI Methanol property was on, which had until then been designated for residential growth, became re-designated for industrial development. In this way, the 2018 amendments to the Land Use Plan further expanded the area designated for industrial development in the majority Black 5th District by encroaching on area that in 2014 was designated for residential growth, seemingly to pave way for the methanol plant.

415.    In August 2018, St. James High School was sold to YCI Methanol. Today it has been demolished and moved to Vacherie to make way for the plant.

416.    In August 2019, Koch Methanol Investments LLC acquired a majority ownership stake in the YCI Methanol project.

417.    On August 8th, 2018, the Parish Council unanimously approved the land use application of Ergon St. James Inc. for an expansion of its crude oil terminal and tank farm located just 500 feet from Plaintiff Mount Triumph Baptist Church near the historic community of Freetown, and on the site of the former St. Cecile plantation.

418.    The approval directly conflicted with the Land Use Plan, both under the 2014 Plan and as amended in 2018, because the property is in an area that is designated for agricultural use.  Because of this conflicting use, the Commission was required to first recommend the approval of the expansion and for the Council to approve it.

### f.   Syngas

419.   On March 25, 2019, St. James Parish Planning Commission approved Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in St. James Parish, likely on site of the former LaPice Plantation.

420.   Syngas was the third methanol facility to be approved by the Parish Council for the 5th District in five years.

421.   Residents again turned out to oppose the facility at Parish meetings.

422.   On April 24, 2019, residents who live and attend church near the location, and Plaintiffs Mount Triumph Baptist Church and RISE St. James, appealed the Planning Commission's ruling. And on May 29, 2019 the Parish Council denied the appeal and affirmed the Planning Commission's land use approval.

423.   The proposed facility is sited in the 5th District of St. James Parish. It is located within 2 miles of Burton Lane Church and near Plaintiff Mount Triumph Baptist Church. Both churches are already surrounded by the NuStar Energy oil terminal to the south, the Ergon tank farm and oil terminal to the north, and would have had South Louisiana Methanol, also to the north.

424.   It is also near the historic communities of Freetown, Chatman Town, and Welcome.

425.   The approval permitted Syngas to construct and operate a methanol plant with the capacity to produce 572,940 tons per year, and with planned increases to up to 600,000 tons of methanol per year.

426.    Syngas's land use application submitted to the Commission lists substances that the proposed facility is "projected to produce and/or store," including, among others, methanol, ammonia, caustic, sulfuric acid, chlorine, biocine, and zinc oxide.

427.    The Council permitted the land use permit when there was no reliable evacuation route for the Burton Lane community in the event of an accident, explosion, or other emergency, natural or man-made, in the area.

428.    The Commission conditioned Syngas's land use permit on financial contribution and other cooperative efforts toward developing an "alternate access route" between Hwy 3127 and Hwy 18.

429.    Syngas failed to provide the Commission with a list of public places within a 2-mile radius as required by Section 86-37(g)(3)(a) of the St. James Parish Code of Ordinances, which requires "a listing and a map of all parks, playgrounds, churches, schools, community or senior citizen centers, nursing homes, hospitals, other places of public assembly, and historic sites within the Impact Area of the use or activity for which approval is sought." Section 86-37(g)(3)(a).

430.    Syngas's application also did not provide the Commission any impact information of air emissions, noise, lighting, traffic, effect on property values, and neighborhood.

431.    Still, the Parish Council denied the residents' appeal, and approved the facility, ignoring once again the pleas of residents who live nearby.

432.    Ms. Lavigne spoke directly to what is at stake when she told the Council, "I am asking you to stop the genocide."[246]

---

[246]  Louisiana Bucket Brigade, Press Release: *St. James Parish Planning Commission Postpones Approval of New Wanhua Chemical Plant Slated for Location of Parish's Predominantly African American Community*, March 26, 2019, *available at* https://labucketbrigade.org/st-james-parish-planning-commission-postpones-approval-of-new-wanhua-chemical-plant-slated-for-location-in-parishs-predominantly-african-american-community/.

## VI.    DEVASTATING HEALTH IMPACTS OF HEAVY INDUSTRY ON BLACK COMMUNITIES IN ST. JAMES PARISH.

### A.    Black Communities in St. James Parish Are Overburdened with Industrial Facilities and Face Significantly Higher Health Risks

433.    There are a total of eleven active industrial facilities in St. James Parish that report to EPA's Toxic Release Inventory (TRI), which tracks the industry release of chemicals causing significant adverse environmental and human health effects, including cancer and chronic conditions.[247] Of these eleven facilities, 4 are located in the 5th District and 5 are located in the 4th District. No new heavy industrial facilities have been located in the majority white parts of the parish in 46 years.

434.    The determination of cancer risk assessed by the Environmental Protection Agency is based on the amount of pollutants allowed pursuant to permits issued by federal state and agencies; it is not based on actual emissions, which often exceed the amount permitted. The risk level also does not reflect the increased risk associated with accidents, spills, or leaks for residents who live in close proximity to facilities.

435.    Neither the state, nor the Parish, have adequate monitoring systems in place to determine actual emissions.

436.    Based on facilities' self-reported emissions data, EPA estimates that 5th District residents, who in 2020 were 89% Black and in 2010 were 87% Black, rank in the 89th percentile statewide and the 95th-100th percentile nationwide for Air Toxic Cancer Risk. Additionally, the

---

[247] EPA's Toxic Release Inventory compiles industry-reported releases and management of 770 toxic chemicals. Facilities that report to TRI are typically larger facilities involved in manufacturing, metal mining, electric power generation, chemical manufacturing, and hazardous waste treatment. Not all industry sectors are covered by the TRI Program, and not all facilities in covered sectors are required to report to TRI.

5th District is among the 90th and 73rd percentile statewide for Air Toxic Respiratory Hazard and Diesel Particulate Matter exposure, respectively.[248]

437.    In the 4th District, which in 2020 was 52% Black and in 2010 was 61% Black, residents rank in the 95th percentile statewide and 95th to 100th percentile nationwide for Air Toxic Cancer Risk. Additionally, residents are among the 90th and 92nd percentile statewide for Air Toxic Respiratory Hazard and Diesel Particulate Matter exposure, respectively.[249]

438.    By contrast, the neighboring 3rd District is 84% white and residents rank in the 34th percentile for Air Toxic Cancer Risk and 20th percentile for Air Toxics Respiratory Risk statewide.

439.    The 3rd District has the lowest rate of industrialization while having the highest percentage of white people and the lowest percentage of Black people. By contrast, the 5th District has the highest rates of industrialization while having an overwhelmingly majority Black population.

440.    The elevated risk of cancer from air pollution is linked to higher cancer incidence among Black communities across Louisiana. One analysis of current cancer incidence and historic National Air Toxic Assessment cancer risk estimates found that toxic air pollution contributed to 850 additional cancer cases among disproportionately Black and impoverished communities over the past decade.[250]

---

[248]   United States Environmental Protection Agency, *EJScreen, Version 2023* (accessed Mar. 15, 2023), from https://ejscreen.epa.gov/mapper. EJScreen is EPA's publicly available mapping tool that provides a nationally consistent dataset for combining environmental and demographic indicators. The cited environmental indicators represent data for census tract 405, which roughly approximates St. James Parish's 5th District.

[249]   United States Environmental Protection Agency, *EJScreen, Version 2023* (accessed Mar. 15, 2023), from https://ejscreen.epa.gov/mapper. The cited environmental indicators represent data for census tract 404, which roughly approximates St. James Parish's 4th District.

[250]   Dr. Kimberly Terrell & Gianna St. Julien, *Air Pollution is Linked to Higher Cancer Rates Among Black or Impoverished Communities in Louisiana*, Envir. Res. Lett. 17 (2022).

441.    Studies have also shown that toxic releases from petrochemical facilities may cause changes in a person's DNA or chromosomal damage.

## B.    Toxic Air Pollutants Emitted Within St. James Parish's 4th and 5th Districts Pose Severe Health Risks

442.    The impacts of criteria pollutants and toxic air pollutants have been widely studied and result in a wide range of deleterious health consequences. The following selection of pollutants are emitted or permitted for emission within St. James Parish's 4th and 5th Districts. Each of these is regulated by state or federal agencies as having adverse health and environmental consequences.

443.    Toxic Air Pollutants (TAPs) and Hazardous Air Pollutants (HAPs) are those pollutants known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects. These pollutants may be immediately dangerous to human health even in small quantities; the degree to which these pollutants affect health increases with the duration and frequency of exposure.

