**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| INCLUSIVE LOUISIANA; MOUNT TRIUMPH BAPTIST CHURCH; RISE ST. JAMES, by and through their members<br>        *Plaintiffs*,<br><br>        vs.<br><br>ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION,<br>        *Defendants.* | Civil Action No. 2:23-cv-00987<br>Section D/1<br>Judge Wendy Vitter<br>Magistrate Judge Janis van Meerveld |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTION TO STRIKE ALLEGATIONS AND DISMISS CLAIMS**</u>

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.      Plaintiffs Have Sufficiently Alleged Multiple Injuries Traceable to Defendants'
        Discriminatory Land Use System and Redressable by this Court. ..................................... 3

II.     Plaintiffs' Claims Are Based on a Decades-Long Continuing Violation
        and Are Not Time-Barred. ................................................................................................. 9

III.    The St. James Parish Council and Parish Planning Commission
        Have the Capacity to Be Sued. ........................................................................................ 13

IV.     Plaintiffs Are Not Required to Exhaust Administrative Remedies
        Before Bringing Civil Rights Claims................................................................................ 15

V.      Claim I: Thirteenth Amendment: Plaintiffs Sufficiently Plead Facts
        Demonstrating That the Land Use System in St. James Parish Is a Badge
        or Incident of the Slavery System. ................................................................................... 16

VI.     Claim II: Equal Protection: Plaintiffs Sufficiently Plead Facts Showing Racially
        Disproportionate Impact *and* Racially Discriminatory Intent. ......................................... 21

VII.    Claim III: Plaintiffs Sufficiently Plead Facts Showing That Defendants'
        Land Use Practices Violate Their Fundamental Right to Bodily Integrity........................ 29

VIII.   Claim IV: Plaintiffs Sufficiently Plead Violations of the Property Rights
        of Black Citizens Under 42 U.S.C. § 1982. .................................................................... 32

IX.     Plaintiffs Sufficiently Plead Violations of RLUIPA........................................................ 33

X.      Claim VII: Plaintiffs Sufficiently Plead an Infringement of Their Right
        to Preserve, Foster, and Promote Their Historic and Cultural Origins. ........................... 36

XI.     This Court Should Reject Defendants' Motion to Strike as an Improper Attack
        on the Substance of Plaintiffs' Claims.............................................................................. 37

XII.    Defendants' Demand For Fees Is Frivolous. .................................................................... 40

CONCLUSION ......................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Atwood v. Humble Oil & Ref. Co.*, 243 F.2d 885 (5th Cir. 1957) ................................. 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 2

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551
   (5th Cir. 2010) ......................................................................................................... 6

*Banks v. McInstosh Cnty., Georgia*, 2022 WL 400810 (S.D. Ga. Feb. 9, 2022) .......... 11

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................... 7

*Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448
   F.3d 138 (2d Cir. 2006) ........................................................................................... 8

*Bossier City Med. Suite, Inc v. City of Bossier City*, 483 F. Supp. 633 (W.D. La. 1980) ........... 15

*Boswell v. Claiborne Par. Det. Ctr.*, 629 Fed. App'x. 580 (5th Cir. 2015).................. 11

*Brock v. St. James Par. Council*, 94-584 (La. App. 4 Cir. 12/8/81) 407 So. 2d 1265 ................. 14

*Charrier v. Bell*, 85-0867 (La.  App. 1 Cir.) 496 So. 2d 601 ........................................ 35

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ....................................... 41

*Church of Scientology of California v. Cazares,* 638 F.2d 1272 (5th Cir. 1981) ......... 8

*Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762 (5th Cir. 2019)........................ 6

*City Council of City of Lafayette v. Bowen*, 94-584 (La. App. 3d Cr. 11/2/94) 649 So. 2d 611 .. 15

*Civil Rights Cases*, 109 U.S. 3 (1883) ......................................................................... 17

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979) ......................................... 23, 29

*Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371 (5th Cir. 2021) ................... 6

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)....................................................... 30

*Dilaura v. Ann Arbor Charter Tp.*, 30 Fed. App'x. 501 (6th Cir. 2002) ..................... 16

*Dotey v. Tangipahoa Par. Council*, 2006 WL 8456326 (E.D. La. Apr. 17, 2006)........... 14, 15

*Dubose v. Kansas City S. Ry. Co.*, 729 F.2d 1026 (5th Cir. 1984) ........................ 12, 13

*Farmer v. Brennan*, 511 U.S. 825 (1970) .................................................................... 30

*Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835 (E.D. La. 2011)....................................... 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ........... 3, 5, 6

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard*,
   648 F. Supp. 2d 805 (E.D. La 2009)........................................................................ 32

*City of Memphis v. Greene*, 451 U.S. 100 (1981)................................................ 6, 21, 33

*Griffin v. Breckenridge*, 403 U.S. 88 (1971).............................................................. 17

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019)............................................... 30, 31

*Harris v. USA Ins. Companies*, 2011 WL 3841869 (E.D. La. Aug. 30, 2011)................ 38

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................... 10, 11

*Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*,
   850 F.3d 731 (5th Cir. 2017) ............................................................................ 10, 11

*Heckler v. Mathews*, 465 U.S. 728 (1984) ................................................................................. 3, 4

*Hernandez v. Woodard,* 714 F. Supp. 963 (N.D. Ill.1989) .......................................................... 21

*Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872 (5th Cir. 2004).............................................................................................................................. 31

*Hitt v. McLane*, 854 Fed. App'x. 591 (5th Cir. 2021) ................................................................. 30

*Humphreys v. Bennett Oil Corp.*, 35539 (La. 4/29/40) 195 La. 531 ..................................... 34, 35

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .................................................................................... 23

*Jennings v. Patterson*, 488 F.2d 436 (5th Cir. 1974) .................................................................. 33

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968).......................................................... 17, 18, 32

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ............................................................................. 7

*Lee v. St. James Par. Council*, 03-834 (La. App. 5 Cir. 12/30/03) 864 So. 2d 736..................... 14

*Lopez v. City of Dallas, Tex*, 2004 WL 2026804 (N.D. Tex. Sept. 9, 2004) ............................. 5, 7

*Marceaux v. Lafayette Consol. Gov't.*, 2012 WL 5197667 (W.D. La. Oct. 18, 2012)................. 40

*Martin v. John C. Bowers & Co.*, 334 F. Supp. 5 (N.D. Ill. 1971) .............................................. 33

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) .............................................................................. 9

*McGraw v. City of New Orleans*, 2016-0446 (La. App. 4 Cir. 3/29/17), 215 So. 3d 319 ........... 36

*Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982)................................................. 3

*Monumental Task Force, Inc. v. Foxx*, 157 F. Supp. 3d 573 (E.D. La. 2016) ............................ 36

*Moore v. City of E. Cleveland*, 431 U.S. 494 (1977).................................................................... 15

*Murphy v. Zoning Comm'n of Town of New Milford*, 148 F. Supp. 2d 173 (D. Conn. 2001)...... 16

*Nat'l Tr. for Historic Pres. in the U.S. v. U.S. Dep't of Veterans Affs.*, No. CIV.A. 09-5460, 2010 WL 1416729, at *7 (E.D. La. Mar. 31, 2010) ........................................................................ 5

*N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).................. 24

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993)........................................................................................................................................ 7

*Oliver v. Foster*, 524 F. Supp. 927 (S. D. Tex. 1981).................................................................. 16

*Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cnty., Ill.*, 46 F.3d 682 (7th Cir. 1995)........................................................................................................................................ 11

*Palmer v. Thompson*, 403 U.S. 217 (1971)................................................................................. 21

*Pan Am. Life Ins. Co. v. Blanco*, 311 F.2d 424 (5th Cir. 1962)................................................. 38

*Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496 (1982) ................................................................. 16

*Petroplex Int'l v. St. James Parish*, 158 F. Supp. 3d 537 (E.D. La. 2016) ................................ 16

*Phillips v. Occidental Chem. Corp.*, 2000 WL 1346893 (E.D. La. Sept. 19, 2000).................... 14

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ................................................................................... 17

*Reyes v. N. Texas Tollway Auth*, 861 F.3d 558 (5th Cir. 2017).................................................. 31

*Riggins v. Nevada*, 504 U.S. 127 (1992).............................................................................. 30, 31

*Roberts v. Sewerage & Water Bd.*, 92-C-2048, (La. 3/21/94) 634 So. 2d 341 ........................... 14

*Rochin v. California*, 342 U.S. 165 (1952) .......................................................................... 30, 31

*Safe Streets All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ................................................ 6

*Smith v. City of Cleveland Heights*, 760 F.2d 720 (6th Cir. 1985) .................................................. 4

*Spoon v. Bayou Bridge Pipeline, LLC*, 335 F.R.D. 468 (M.D. La. 2020) .............................. 38, 40

*St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Ref., L.L.C*, 354 F. Supp. 2d 697 (E.D. La. 2005) ......................................................................................................................................... 5

*Stukenberg ex rel. M.D. v. Abbott*, 907 F.3d 237 (5th Cir. 2018) ................................... 11, 30, 31

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810 (4th Cir. 1995) ........................................ 23

*Taylor v. U.S. Treasury Dep't*, 127 F.3d 470 (5th Cir. 1997) ...................................................... 16

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789 (5th Cir. 2000) ...................................................................................................................................... 5

*Texas Cable & Telecommunications Ass'n v. Hudson*, 265 F. App'x 210 (5th Cir. 2008) ........... 4

*Thomas v. Mobley*, 4760 (La. App. 1st Cir. 3/21/60) 118 So. 2d 476 ......................................... 35

*Tyson v. Sabine*, 42 F.4th 508 (5th Cir. 2022) ............................................................................ 30

*U.S. v. Brown*, 561 F.3d 420 (5th Cir. 2009) ....................................................................... 23, 29

*U.S. v. City of Parma, Ohio*, 661 F.2d 562 (6th Cir. 1981) ................................................... 10, 11

*U.S. v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836 (5th Cir. 1966) ........................................... 18

*U.S. v. Nelson*, 277 F.3d 164 (2d Cir. 2002) ............................................................................... 18

*United Indus., Inc. v. Simon-Hartley, Ltd.*, 91 F.3d 762 (5th Cir. 1996) .................................... 41

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc ..................................................... 23, 24

*Vidrine v. Vidrine*, 2697 (La. App. 3 Cir. 8/7/69) 225 So. 2d 691, 696 ...................................... 34

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................... Passim

*Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) ......................................................... 15

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................................... 3

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................................. 22

*Wheelahan v. City of New Orleans,* No. 19-11720, 2020 WL 1503560 (E.D. La. Mar. 30, 2020). ......................................................................................................... 22

*White v. New Hampshire Dep't of Emp. Sec.*, 455 U.S. 445 (1982) ............................................ 40

*Williams ex rel. J.W. v. City of Jackson, Mississippi*, 2023 WL 2617395 (S.D. Miss. Mar. 23, 2023) ........................................................................................................................................... 30

*Williams v. City of New Orleans*, 729 F.2d 1554 (5th Cir. 1984) ............................................... 18

*Williams v. Matthews Co.*, 499 F.2d 819 (8th Cir. 1974) ........................................................... 33