444.    ***Particulate matter*** exposure is known to cause premature mortality, respiratory and cardiovascular disease, and cognitive impairment.[251] In addition to the direct damage that PM2.5 and air toxics cause to the lungs and other organs, these pollutants can increase susceptibility to infectious disease. For example, there is strong evidence that the risk of death from COVID-19 is higher for people who have long-term exposure to PM2.5[252] or air toxics.[253]

---

[251]  Yang Yang et al., *Short-term and long-term exposure to fine particulate matter constituents and health: A systemic review and meta-analysis*, Environ. Pollut. 247, 874-882 (2018).

[252]  X. Wu et al., *Air pollution and COVID-19 mortality in the United States: Strengths and limitations of an ecological regression analysis*, 6 Science Adv. 45 (2020).

[253]  Michael Petroni et al., *Hazardous air pollutant exposure as a contributing factor to COVID-19 mortality in the United States*, Environ. Res. Lett. 15 (2020).

This evidence is consistent with the observation that Louisiana parishes with higher COVID-19 death rates had higher proportions of Black residents and higher pollution burdens.

445.   **Gaseous pollutant** (NOx, SO2, CO, and VOCs) exposure can cause a range of respiratory illnesses and heart disease and can cause permanent lung tissue damage from long-term exposure.

446.   **Ethylene oxide** is a known carcinogen that has been found to significantly contribute to elevated risks for some types of cancers, including cancers of the white blood cells (such as non-Hodgkin's lymphoma, myeloma, lymphocytic leukemia) and breast cancer in females. Short term exposure to ethylene oxide can cause depression of the central nervous system, birth defects, and other impacts to the reproductive system. Long-term exposure to ethylene oxide has been linked to irritation of the eyes, skin, nose, throat, and lungs, and damage to the brain and central nervous system. There are currently no sources of ethylene oxide in St. James Parish, however, Formosa could become the largest source of ethylene oxide in Louisiana.

447.   **Benzene** is a known carcinogen that has been linked to increased incidence of leukemia. Long-term exposure has caused various blood disorders, including reduced red blood cells and aplastic anemia. Reproductive effects, including birth defects, have also been observed.

448.   **Asbestos** exposure is known to cause asbestosis, which may cause severe respiratory impairment. Asbestos is a known carcinogen; inhalation exposure causes lung cancer and mesothelioma. Studies suggest it is a possible cause of stomach, laryngeal, and colorectal cancer.

449.   **Hydrogen fluoride** can cause severe respiratory damage, eye irritation, and skin burns from short-term exposure. Long-term exposure has resulted in skeletal fluorosis, a bone

disease, and studies have reported harmful effects on the lungs, liver, and kidneys from acute and chronic exposure.

450. ***Formaldehyde exposure***, both short and long-term, can result in harmful effects on the respiratory system, as well as eye, nose, and throat irritation. Studies have reported links between formaldehyde exposure and lung and nasal cancers.

451. ***Acetaldehyde*** is classified as a probable human carcinogen. Short term exposure results in irritation of the respiratory system, and irritation of eyes and skin. Long-term exposure has been linked to cancer of the nose and larynx. Studies also suggest that acetaldehyde may be a potential developmental toxin.

452. ***1,3-Butadiene*** is a known carcinogen that has been linked to an increased incidence of leukemia. Long-term exposure is also associated with cardiovascular disease. Short-term exposure results in irritation of the eyes and respiratory system.

453. ***Styrene*** has been shown to impact the central nervous system, including causing headaches, fatigue, weakness, depression, nervous system dysfunction, hearing loss, and peripheral neuropathy from long-term exposure. Several studies suggest an association between exposure and an increased risk of leukemia and lymphoma.

454. ***Toluene***, both from short and long-term exposure, produces central nervous system dysfunction and narcosis, which manifests in symptoms including fatigue, headaches, and nausea. Chronic exposure also causes irritation of the upper respiratory tract and eyes, dizziness, and headaches. Human studies have also found developmental effects including central nervous system dysfunction as well as birth defects.

455. ***Ethylbenzene*** can cause eye and throat irritation, vertigo, and dizziness. Developmental effects as well as hepatoxicity have also been observed.

456.   ***Ammonia*** is an upper respiratory irritant which causes immediate irritation to the nose and throat, as well as burns, blisters, and lesions to the skin.

457.   ***Chlorine*** is a potent irritant to the eyes, upper respiratory tract, and lungs. Long-term exposure to chlorine gas may result in respiratory effects, including eye and throat irritation and airflow obstruction.

458.   ***Ethyl dichloride*** inhalation can impact the human nervous system, liver and kidneys, cause respiratory distress, cardiac arrhythmia, nausea, and vomiting. Long term exposure has produced effects on the liver and kidneys, and studies have shown decreased fertility and increased embryo mortality. EPA classifies ethylene dichloride as a probable human carcinogen.

459.   ***Hydrogen sulfide*** affects the central nervous system and respiratory tract, which has been seen to cause unconsciousness, persistent headaches, poor concentration ability, impaired short-term memory, impaired motor function, respiratory distress, pulmonary edema as well as cardiovascular effects.

460.   On top of the plethora of harmful impacts of individual pollutants, pollutant mixtures can have more harmful impacts than their individual parts.[254]

**C.     Plaintiffs Suffer from Severe Health Impacts As a Result of St. James Parish's Land Use Practices**

461.   Residents of St. James Parish, including Plaintiffs and their friends and family, suffer a myriad of health impacts due to the presence of the industrial sites.

---

[254]   Yuh-Chin T. Huang, Ana G. Rappold, Donald W. Graff, Andrew J. Ghio & Robert B. Devlin, *Synergistic effects of exposure to concentrated ambient fine pollution particles and nitrogen dioxide in humans*, Inhalation Toxicology, 24:12, 790-797 (2012); Jerold A. Las, *Synergistic effects of air pollutants: ozone plus a respirable aerosol*, Res Rep Health Effects Institute (1990).

462.    Ms. Felton, founding member of Plaintiff Inclusive Louisiana, who has lived in Romeville for the last 45 years, lost three members of her immediate family to cancer, and one – her husband – to respiratory problems in the span of three months in 2014. As set out above, she lives between Occidental Chemical and Nucor Steel, and less than 2 miles away from Mosaic Uncle Sam. Today, Ms. Felton suffers from chronic coughing, headaches, and sinus problems.

463.    Ms. LeBoeuf, founding member of Plaintiff Inclusive Louisiana, has lived in St. James Parish all her life. Until 1990, she lived in Convent, then moved to Gramercy, where she lives one mile from the Atlantic Alumina plant, which is permitted to emit over 110 tons per year of criteria pollutants. In December 2022, she was diagnosed with cancer and is currently undergoing chemotherapy treatment.

464.    Ms. Washington, founding member of Plaintiff Inclusive Louisiana, who has lived in Romeville all her life, suffers from a chronic cough and requires the frequent use of an inhaler to aid in breathing. She has counted at least 50 people she knows who died of cancer, including her sister who died in 2012 at age 57. Three of her high school classmates were diagnosed with cancer, one of whom died in 2023. In approximately 2015, five of her neighbors died from cancer. As set out above, she lives between Occidental Chemical and Nucor Steel.

465.    Pastor Harry Joseph of Plaintiff Mount Triumph Baptist Church witnesses cancer and other pollution-related illnesses plague residents and visitors of Mount Triumph Baptist Church. He sees a key part of his mission as serving those who are sick, and spends a lot of time visiting people in their homes or in hospitals. In June 2017, he publicly shared that he "buried five residents in the past six months, all victims of cancer."[255]

---

[255] Lauren Zanolli, *'Cancer Alley' residents say industry is hurting town: 'We're collateral damage'*, The Guardian, (June 6, 2017, 6:00), https://www.theguardian.com/us-news/2017/jun/06/louisiana-cancer-alley-st-james-industry-environment.

466.     Ms. Lavigne of Plaintiff RISE St. James, speaks of many friends and neighbors with cancer, and who have died of cancer, and has been to many funerals of people who lived in the area and died from cancer.

## VII.   UNMARKED ANCESTRAL CEMETERIES HAVE BEEN DESECRATED BY HEAVY INDUSTRY, AND MORE ARE UNDER THREAT.

467.     In addition to the impact on Plaintiffs' members' health, well-being, and lives, land use patterns and practices in St. James Parish have also impacted the historic, unmarked cemeteries of Plaintiffs' members' enslaved ancestors in St. James Parish.

468.     As described above, the landscape of St. James Parish was historically characterized by farms and eventually larger plantations where a brutal and deadly form of chattel slavery was enforced. In the decades preceding the Civil War, planters consolidated land into increasingly large plantations, mostly for sugarcane farming. As the plantations grew in size, so did the number of people enslaved on them. They were forced to live, labor, and die there.