## Statutes and Ordinances

28 U.S.C. § 1658(a) ...................................................................................................................... 12

42 U.S.C. § 1985(3) ...................................................................................................................... 17

42 U.S.C. § 2000cc–5(5) ......................................................................................................... 34, 35

42 U.S.C. § 2000cc(a)(1) .............................................................................................................. 13

La. Stat. Ann. § 33:101, §107 ......................................................................................................... 7

La. Stat. Ann. § 19:2.1 .................................................................................................................. 14

La. Stat. Ann. § 33:107 ................................................................................................................. 37

St. James Par., Ordinances Art. II, §§ A(5)(d), A(6)(c), (A)(7)(c)(vii), A(7)(d)(1984) ........... 14

St. James Par., Ordinances, § 82-25(m)(2022) ............................................................. 14

**Rules**

Fed. R. Civ. P. 17(b)(3) ..................................................................................... 13

Fed. R. Civ. P. 54(d)(2)(A) ................................................................................. 41

**Other Authorities**

5C Charles Alan *Wright & Arthur R. Miller, Federal Practice and Procedure* §§ 1380. 1382 (3d Ed. 2003) ................................................................................................. 38, 40

La. Const. 1974 Art. IV, Sec. 17 ........................................................................... 37

La. Const. 1974, Art. VI, Sec. 17 ........................................................................... 9

La. Const. 1974, Art. XII, Sec. 4 ........................................................................... 36

La. Atty. Gen. Op. No. 08-0186 at 1-2, available at http://www.lcb.state.la.us/ago/ago08-0186.pdf. .................................................. 34

# BACKGROUND

Plaintiffs' Complaint details a decades-long and consciously-reinforced discriminatory land use system implemented by Defendants that has its roots in slavery and its afterlife. Plaintiffs' members are descendants of people who were enslaved on the brutal sugarcane plantations that flourished in St. James Parish, and others who endeavored to make a life for themselves after Emancipation, despite the new forms of land and labor exploitation that pervaded following Reconstruction. Amended Complaint, ECF No. 29 ("Complaint" or "Compl.") ¶¶ 23-25, 51, 163-70, 246. As a result of multi-faceted and frequently violent efforts to displace Black political and economic liberation throughout the state during Jim Crow, the Parish ruling elite retained total political control, including over land use, which was still tied to the plantation system. *Id.* ¶¶ 141-62, 174-80, 186-87, 208. The exploitative and discriminatory land use system continues: Plaintiffs' members are residents and property-owners in the majority-Black 4th and 5th Districts, which Defendants have, as a policy, pattern, and practice, sacrificed to industry since the 1960s, while simultaneously sparing majority-white districts. *Id.* ¶¶ 23-25, 90, 259, 339 (Plaintiffs), 187, 199, 203, 305-41, 499 (industrial steering).

As a result of this unequal treatment, residents in the predominantly Black 4th and 5th Districts are exposed to deadly levels of pollutants and face among the highest risks of cancer and respiratory hazards in the country. *Id.* ¶¶ 436-41. The health effects of this land use system became obvious to Defendants at least in the 1980s (*id.* ¶¶ 206, 210-13, 215, 217-18, 226, 244, 265), but Parish officials willfully ignored this and continued to lure heavy industry to the 4th and 5th Districts, over intense opposition from Black community members. *Id.* ¶¶ 342-432.

In the past decade, Defendants have effectively codified this discriminatory land use system that Plaintiffs challenge. In 2014, Defendants hurriedly enacted a land use plan ("Land

Use Plan") (*id*. ¶ 275), confirming what residents of the 4th and 5th Districts had been concerned about for years: (i) that Defendants intended to continue steering industry into formally-designated "Industrial" and "Residential/Future Industrial" areas in the majority-Black 4th and 5th Districts, and away from majority-white districts (¶¶ 278-80, 284); (ii) that Defendants intended to protect schools and churches in majority-white areas of the Parish, but not in majority-Black areas (¶¶ 280-83); and (iii) that Defendants intended to restrict the subdivision and sale of property only in the majority-Black 4th and 5th Districts (¶¶ 284-89). Since 2014, Defendants have continued to grant industry land use approvals in majority-Black parts of the Parish, near churches and schools (*id*. ¶¶ 342-432), often by departing from normal procedure (¶¶ 355-59, 380-81, 410-18, 399-402, 429-30), while rejecting similar applications in white parts of the Parish (¶¶ 305-41).

In addition to the substantial dignitary and other harms, the discriminatory land use system implemented by Defendants continues to threaten Plaintiffs' members' culture, history, and religion, *id*. ¶¶ 508, 541-46, 607, 609, including historic communities built by freedpeople (*id*. ¶¶ 84, 88, 89), historic Black churches (¶¶ 24, 89, 543), schools (¶¶ 7, 281, 415), and perhaps most shockingly, cemeteries of enslaved people (¶¶ 467-551). In challenging this decades-long discriminatory system, Plaintiffs seek the only appropriate remedy: a mandate of equal treatment.

## ARGUMENT

In reviewing a 12(b)(6) motion to dismiss, a court must assess whether a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

I.   **PLAINTIFFS HAVE SUFFICIENTLY ALLEGED MULTIPLE INJURIES TRACEABLE TO DEFENDANTS' DISCRIMINATORY LAND USE SYSTEM AND REDRESSABLE BY THIS COURT.**

An associational plaintiff has standing to bring suit based on injury to itself, or "on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Defendants' extensive reliance on *Warth v. Seldin,* 422 U.S. 490 (1975),[1] only reveals the comparative strength of Plaintiffs' standing. Unlike the out-of-town plaintiffs in *Warth* who had no personal stake in their challenge to an allegedly discriminatory *neighboring* town's zoning ordinance, *id.* at 494-96, 504, Plaintiffs here actually reside in the 4th and 5th Districts and thus directly suffer discrimination and other injuries from Defendants' land use policies; accordingly, an injunction would redress these ongoing harms directly. Compl. ¶¶ 23-25.

A.   **All Plaintiffs Are Injured by the Parish's Unequal Treatment Based on Race and/or Religion.**

*First*, "[u]nequal treatment," which has been "long recognized as [a] judicially cognizable injury," *Heckler v. Mathews*, 465 U.S. 728, 738 (1984); *see also Mississippi University for Women v. Hogan,* 458 U.S. 718, 725 (1982), forms the basis of each of Plaintiffs' claims. Plaintiffs and their members, as Black residents of the majority-Black 4th and 5th Districts, suffer discriminatory injury because Defendants have steered industry into their Districts, and away from majority-white districts, because of race. *See* Sections V and VI, *infra* (setting forth facts relevant to Thirteenth and Fourteenth Amendment claims, which are relevant

---

[1]    Defendants' Memorandum of Law in Support of Rule 12 Motion to Strike and Dismiss All Claims, ECF 33 ("Defs.' Br.") at 11-12.

to all other claims turning on unequal treatment). As Plaintiffs' members Sharon Lavigne and Gail LeBoeuf describe, "it is painful to see a land use map that so clearly signals the disregard of our lives and communities." Compl. ¶ 11. "[B]y stigmatizing members of the disfavored group" – Plaintiffs' members – as "innately inferior," Defendants have injured them. *Heckler*, 465 U.S. at 729; *Smith v. City of Cleveland Heights*, 760 F.2d 720, 722 (6th Cir. 1985). This alone establishes standing.

*Second*, as another basis for Claim IV, Plaintiff Inclusive Louisiana members are injured because the Land Use Plan imposes unique restrictions on their ability to subdivide and sell their properties, which are located in the majority-Black 4th District and designated as "Residential/Future Industrial," Compl. ¶¶ 23, 289, violating their property rights protected by § 42 U.S.C. 1982. *Third*, as another basis for Claim VI, Plaintiff Mount Triumph is injured by the discriminatory land use system because Defendants have applied industry buffer zones to Catholic churches in predominantly white parts of the Parish, while refusing to apply similar protections to it, a Baptist church in the majority-Black 5th District, *id*. ¶¶ 280-81, 593-604 – a discriminatory injury based on religious denomination.

## B. Defendants' Actions Have Injured Plaintiffs' Members' Environment, Health, and Property.

The Fifth Circuit has clarified that once unequal treatment is plausibly alleged, allegations of additional injury resulting from the unequal treatment are not required. *Texas Cable & Telecommunications Ass'n v. Hudson*, 265 F. App'x 210, 218 (5th Cir. 2008). Still, Plaintiffs' members face additional injuries to their environment, health, and property.

### 1. Plaintiffs' Members Suffer Injuries to their Environment, Health, and Property.

Plaintiffs' members are exposed to pollution from industry steered by Defendants into their Districts. Compl. ¶¶ 23-25, 190-93, 201-03, 251-55, 263, 442-60. This is plainly a

cognizable injury. *Friends of the Earth.*, 528 U.S. at 181-182; *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (injury from "breathing and smelling polluted air"); *St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Ref., L.L.C*, 354 F. Supp. 2d 697, 701 (E.D. La. 2005) (injury from smelling oil refinery odors); *Lopez v. City of Dallas, Tex*, No. 3:03-CV-2223-M, 2004 WL 2026804, at *5 (N.D. Tex. Sept. 9, 2004) (discriminatory zoning caused "exposure to hazardous substances, elevated birth defect rates, exposure to burning and gagging odors. . . and diminished property values").

Plaintiffs are also injured by harms to "the aesthetic and recreational values," *Friends of the Earth,* 528 U.S. at 183, as well as the historic value of the area which they use, *Nat'l Tr. for Historic Pres. in the U.S. v. U.S. Dep't of Veterans Affs.*, No. CIV.A. 09-5460, 2010 WL 1416729, at *7 (E.D. La. Mar. 31, 2010) (actions that limit enjoyment of the "historic character and architecture of the neighborhood" are cognizable). *See* Compl. ¶¶ 88-90, 164, 190, 202, 349, 366, 375, 382, 417, 498, 503, 506, 507, 543, 609.

Once they sufficiently allege that they are exposed to pollution, "plaintiffs need not show . . . that they suffer a bodily injury caused by" it. *St. Bernard Citizens for Env't Quality,* 354 F. Supp. 2d at 702 (E.D. La. 2005). Yet Plaintiffs also allege that the heavy industry in their communities causes severe disease, Compl. ¶¶ 433-60, including to members and their families, ¶¶ 461-66. Defendants argue that these ongoing health injuries are not redressable, effectively because Defendants have already caused them and any harm not yet sustained is not actionable. Defs.' Br. at 17. But the land use system which increases pollution in majority-Black districts will produce continuing and future harm, and prospective relief for an imminent future injury or "continuing injury" is redressable, especially when based on a "systematic…practice." *Crawford v. Hinds Cnty. Bd. of Supervisors,* 1 F.4th 371, 375-76 (5th Cir. 2021).