469.     Historic mortality records reveal just how deadly sugarcane plantations were for the people enslaved on them. In 1850, the population of enslaved people in St. James Parish was 7,751; that year at least 194 enslaved people died. The average age of death for enslaved people in St. James Parish between 1850-1860 was 21.4 years old.[256]

470.     Another tragic, brutal statistic shows that the death rate for children up to ten years of age was notably high, as was the high percentage of mothers who died in childbirth.[257]

---

[256]  Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics* (2022) at 109
[257]  *Id.*

471.    As compared to the rest of the slaveholding areas, Louisiana's sugar plantations were the only area where slavery existed with a negative birth rate among the enslaved population.[258]

472.    With the advent of new technology and means of locating burial sites, there is now more ability to affirmatively locate and identify mass graves and cemeteries.

**A.    There Are Hundreds of Unmarked Cemeteries in St. James Parish of People Once Enslaved There**

473.    Integral to the broader strategy of domination, violence, and dehumanization was the deprivation of human dignity even in death. Enslaved people could not choose where to be buried once they died; they could not choose to lay their loved ones to rest outside of the plantation – the site of their oppression.

474.    The 1685 Code Noir, first decreed for the Caribbean and then applied to Louisiana forced Catholic, Apostolic, or Roman religion on enslaved people and, required that "Masters are held to put into Holy Ground in cemeteries so designated [as will] their baptized slaves; and those who die without having received baptism will be buried at night in some field near the place where they died."[259] The 1724 Code Noir, which remained largely in effect under subsequent Spanish rule, also forced Catholicism upon the enslaved population, and was modified to read: "[m]asters shall have their Christian slaves buried in consecrated ground." [260]

475.    Enslaved people from this period through to Emancipation were generally not buried in church cemeteries. Instead, they were buried on uncultivated land within the plantation

---

[258]   Slavery in Louisiana: The Whitney Plantation, The Whitney Plantation, https://www.whitneyplantation.org/history/slavery-in-louisiana/ (March 18, 2023). *See also*, Richard Follett, '*Life of Living Death:* ' The Reproductive Lives of Slave Women in the Cane World of Louisiana, Vol. 26, No. 2, August 2005, pp. 289-304.

[259]   1685 Code Noir, art. XIV, available at: https://slaverylawpower.org/code-noir-1685/.

[260]   1724 Code Noir, arts. I, II, V, XI, available at https://www.loc.gov/item/2021667007. Translation available at: https://64parishes.org/wp-content/uploads/2013/10/LouisianaCodeNoirTranslation.pdf.

where they were enslaved. This practice continued through French and Spanish rule, and after the transfer of the territory to the United States.

476.   Individual deaths were generally not recorded – neither on paper, in public records, nor through headstones. Descendants could not gather to engage in religious and spiritual practices at these burial sites to honor, pray, and pay their respects to their ancestors.[261]

477.   Enslaved people were generally buried on uncultivated land in the back of the plantation, further away from the Mississippi River and in or at the edge of the forest. As plantations grew in size, plantation owners, usually using enslaved laborers, cut down more of the forest, and cultivated more land, often avoiding existing cemeteries. New cemeteries emerged at the edges of the new plantation properties, even further away from the River. By the time of Emancipation there were likely several cemeteries of enslaved people within each plantation.

478.   Plantation owners were generally buried elsewhere, in church cemeteries or in family plots, which would be marked with headstones, their deaths noted in church and state records.

479.   There are hundreds of unmarked cemeteries of people enslaved on the plantations in St. James Parish. Louisiana's chief archaeologist, Dr. Chip McGimsey, has stated, "with almost 100% certainty" that there is "going to be a slave cemetery" on "every plantation that existed."[262]

---

[261]   *Id*. art. XIII (Prohibiting the "gather[ing] in crowds either by day or by night, under the pretext of a wedding, or for any other cause" of "slaves belonging to different masters."); 1806 Black Code of Louisiana, June 7, 1806, Sec. 12, *available at* https://www.accessible-archives.com/2011/08/the-black-code-of-louisiana-1806 (Prohibiting any slaveowner from "suffer[ing] on his plantation assemblies of any slaves but his own…").

[262]   Charisse Gibson, *Who Benefits from the petrochemical industry in St. James Parish?*, WWL TV CBS, Feb. 14, 2020, available at https://www.wwltv.com/article/news/local/who-benefits-from-the-petrochemical-industry-in-stjames-parish/289-e41c3adb-0a11-47c4-b28e-dcfc2bc230e6.

480.     Despite this certainty, there have been no comprehensive archeological studies done to confirm the locations of unmarked cemeteries across St. James Parish.

481.     Although the deaths of enslaved individuals were not recorded on paper, nor through headstones, their loved ones did sometimes plant trees to mark gravesites. Over the years, these cemeteries would also have been avoided by laborers or farmers who knew that graves were located there.

482.     In this way, some cemeteries were preserved and eventually grew to become clusters of trees on tracts of land that are otherwise flat. Some of these clusters persisted for decades or even centuries; some remain through to today. These are clues left behind for descendant communities rediscovering their connection to ancestors – connections that continue to be threatened by the legacy of slavery that carries to this day.

483.     The image below identifies anomalies (in yellow) in St. James Parish that are seen in aerial imagery from 1940. These anomalies are things – often clumps of trees or unploughed areas – that appear out of place in agricultural settings. They typically correspond to historical structures that should be investigated and then protected, including plantation structures such as enslaved people's quarters. They often correspond to unmarked cemeteries, though they are necessarily underinclusive and do not represent all possible unmarked cemeteries in St. James Parish.



Image created by Forensic Architecture

484.    The image below is an image of maps from 1877 and 1878 that identify with clear symbology, generally a cross, some of the cemeteries that existed at the time. In this image, those cemeteries are identified in red. These are the very few unmarked cemeteries in St. James Parish that were known and mapped at those points in time, though this map does not capture all the cemeteries that existed at the time; only those that were obvious and visible to the cartographers.



Image created by Forensic Architecture

### B.  St. James Parish's Land Use Decisions and Practices Are Worsening and Deepening One of the Core Harms of Slavery

485.  While enslaved people were prevented from *leaving* plantations to bury the dead where they chose, their descendants, after gaining freedom from slavery, were conversely prevented from *entering* the land where their enslaved ancestors were buried to consecrate, commemorate, and honor them.

486.    The Black Codes established in 1865 outlawed trespassing on plantations, which was "intended to prevent freedmen from leaving the plantations on which they are employed, and from visiting each other…."[263]

487.    Like their enslaved ancestors before them, freedpeople were also often prevented from gathering to exercise their religion. For example, Thomas Conway reported to Congress that in the summer of 1865, worship services attended by freedpeople were raided and the "worshipers were all carried off to jail."[264] And in December 1865, 28 freedmen from St. James Parish, led by Pas Shepard, sent a petition to the Freedmen's Bureau headquarters describing how they had been prevented from attending church services by the Parish patrol, and warning the Bureau that there was "much danger of a serious disturbance here."[265]

488.    After Reconstruction enactments sought to limit the Black Codes, the freedpeople who left the plantations also left behind the graves of ancestors, family members, and community in the private property of landowners, to which they would not easily have access.

489.    One of the enduring harms of slavery still felt today by Plaintiffs' members and other descendants of those who were enslaved is the continued forced separation from their families' burials and the inability to find, and freely connect with, consecrate, commemorate, and honor them at their gravesites.

490.    Because of how slavery worked, and the lack of regard for and recordkeeping about the deaths and burials of those who were enslaved, many descendants cannot trace their

---

[263]  Report of Ex-governor Hahn on Louisiana Legislation Relating to Freedmen, April 12, 1866, *available at* https://archive.org/details/exgovernorhahnon00hahn/page/n5/mode/2up?q=apprentice.
*See also,* Du Bois, *supra* n. 16 at 168.

[264]  Report of the Joint Committee on Reconstruction, at the First Session, Thirty-Ninth Congress (1866), at p. 79; Du Bois, *supra* n. 16 at 178.

[265]  Pas Shepard and Twenty seven Other Freedmen Petition to Headquarters, Freedmen's bureau, December 25, 1865," in Letters Received, Assistant Commissioner, Louisiana, BRFAL. *See also*, Ripley, *supra* n.  at 193-94.

ancestors with any degree of certainty. This is why the discovery of *any* burial site of people who were enslaved on any plantations has special meaning and significance for all descendants. Moreover, because biological families were often forcibly separated, people enslaved often formed close kinship ties and support networks, expanding the concept of "family."