Plaintiffs are also injured because Defendants' discriminatory steering of industry into their communities has harmed their properties, including by depreciating their property values. Compl. ¶¶ 24, 259, 338-39. Defendants' argument that these allegations of property harms are insufficiently specific would improperly heighten pleading standards. *See Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) ("A court thus inappropriately heightens the pleading standard by subjecting a plaintiff's allegations to a rigorous factual or evidentiary analysis."). It is enough, as *Friends of the Earth* explained, to allege that a plaintiff's "home, which is near [the polluting] facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy." 528 U.S. at 182-83. Because Plaintiffs allege their properties are surrounded and polluted by industry, which interferes with their use and enjoyment, they need not plead a specific diminished value. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 887 (10th Cir. 2017).[2]

      2.   <u>Plaintiffs' Injuries Are Traceable to Defendants' Discriminatory Land Use System and Are Redressable by This Court.</u>

Defendants cannot defeat standing simply because other entities such as health or regulatory authorities may also have contributed to Plaintiffs' injury. Defs' Br. at 15–16. Fair traceability only requires that a defendant be *a* "but for" cause, not the *sole* cause, as injuries can have concurrent sources. The traceability requirement is satisfied where defendants

---

[2]    Defendants wrongly insist that assessing injury to property values will "require participation of individual members." Defs.' Br. at 14. But, unlike the case cited by Defendants, *Warth*, 422 U.S. at 515, because this is not a damages case and Plaintiffs seek only declaratory and injunctive relief, "an association[al] plaintiff can prove its case with a sampling of evidence from its members." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010). Here, the Court can rely on expert testimony to determine whether the steering of heavy industry has generally reduced the value of properties in the 4th and 5th Districts. *See, e.g., City of Memphis v. Greene*, 451 U.S. 100, 117 (1981) (effect on property values established through expert testimony).

"significantly contribute[ ] to Plaintiffs' alleged injuries," even if there are other contributors, because "[t]racing an injury is not the same as seeking its proximate cause." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (citing *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997)). In other words, Plaintiffs need not show that Defendants' "actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 169. Because Defendants determine whether and where industry will be located and have primary authority over land use decisions and environmental implications, Compl. ¶ 215, and because the Land Use Plan was enacted pursuant to statutory authority requiring the Parish to promote the health and safety of residents, ¶ 276 (citing La. Stat. Ann. §33:101, §107), their decisions to discriminate against Plaintiffs and to exacerbate environmental and health-related harms, are fairly traceable to Defendants. *See, e.g., Lopez,* 2004 WL 2026804, at *5 (Plaintiffs satisfied standing by alleging connection between their injuries and defendant's zoning property for industrial use and tolerating industrial pollution). And because discrimination is the primary injury alleged, it follows that the Parish is the "cause" of that cognizable injury and a judicial decree directing the Parish to discontinue the discrimination would "redress" the injury. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 n.5 (1993).

Likewise, that land use discrimination impacted Plaintiffs even before the adoption of the Land Use Plan in 2014 does not defeat causation or redressability. Defs. Br. at 15, 17. Plaintiffs challenge the overall pattern and practice of discriminatory land use decisions, which includes and is further perpetuated by the Land Use Plan, but began long before its enactment.[3] As such, any remedy imposed by this Court would not need to be limited to invalidation of the Land Use

---

[3] The Land Use Plan has caused additional injury: Defendants have steered at least seven major industrial facilities into the 4th and 5th District since its enactment, Compl. ¶¶ 342–432, while turning away at least three from majority-white districts, ¶¶ 305–41.

Plan, but would prevent a discriminatory land use system altogether. Compl. ¶¶ 17-18 (seeking broad injunction preventing continuation of pattern and practice of discriminatory land use).

### C. Defendants' Actions Have Injured Plaintiffs' Members' Religious Exercise.

1. Plaintiffs' Members Suffer Injuries to Their Religious Exercise That Are Germane to Plaintiffs' Purposes.

Despite the fact that Plaintiff organizations are faith-based, with work grounded in Christian faith and supported through prayer, Compl. ¶¶ 23, 25, Defendants argue that Inclusive Louisiana and RISE St. James cannot base their claims of injury to their religious and cultural interests stemming from the Parish-authorized construction upon and desecration of cemeteries, ¶¶ 494, 508, 607, because religion is not related to their "associational ties" – or in other words, that religion is not germane to their organization. Defs.' Br. at 18.[4] But the "requirement of germaneness is 'undemanding'; 'mere pertinence between litigation subject and organizational purpose' is sufficient." *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006). And Plaintiffs and their members have organized religious ceremonies on the Buena Vista cemetery site,[5] including an All Saints' Day ceremony, in which religious leaders conducted cemetery and grave rituals. Compl. ¶¶ 534-36.

---

[4]     Defendants do not argue, nor could they, that Plaintiff Mount Triumph Baptist Church cannot base its claims on these injuries. *See Church of Scientology of California v. Cazares,* 638 F.2d 1272, 1279 (5th Cir. 1981) (church can bring claims on behalf of its members who are injured by burden on their religious exercise).

[5]     Contrary to Defendants argument, RISE St. James' performance of religious ceremonies on Buena Vista does not vitiate their injury, Defs.' Br. at 18, because Plaintiffs also allege that cemeteries have been desecrated and destroyed by industrial development, and that additional cemeteries, including the Buena Vista and Acadia cemeteries on the Formosa site, are at imminent risk by facilities approved by Defendants. Compl. ¶¶ 541-45, 547, 587. In any case, having to obtain a restraining order before being permitted this religious exercise, as RISE St. James has had to do, *id*. ¶¶ 534-35, is certainly a burden on religious exercise.

2.   Injury to Plaintiffs' Religious Exercise is Traceable and Redressable.

As explained in Section I(B)(2) *supra*, that other government entities are charged with regulating cemeteries does not defeat causation, particularly here, given Defendants have the primary, constitutional responsibility to "adopt regulations for land use, zoning, and *historic preservation*." Compl. ¶ 179 (citing La. Const. 1974, Art. VI, Sec. 17) (emphasis added). Defendants determine where industrial facilities will be located, and whether to grant or deny particular land use applications that may desecrate cemeteries or make them inaccessible. As such, Defendants *do* and *have* approved the construction of industry upon cemeteries – they have done so at the very least with Formosa and likely South Louisiana Methanol. *Id*. ¶¶ 467-539. Formosa has suggested it may remove two cemeteries to build the facility that Defendants have approved. *Id*. ¶¶ 518–20, 529.

As discussed more *infra* Section IX, Defendants' suggestion that private landowners may deny descendant communities access to cemeteries located on private property, Defs' Br. at 19, does not defeat causation, since Defendants approve industrial facilities on top of cemeteries in which Plaintiffs have a property interest – a but-for source of injury, regardless of hypothetical acts of third parties. Plaintiffs need only demonstrate that the redress sought will provide some relief, even if imperfect, to their injury. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007).

## II.   PLAINTIFFS' CLAIMS ARE BASED ON A DECADES-LONG CONTINUING VIOLATION AND ARE NOT TIME-BARRED.

Contrary to Defendants' arguments, Defs.' Br. at 24, 33-34, 36, Plaintiffs claims are not time-barred because the discriminatory actions challenged here occurred long before and continue long after the Land Use Plan was enacted in 2014, and include acts that have occurred within the applicable one-year and four-year prescriptive periods so as to constitute actionable continuing violations.

**A.  All of Plaintiffs' Claims Are Based on A Continuing Violation.**

The continuing violation doctrine asks whether a claim is based on an "unlawful practice" that "manifested in a number of incidents," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982) (superseded on other grounds by statute 42 U.S. § 3613(a)(1)(A)), rather than being based on "discrete acts," *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 740 (5th Cir. 2017), *as revised* (Mar. 13, 2017). If so, the "doctrine provides that . . . as long as . . . at least one act which comprises the . . . claim is still timely, the entire time period . . . may be considered by a court for the purpose of determining liability." *Id.* at 736 (internal quotations omitted) (citation omitted). Such claims are based "on the cumulative effect of a thousand cuts." *Id.* at 737. The Complaint makes clear that Plaintiffs' claims are based on unlawful practice manifested in discriminatory land use decisions over decades, and which includes a Land Use Plan that singles out those majority-Black agricultural and residential areas as "industrial" or "future industrial" – revealing an intention to erase them. Compl. ¶¶ 280, 284-86. This policy, pattern, and practice forms the basis of each of Plaintiffs' constitutional and statutory claims and has been "continued" for statute-of-limitations purposes by related acts that unambiguously occur within the prescriptive period.

In *U.S. v. City of Parma, Ohio*, the Sixth Circuit applied the continuing violations doctrine to discriminatory housing claims against the City for a "series of actions" contributing to a "virtually all-white community," 661 F.2d 562, 565 (6th Cir. 1981). The City argued, like Defendants do here, that the claims were time-barred because two discrete zoning decisions evidencing discrimination occurred before the prescriptive period. *Id.* at 573. But the Sixth Circuit found a continuing violation made the claims timely, as those zoning decisions were just one "part of 'a pattern or practice of resistance to the full enjoyment' of rights." *Id.* at 576. *See also Havens Realty Corp.*, 455 U.S. at 381 (continuing violation doctrine applied to ongoing

"pattern, practice, and policy" of racial steering); *Boswell v. Claiborne Par. Det. Ctr.*, 629 Fed.

App'x. 580, 583 (5th Cir. 2015) (doctrine applied to incarcerated plaintiff's § 1983 medical care-

related claim); *Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cnty., Ill.*, 46 F.3d

682, 683 (7th Cir. 1995) (doctrine applied to discriminatory school-closing plan because "a claim

of racial discrimination arises each day a child is assigned to school under a racially

discriminatory policy"); *Banks v. McInstosh Cnty., Georgia*, No. 2:16-CV-53, 2022 WL 400810,

at *6-11 (S.D. Ga. Feb. 9, 2022) (doctrine applied to plaintiffs' discrimination claims against the

County for inferior municipal services, although discriminatory treatment began before

limitations period).

      The continuing violations doctrine should apply with greater force to claims that require a

plaintiff to demonstrate a historical and ongoing record of discrimination. *See infra* Section IV

(discussing relevance of history of discrimination to show intentional discrimination). Likewise,

claims requiring proof of deliberate indifference may require showing historical disregard to

known harm. *See, e.g.*, *Stukenberg ex rel. M.D. v. Abbott*, 907 F.3d 237, 260 (5th Cir. 2018).

### B. At Least Two Acts that Comprise Plaintiffs' § 1982, § 1983, and Louisiana Constitution Claims Occurred After March 21, 2022.

      Once a continuing violation is established, "[a]s long as an act contributing to the claim

occurs within the filing period," the court is permitted to consider "the entire time period . . . for

the purpose of determining liability." *Heath*, 850 F.3d at 736. In addition to the long, historical

practice of discriminating against Black communities, the Parish has taken at least two acts that

comprise this continuing violation since March 21, 2022, specifically on August 17, 2022. For

years, the Parish refused to act on repeated requests by Black residents to impose a moratorium

on petrochemical facilities in their districts, Compl. ¶¶ 338, 341, 387-88, 432. Yet on August 17,

2022 – less than one year before the commencement of this action – the Parish amended its Land

Use Plan because residents of majority-white parts of the Parish opposed a solar farm "in [their] backyard," *id.* ¶¶ 330-34, to enact a moratorium on such farms to protect white constituents. *Id.* ¶ 335. On the very same day it again refused to consider the renewed call by RISE St. James for a moratorium on petrochemical facilities that impact majority-Black parts of the Parish. Compl. *Id.* ¶ 341. Because this continuing, discriminatory act occurred within the statute of limitations period, all of Plaintiffs' claims are deemed timely.