491.    Known burial sites are rare and when they are somehow found, they take on a whole new level of religious, cultural, and historical significance.

492.    Plaintiffs have worked with archaeologists who, using a methodology called cartographic regression analysis, have identified just a few of the hundreds of cemeteries of enslaved people in St. James Parish.

493.    The archaeological investigations reveal that the Parish's land use decisions and practices have resulted in the desecration and destruction of some of these cemeteries, since the earliest petrochemical facilities in St. James Parish through to today.

### a.  Cemeteries Have Already Been Desecrated as a Result of the Parish's Permitting of Heavy Industry

494.    Plaintiffs have discovered that the heavy industry authorized by the Parish has already desecrated several cemeteries in St. James Parish. This includes: the Rain CII calcined coke plant which today operates on property formerly owned by Kaiser Aluminum; the Mosaic Faustina fertilizer plant; and a borrow pit and pipeline on what is today the Formosa project site.

495.    In the 1950s, the Parish allowed the construction of the Kaiser Alumina Plant (today Atlantic Alumina), which began production in 1959, and is located in the former Sports Place Plantation in Gramercy. At some point before 1988, a calcined coke plant was constructed on the property, and in 1988 Rain CII purchased the plant.

496.    The Sports Place Plantation was a sugarcane plantation owned by the Duplantier family. In 1830, the Duplantier family enslaved 116 people on that plantation. By 1850, that

122

number had grown to 148 people, and by 1860 it had decreased to 62. In 1866, between 35 and 60 freedpeople were working on the plantation.[266]

497.    An 1876-1877 map depicts a cemetery on the Sports Place Plantation. It was located near the front of the plantation, along the property line that separated it from another plantation – Golden Grove. Field notes from 1890 written by a surveyor on the property also describe the cemetery. Subsequent aerial imagery shows the cemetery as an uncultivated plot of land surrounded by ploughed fields.

498.    In March 2021, through an archaeological cartographic regression analysis, Plaintiffs discovered that by 1975, a coke storage yard associated with a calcined coke plant had been built on top of the cemetery.[267] Calcined coke, a key ingredient in producing alumina, has been produced in the plant next to the alumina plant by several companies. Since 1988, Rain CII has operated the calcined coke plant. By 1998, a pond had been dug on the western part of the cemetery. While this construction has likely impacted some of the interments, Plaintiffs believe and hope that some of the cemetery remains intact.

499.    Upon information and belief, the Parish allowed the construction of the Gulf Oil Corporation's Faustina Works fertilizer plant, now Mosaic Faustina, in 1966. The plant began operation in 1968. It is located on the site of the former Lauderdale plantation, which was a sugarcane plantation owned from as early as 1828 by Robert C. Nicholas, who eventually served as a U.S. Senator and State Superintendent of Public Schools.[268]

---

[266]   Don Hunter & Joanne Ryan, *Golden Grove and Sports Place Plantations: Two Unmarked Plantation Cemeteries in St. James Parish, Louisiana: Land-Use History and Cartography,* 11-15 (2021).

[267]   *Id*. at 22-42.

[268]   Coastal Environments, Inc., *Cartographic Regression Analysis of certain Tracts of Land Located in T. 11 S and T. 12 S., R. 15 E. (Southeastern Land District West of the Mississippi River), St. James Parish, Louisiana*, at 39 (2020), available at: https://ccrjustice.org/sites/default/files/attach/2020/03/St.%20James%20Cemeteries%20(Reduced)%20(1).pdf.

500.    In 1850, Nicholas was enslaving 236 people on the plantation.[269] Ownership of the plantation changed a few times between 1851 and 1857, until Mathew Watson and Bergondy LaPice, who served as Parish President in 1872, took over ownership of the plantation between 1857 and 1907. In 1860, they were enslaving 245 people. In 1865, between 42 and 90 freedpeople were working on the plantation.

501.    An 1878 map depicts a cemetery on the Lauderdale Plantation.[270]

502.    Robert Taylor is a descendant of people who were enslaved in the River Parishes and is a resident of neighboring St. John the Baptist Parish. He has been able to confirm his grandparents were buried in the Lauderdale cemetery. Castilia and Cornelius Taylor were buried there in 1919 and 1925, respectively. His grandfather was approximately 70 years of age and born into slavery, though his birthdate was unknown, and he worked as a laborer on the Lauderdale Plantation, which continued in operation after the Civil War.

503.    In or about February 2020, through a cartographic regression analysis of the Lauderdale Plantation, Plaintiffs discovered that by 1998, a retention pond had been built in the Mosaic Faustina property, and the levee of the pond had been built on top of the cemetery. By 2005, another set of retention ponds were excavated in the area.[271]

504.    It is not clear when the pond was built, but there is no record of any cultural resources analysis done in the site of the Lauderdale Cemetery. While it is possible that some of the cemetery might have been destroyed, Plaintiffs believe and hope that there are still intact human remains under the levee or retention ponds.

---

[269] *Id*.

[270] *Id*. at 42.

[271] *Id*. at 43-60.

505.     In November 2019, as set out further below, Plaintiffs learned of two cemeteries on land in Welcome where Formosa Plastics proposed to build a massive new facility. The existence of the burial sites only came to light after a public records request to the Louisiana Division of Archaeology.

506.     The records revealed that the cemetery that had existed on the Acadia Plantation had been destroyed when the land was previously used under a different owner as a borrow pit and the dirt was dug out and transported elsewhere.[272] Archaeologists who undertook the study of the site on behalf of Plaintiffs believe there may still be some human remains on the site.

507.     Additionally, the integrity of the other cemetery that existed on the Buena Vista Plantation had been compromised and desecrated when a pipeline was constructed through the property several years before.[273]

> **b.     The Parish's Approval of Heavy Industry Threatens Additional Burial Sites and Prevents Plaintiffs from Exercising their Religion**

508.     Plaintiffs have discovered that other facilities that have been approved by the St. James Parish Planning Commission and the St. James Parish Council, but not yet constructed, threaten to disturb, desecrate, or destroy several other cemeteries that likely contain the remains of enslaved people. This includes the Formosa Plastics facility and the South Louisiana Methanol ("SLM") facility.

509.     On November 13, 2018, the St. James Parish Planning Commission granted Formosa's land use approval for a massive chemical manufacturing complex on 2,400 acres of land in St. James Parish. Plaintiff RISE St. James appealed the permit to the Parish Council

---

[272]  *Id.* at 19.

[273]  *Id.* at 87.

citing health impacts to the surrounding community, but the Parish Council approved the permit on January 23, 2019.

510.    The Formosa project site is located on several former plantations, including the Buena Vista/Winchester plantation, the Acadia plantation, and the Elina plantation.

511.    The Buena Vista/Winchester plantation was owned by the Winchester family for four decades, beginning as early as 1818 when Benjamin Landry Winchester bought the first tracts of land that would make up the plantation.[274] The Winchesters were large-scale sugar producers and needed a large labor force to accomplish this work. In the 1820s, Benjamin Winchester began to build this labor force by purchasing people to be enslaved on the plantation. One of those people was a four-year-old named Rachel, who died when she was nine years old.[275]  She is likely buried in what is today the proposed Formosa site.

512.    By 1830, the Winchesters were enslaving 82 people. By 1860, that number had grown to over 200. In 1866, there were 120 freedpeople working on the Winchester plantation.[276]

513.    A map from 1878 shows a cemetery on the Winchester plantation within the Formosa project site.[277] Subsequent aerial photographs from 1940 until 1971 show a cluster of

---

[274]   Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics,* 3 (2022), available at:

[275]   *Id*. at 7; Geoff Dembicki, *This nine-year-old was enslaved in the US. Her story could help stop a chemical plant*, The Guardian (Sept 20, 2022), https://www.theguardian.com/us-news/2022/sep/20/formosa-sunshine-project-louisiana-rachel-buena-vista-plantation-taiwan.

[276]   Don Hunter and Joanne Ryan, *Who's Buried at Buena Vista? An Unmarked Plantation Cemetery in St. James Parish, Louisiana: History, Genealogy, and Mortality Demographics,* 15-17 (2022).

[277]   Coastal Environments, Inc., *Cartographic Regression Analysis of certain Tracts of Land Located in T. 11 S and T. 12 S., R. 15 E. (Southeastern Land District West of the Mississippi River), St. James Parish, Louisiana,* 72 (2020), available at:
https://ccrjustice.org/sites/default/files/attach/2020/03/St.%20James%20Cemeteries%20(Reduced)%20(1).pdf.

trees located at the site of the cemetery, suggesting that it was being maintained (and potentially used) until then.[278] By 1978, the trees had been removed and the site plowed for agriculture.