### C. Several Acts that Comprise Plaintiffs' RLUIPA Claims Occurred or Were Discovered After March 21, 2019.

1. Plaintiffs' Count V (RLUIPA Substantial Burden) Is Based on Facts that Plaintiffs Only Discovered After March 21, 2019.

RLUIPA claims have a four-year statute of limitations, 28 U.S.C.A. § 1658(a). The discovery rule tolls the statute of limitations period "whenever a plaintiff is not aware of and has no reasonable opportunity to discover the critical facts of his injury and its cause." *Dubose v. Kansas City S. Ry. Co.*, 729 F.2d 1026, 1030 (5th Cir. 1984). As Defendants acknowledge, Defs.' Br. at 36, it was only in November 2019 (less than 4 years from the Complaint filing) that Plaintiffs discovered the existence of cemeteries in the Buena Vista and Acadia tracts, where the Parish has approved Formosa's plans to build a petrochemical complex, Compl. ¶ 516, and only after Plaintiffs uncovered emails – via public records request – between Formosa, the Louisiana Attorney General, and the Louisiana Division of Archaeology, which revealed that Formosa knew of the existence of those cemeteries as early as July 2018, but concealed this from descendant communities while awaiting approval of its land use application. *Id.* ¶ 525. Plaintiffs had "no reasonable opportunity to discover the critical facts" of this claim before then. *Dubose*, 729 F.2d at 1030. Plaintiffs only learned of the existence of other cemeteries in the Parish after the Formosa revelations prompted Plaintiffs to work with an archaeologist who assessed the

properties of other industrial facilities. Compl. ¶¶ 492-98, 527, 539. These facts form the basis of

Plaintiffs' RLUIPA "substantial burden" claim, which is thus not time-barred. 42 U.S.C. §

2000cc(a)(1).

> 2. At Least Two Acts that Relate to Count VI (RLUIPA Discrimination) Occurred
>    After March 21, 2019.

In Count VI, Mount Triumph asserts that Defendants discriminated against Black and

Baptist churches by applying industry buffer zones only to protect Catholic churches, which have

predominantly white congregations. Compl. ¶¶ 591-604. This discriminatory intent was

explicitly evidenced by the Land Use Plan in 2014. *Id.* ¶¶ 280-81. In 2018, the explicitly

discriminatory buffer zones were scrubbed from the Land Use Plan, but the Parish has continued

this pattern and practice by granting land use approvals to industrial facilities within 2 miles of

majority-Black, Baptist churches. *Id.* ¶¶ 374-75, 385, 391-93, 417, 423. At least two of these

approvals were granted after March 21, 2019, *id.* ¶¶ 385, 422, which in light of the preservation

of Catholic churches for 46 years, ¶¶ 4, 347, 433, are actions that form the basis of Claim VI.

## III.   THE ST. JAMES PARISH COUNCIL AND PARISH PLANNING COMMISSION HAVE THE CAPACITY TO BE SUED.

Under Fed. R. Civ. P. 17(b)(3), an entity's capacity for suit is determined by "the law of

the state where the court is located." In Louisiana, local government units such as the St. James

Parish Council and Planning Commission "may be deemed to be a juridical person separate and

distinct from other government entities, when the organic law grants it the legal capacity to

function independently and not just as the agency or division of another governmental entity."

*Roberts v. Sewerage & Water Bd.*, 92-C-2048 (La. 3/21/94) 634 So. 2d 341, 347; *see also Dotey*

*v. Tangipahoa Par. Council*, No. CV 05-4018, 2006 WL 8456326 at * 2 (E.D. La. Apr. 17,

2006).  An entity will be considered an "independent and autonomous" juridical person where it

has the power to sue and be sued, make contracts, hire employees, and exercise eminent domain. *Roberts*, 634 So. 2d at 347 (collecting cases).

The St. James Parish Council and Planning Commission have both been sued and defended lawsuits as discrete defendants. *See, e.g.*, *Butler v. St. James Par., St. James Par. Council, & St. James Par. Plan. Comm'n.*, 23-C-305 (La. App. 5 Cir. 7/25/23) (denying writ); *Lee v. St. James Par. Council*, 03-834 (La. App. 5 Cir. 12/30/03) 864 So. 2d 736; *Brock v. St. James Par. Council,* 5-149 (La. App. 4 Cir. 12/8/81) 407 So. 2d 1265. Additionally, the St. James Parish Council intervened in support of plaintiffs in *Phillips v. Occidental Chem. Corp.*, No. 99-828, 2000 WL 1346893 at *3 (E.D. La. Sept. 19, 2000). And the St. James Parish Code of Ordinances explicitly grants the Council the power of eminent domain. *See* St. James Par., Ordinances Art. II, § A(7)(d) (1984). Under Louisiana law, the exercise of this power includes instituting a suit in district court. La. Stat. Ann. § 19:2.1.[6]

*Dotey* and *Bowen*, upon which Defendants rely, are distinguishable. In both cases the Parish Councils were not authorized by charter to maintain or defend suits, nor to exercise the power of eminent domain. *See City Council of City of Lafayette v. Bowen,* 94-584 (La. App. 3d Cr. 11/2/94) 649 So. 2d 611, 616; *Dotey,* 2006 WL 8456326, at *2. Although the St. James Parish Council is indeed the legislative branch in a council-president governing structure, under relevant precedent, that the entities have capacity to sue and be sued, and that the Council has power of eminent domain is dispositive.

---

[6]      Both the Council and Planning commission exercise other duties that signify autonomy from the Parish under the *Roberts* inquiry. The Parish Council "determine[s] its own rules and order of business," St. James Par., Ordinances Art. II, § A(5)(d)(1984); fills vacancies in staff, § (A)(6)(c); enters into contracts, § (A)(7)(c)(vii); and exercises the power of independent appellate review over Planning Commission land use decisions. St. James Par. Ordinances, § 82-25(m)(2022). The Planning Commission may appoint employees and enter into contracts with third parties. La. Stat. Ann. § 33:105.

IV.    **PLAINTIFFS ARE NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES BEFORE BRINGING CIVIL RIGHTS CLAIMS.**

Courts have long held that plaintiffs can challenge the constitutionality of local land use laws, as Plaintiffs do here, without first exhausting administrative procedures under local zoning codes. *See Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926) (rejecting exhaustion requirement for suit challenging zoning ordinance under 14th Amendment); *Moore v. City of E. Cleveland*, 431 U.S. 494, 498 n.5 (1977) (rejecting requirement to pursue administrative remedies when challenging the constitutionality of those ordinances); *Bossier City Med. Suite, Inc v. City of Bossier City*, 483 F. Supp. 633, 641 (W.D. La. 1980) (same).

Defendants erroneously argue that Plaintiffs' only recourse for violations of their constitutional and statutory rights by Defendants' discriminatory land use system is under the local ordinance, which allows a judicial appeal within 30 days of final decisions by the Parish Council. Defs.' Br. at 23. But the availability of a procedural appeal of a single decision does not extinguish Plaintiffs' independent right to seek systemic remedies and is otherwise inadequate to provide the relief Plaintiffs seek. First, the Supreme Court has made clear that § 1983 is a remedy parallel to any state or local law remedies, such that exhaustion would not be required to vindicate the constitutional interests reflected in Plaintiffs' 13th and 14th Amendment claims. *See Patsy v. Bd. of Regents of Fla.,* 457 U.S. 496, 507 (1982) (exhaustion not required for § 1983 claims. Plaintiffs' RLUIPA and §1982 claims are also properly before this Court. *See e.g. Oliver v. Foster*, 524 F. Supp. 927, 929 (S. D. Tex. 1981) (exhaustion not required in § 1982 challenge); *Murphy v. Zoning Comm'n of Town of New Milford*, 148 F. Supp. 2d 173, 184 (D. Conn. 2001) ("RLUIPA requires only that the 'final decision' made by the governmental agency be to implement or impose a land use regulation . . . ."); *Dilaura v. Ann Arbor Charter Tp.*, 30 Fed. App'x. 501, 507 (6th Cir. 2002) (RLUIPA claims challenging a final land use decision via §

1983 do not require exhaustion). All the land use approvals at issue are final, either because they were granted by the Planning Commission, or because they were approved by the Parish Council after appeals by residents. *See* Compl. ¶¶ 358, 373, 397-402, 410, 417, 420, 431.[7]

Finally, exhaustion is not required because the administrative remedies available to Plaintiffs would be "plainly inadequate." *Taylor v. U.S. Treasury Dep't,* 127 F.3d 470, 477 (5th Cir. 1997). Plaintiffs do not, contrary to Defendants' suggestion, pursue a collateral attack on a specific land use decision; the land use decisions form the basis for and evidence of the systemic constitutional and statutory violations that only this Court can fully and properly adjudicate.

## V.   CLAIM I: THIRTEENTH AMENDMENT: PLAINTIFFS SUFFICIENTLY PLEAD FACTS DEMONSTRATING THAT THE LAND USE SYSTEM IN ST. JAMES PARISH IS A BADGE OR INCIDENT OF THE SLAVERY SYSTEM.

The Complaint sets out in detail how the discriminatory land use system in effect in St. James Parish today is directly traceable to the slavery system and its afterlife in the Parish as an ongoing "badge or incident" of slavery, in violation of the Thirteenth Amendment. The Parish relies almost exclusively on the outdated and largely discredited Thirteenth Amendment holding of the *Civil Rights Cases*, 109 U.S. 3 (1883). Defs.' Br. at 25-27.

Far from being a beacon to guide this Court as to what should be considered a badge or incident of slavery, the decision in the *Civil Rights Cases* provided a key legal pillar that helped maintain white supremacy and segregation throughout the South, including in St. James Parish. There, the Court ruled that racial discrimination in public accommodations did not constitute a badge or incident of slavery, such that the 1875 Civil Rights Act's prohibition on such

---

[7]     Contrary to Defendants' suggestion, *Petroplex Int'l v. St. James Parish*, 158 F. Supp. 3d 537 (E.D. La. 2016) only supports Plaintiffs' position. In *Petroplex,* this Court considered the merits of the plaintiff's constitutional claims against the St. James Parish Land Use Plan even though they had not availed themselves of administrative remedies, particularly because those claims – like Plaintiffs claims – alleged constitutional violations. *Id.* at 540-543.

discrimination could not be supported by Congress's authority under the Thirteenth Amendment. This decision, together with the Court's subsequent decision upholding a Louisiana "separate but equal" statute in *Plessy v. Ferguson*, 163 U.S. 537 (1896), gave legal license to racist, "whites only" segregation, helped Jim Crow to flourish, and ultimately emboldened the discriminatory actions of St. James Parish officials – which form in large part the basis of Plaintiffs' claim. Compl. ¶¶ 141-84.