514.    The Acadia plantation was owned by the Mire family. Records do not indicate that they were involved in sugarcane farming before the 1840s, but were likely involved in some type of agriculture.[279] In 1830, the Mire family enslaved 29 people. The family had entered sugarcane production by the 1843-1844 growing season, which required additional labor, so by 1860, the number of people enslaved by the Mire family had grown to 149. In 1865, there were 33 freedmen working on the plantation.

515.    A map from 1878 shows a cemetery on the Acadia plantation, within the Formosa project site.[280]

516.    At the urging of local residents, in particular Ms. LeBoeuf, founding member of Plaintiff Inclusive Louisiana, Plaintiffs' counsel sent a public records request to the Louisiana Division of Archaeology. Through this request, in November 2019, Plaintiffs discovered that the Buena Vista and Acadia Plantation cemeteries were located within the Formosa project site.

517.    Plaintiffs discovered that Formosa had done an initial assessment of the area in 2018, which had not identified these cemeteries. But in July 2018, an independent archaeologist had alerted the Louisiana Division of Archaeology that there were likely cemeteries on areas of the property that Formosa had failed to investigate.

518.    On August 8, 2018, Formosa's attorney emailed the Louisiana Attorney General's office to explain that if any remains were found in the Acadia cemetery, Formosa would choose

---

[278]  *Id*. at 73-86.

[279]  *Id*. at 9.

[280]  *Id*. at 18.

to remove those remains because otherwise the "utilities plant may have to be relocated which makes this a very difficult option for FG at this stage."

519.    By October 25, 2018, a second assessment by Formosa's archaeologists confirmed the existence of a cemetery on the Buena Vista portion of the property, but noted that a pipeline constructed in the past 10 years and "operated by Dow Pipeline (Dow)/UCAR ran through the cemetery."

520.    Records from the Division of Archaeology revealed that as late as November 2019 Formosa was seriously considering relocating these graves as well. Ultimately, the company and the Division agreed that the Buena Vista cemetery should be fenced off and not disturbed further. As for the Acadia portion of the property, Formosa's archaeologists reported that the cemetery had likely been destroyed by the "borrow pit" that had been dug out by a previous landowner.

521.    On November 18, 2018, the St. James Parish Planning Commission approved Formosa's land use permit.

522.    In January 2019, the independent archaeologist informed the Division of Archaeology that Formosa had looked for the Acadia cemetery in the wrong area, about 300 feet northeast from its actual location.

523.    A January 7, 2019 report on the third assessment undertaken by Formosa's archaeologists informed the Louisiana Division of Archaeology that they had found, after already being granted a land use permit by the Planning Commission, additional remains in the Buena Vista site, and that the property should be fenced off further. As for the Acadia portion of the property, Formosa reported that they found no remains.

524.    On January 23, 2019 the Parish Council approved Formosa's land use application over an appeal by Plaintiff RISE St. James informing the Council of the devastating health impacts of the proposed facility.

525.    Formosa knew about these cemeteries as early as July 2018, yet failed to disclose their existence to the Parish Council, Planning Commission, residents and descendant communities while it was seeking approval for its land use application.

526.    But on December 23, 2019, representatives for Plaintiff RISE St. James informed the St. James Parish Council that it had independently learned of the existence of Buena Vista and Acadia cemeteries on the Formosa project site, which the Council had permitted, requesting that it rescind Formosa's land use permit.

527.    In February 2020, Plaintiffs discovered through additional archaeological review and cartographic regression analysis that there were between one and five additional cemeteries that Formosa had not yet investigated that were likely located on the project site. The first is the Elina plantation cemetery. This cemetery is located on a tract of land that Formosa acquired in the fall of 2018, and was not included in its survey area. The remainder are at least four other anomalies on the Formosa project site, which archaeologists discovered through cartographic regression analysis and believe to be cemeteries.

528.    In March 2020, Plaintiff RISE St. James again wrote to the St. James Parish Council informing it of these five additional cemeteries, and requesting it to rescind Formosa's land use permit.

529.    On July 8, 2020, Plaintiff Inclusive Louisiana founding member Ms. LeBoeuf put forward a request, on behalf of Plaintiff RISE St. James and others, to the Parish Council that

they consider an ordinance that would simply require that the Parish be notified when any

cemeteries of any kind are discovered in the Parish.



Gail LeBoeuf, founding member of Plaintiff Inclusive Louisiana, speaks at Parish Council meeting on July 8, 2020, requesting that the Parish consider an ordinance to protect unmarked cemeteries of enslaved people.

530.    At the meeting Ms. LeBoeuf said:

> The resolution we're asking for will allow all of us to heal.
> It is self-evident that all of our ancestors live within us and
> through us. These slaves, and other countless
> slaves…should be given the respect and gratitude and debt
> that they never, ever received in life. After all, they did
> build America and never got paid.

531.    The Parish Council never responded in any way to this request.

532.    The Parish Council has not rescinded the land use approval, nor responded in any

way to Plaintiffs' requests. Today, the land use approval for the Formosa project site still stands.

533.    After confirming the existence of these cemeteries, Plaintiffs' members visited the

Buena Vista site to pray, sing, and commune with ancestors, but were soon joined by local

sheriff's deputies who told them they had to leave the property or face arrest.

534.    Sharon Lavigne, founder of RISE St. James, who, alongside members of Plaintiff

Inclusive Louisiana and Plaintiff Mount Triumph Baptist Church, has planned prayer services on

130

the Buena Vista burial site, was approached in 2020 by a St. James Parish sheriff's deputy who informed her that the property was owned by Formosa and she could be subject to arrest if she visited the site. She had to request a temporary restraining order from a court to ensure that RISE and their partners were able to proceed with the planned prayer service without being arrested.

535. The Court ordered the company to allow Plaintiff RISE St. James to conduct the event on the site in June 2020. Several ministers and a Catholic priest, Father Vincent Dufresne, gathered with dozens of people in attendance to sing and pray and consecrate the gravesite.

536. On October 31, 2020, Plaintiff RISE St. James also conducted an All Saints' Day celebration at the Buena Vista site. All Saints' Day is an important Christian ceremony during which cemetery and grave rituals take place. Catholic Bishop Michael Duca conducted part of the services.

537. Moreover, Formosa Plastics has not cared for or tended the cemetery and, upon information and belief, has allowed the land to become overgrown.

538. On April 23, 2014, three weeks after the Land Use Plan was enacted, the St. James Parish Planning Commission granted South Louisiana Methanol's ("SLM") land use application for a massive petrochemical complex.

539. The proposed SLM facility would be located on several former plantations – St. Amelia, St. Claire, St. Prisca, and J.S. Webre. A May 2019 cultural resource survey of the area confirmed the presence of "intact, buried cultural features associated with the historic St. Amelia Plantation" and that further digging would likely uncover "additional intact remains." In July 2022, through cartographic regression analysis, an archaeologist identified at least four "anomalies" that are likely to correspond to cemeteries on the proposed site of the SLM

131

facility.[281] No archaeological surveys have been conducted to investigate whether these anomalies are also cemeteries.

### C.     Cemeteries Hold Religious, Historical, and Personal Significance to Plaintiffs

540.     The cemeteries of enslaved people are sacred sites that carry religious, historic, and personal significance to Plaintiffs.

541.     Every Plaintiff has members who have ancestors who were enslaved in Louisiana, many of whom were enslaved in St. James Parish, and who are buried in unmarked cemeteries on former plantations.

542.     Members of Plaintiff Inclusive Louisiana have ancestors buried in former plantations in St. James Parish, including the Brusley and Monroe plantation cemeteries in Convent, now owned by Shell Oil, and likely other plantation cemeteries across St. James Parish. Inclusive Louisiana is concerned that these cemeteries, where its members' enslaved ancestors are buried, will be destroyed by the permitting of heavy industry by the Parish.

543.     Plaintiff Inclusive Louisiana's founding members, Barbara Washington and Myrtle Felton, also have family members buried in Pleasant Hill cemetery in Romeville, a historically Black cemetery that is connected to Pleasant Hill Baptist Church, both of which have existed for over 100 years. Neither the church nor the cemetery are protected from industrial development in the Parish's Land Use Plan, and in fact it is located in the area designated as Residential/Future Industrial in the Plan. Inclusive Louisiana is concerned that it will be destroyed by the permitting of heavy industry by the Parish.