More than a half century later, the Supreme Court in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) took a broader and more realistic view of what constitutes "badges" or "incidents" of slavery, observing that "[j]ust as the Black Codes, enacted after the Civil War to restrict the free exercise of those rights, were substitutes for the [slave] system," the exclusion of Black people from white communities "became a substitute for the Black Codes." *Id*. at 441-42. The Court later reiterated that badges or incidents of slavery extend "far beyond the actual imposition of slavery or involuntary servitude." *Griffin v. Breckenridge,* 403 U.S. 88, 105 (1971); *see also id*. at 103 (Black men assaulted by white assailants who thought they were civil rights workers could bring action under 42 U.S.C. § 1985(3)).

Even before the Supreme Court's pronouncement in *Jones* and *Griffin*, the Fifth Circuit identified school segregation as a badge of slavery. *See U.S. v. Jefferson Cnty. Bd. of Educ.,* 372 F.2d 836, 873 (5th Cir. 1966) (Black school children were attending "inherently unequal schools and wearing the badge of slavery separation displays"). In a later case, Judge Wisdom, concurring in the judgment for Black plaintiffs challenging employment discrimination in the New Orleans Police Department, observed that the Thirteenth Amendment would have supported their Title VII claim because of the "discriminatory effect upon blacks as a class [which] can be linked with a discriminatory practice against blacks as a race under the slavery system." *Williams*

*v. City of New Orleans,* 729 F.2d 1554, 1577 (5th Cir. 1984). Reviewing the historical record, Judge Wisdom observed that "[o]ne of the cornerstones of slavery was the race-based denial of equal economic opportunities" and found that the under-representation of Black officers on the police force due to Black Codes and throughout Jim Crow was a badge of slavery because it was "closely linked to the former system of slavery and the reaction of whites unwilling after Reconstruction and Redemption to accept any blacks on the police force." *Id.* at 1579-80.

Since *Jones*, courts have recognized that the Thirteenth Amendment extends beyond mere chattel slavery to affirmatively protect against the ongoing subjugation of freedpeople. Upholding the constitutionality of a federal hate crimes conviction, the Second Circuit held that "race-based private violence" was a badge or incident of slavery, because it "both continued beyond the demise of the institution of chattel slavery and was closely connected to the prevention of former slaves' exercise of their newly obtained civil and other rights. . . ." *U.S. v. Nelson,* 277 F.3d 164, 190 (2d Cir. 2002); *see also id.* at 189 (examining relevant conduct against "a long and intimate historical association with slavery and its cognate institutions").

 Here, Plaintiffs' Complaint thoroughly details how the present-day discriminatory land use system in St. James Parish is closely linked and directly traceable to the system of slavery as it operated in St. James Parish specifically, with its after-effects reverberating through the Black Codes, Reconstruction, and Jim Crow up through to today when Defendants use their political power to racialize land use decisions that uniformly harm Black residents, while protecting white residents.[8] Compl. ¶¶ 29-59 (origins of land use system, land distributions to white planters, slavery system), ¶¶ 70-87 (land granted to then taken from Black planters after Emancipation),

---

[8]        *See also*, Section VI (Equal Protection) *infra*, discussing historical background of land use system.

¶¶ 91-109, 126-62 (white supremacist violence and political repression), ¶¶ 32-34, 84-90, 163-70 (formation of free communities adjacent to plantations, and a nearby labor supply). Plaintiffs' members are descendants of people enslaved under this system, whose families continued to reside nearby and work for their survival on those plantations after Emancipation. *Id.* ¶¶ 23-25, 89, 166. On the other side, Parish officials in key post-war positions, and in succeeding generations, belonged to or descended from plantation-owning families. *Id*. ¶¶ 64-65, 141-45, 162, 187, 208.

After Reconstruction, freedpeople were stripped of all political power and deprived of any ability to take part in decision-making about land use in the Parish for succeeding generations, through the relentless efforts of white lawmakers "to establish the supremacy of the white race" and "disenfranchise as many [Black voters] and as a few whites as possible." *Id.* ¶ 149. *See also id.* ¶¶ 141-80 (successive constitutional efforts to suppress Black political power and voting). The post-war political disenfranchisement was accompanied by rampant white violence and intimidation in St. James and beyond. *Id.* ¶¶ 126-40.

These efforts to destroy the possibility of Black political power in St. James Parish had their intended effect. *Id*. ¶¶ 154-57. By the time the Voting Rights Act was enacted in 1965, white political power over land use had been firmly established, and heavy industry was steadily moving in, rendering neighboring Black residents less necessary as a form of plantation labor, and therefore more expendable. *Id.* ¶¶ 180-87 (industries locating in 1960s), ¶¶ 205-45 (growing awareness of impacts of industry and community opposition in 1980's and 90's), ¶¶ 260-74 (Parish defends its non-zoning in 2000's), ¶¶ 275-81 (enactment of Land Use Plan). Plaintiffs also describe the travesty of burial grounds of people enslaved on the plantations and Plaintiffs' efforts to find, preserve, protect, and worship at them. *Id.* ¶ 53; ¶¶ 467-551.

As detailed in Section VI, *infra* (Equal Protection), for over 50 years since, the Parish has leveraged the historical legacy of slavery and Jim Crow alongside its dominant white political power to create exploitative and discriminatory land use policies and to direct industry to majority-Black districts while taking persistent actions to preference and protect the land and health of white residents. The result of this continuous, unbroken chain of severe discrimination is that Plaintiffs and others residing in majority-Black parts of the Parish are exposed to some of the most harmful pollutants known – and at levels that place them in the highest category of risk in the country of cancer and other illnesses – while the Parish has aggressively protected white communities against these dangers. Plaintiffs' members have borne the heavy, devastating loss of relatives and loved ones to cancer and other illnesses at alarming rates, and some suffer from those illnesses themselves. Compl. ¶¶ 462-66. This ongoing discrimination has also impacted Plaintiffs' ability to preserve their cultural origins in the Parish, including their ancestors' burial grounds, *id.* ¶¶ 467-551, and other sites with historic significance. *Id.* ¶¶ 24, 88, 281, 543.

Defendants suggestion that "the sales of large tracts of land to industry were done by private parties" should "sever[] any potential causal chain between the Land Use Plan and the geographic composition that arose in St. James Parish after the end of slavery," Defs.' Br. at 27, ignores the allegations in the Complaint that it was an intentional, official Parish policy of "non-zoning" that allowed for these types of sales and that Parish officials were actively involved in luring industry to majority-Black communities even before an official land use plan was adopted. Compl. ¶¶ 221-54, 265-69. The "non-zoning" policy only changed when two major facilities were getting ready to locate in predominantly white parts of the Parish, at which point the Parish Council swiftly enacted the Land Use Plan as a preventive measure. *Id.* ¶¶ 275-80, 305-29.

Defendants' reliance on *Palmer v. Thompson,* 403 U.S. 217 (1971), and *Greene*, 451 U.S. 100, is unavailing. Both cases raised important questions of ongoing racial animus endured by Black citizens as a legacy of slavery, but dealt with challenges to a single municipal action or decision.[9] In *Greene*, the Court declined to invalidate a decision to close a road, despite its racially discriminatory impact, because there was insufficient evidence necessary to prevail *at trial* under 42 U.S.C. § 1982; however, with regard to the Thirteenth Amendment, the Court left open the question of "the sort of impact on a racial group that might be prohibited by the Amendment itself." 451 U.S. at 128-29. Here, Plaintiffs do not challenge a single, municipal decision. They challenge a thorough-going, continuous pattern and practice of severe discrimination against residents in majority-Black parts of St. James Parish – with direct connections to white supremacist practices through multiple generations which made this systemic discrimination and repression possible.

## VI.   CLAIM II: EQUAL PROTECTION: PLAINTIFFS SUFFICIENTLY PLEAD FACTS SHOWING RACIALLY DISPROPORTIONATE IMPACT *AND* RACIALLY DISCRIMINATORY INTENT.

### A.  Plaintiffs Sufficiently Plead Racially Disproportionate Impact.

Whether official action "'bears more heavily on one race than another,'" is "an important starting point" in determining whether a violation of Equal Protection has occurred. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977) (quoting *Washington*, 426 U.S. at 242). Plaintiffs plead at length – and Defendants barely contest – how the Parish's land use system has had, and continues to have, a racially disproportionate impact on Plaintiffs'

---

[9]     The Court's holding in *Palmer* that racial animus or motivation behind a legislative body's decision-making is irrelevant has been impliedly set aside by later Supreme Court decisions. *Hernandez v. Woodard,* 714 F. Supp. 963, 970 (N.D. Ill.1989) (citing *Washington v. Davis*, 426 U.S. 229, 244 n.11 (1976)).

health, environment, property, and religion. *See, e.g.,* Compl. ¶¶ 23-25, 251, 433-66 (environment, health, property), 24, 190, 199, 281, 303, 375, 393, 465, 508-39 (religion). The Land Use Plan enacted in 2014 and amended in 2018, excluded Black churches and schools in the 4th and 5th Districts from buffer zones intended to protect against the harms caused by heavy industry, while placing such buffers around Catholic churches and schools in majority-white parts of the Parish. *Id.* ¶¶ 24, 199, 277, 280-88, 344-47, 373, 397-402, 406, 414, 417.

        The Land Use Plan also designated large areas in the majority-Black 4th and 5th Districts as industrial and designated residential areas in those districts as "existing residential/future industrial," which limited residents' ability to subdivide and sell land and revealed an intention that those predominantly-Black residential areas alone, would cease to exist. *Id.* ¶¶ 284-86. The Parish also allowed industry to close off the only alternate emergency evacuation route for residents in and around Freetown and has failed to remedy that for over seven years. *Id.* ¶ 202. Finally, the Land Use Plan and Parish practices have had, and continue to have, a disproportionate impact on Black residents' ability to locate, protect, preserve, and worship at the cemeteries of their ancestors who were buried without record or regard by white enslavers and overseers. *Id.* ¶¶ 467-551.[10]

        **B. Plaintiffs Sufficiently Plead Discriminatory Intent or Purpose.**

        While proof of racially discriminatory intent or purpose is required to show an Equal Protection violation, a plaintiff is not required to prove that the challenged action "rested solely," or even primarily, "on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265; *U.S. v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). "Outright admissions of impermissible racial

---

[10]     Defendants' sole reliance on *Wheelahan v. City of New Orleans,* No. 19-11720, 2020 WL 1503560 (E.D. La. Mar. 30, 2020) borders on the frivolous, given the absence of a race discrimination claim in the case and the comparatively bereft allegations there.

motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999). Thus, the Supreme Court has adopted a series of factors to guide the determination of discriminatory intent or purpose. *Veasey v. Abbott,* 830 F.3d 216, 230-31 (5th Cir. 2016) (en banc) (plurality opinion).