---

[281]   Donald G. Hunter, *Archeological and Cartographic Review: The South Louisiana Methanol Facility, St. James Parish, Louisiana*, 13 (2022).

544.     Pastor Harry Joseph of Plaintiff Mount Triumph Baptist Church has ancestors buried in St. James Parish, including, he believes, in the Brusley plantation cemetery. He is concerned that industrial development will destroy cemeteries of enslaved people in St. James Parish.

545.     Plaintiff RISE St. James founder Sharon Lavigne believes her ancestors are buried at the Buena Vista plantation cemetery. Other members of RISE St. James believe their ancestors are buried at other plantation cemeteries throughout St. James Parish. Ms. Lavigne and RISE members wish to visit the graves of their ancestors and are concerned their ancestors' graves will be further desecrated by industrial development.

546.     It is important to Plaintiffs that once these cemeteries are found, Plaintiffs' members are able to maintain and deepen their connections to their enslaved ancestors, who they know were enslaved on plantations across St. James Parish. Members of Plaintiffs Inclusive Louisiana, Mount Triumph Baptist Church, and RISE St. James believe in the sanctity of gravesites, and the ability to reconnect with and honor ancestors at their gravesites is crucial to their members' religious practice.

547.     The Louisiana Supreme Court has recognized the sanctity of cemeteries:

> Regardless of the laws and rules relating to the ownership and control of real property, when a plot of ground is set apart for cemetery purposes, and burials are made in the land, the ground changes its character in the minds and feelings of the community. It assumes a sacred quality that overrides conveyancers' precedents and requires freedom from profanation until, by abandonment and removal of the bodies or by complete disintegration, there remains nothing to appeal to the emotions of the survivors.

*Humphreys v. Bennett Oil Corp.*, 195 La. 531, 551, 197 So. 222, 229 (1940) (citations omitted).

548.      The Louisiana Attorney General has recognized the profound cultural significance of cemeteries, which contain the "history of their respective communities" and "lead

133

us to a better understanding of our own culture: who we are, where we have come from, and where we are going… We, the living, are custodians of the dead and the stories that they can tell, and we must strive to protect those stories."[282]

549.    The National Park Service's National Register Bulletin 41 *Guidelines for Evaluating and Registering Cemeteries and Burial Places*, which provides guidelines for inclusion into the National Registry of Historic Places, recognizes the importance of preserving African American cemeteries in particular:

> For example, West Africans carried in the slave trade to the east coast of America, and their descendants, adapted traditional burial rites to plantation and community life. Studies of African American cemeteries in the South reveal a variety of gravesite treatments based on a view of the spirit world that can be traced to the Bakongo culture of West Africa. Light-reflecting objects and personal possessions used to define and decorate graves are intended to attract and contain the spirit. The spiralled conch shell seen on graves in the coastal areas is an emblem of the eternal cycle of life and death, and inverted objects are oriented to the spirit world, which in traditional culture is a shimmering mirror of the living world beneath the earthly plane.[283]

550.    The Louisiana Attorney General has also recognized that the rights of descendants or friends of those buried in any cemetery located on property that they do not own are comparable to the rights of a dominant servitude holder over a servient estate.[284] Because Plaintiffs are members of descendant communities, they have this property right over the cemeteries of their enslaved ancestors.

---

[282]  Attorney General Opinion No. 07-0183, available at http://www.lcb.state.la.us/ago/ago07-0183.pdf.

[283]  Available at https://www.nps.gov/subjects/nationalregister/upload/NRB41-Complete.pdf.

[284]  Attorney General Opinion No. 08-0186 at 2, available at http://www.lcb.state.la.us/ago/ago08-0186.pdf

551.    The Parish Council has been informed by Plaintiffs of the existence of burial sites on property that the Commission and Council have permitted for construction of heavy industry. They have not rescinded or modified the land use permits granted to individual facilities under the Land Use Plan, despite the fact that the information about the existence of cemeteries was withheld from the Parish and community. Nor have they modified the Land Use Plan to prevent industrial development upon cemeteries of enslaved people. Nor have they even modified the Plan to require that the Parish be notified of the existence of cemeteries. Instead, the Parish's permitting of heavy industry continues the pattern and practice of protecting only predominantly white parts of the Parish, and only institutions that are of historic significance to white communities, such as plantations open for tourism and Catholic churches.

## CLAIMS FOR RELIEF

## CLAIM I: THIRTEENTH AMENDMENT

### The Discriminatory Land Use Practice in St. James Parish Violates the Thirteenth Amendment as a Present-Day Badge or Incident of the Slavery System
### (By all Plaintiffs against all Defendants)

552.    The allegations contained in all preceding paragraphs are incorporated herein by reference.

553.    The Thirteenth Amendment, ratified in 1865, abolished slavery, including the badges and incidents of the system, and constitutionalized universal freedom.

554.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of race-based land use that is a relic or vestige of the plantation and slavery system that existed in St. James Parish, and continues a severe form of discrimination against Plaintiffs and their members or congregants as well as other residents, churches, and associations in the 4th and 5th Districts of St. James Parish, which have majority

Black populations, many of whom are descendants of people once enslaved on the plantations in St. James Parish.

555.    The discriminatory land use system in effect today in St. James Parish can be traced directly back through to the system that enslaved the ancestors of Plaintiffs' members, and, to the subsequent efforts of former enslavers to deploy land use, violence, and political disenfranchisement of Plaintiffs' ancestors in order to ensure succeeding generations in a condition of servitude immediately after emancipation and inequality through to the present.

556.    The Defendants' constitutional abuses and violations were and are caused by the policies, practices, and/or customs devised, implemented, enforced, encouraged and sanctioned by Defendants, in particular the discriminatory siting of heavy industrial facilities in the predominantly Black 4th and 5th Districts of St. James Parish, which dramatically increased the risk of cancer and other illnesses and negative health effects in those Districts for the majority Black populations that live there.

557.    The discriminatory land use system has also resulted in the desecration and destruction of cemeteries and burial sites of people once enslaved on the plantations that exist in St. James Parish.

558.    The discriminatory land use system in St. James Parish has resulted in Plaintiffs' members and congregants and other descendants of those enslaved in St. James Parish being unable to locate, recover, access, consecrate, commemorate, and visit ancestral cemeteries and burial sites known to exist in the Parish.

559.    The discriminatory land use system has also resulted in diminution in the value of property owned by Plaintiffs, their members and congregants, some of which has been in their

families since shortly after emancipation, and by other Black residents, churches, and associations in the 4th and 5th Districts of St. James Parish.

560.    In implementing the land use system, Defendants have acted with knowledge of these harms and a discriminatory purpose. Defendants' acts and omissions have caused, and will continue to cause, violations of Plaintiffs' rights to be free of the discriminatory vestiges of the slavery system.

561.    Defendants continue to implement and enforce a land use system that has its roots in slavery and its immediate afterlife, which is inherently discriminatory, and which has caused ongoing harm to Plaintiffs. Plaintiffs have no adequate remedy at law and, absent judicial relief, Defendants will continue to violate the Thirteenth Amendment. Plaintiffs seek a declaration adjudging Defendants conduct in violation of the Thirteenth Amendment and an injunction against any continuing and future violations.

## CLAIM II: FOURTEENTH AMENDMENT
## (EQUAL PROTECTION)

**The Discriminatory Land Use Practice in St. James Parish Violates
the Equal Protection Clause of the Fourteenth Amendment
(By all Plaintiffs against all Defendants)**

562.    The allegations contained in all preceding paragraphs are incorporated herein by reference.

563.    The Fourteenth Amendment went into effect in 1868 to affirmatively grant citizenship, due process, and equal protection of the laws to all those "born or naturalized in the United States" with the specific intention and in a manner specifically to protect those formerly enslaved.

564.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that violates the equal protection clause of the

Fourteenth Amendment by discriminating on the basis of race against Plaintiffs and their members and congregants, as well as against other Black residents, churches, and associations in the 4th and 5th Districts of St. James Parish, which have majority Black populations.

565.    Defendants' constitutional abuses and violations were and are caused by policies, practices, and/or customs devised, implemented, enforced, encouraged and sanctioned by all Defendants, in particular, through the Parish's discriminatory land use system that locates heavy industrial facilities in the predominantly Black 4th and 5th Districts of St. James Parish, which have produced vast amounts of pollution for decades and dramatically increased the risk of cancer and other illnesses and health effects for people residing in those Districts.

566.    The discriminatory land use system has also resulted in the desecration and destruction of cemeteries of people once enslaved on the plantations that exist in St. James Parish, and has resulted in Plaintiffs' members and other descendants of those enslaved in St. James Parish being unable to locate, recover, access, consecrate, commemorate, and visit ancestral cemeteries known to exist in the Parish.