The Complaint includes factual allegations that speak to *all* of the non-exhaustive *Arlington Heights* factors, including: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history . . ." *Id.* Foreseeability of discriminatory impact is another factor that can be considered consistent with the *Arlington Heights* analysis. *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449 (1979). Cumulatively, *Arlington Heights* factors assess whether there is a consistent, historical, or recent pattern of discriminatory conduct by a decisionmaker. *See Sylvia Dev. Corp. v. Calvert Cnty., Md.,* 48 F.3d 810, 819 (4th Cir. 1995); *N. Carolina State Conference of NAACP v. McCrory,* 831 F.3d 204, 223 (4th Cir. 2016).

### Factor No. 1: Historical Background

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. As set out *supra* with regard to Plaintiffs' Thirteenth Amendment claim, Plaintiffs describe how the current land use system as it operates today is a result of the history of land use patterns that were set during slavery, and how the communities that exist today were founded on the edges of plantations after Emancipation when plantation owners needed a nearby supply of labor to farm the land. These developments were accompanied by pronounced racial discrimination that has existed in the Parish since slavery and long after Emancipation, through Jim Crow to

today. *See Veasey*, 830 F.3d at 232 (recognizing that history "provides context and that historical discrimination (for example, in education) can have effects for many years"). The Complaint also describes how, when the health effects of these decisions to locate heavy industrial facilities in the Parish became glaring in the 1980s, Parish officials ignored the concerns and continued to lure heavy industry to the 4th and 5th Districts, over intense opposition from community members. Compl. ¶¶ 205-57, 272-74, 275-80, 305-15, 342-432.

### Factor No. 2: Specific Sequence of Events

"The specific sequence of events leading up to the challenged decision[s] . . . may shed . . . light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. In *Arlington Heights*, the Supreme Court emphasized that evidence of a sudden zoning change to exclude integrated housing made after a town discovered plans to erect such housing would be evidence that "discriminatory purpose was a motivating factor." *Id*. at 266-67.

That is precisely what Plaintiffs allege here with regard to the Parish's hurried adoption of a Land Use Plan in 2014. The Parish deliberately chose to operate without a zoning ordinance or land use plan for decades so as not to hamper large landowners who stood to benefit the most from lack of regulation, particularly using this free reign to locate industrial facilities in majority-Black districts. Compl. ¶¶ 181-88, 260-74. It was only when two companies made plans to locate in majority-white parts of the Parish that Defendants enacted a Land Use Plan, which they rigidly enforced to keep those companies away. *Id.* ¶¶ 275-78, 305-29.

### Factors 3 and 4: Departures from the Normal Sequence and Substantive Departures

"Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. Likewise,

"substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*

The Parish's track record of protecting white parts of the Parish from the encroachment of industry and steering industry to the 4th and 5th Districts is shot through with departures from the normal procedural sequence as well as substantive departures from factors purportedly deemed important by the Defendants, at least when majority-white parts of the Parish are concerned. Compl. ¶¶ 316-29 (Parish officials used Land Use Plan to quickly revoke land use permit from Petroplex), ¶¶ 307-15, 359 (Parish refused to grandfather in Wolverine Terminal even though it had already leased property it sought to develop before the land use plan went into effect). The Parish's strict treatment of Petroplex and Wolverine is in stark contrast to its treatment of South Louisiana Methanol ("SLM"), which was approved around the same time in 2014 for location in the majority-Black 5th District. *Id.* ¶ 355. SLM did not purchase the property until three years after its land use was approved – and after the land's designation had been changed from "future industrial" to "residential growth" in 2018 amendments to the Land Use Plan. At that point, SLM's project had become non-conforming but the Parish allowed SLM to be "grandfathered in" – even though it had not commenced serious construction, its proposed use was now non-conforming, and it had not purchased property before the land use designation was changed, *id.*. ¶¶ 356-58. Similarly, the Planning Commission has granted land use applications for facilities wishing to locate in the 5th District in violation of the Parish's own land use regulations. *Id.* ¶¶ 406-08, 412-13 (Planning Commission approval of facility was in contravention of the Land Use Plan because it required that decisions about non-conforming land uses be made by the Parish Council).

As for substantive departures, Parish officials have overlooked major omissions from applications submitted by several of these facilities seeking to locate in the 4th and 5th Districts – omissions of information about public health and safety. In 2018, the Planning Commission approved a land use application by Wanhua Chemical U.S. Operations, which sought to operate in the 4th District, even though it failed to include information required by the Parish's 2018 amended land use regulations about public establishments, parks, playgrounds, churches, schools and community centers within the Project's two-mile impact area. *Id.* ¶¶ 380-81. Similarly, the Parish granted a land use permit to Syngas Energy Holding to build a methanol production plant in the 5th District, even though it also failed to provide the Commission with the list of public places within a two-mile radius. *Id.* ¶ 429. Syngas also did not provide the Commission with an impact information of air emissions, noise, lighting, traffic, effect on property values, and neighborhood. *Id.* ¶ 430.

The Parish also refused to review a permit approval to Formosa Plastics, which would nearly double the air pollutant emissions in the Parish – already among the most polluted areas in the country – even after it was notified that the company had made a series of misrepresentations in its application about measures it took to mitigate harm to a nearby elementary school and church in the 5th District. *Id.* ¶¶ 399-401. As it turned out, whatever changes Formosa claimed it made were not in response to concerns about health and safety and would actually exacerbate health threats by placing a plant with the most potent carcinogenic emissions closer to the school and church. *Id.* ¶¶ 400-402. The Parish did not care.

*Factor 5: Legislative History*

"The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings,

or reports." *Arlington Heights*, 429 U.S. at 268. The legislative history of the adoption of the

Land Use Plan and individual permitting decisions reveals an ongoing discriminatory intent or

purpose behind the Parish's land use policy and practice.

　　As set out above, there are numerous detailed allegations showing that the Land Use Plan

was hurriedly enacted in 2014 at the same time two heavy industrial facilities were seeking to

locate in majority-white parts of the Parish. To give a legitimating gloss to the Plan, the Parish

Council suggested in its preamble that it was based on a process undertaken by the South Central

Planning and Development Commission to develop the Parish's "Comprehensive Plan 2031."

Compl. ¶ 292. However, that process had concluded two years earlier, and did not mention or

have any recommendation as to two-mile buffer zones for Catholic churches and schools in the

white parts of the Parish. *Id.* ¶¶ 296-98. Nor was there any mention of an "existing

residential/future industrial" land use designation. *Id.* There has never been an official

explanation as to why the Plan lay dormant for two years before being invoked as a basis for the

rushed Land Use Plan. *Id.* ¶¶ 297-98.

　　During the proceedings, the representative of the overwhelmingly white 3rd District

touted the need and benefits of the Plan to "keep our young people, our young residents in the

community" so they can feel "pretty secure their property is gonna be valued from here on out,

for twenty years plus that we can't put an industry next to them." *Id*. ¶ 290.

　　Similarly, when the Council adopted a resolution opposing the location of Wolverine in

the predominantly white area of Paulina, Parish Council members recognized and thanked

residents who showed up to oppose the facility. *Id.* ¶ 310. One council member "pledged his

commitment to moving forward with the master Plan to ensure that industrial developments are

located in designated industrial areas" (read: Black areas designated for industrial use) so these

residents would not have to go through this process again. *Id.* Parish officials then tried to redirect Wolverine to the predominantly Black community of Convent in the 4th District, which Wolverine declined because it was not "economically feasible." *Id.* ¶¶ 311-12, 314.

The Parish Council's gratitude to white residents stands in sharp contrast to the thankless efforts of 4th and 5th District residents, who have shown up time and again for years to no avail to oppose more of the Parish's approvals of heavy industrial facilities in their communities. *Id.* ¶¶ 354, 361-63, 369-72, 377-79, 386-88, 405-08, 432.

A more recent and telling contrast can be seen in the Parish's amendment of the Land Use Plan in August 2022 to enact a moratorium on solar farms at the request of residents in the majority-white part of the Parish to carefully study the economic and environmental impacts of such facilities. *Id.* ¶¶ 330-41. The Council listened to the concerns of one resident who lived near where a solar farm would be located, who advised the Council: "Nobody in this room is against solar panels. Nobody in this room is against green energy. You know what we don't want? We don't want it to be in our backyard." *Id.* ¶ 333. The Parish Council subsequently passed the resolution enacting the moratorium. *Id.* ¶¶ 335-36.

Yet the Parish refused to even consider a moratorium on harmful, polluting heavy industry long requested by Black residents. In September 13, 2019, Plaintiffs' members Sharon Lavigne and Gail LeBoeuf sent a letter officially requesting that the Council consider the possibility of a moratorium on heavy industry, *id.* ¶ 338, reflecting long-standing demands of Black residents. *Id.* ¶¶ 387-88. The Council never addressed these constituent demands in any way. *Id.* ¶ 340. At the Council meeting passing the solar moratorium resolution, Plaintiffs' member Sharon Lavigne again stated: "We need a moratorium on petrochemical facilities

because this is Cancer Alley and people are dying. How many more have to die because of you all?" *Id.* ¶ 341. The Parish Council once again ignored this appeal.

### *Additional Factor 6: Foreseeability*

The Supreme Court has held that, "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence" is relevant to an inference of discriminatory intent. *Penick*, 443 U.S. at 465 (internal quotation marks omitted) (citation omitted). *See also, Brown,* 561 F.3d at 433. As discussed in Section VII(B) *infra*, Defendants have long been on notice about the risks of heavy industry – particularly in what came to be known in the 1980s as "Cancer Alley." Despite all the ways in which Defendants have been put on notice over the course of decades, they have adhered to their discriminatory land use policies and practices, with full knowledge of the predictable effects of that adherence on residents in these majority-Black districts.

## VII.    CLAIM III: PLAINTIFFS SUFFICIENTLY PLEAD FACTS SHOWING THAT DEFENDANTS' LAND USE PRACTICES VIOLATE THEIR FUNDAMENTAL RIGHT TO BODILY INTEGRITY.

Under the substantive Due Process Clause of the Fourteenth Amendment, Plaintiffs have a fundamental right to bodily integrity, *Tyson v. Sabine*, 42 F.4th 508, 517 (5th Cir. 2022), such that involuntary intrusions by the government into the body of nonconsenting persons violates this right. *Riggins v. Nevada*, 504 U.S. 127, 133-35 (1992); *Rochin v. California*, 342 U.S. 165, 172 (1952). This includes Plaintiffs' right to be free from the intrusion of harmful contaminants into their bodies. *Guertin v. Michigan*, 912 F.3d 907, 918-22 (6th Cir. 2019) (residents of Flint, Michigan had fundamental right to be free from government knowingly and intentionally introducing harmful contaminants into water supply); *Williams ex rel. J.W. v. City of Jackson, Mississippi*, No. 3:21-CV-663-CWR-LGI, 2023 WL 2617395, at *12 (S.D. Miss. Mar. 23, 2023)

("right to bodily integrity is violated when the government induces unwitting citizens to consume lead-contaminated water without their consent").