567.    Defendants have acted with knowledge and a discriminatory purpose and intent and their acts and omissions have directly and proximately caused, and will continue to cause, violations of the Fourteenth Amendment rights of Plaintiffs and their members and congregants.

568.    Defendants continue to implement and enforce the discriminatory land use system that targets the predominantly Black populations in the 4th and 5th Districts for heavy industrial facilities and development. As Plaintiffs are located in the 4th and 5th Districts and their members and congregants reside in these Districts, they face the real and immediate and irreparable violations of their Equal Protection rights. Plaintiffs have no adequate remedy at law

and, unless enjoined by this Court, Defendants will continue to violate the Fourteenth Amendment right to equal protection of Plaintiffs and their members and congregants.

569.     Plaintiffs seek a declaration adjudging Defendants' conduct in violation of the Fourteenth Amendment and an injunction restraining and preventing continuing and future violations of Plaintiffs' Fourteenth Amendment rights.

## CLAIM III: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS (BODILY SAFETY AND INTEGRITY)

**The Discriminatory Land Use System Violates the Right to Bodily Safety and Integrity (By all Plaintiffs against all Defendants)**

570.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

571.     The Due Process clause of the Fourteenth Amendment protects a person's fundamental right to bodily integrity including protection from harms undertaken by private actors that are made possible by state action.

572.     Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that has and is causing lethal harm by industrial entities to Plaintiffs' members and other Black residents, and members of churches and associations in the 4th and 5th Districts of St. James Parish – which violates their Fourteenth Amendment right to bodily safety and integrity.

573.     Defendants have also acted with deliberate indifference in implementing and enforcing a discriminatory land use system in the Parish through which they have introduced life-threatening substances into residents of the 4th and 5th Districts without consent and over their persistent objections.

139

574.    The acts and omissions of Defendants reflect an egregious disregard for the health and well-being of predominantly Black residents that shocks the conscience, infringes on the decencies of civilized conduct, and are brutal and offensive to human dignity.

575.    Defendants continue to implement and enforce the discriminatory land use system that targets the predominantly Black populations in the 4th and 5th Districts for heavy industrial facilities and development, and introduces life-threatening substances into their bodies. As Plaintiffs are located in the 4th and 5th Districts and their members reside in these districts, they face the real and continuing harms that, unless enjoined by this Court, Defendants will continue to violate their Fourteenth Amendment right to bodily integrity.

576.    Plaintiffs therefore seek a declaration adjudging that Defendants have violated and continue to violate Plaintiffs' right to bodily integrity and an injunction preventing continuing and future violations of their Fourteenth Amendment rights.

### CLAIM IV: 42 U.S.C. § 1982 – PROPERTY RIGHTS OF BLACK CITIZENS

**The Discriminatory Land Use Practice in St. James Parish Violates
the Rights of Black Residents to Inherit, Purchase, Lease, Sell, Hold, and Convey
Real Property on Equal Terms as White Citizens
(By all Plaintiffs against all Defendants)**

577.    The allegations contained in all preceding paragraphs are incorporated herein by reference.

578.    42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The law was originally enacted as part of the first Civil Rights Act of 1866 and later the Civil Rights Act of 1870, and passed under Congress' Thirteenth Amendment authority to regulate the badges and incidents of

slavery, to address the rampant and profound inequities and unfairness encountered by formerly enslaved people after the Civil War.

579.    Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that violates Plaintiffs' rights, and the rights of other residents in the 4th and 5th Districts of St. James Parish, to inherit, purchase, lease, sell, hold, and convey real and personal property on equal terms as white citizens in the Parish, by steering heavy industrial facilities to those predominantly Black areas, resulting in lowered property values and other harms to their properties.

580.    The discriminatory land use system implemented and enforced by Defendants also places limitations on the ability of some members of Plaintiff Inclusive Louisiana residing in the 4th District to sell, hold, and convey their property that do not apply to residents in the parts of the Parish where majority white populations reside.

581.    Defendants have acted with knowledge and a discriminatory purpose and intent and their acts and omissions have caused, and will continue to cause, violations of Plaintiffs' rights under 42 U.S.C. § 1982.

582.    Defendants continue to implement and enforce the discriminatory land use system that targets the predominantly Black populations in the 4th and 5th Districts for heavy industrial facilities and development. Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of serious harm to Plaintiffs and further violations of their rights under 42 U.S.C. § 1982.

583.    Plaintiffs seek declaratory relief adjudging their conduct unlawful and injunctive relief preventing Defendants from engaging in continuing and future violations of Plaintiffs rights.

## CLAIM V: RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT (SUBSTANTIAL BURDEN)

**The Land Use System in St. James Parish Places a Substantial Burden on the Exercise of Religion**
**42 U.S.C. § 2000cc(a)**
**(By all Plaintiffs against all Defendants)**

584.    The allegations contained in all preceding paragraphs are incorporated herein by reference.

585.    Plaintiffs' members are descendant communities of people once enslaved in plantations in St. James Parish and buried in unmarked cemeteries, and as such Plaintiffs' members have a property interest in these cemeteries.

586.    Defendants have implemented land use regulations in a manner that imposes a substantial burden on Plaintiffs' religious exercise.

587.    Specifically, Defendants have burdened Plaintiffs' members' ability to pray upon the unmarked cemeteries of enslaved ancestors by permitting the construction of industrial facilities upon these cemeteries. The following are among Defendants' acts that have imposed a substantial burden on Plaintiffs' religious exercise:

   a.   The Parish, Planning Commission, and Parish Council's adoption and imposition of the 2014 Land Use Plan, amended in 2018 and 2022, which authorizes industrial development in areas in St. James Parish that contain unmarked cemeteries of enslaved people.

   b.   The Planning Commission and Parish Council's January 24, 2019 land use approval of Formosa under Resolution 19-07, which permits construction of a petrochemical facility upon the Acadia, Buena Vista/Winchester, Elina, and other unmarked cemeteries.

142

c.   The Planning Commission's April 23, 2014 land use approval of South Louisiana Methanol, which permits construction of a methanol facility upon areas that are likely to contain several unmarked cemeteries.

588.   The substantial burden is imposed by Defendants upon Plaintiffs "in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).

589.   The substantial burden imposed by Defendants upon Plaintiffs "affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability." 42 U.S.C. §§ 2000cc(a)(2)(b).

590.   Defendants have demonstrated no compelling governmental interest behind these actions.

## CLAIM VI: RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT (DISCRIMINATION)

**The Land Use System Discriminates on the Basis of Religion**
**42 U.S.C. § 2000cc(b)(2)**
**(By Plaintiff Mount Triumph Baptist Church against all Defendants)**

591.   The allegations contained in all preceding paragraphs are incorporated herein by reference.

592.   Under RLUIPA's Nondiscrimination provision, "[n]o government shall impose or implement a land use regulation in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

593.     Defendants, by and through the land use regulations carried out under the Land Use Plan, have discriminated against Black and Protestant churches, including Plaintiff Mount Triumph Baptist Church, on the basis of religious denomination.

594.     Defendants issued a land use approval for Ergon St. James Inc.'s expansion of its crude oil terminal and tank farm, which is located just 500 feet from Mount Triumph Baptist Church.

595.     Defendants issued a land use approval for Formosa Plastics' chemical manufacturing complex, which is less than 2 miles from Mount Cavalry Baptist Church and Peaceful Zion Baptist Church.

596.     Defendants issued a land use approval for Syngas Energy's methanol production plant within two miles of Burton Lane Church.

597.     Defendants issued a land use approval for Wanhua Chemical's polyeurethane production facility within two miles of Pleasant Hill Baptist Church.

598.     These authorizations were carried out under the Land Use Plan after it was amended in 2018.

599.     Upon information and belief, Defendants have granted protections by denying land use authorizations and industrial expansion within 2-miles of Catholic Churches in St. James Parish.

600.     The 2018 Land Use Plan has carried out the same discriminatory pattern and practice explicitly endorsed in the 2014 Land Use Plan: to institute two-mile buffer zones around *Catholic* Churches only protecting them, but not other churches, from industrial expansion and intrusion.

601.     In doing so, Defendants have discriminated against Protestant churches, including Plaintiff Mount Triumph Baptist Church, by denying them equal protection from dangerous land use development.

602.     As a result, Plaintiff Mount Triumph Baptist Church has been surrounded by industry and continued industrial expansion.

603.     Defendants' continued authorization of industry on the fence line of Plaintiff Mount Triumph Baptist Church has directly and proximately caused adverse impacts to its congregation, including the peaceful worship of the assembly and the health of its members.