State officials violate this fundamental right "when their conduct is 'arbitrary, or conscience shocking[.]'" *Hitt v. McLane*, 854 Fed. App'x. 591, 596 (5th Cir. 2021) (internal citations omitted); *see also Stukenberg ex rel. M.D.*, 907 F.3d at 251 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Actions may shock the conscience if they are (1) "intended to injure in some way unjustifiable by any government interest" or if they (2) "resulted from deliberate indifference," which requires plaintiffs to allege facts indicating a state actor "consciously disregard[ed] a known and excessive risk to the victim's health and safety." *Id*. at 252 (internal quotations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

## A.  Defendants Introduced Lethal Chemicals into Plaintiffs' Bodies Without Their Consent.

Defendants have knowingly and intentionally approved the introduction of highly dangerous air pollutants, Compl. ¶¶ 9, 442-66, into Plaintiffs without their consent and despite persistent appeals, ¶¶ 5, 8, 341, 354, 363, 370-72, 387, 379, 382, 401, 405, 408, 573. In so doing, Defendants have stripped from Plaintiffs the capacity to decide for themselves what substances may enter their bodies, or whether to consume these life-threatening, cancer-causing chemicals, mirroring the very kind of forced, involuntary intrusions on bodily integrity that the Supreme Court has guarded against. *Riggins*, 504 U.S. at 133-35; *Rochin*, 342 U.S. at 172. *See also Guertin,* 912 F.3d at 919 ("[T]his [is] especially so when the foreign substance can have serious, even fatal, side effects, despite some therapeutic benefits.") (internal quotations omitted).

## B.  Defendants' Exhibited Conscience-Shocking Deliberate Indifference

As comprehensively alleged, Defendants have had notice of the deadly impacts of locating polluting industry in St. James Parish's majority-Black 4th and 5th Districts since at

least the 1980s, through concerns raised by residents and government agency reports, some of which specifically described the situation in St. James Parish. Compl. ¶¶ 206, 210-12, 215-16, 226, 261, 264. But Defendants have "consciously disregard[ed]" this "excessive risk to [Plaintiffs'] health and safety." *Stukenberg ex rel. M.D.*, 907 F.3d at 252 (quoting *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.,* 380 F.3d 872, 880 (5th Cir. 2004)). The Parish President at the time dismissed this data and instead blamed these health impacts on the lifestyle choices of Black residents. Compl. ¶ 244. For decades since then, Plaintiffs and other residents of St. James Parish have been alerting Defendants to these disproportionate harms every time a new industrial facility is proposed in their community. *Id.* ¶¶ 8, 341, 354, 363, 370-72, 379, 382, 401, 405, 408. That the serious risks of siting decisions were obviously known is made plain – and unconscionable – by Defendants' decisions to protect white residents from proximity to petrochemicals, *id.* ¶¶ 307-29, at the same time Defendants granted every single request by polluting industry to locate their facilities in majority-Black districts, resulting in at least 20 such facilities being located there, ¶¶ 4-5, 342-432. And these approvals came despite repeated warnings from Black residents that industry applications were defective and inaccurately described relevant health risks, and by the Parish's refusal to amend or revoke such approvals. Compl. ¶¶ 8, 380-81, 399-402, 429-31.

The Court should reject Defendants' suggestion that it apply merely rational basis review, Defs.' Br. at 32, because this permissive test only applies to "substantive due process claims that do *not* implicate a fundamental right," *Reyes v. N. Texas Tollway Auth*, 861 F.3d 558, 561 (5th Cir. 2017) (emphasis added), and none of the cases that Defendants cite are based on violations of a fundamental right. *Petroplex,* 158 F. Supp. 3d at 542, upon which Defendants rely, involved a challenge to a residential and agricultural land use designation – the clear province of rational

basis – not that the land use plan was evidence of a consistent pattern and practice of violating a fundamental right to bodily integrity. In any case, conduct that shocks the conscience, *i.e.* is deliberately indifferent, cannot even survive rational basis review. *Brennan v. Stewart*, 834 F.2d 1248, 1256 (5th Cir. 1988).

## VIII.   CLAIM IV: PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF THE PROPERTY RIGHTS OF BLACK CITIZENS UNDER 42 U.S.C. § 1982.

The facts set forth above, *supra* Section VI(B), that support Plaintiffs' showing of intentional discrimination for their Equal Protection claim are likewise sufficient to show discriminatory intent or purpose under the standards governing 42 U.S.C. § 1982. Defendants also seem to suggest that this statute only recognizes a decrease in property value and that Plaintiffs have not pled such facts sufficiently. Defs' Br. at 34. Defendants are plainly incorrect on both counts.

First, violations of 42 U.S.C. § 1982 can arise from a range of harms beyond diminution of property values, such as a right to nondiscrimination in the enjoyment of property. *See*, *e.g., Jones*, 392 U.S. 409 (racial discrimination in the sale of property was a violation of 42 U.S.C. § 1982); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 648 F. Supp. 2d 805, 819 (E.D. La 2009) (invalidating "blood relative" ordinance restricting rental, lease, or loan of residences to blood relatives for a racially discriminatory purpose)*; Williams v. Matthews Co.*, 499 F.2d 819, 823 (8th Cir. 1974) (invalidating a "builders only" policy that operated with purpose of excluding Black homebuyers); *Jennings v. Patterson,* 488 F.2d 436 (5th Cir. 1974) (recognizing Black property owners the right to enjoy their property on the same basis as white citizens); *Martin v. John C. Bowers & Co.,* 334 F. Supp. 5 (N.D. Ill. 1971) (lying about the availability of apartments).

Second, the Complaint does in fact contain allegations that Parish conduct resulted in a diminution in property values. Compl.*, ¶¶ 15, 23-25, 168, 249-59, 559. *Greene,* 451 U.S. 100, is obviously unhelpful to Defendants, as the Court determined there was insufficient evidence of the asserted diminished property values adduced after a full *trial* on the merits; by contrast, at the pleading stage, Plaintiffs allegations – which must be taken as true and with inferences in a light most favorable to Plaintiffs – plausibly show that Defendants have caused a diminution in property value. Compl. ¶¶ 23-25, 203-04, 249-59 (heavy industry in Plaintiff communities produced heavy pollution that limited Plaintiffs' enjoyment of property), ¶¶ 24, 189-93, 199-201, 281, 410-18, 465 (harming church congregation and property), ¶¶ 284-85 (changing designations from "existing residential" to "future industrial" in 4th and 5th Districts signaling end or damage to residential areas and possible sale or disposition of property there), ¶¶ 289 (restrictions on ability of residents in "future industrial" areas to sell or subdivide property, which are not applicable to white residential areas). Plaintiffs also set forth detailed facts describing the impacts of these official actions on the ability of Plaintiffs to locate, preserve, and worship at their ancestral burial sites, in which they are deemed to have a property interest, as discussed more below. *See infra* Section IX; Compl. ¶¶ 467-551.

## IX.    PLAINTIFFS SUFFICIENTLY PLEAD VIOLATIONS OF RLUIPA.

Under Claim V,[11] Plaintiffs assert that Defendants have imposed a substantial burden on their members' religious exercise by implementing a land use system, including the Land Use Plan, which sites industrial facilities upon cemeteries of their enslaved ancestors, and by

---

[11]    Defendants do not raise any arguments that support dismissing Claim VI, in which Plaintiff Mount Triumph claims Defendants' policy and practice of preferencing Catholic churches in majority-white parts of the Parish through protective buffer zones not applied to Baptist churches in majority-Black parts, violates the nondiscrimination provision of RLUIPA. 42 U.S.C. § 2000cc(b)(2). Compl. ¶¶ 190, 199, 280-81, 375, 385, 393-97, 417, 422-23.

approving individual industrial land use applications upon these cemeteries, Compl. ¶¶ 485-539, 587. These actions have desecrated or threaten to desecrate these cemeteries, are inconsistent with cemetery use, and make Plaintiffs' religious exercise upon these cemeteries – which hold a deep religious significance to them, ¶¶ 540-49 – impracticable.

Plaintiffs have alleged, as RLUIPA requires, that they have "an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc–5(5). To begin, under Louisiana law, "once real estate is set apart and used for a final resting place of the dead, the owner cannot thereafter make another use of it," and as such although descendants "do not own, in a strict legal sense, an interest in the cemetery, they do have a 'species of interest or form of title' therein." *Humphreys v. Bennett Oil Corp.*, 35539 (La. 4/29/40) 195 La. 531, 549. "[W]hen a plot of ground is set apart and used for cemetery purposes… descendants and near relatives of those interred therein are entitled to . . . injunctive relief to protect the graves and their burial and visitation rights related thereto." *Vidrine v. Vidrine*, 2697 (La. App. 3 Cir. 8/7/69) 225 So. 2d 691, 696, *writ refused*, 254 La. 853, 227 So. 2d 594 (La. 1969). *See also Charrier v. Bell*, 85-0867 (La.  App. 1 Cir.) 496 So. 2d 601, 604, *writ denied*, 498 So. 2d 753 (La. 1986). This constitutes a property interest under RLUIPA. 42 U.S.C. § 2000cc–5(5).[12]

Defendants do not deny descendant communities by law have a property interest in land that is dedicated for cemetery purposes, but argue that that the cemeteries described by Plaintiffs have not been so dedicated. Defs.' Br. at 38. But even the case Defendants rely upon on makes clear under Louisiana law that *formal* dedication is not required. *Humphreys*, 195 La. at 540. In

---

[12]    The Attorney General has recognized this as comparable to the "rights of a dominant servitude holder over a servient estate" that extend to "descendants and friends." La. Atty. Gen. Op. No. 08-0186 at 1-2, available at http://www.lcb.state.la.us/ago/ago08-0186.pdf.

*Thomas v. Mobley*, the court found that a plantation cemetery had in fact been dedicated when "commencing in slavery days, a tract of about an acre in extent had been used for burial purposes" by Black families residing on or near the plantation, and "[r]elatives of those interred in the . . . Cemetery continued to be buried therein up to 1948, after which date no further interments took place[,]" even though "by 1956 the graveyard, although readily distinguishable from the surrounding pasture, had become overgrown" and otherwise deteriorated. 4760 (La. App. 1st Cir. 3/21/60) 118 So. 2d 476, 478.

Similarly here, Plaintiffs have alleged that plantation owners were legally required to set aside land for burying the people they enslaved, Compl. ¶ 474, that burials generally occurred in uncultivated land in the back of plantations, ¶ 477, where graves were often marked by trees – and preserved by laborers and farmers – to identify them for loved ones and descendant communities, ¶¶ 481-82. It is virtually certain that there is a cemetery in every plantation in St. James Parish. *Id*. ¶ 479. Plaintiffs have identified at least five cemeteries that were explicitly marked on maps from the 1870s as being set aside for burial purposes, and which have been desecrated, or threaten to be, by actions approved by Defendants. *Id*. ¶¶ 497, 501, 507, 513, 515, 527. And Plaintiffs have identified other land that was likely set aside as a cemetery which is threatened by Defendants' actions. *Id*. ¶¶ 527, 539. This is sufficient for the Court to draw a plausible inference that the land at issue has been dedicated for cemetery use, and that therefore Plaintiffs, as descendants of people enslaved in the Parish, have a property interest in them.