604.     As a direct and proximate result of Defendants' Land Use Plan and authorizations, Plaintiff Mount Triumph Baptist Church continues to suffer irreparable harm for which there is no adequate remedy at law.

### CLAIM VII: LOUISIANA CONSTITUTION, Art. XII, Sec. 4
### PRESERVATION OF CULTURAL ORIGINS

**The Discriminatory Land Use Practice in St. James Parish Violates
the Rights of Black Residents to Preserve, Foster, and Promote
Their Historic and Cultural Origins
(By all Plaintiffs against all Defendants)**

605.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

606.     Art. XII, Sec. 4 of the Louisiana Constitution of 1974 recognizes the "right of the people to preserve, foster, and promote their respective historic linguistic and cultural origins."

607.     Defendants have devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that violates Plaintiffs' rights to preserve, foster, and promote their historic and cultural origins, by implementing and continuing to enforce a land use system that has already resulted in the destruction and desecration of cemeteries and burial sites of people once enslaved on the plantations in St. James Parish.

608.    The discriminatory land use system also hinders the ability of Plaintiffs and their members and other descendants of people enslaved in St. James Parish to locate, identify, recover, access, consecrate, commemorate, and visit the cemeteries and burial sites of their enslaved ancestors.

609.    The discriminatory land use system has also harmed other sites with enormous historic and cultural value to Black communities like churches, schools, homes, and neighborhoods, and continues to threaten such places.

610.    Defendants have acted with knowledge and a discriminatory purpose and intent and their acts and omissions have caused, and will continue to cause, violations of Plaintiffs' rights under Art. XII, Sec. 4 of the Louisiana Constitution.

611.    Defendants' practices have resulted and will continue to result in irreparable injury, including a continued risk of serious harm to Plaintiffs and further violations of their rights under Art. XII, Sec. 4 of the Louisiana Constitution of 1974.

612.    Plaintiffs seek a declaration adjudging their actions unlawful under the Louisiana Constitution and injunctive relief restraining Defendants from engaging in continuing and future violations of their rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that the Court will:

A) Issue a judgment declaring that Defendants' policies, practices, and/or customs pertaining to the discriminatory land use system and, in particular, the discriminatory siting of industrial facilities, violates the Thirteenth and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Constitution of the State of Louisiana.

B) Issue a judgment declaring the land use approvals granted to Formosa and South Louisiana Methanol invalid.

C) Issue a judgment declaring invalid those provisions of the Land Use Plan that direct industrial development to the majority Black 4th and 5th Districts.

D) In light of a federal court's broad equitable power to ensure short and long-term remediation of constitutional violations, this Court should issue an order for the following additional injunctive relief:

 i) Enjoining Defendants from siting more industrial facilities, and in particular, in the 4th and 5th Districts, which are overwhelmingly majority Black;

 ii) Enjoining Defendants from continuing all policies, pattern and practices, and/or customs pertaining to the racially and religiously discriminatory land use system;

 iii) Appoint an independent Monitor to measure and enforce compliance with a number of affirmative measures necessary to ensure the right to health, safety, and religious freedom of residents of St. James Parish. Those measures should include, but are not limited, to:

  a. Installation of air and toxic quality monitors and sensors in locations recommended by health and environmental impact experts to track air, soil, and water quality, pollutants, and chemicals, including assessment of cumulative environmental impacts from the multiplicity of existing industrial sites;

  b. Issuing air and toxic quality reports, assessments, and predictions in an electronically searchable format, accessible in real-time, to provide

residents with adequate information to monitor the safety and quality of air, water, and soil at all times;

c.   Undertaking periodic compliance assessments, publicly filed with the Court, with a particular focus on local facilities and Defendants' fulfillment of enforcement duties and obligations;

d.   Assessing the need for distribution of air filters in residents' homes, churches, community centers, and places of business.

iv)  Order the development of a Community Engagement Process to ensure that residents of St. James Parish who have been and may continue to be harmed by the Defendants' land use and environmental policies ("Directly-Impacted Communities") and other community residents and relevant stakeholders have their interests heard and their own proposed recommendations and reforms for land use, including land use affecting cemeteries, and environmental health and safety are considered by the Monitor and the Court. The Community Engagement Process should include, at a minimum, these identified mechanisms, as well as consider mechanisms recommended by Directly-Impacted Communities and stakeholders:

a.   The Independent Monitor shall oversee discussions, negotiations, and remedial processes between Defendants, Directly-Impacted Communities, and stakeholders, and consider and subsequently submit to the Court additional remedial measures recommended by the Community Engagement Process at the earliest practicable time;

b.   requiring the parties to engage in a joint process – to be facilitated by a neutral, third-party facilitator ("Facilitator") with expertise in civil rights,

environmental harm, and/or injustice, and/or religious discrimination – to supplement the Monitor's recommended measures/reforms through jointly proposed and agreed-upon remedial measures between the parties to address the unconstitutional and discriminatory practices of Defendants ("Joint-Remedial Process");

c.    implementing a permanent Community Board, composed of the Parish's residents, Directly-Impacted Communities, and other relevant stakeholders to, among other things, solicit input from the residents and advise the Monitor and the Court about additional, necessary reforms to remediate the harms caused by Defendants and to offer periodic written assessments about compliance with the mechanisms this Court and the Monitor recommends necessary to remediate those harms.

v)  In order to ensure the preservation and integrity of unmarked cemeteries of enslaved people in St. James Parish, require a study, led by experts in archeology, historic and cultural preservation, and religion, and community leaders who will be identified in a process that includes recommendations by the Community Board (the "Expert Committee"); the study shall provide recommendations regarding the preservation of these cemeteries and their cultural, historic, and religious significance.

vi)  As part of the remedial process, and in service to healing and recognition of the dignity of impacted communities, require Defendants to engage in a mediated process, facilitated by restorative justice experts, designed to lead Defendants to hear from Directly-Impacted Communities and come to understand and publicly

acknowledge the historical and race-based discrimination and resulting

environmental harms imposed on the Black communities in the Parish; as part of this

Transformative Justice process, Defendants shall be instructed to read and review the

Study created by the Expert Committee as part of a mandatory educational program,

in order to inform their understanding and acceptance of accountability, and to

prevent past and potential unconstitutional and otherwise discriminatory land use

systems, plans, permit approvals, siting, and other practices.

E)   Award reasonable attorneys' fees to all Plaintiffs, pursuant to 42 U.S.C. § 1988;

F)   Award costs of litigation to all Plaintiffs, pursuant to 42 U.S.C. §§ 1920 and 1988;

G)   Award such other relief as this Court may deem appropriate and in the interests of justice.

Dated: July 7, 2023                                    Respectfully Submitted,


s/Devin Lowell                                         Astha Sharma Pokharel (admitted *pro hac vice*)
Devin Lowell, Trial Attorney                           Pamela C. Spees, Trial Attorney
La. Bar Roll No. 36555                                 La. Bar Roll No. 29679
Clara Potter, La. Bar Roll No. 38377                   Baher Azmy*
Lauren Godshall, La. Bar Roll No. 31465                Sadaf Doost (admitted *pro hac vice*)
TULANE ENVIRONMENTAL LAW CLINIC                        CENTER FOR CONSTITUTIONAL RIGHTS
6329 Freret St.                                        666 Broadway, 7th Floor
New Orleans, LA 70118                                  New York, NY 10012
Tel.: (504) 865-5789                                   Tel. & Fax (212) 614-6462
Fax: (504) 862-8721                                    asharmapokharel@ccrjustice.org
dlowell@tulane.edu                                     pspees@ccrjustice.org
cpotter2@tulane.edu                                    bazmy@ccrjustice.org
lgodshall@tulane.edu                                   sdoost@ccrjustice.org

*Attorneys for RISE St. James*                         *\*Application for pro hac vice admission
                                                       forthcoming*

                                                       William P. Quigley (cooperating counsel)
                                                       La. Bar Roll No. 7769
                                                       Professor Emeritus
                                                       Loyola University College of Law
                                                       7214 St. Charles Avenue
                                                       New Orleans, LA 70118
                                                       Tel. (504) 710-3074
                                                       Fax (504) 861-5440
                                                       quigley77@gmail.com

                                                       *Attorneys for Plaintiffs Inclusive Louisiana
                                                       and Mount Triumph Baptist Church*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing.


Respectfully submitted,


<u>s/Astha Sharma Pokharel</u>
Astha Sharma Pokharel (admitted *pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel. & Fax (212) 614-6462
asharmapokharel@ccrjustice.org