X.    **CLAIM VII: PLAINTIFFS SUFFICIENTLY PLEAD AN INFRINGEMENT OF THEIR RIGHT TO PRESERVE, FOSTER, AND PROMOTE THEIR HISTORIC AND CULTURAL ORIGINS.**

This case warrants the protections enacted through Art. XII, Sec. 4, of the Louisiana Constitution of 1974.[13] With regard to Plaintiffs' factual allegations concerning burial grounds, Defendants mischaracterize Plaintiffs' claims – suggesting that they "seek to compel the Parish to promote their members' culture." Defs.' Br. at 40. To the contrary, they seek ordinary relief – to preserve and protect ancestral burial grounds so that Plaintiffs can commune and worship there. Defendants also incorrectly assert that "Plaintiffs lack a property right on which to base this claim," – an argument fully refuted in Section IX, *supra*, related to RLUIPA.[14]

Defendants do not address Plaintiffs' other factual allegations demonstrating that the Parish's discriminatory land use system has had and continues to have harmful impacts on sites of their communities' cultural origins when emerging from slavery. Compl. ¶¶ 84-90 (settlements of Freetown and Romeville); ¶¶ 349, 366, 417, 424 (land use decisions impacting

_____

[13]    While the driving concern behind the drafting of the Constitutional provision may have been the disappearing Acadian language and culture, the fundamental mandates of equal protection and non-discrimination require that the Louisiana Constitution cannot be read, as Defendants suggest this court do, Defs.' Br. at 39, in a manner so cramped as to exclude the rights of other peoples to preserve, foster, and promote their historic and cultural origins.

[14]    Cases the Defendants rely on are inapposite because they involve disposition of public confederal monuments in public spaces. *See McGraw v. City of New Orleans,* 2016-0446 (La. App. 4 Cir. 3/29/17), 215 So. 3d 319, 331, *Monumental Task Force, Inc. v. Foxx*, 157 F. Supp. 3d 573 (E.D. La. 2016). Those plaintiffs had no "vested property right in the monuments" and could not establish "irreparable harm in violation of federal and state constitutional provisions should the monuments be damaged by their removal, transportation, or storage." *McGraw,* 215 So. 3d at 332-33. *See also, Monumental Task Force,* 157 F.3d at 598 ("Plaintiffs have failed to demonstrate that they have a property interest in the monuments sufficient to require constitutionally adequate due process."). Plaintiffs here have a property interest in these burial grounds, and their interest in preserving the sanctity of cemeteries is profound. *See supra* Section IX.

Freetown); ¶¶ 190, 246-59, 374-75 (land use decisions impacting Romeville); ¶¶ 24, 281, 349, 366, 410-18, 465 (impacts on and threats to Mount Triumph, founded 119 years ago); ¶ 609.

That state and federal laws also provide for regulation of cemeteries does not defeat this claim. The Parish has constitutional authority over land use, zoning, *and historic preservation.* La. Const. 1974 Art. IV, Sec. 17, and the statutory responsibility to promote the general welfare of its citizens, in addition to their health and safety. La. Stat. Ann. § 33:107.

## XI.   THIS COURT SHOULD REJECT DEFENDANTS' MOTION TO STRIKE AS AN IMPROPER ATTACK ON THE SUBSTANCE OF PLAINTIFFS' CLAIMS.

### A.  Defendants' Attempt to Dismiss the Entirety of Plaintiffs' Complaint Through a Motion to Strike is Outrageous.

Defendants make a remarkable and likely unprecedented demand that this Court strike paragraphs 1 *through* 551 – the *entirety* of the factual allegations of the Complaint, in blunderbuss fashion – because they are offended by allegations, the truth of which they regard as "immaterial, impertinent, and scandalous." Defs.' Br. at 9. Their argument is so arbitrary and slapdash, that it demands even striking sections on Jurisdiction, Venue, and Parties. As for the Factual Background, all of the allegations are relevant to Plaintiffs' claims of a harmful, painful legacy of discriminatory mistreatment.

Motions to strike under Rule 12(f) "are disfavored" and are "considered a drastic remedy." *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *on reconsideration in part*, No. 11-871, 2012 WL 1230736 (E.D. La. Apr. 12, 2012) (internal quotations omitted). "Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation." *Pan Am. Life Ins. Co. v. Blanco*, 311 F.2d 424, 428 n.13 (5th Cir. 1962). Rule 12(f) is "neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint." 5C Charles Alan *Wright & Arthur R. Miller, Federal*

*Practice and Procedure* § 1380 (3d Ed. 2003). "Any doubt about whether the challenged

material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the

non-moving party." *Spoon v. Bayou Bridge Pipeline, LLC*, 335 F.R.D. 468, 471 (M.D. La. 2020).

Here, Defendants – who cannot be bothered to conduct legal analysis tethered to 12(f) standards

– clearly intend their Motion to Strike to effectively procure dismissal of the *entire* Complaint.

As Plaintiffs have painstakingly detailed, all of the allegations when taken as true and viewed in

a favorable light, as they must be, do detail a horrible and painful history that is relevant to

understanding the legacy of discrimination, emanating to this day .[15]

### B. The Complaint's Allegations Are Material to the Claims Which Depend in Part on a History of Discrimination.

To prevail on their assertion of "immateriality," Defendants must show allegations "can

have no possible bearing upon subject matter of the litigation." *Harris v. USA Ins. Companies*,

No. CIV.A. 11-201, 2011 WL 3841869, at *1 (E.D. La. Aug. 30, 2011). Defendants do not even

gesture towards meeting this "no-possible-bearing" standard; their conclusory statement that

historical allegations are "irrelevant to the claims asserted," Defs.' Br. at 7, is a failure.[16]

Plaintiffs' Equal Protection and § 1982 claims require a showing of discriminatory intent, which

the Supreme Court instructs may rely upon the historical background of the challenged actions.

*See* Section VI(B) *supra* (discussing *Arlington Heights* framework's reference to historical

---

[15]     Defendants appear to take particular offense at the preliminary statement and its
necessary overview of the lengthy allegations and legal claims that follow, which Defendants
find "irrelevant and immaterial."  Defs.' Br. at 4, 6. But Defendants' concerns "do not rank in
importance with the right and the duty of a litigant to present his demands through counsel of his
own choosing and in a style and form of expression which represent the attorney's honest effort
to present the claims according to his own notions of their merits . . . ." *Atwood v. Humble Oil &
Ref. Co.*, 243 F.2d 885, 888 (5th Cir. 1957).
[16]     For example, Defendants claim that "the Complaint continues to assert immaterial facts,"
Defs.' Br. at 7, but do not bother even to identify which those facts are.

background). The Thirteenth Amendment requires showing that practices constitute a "badge and incident of slavery." How exactly would Defendants propose Plaintiffs make this showing without discussing slavery, Jim Crow, and its deep history in the Parish? Likewise, more recent historical background is relevant to assessing the discriminatory impact and intent of Defendants' land use practices, and statements of Plaintiff members are relevant to standing and underscore the indignity (relevant to the assessment of standing and harms) Black residents of the Parish have endured for years as their pleas to elected officials go unheard, while witnessing profound property, health, and community damage.

Defendants make no specific showing of which paragraphs are "immaterial" or "impertinent" – let alone one that meets the "no-possible-bearing" standard – and they show no prejudice if those paragraphs are not struck. This Court should deny the Motion to Strike.

### C. The Truth About the Long and Ugly History of Racial Discrimination in St James Parish Cannot be Struck as "Scandalous."

Defendants also broadly claim that the *entire Complaint* is "scandalous," and should thus be struck. Defs.' Br. at 7. But under Defendants' view, any complaint alleging discrimination or horrible conduct would have to be struck to protect the sensibility of those accused of perpetrating such harms. While a particular allegation may be deemed scandalous if it contains an egregious – and immaterial – derogatory statement, "it is not enough that the matter offends the sensibilities of the objecting party" or the person who is the subject of the statements in the pleading, "'if the challenged allegations describe acts or events that are relevant to the action.'" *Spoon*, 335 F.R.D. 468, 470-71 (M.D. La. 2020) (quoting Wright & Miller, *Federal Practice and Procedure* § 1382). The purpose of striking [scandalous] matter "is aimed, in part, at avoiding prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegations any other unnecessary notoriety." *Marceaux v. Lafayette Consol. Gov't.*, No. 12-CV-

01532, 2012 WL 5197667, at *1 (W.D. La. Oct. 18, 2012).[17]

Defendants do not even attempt to identify any prejudice, which is fatal to their argument. Indeed, everything referenced in the Complaint is – far from some private or embarrassing detail – a matter of *public record*. And the long-legacy of discrimination is relevant to the theory of unequal treatment that undergirds nearly all of Plaintiffs' claims.

## XII.   DEFENDANTS' DEMAND FOR FEES IS FRIVOLOUS.

Defendants' demand for attorneys' fees is procedurally improper and substantively absurd. Resolution of an attorneys' fees motion – by any party – is necessarily "collateral" to and "separate from" a decision on the merits and as such, is "an inquiry that cannot even commence until one party has 'prevailed.'" *White v. New Hampshire Dep't of Emp. Sec.*, 455 U.S. 445, 451-52 (1982). Under Fed. R. Civ. P. 54(d)(2)(A), "claims for attorneys; fees must be made by separate motion to the district court." *United Indus., Inc. v. Simon-Hartley, Ltd.,* 91 F.3d 762, 765–66 (5th Cir. 1996). On the substance of Defendants' claims, their persistent conclusory assertions clearly do not meet their enormously high burden to show "frivolousness" as required under *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978).

### CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss and their request to strike the allegations in the Complaint.

---

[17]   Presumably, under Defendants perspective, Judge Minor Wisdom's landmark decision in *U.S. v. Louisiana*, 225 F. Supp 353 (1963) – with its detailed explanation of the profound relevance of the history of white supremacist violence and discrimination against Black Louisianians – would count as "scandalous," even though these "pages of history" were necessary to fully evaluating plaintiffs' claims.

Date: August 14, 2023

Respectfully submitted,

s/Devin Lowell

s/Pamela C. Spees

Devin Lowell, Trial Attorney
La. Bar Roll No. 36555
Lauren Godshall, La. Bar Roll No. 31465
Clara Potter, La. Bar Roll No. 38377
TULANE ENVIRONMENTAL LAW CLINIC
6329 Freret St.
New Orleans, LA 70118
Tel.: (504) 865-5789
Fax: (504) 862-8721
dlowell@tulane.edu
lgodshall@tulane.edu
cpotter2@tulane.edu

*Attorneys for RISE St. James*

Pamela C. Spees, Trial Attorney
La. Bar Roll No. 29679
Baher Azmy*
Sadaf Doost (admitted pro hac vice)
Astha Sharma Pokharel (admitted pro hac vice)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel. & Fax (212) 614-6431
pspees@ccrjustice.org
bazmy@ccrjustice.org
asharmapokharel@ccrjustice.org
sdoost@ccrjustice.org
*\*Application for pro hac vice admission pending*

William P. Quigley (cooperating counsel)
La. Bar Roll No. 7769
Professor Emeritus
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel. (504) 710-3074
Fax (504) 861-5440
quigley77@gmail.com

*Attorneys for Plaintiffs Inclusive Louisiana and Mount Triumph Baptist Church*

41