UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

INCLUSIVE LOUISIANA ET AL.                    CIVIL ACTION

VERSUS                                        NO: 23-987

ST. JAMES PARISH ET AL.                       SECTION: "J"(1)

## ORDER AND REASONS

Before the Court is a *Re-Submitted Rule 12(b)(6) Motion to Dismiss Claims*
**(Rec. Doc. 108)** filed by Defendant St. James Parish, on behalf of itself and the St.
James Parish Council and the St. James Parish Planning Commission (hereinafter
collectively "Defendants"). Plaintiffs Inclusive Louisiana, Mount Triumph Baptist
Church, and RISE St. James ("Plaintiffs") opposed the motion (Rec. Doc. 110), and
Defendants filed a reply memorandum (Rec. Doc. 113). Further, the Court held oral
argument on the motion on January 28, 2026. Having considered the motion and
memoranda, the record, the parties' oral arguments, and the applicable law, the
Court finds that Defendants' motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

St. James Parish, one of the original nineteen parishes established in
Louisiana in 1807, is located on the Mississippi River between Baton Rouge and New
Orleans. Because of its proximity to the river, St. James Parish has attracted
significant industrial development, and it is because of this industrial development
that the stretch of land between Baton Rouge and New Orleans is referred to as

"Cancer Alley." In fact, in this roughly-85-mile industrial corridor alone, there are more than 200 petrochemical plants and refineries, which process approximately 25% of the United States' petrochemical products. Public Health on Call, *Louisiana's "Cancer Alley" Is More Deadly Than Previously Imagined*, Johns Hopkins Bloomberg Sch. Pub. Health (Aug. 4, 2025), https://publichealth.jhu.edu/2025/the-shocking-hazards-of-louisianas-cancer-alley. Due in part to pollutants and toxic emissions from petrochemical and other industrial facilities, St. James Parish has the fifth highest cancer incidence rate among Louisiana parishes with 533.5 cases per 100,000 people,[1] compared to a national rate of 462.8 per 100,000 in 2022.

In St. James Parish, most of these heavy industrial facilities are located in majority-black districts; specifically, 28 industrial facilities have been permitted to build in the 4th and 5th Districts, which are both home to majority-black populations, while there are only 4 such facilities in all of the other seven districts combined. (Rec. Doc. 104, at ¶ 373). Furthermore, Plaintiffs claim that the Parish Council has not permitted an industrial facility to locate in a majority-white part of the Parish for almost 50 years, while at the same time, the Council has allegedly granted *every* request from companies that sought to locate in majority-black districts. *Id.* Not coincidentally, according to Plaintiffs, 4th and 5th District residents ranked in the 95th–100th percentile in the nation for Air Toxic Cancer Risk based on the

---

[1] According to the National Cancer Institute, this number is currently on the rise. *State Cancer Profiles*, Nat'l Cancer Inst., https://statecancerprofiles.cancer.gov/incidencerates/index.php?stateFIPS =22&areatype=county&cancer=001&race=00&sex=0&age=001&type=incd&sortVariableName=rate &sortOrder=default&output=0 (last visited Feb. 6, 2026).

Environmental Protection Agency's Toxic Release Inventory, while the 3rd District, which is majority white and has "the lowest rate of industrialization," ranked in the 34th percentile. *Id.* at ¶¶ 557–60. The siting of heavy industrial facilities in St. James Parish forms the centerpiece of this litigation.

Plaintiffs Inclusive Louisiana, Mount Triumph Baptist Church, and RISE St. James, by and through their members, filed their initial complaint against St. James Parish, the St. James Parish Council, and the St. James Parish Planning Commission on March 21, 2023. Inclusive Louisiana is a non-profit community advocacy organization based in St. James Parish with a goal of protecting the Parish against environmental harm. Mount Triumph Baptist Church is a local congregation in St. James Parish whose members claim descent from formerly enslaved people who lived in St. James Parish. RISE St. James is a faith-based, grassroots organization advocating for the end of petrochemical industries in St. James Parish. All three Plaintiffs claim that their members are residents of St. James Parish descended from formerly enslaved persons whose civil liberties, property rights, and religious rights are violated by Defendants' 2014 Land Use Plan ("the Land Use Plan" or "the Plan") and actions both before and after its adoption.

Defendants are St. James Parish, the St. James Parish Council, and the St. James Parish Planning Commission. St. James Parish is a local governmental subdivision of the State of Louisiana. St. James Parish Council is the legislative body of the St. James Parish government, and the St. James Parish Planning Commission

is a municipal body that oversees and implements local land use regulations and zoning.

Plaintiffs center their allegations on St. James Parish's adoption of a Land Use Plan in 2014, but throughout their complaint, they refer to a pattern of land use practices that long predated the Plan. Prior to 2014, St. James Parish had never adopted a formal land use plan, and Plaintiffs allege that the 2014 Plan effectively codified an existing practice of discriminatory behavior toward their neighborhoods. Further, Plaintiffs assert that the 2014 Land Use Plan was used to protect majority-white parts of the Parish from industrial development, while steering industry to the 4th and 5th Districts, which are home to populations that are majority black. Chief among Plaintiffs' allegations is that the Plan's designation of large tracts of property in the 4th and 5th Districts as "residential/future industrial," in addition to the heavy industry that Defendants had already permitted to build facilities in these areas, evinces an intent to industrialize the majority-black districts and erase these communities. Not coincidentally, according to Plaintiffs, many of these industrial facilities were built on sites where sugarcane plantations once stood. Further, Plaintiffs claim that the 2014 Land Use Plan created industrial buffer zones for white-majority churches but not black-majority churches in the Parish. In their complaint, Plaintiffs tell the story of how plantations gave way to industrial facilities that now endanger black residents' health, negatively impact their quality of life, and desecrate the unmarked cemeteries of their ancestors.

Plaintiffs bring the action under 42 U.S.C. § 1983 and allege that Defendants have violated the Thirteenth Amendment, the Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Louisiana Constitution. Specifically, Plaintiffs allege that Defendants have maintained a discriminatory, unequal, and injurious system that deprives Plaintiffs' members of their rights via zoning and land use decisions. Plaintiffs seek declaratory and injunctive relief against Defendants for the alleged violations.

On November 4, 2025, Plaintiffs amended their complaint for the second time, seeking declaratory and injunctive relief on seven claims (Rec. Doc. 104). In Claim I, Plaintiffs allege that Defendants have violated the Thirteenth Amendment because the existing land use system operates as a badge and incident of slavery. In their second claim, Plaintiffs contend that Defendants have violated the Fourteenth Amendment's Equal Protection guarantee because discriminatory intent undergirds the Parish's land use decisions, which create a disparate impact on the Parish's black residents. In Claim III, Plaintiffs bring a substantive due process claim under the Fourteenth Amendment, alleging that Defendants' land use decisions have infringed their fundamental rights to bodily integrity and freedom from state-facilitated harm. In Claim IV, Plaintiffs allege that Defendants' conduct has violated 42 U.S.C. § 1982 because the Land Use Plan's intentional discrimination has negatively impacted Plaintiffs' members' property rights.

Additionally, Plaintiffs bring claims against Defendants under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). In Claims V and VI,

Plaintiffs assert that the Parish's Land Use Plan has placed a substantial burden on their members' ability to practice their religion and has enabled religious discrimination against black Baptist churches in the Parish. Lastly, in Claim VII, Plaintiffs assert that Defendants have violated the Louisiana Constitution's guarantee of their members' rights to preserve, foster, and promote their cultural and historical heritage.

Defendants filed their first Rule 12 Motion to Strike Allegations and Dismiss Claims (Rec. Doc. 20) on June 16, 2023, which this Court granted in part and denied in part. Specifically, the Court denied the motion to strike, dismissed Claims V and VII for lack of standing, and dismissed Plaintiffs' remaining claims (I–IV and VI) with prejudice based on prescription. Plaintiffs appealed the decision, and the Fifth Circuit reversed and remanded on April 9, 2025. First, the Fifth Circuit agreed with Plaintiffs that their claims were based not on a "single incident" (i.e., St. James Parish's adoption of the 2014 Land Use Plan) but rather on a "longstanding pattern and practice of racially discriminatory land use decisions." *Inclusive Louisiana v. St. James Par.*, 134 F.4th 297, 305 (5th Cir. 2025). The court held that Claims I–IV had not prescribed because Plaintiffs supported these claims with at least two acts that had occurred within the one-year limitation period, namely Defendants' August 17, 2022 denial of Plaintiffs' request for a moratorium on "polluting industry" in the 4th and 5th Districts, and Defendants' contemporaneous decision to grant a moratorium on the solar industry that was requested by some of the Parish's white residents. *Id.* at 306. Similarly, the Fifth Circuit ruled that Claim VI, which is subject to a four-

year limitation period, had not prescribed because Plaintiffs cited acts that occurred in May of 2019 pertaining to land use permits for both Wanhua Chemical US Operations and Syngas Energy Holding, LLC to support the claim. *Id.*

More importantly, however, the Fifth Circuit rejected Defendants' argument that all of Plaintiffs' claims ultimately arose from the 2014 Land Use Plan, and to support this finding, the court provided multiple land use decisions, dating from 1966 through 2022, that Plaintiffs included in their first amended complaint. *Id.* at 306–08. Furthermore, the court pointed out that even if all of Plaintiffs' claims did arise from the Parish's 2014 adoption of the Land Use Plan, that would not automatically mean that the claims had prescribed because land use plans are not "self-implementing," and therefore, decisions concerning the implementation of that plan are ongoing. *Id.* at 308. Finally, the appellate court held that Plaintiffs have standing to bring Claims V and VII. *Id.* at 309.

Subsequently, Defendants sought a writ of certiorari from the United States Supreme Court, which was denied. Plaintiffs were then granted leave to supplement their complaint, and the second amended complaint was filed into the record on November 4, 2025. On November 18, 2025, Defendants filed the instant motion to dismiss, and the Court scheduled oral argument on the motion for January 28, 2026.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim

is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## DISCUSSION

### A. Thirteenth Amendment

Plaintiffs bring their first claim against Defendants under the Thirteenth Amendment, arguing specifically that St. James Parish's land use system and zoning ordinances represent a "badge and incident" of slavery. Conversely, Defendants contend that Plaintiffs' Thirteenth Amendment claim must fail because Plaintiffs "have not pled any deprivation of rights that is a 'badge or incident of slavery.'" (Rec. Doc. 108-1, at 11). Defendants' argument rests on a definition of "badges and incidents of slavery" that requires the "subjection of one man to another." *Id.* at 11–12 (quoting *Civil Rights Cases*, 109 U.S. 3, 24 (1883)).

The Thirteenth Amendment was ratified in 1865 after the Civil War. Arguably one of the most important (if not *the* most important) amendments, it abolished slavery and involuntary servitude, except in the case of a person who has been convicted of a crime, and also included an enforcement clause, granting Congress the power to pass "appropriate legislation" to achieve the amendment's purposes. U.S. Const. amend. XIII. In the *Civil Rights Cases* of 1883, the United States Supreme Court declared that the enforcement clause of the Thirteenth Amendment "clothe[d] Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *C.R. Cases*, 109 U.S. at 20. Since 1883, much ink has been spilled regarding the scope of the phrase, "badges and incidents of slavery."

By 1865, "incidents" was already considered a term of art, and in the Thirteenth Amendment context, it referred to "any legal right or restriction that necessarily accompanied the institution of slavery." Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 J. Const. L. 561, 575 (2012). For this reason, the term was often bound up in "the aspects of property law that applied to the ownership and transfer of slaves," as well as the "civil disabilities imposed on slaves by virtue of their status as property." *Id.* "Badges of slavery," on the other hand, was largely used in a figurative, rather than a legal, sense until after the Civil War, and in the United States, it often referred to skin color because certain legal restrictions associated with slavery were frequently visited not only on enslaved African Americans, but also on free people of color because of their race. *Id.* at 576.

Immediately after the Thirteenth Amendment's ratification, however, "badges of slavery" "became more of a term of art that referred to legal restrictions imposed by states on the civil rights of freed slaves." *Id.* at 581. Naturally, the term's meaning evolved in a way that reflected "the reality of emancipation . . . and the term was used to reference ways in which southern governments and white citizens endeavored to reimpose upon freed slaves the incidents of slavery or, more generally, to restrict their rights in such a way as to mark them as a subordinate brand of citizens." *Id.* at 577–78. In other words, as states developed new ways to subjugate the people who had previously been enslaved, the meaning and scope of "badges and incidents of slavery" necessarily expanded.

As language does, the concept behind this term of art—"badges and incidents of slavery"—has evolved with the times. For example, in the *Civil Rights Cases*, the Court provided concrete examples of what it saw as the incidents of slavery: "[c]ompulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities." *C.R. Cases*, 109 U.S. at 22. When the *Civil Rights Cases* were heard in 1883, the concept of the "badges and incidents of slavery" was interpreted more "literally" because the direct and immediate effects of chattel slavery were still being felt. As understandings of the lasting effects of slavery in the United States have developed, however, the meaning ascribed to "badges and incidents of slavery" has expanded. Most recently, for example, Congress determined

10

that "public and private . . . racially motivated violence" constitutes a badge and incident of slavery, and as a result in 2009, Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act under the authority of the Thirteenth Amendment's Enforcement Clause. Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 J. Const. L. 561, 564 (2012) (citing National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 4702, 123 Stat. 2190, 2835–36 (2009)).

Defendants base their argument to dismiss Plaintiffs' claim under the Thirteenth Amendment primarily on an outdated concept of the "badges and incidents of slavery." Specifically, Defendants focus only on the "subjection of one man to another" and "the involuntary servitude prohibited by the Thirteenth Amendment." (Rec. Doc. 108-1, at 13). Based on the legal development of the concept since 1883, however, the Court finds Defendants' argument unavailing.

Additionally, Defendants maintain that Plaintiffs cannot bring a claim under the Thirteenth Amendment because it does not create a private right of action. Plaintiffs respond that they brought their Thirteenth Amendment claim under 42 U.S.C. § 1983, which enables a plaintiff to bring a cause of action against a person who, acting under color of state law, deprives the plaintiff of constitutional rights. 42 U.S.C. § 1983. Defendants question whether § 1983 is the proper procedural vehicle for Plaintiffs to use to vindicate their rights under the Thirteenth Amendment and instead suggest that Plaintiffs must bring a Thirteenth Amendment claim under a statute that Congress has passed pursuant to the amendment's Enforcement Clause.

11

Both parties cite cases to support their positions, but none of these cases fully resolves the matter.

For example, Defendants rely on *Murray v. Earle* to support their claim that the Fifth Circuit has not determined whether a plaintiff may bring a suit for a violation of the Thirteenth Amendment under § 1983. In that case, the Fifth Circuit said the following: "It is not altogether clear that there is a private right of action under § 1983 for violations of the Thirteenth Amendment. . . . However, other circuits have concluded that state actors may be held responsible for Thirteenth Amendment violations under § 1983." *Murray v. Earle*, 334 F. App'x 602, 607 (5th Cir. 2009) (citing *Channer v. Hall*, 112 F.3d 214, 217 n.5 (5th Cir.1997) ("suits attacking the 'badges and incidents of slavery' must be based on a statute enacted under § 2"); *Sumpter v. Harper*, 683 F.2d 106, 108 (4th Cir. 1982) (explaining that § 1983 is "a key enforcement vehicle for the Thirteenth and Fourteenth Amendments")). The *Murray* court did not hold that a plaintiff could validly bring a Thirteenth Amendment claim under § 1983, but it also did not hold that a plaintiff could not do so.

Moreover, the legislative history of § 1983 suggests that the statute is the proper procedural vehicle to enforce the Thirteenth Amendment against state actors. Shortly after the Thirteenth Amendment was ratified, Congress overrode President Andrew Johnson's veto to pass the Civil Rights Act of 1866 as an act "[t]o protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication." Civil Rights Act of 1866, 39 Cong. ch. 31, 14 Stat. 27. The first section of the act became § 1981, which guarantees to "[a]ll persons within the jurisdiction of

the United States . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42. U.S.C. § 1981. Later, after the Fourteenth Amendment was passed, Congress enacted the Civil Rights Act of 1871, which included § 1983. *Civil Rights Act of 1871*, Fed. Jud. Ctr., https://www.fjc.gov/history/timeline/civil-rights-act-1871 (last visited Feb. 6, 2026). The 1871 Act made it possible for plaintiffs to sue state actors for violations of constitutional rights, whereas § 1981 only reached private conduct. In *Jett v. Dallas Independent School District*, the Supreme Court said, "We think the history of the 1866 Act and the 1871 Act . . . indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989). In sum, Congress enacted § 1981 explicitly so that people, specifically African Americans and former slaves, could vindicate their rights under the Thirteenth Amendment. Based on this history and the understanding that § 1983 constitutes an extension of § 1981, the Court finds that Plaintiffs have validly stated a Thirteenth Amendment claim under § 1983.

### B. Plaintiffs' Claims Under the Fourteenth Amendment

### 1. Equal Protection Clause

The Fourteenth Amendment's Equal Protection Clause guarantees all persons equal protection under the law and therefore prohibits any state governmental action that results in the differential treatment of similarly situated individuals. U.S. Const. amend. XIV, § 1; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439

(1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To state a claim under the Fourteenth Amendment's Equal Protection Clause, plaintiffs must first establish that they have been treated differently due to their membership in a protected class. *Mills v. City of Bogalusa*, 112 F. Supp. 3d 512, 516 (E.D. La. 2015) (citing *Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Miss.*, 543 F.3d 221, 228 (5th Cir. 2008)). When a facially neutral state or local law (like the Land Use Plan at issue in this case) has a disparate impact on similarly situated individuals, a plaintiff must also demonstrate that the disparate impact of the governmental action results from discriminatory intent. *Id.* To establish discriminatory intent, a plaintiff must show "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (citation omitted). When a plaintiff proves that a challenged state action has a disparate impact based on race and that it was motivated by a discriminatory intent, the burden then shifts to the defendant, and the state action must survive strict scrutiny. *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 354 (5th Cir. 2015).

*Arlington Heights* remains the seminal Supreme Court decision concerning discriminatory intent and the interplay between land use decisions and the Equal Protection Clause. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). There, the Court explained that a plaintiff challenging state governmental action based on disparate impact must also prove discriminatory intent, which "demands a sensitive inquiry into such circumstantial and direct evidence of intent

as may be available." *Id.* at 266. The Court acknowledged that in what it called rare cases, "a clear pattern, unexplainable on grounds other than race," may sometimes supply the evidence of discriminatory intent. *Id.* (citing four cases, including *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)). In most cases, however, a court must examine other evidence to determine whether discriminatory intent prompted the challenged action, including the following non-exhaustive list of factors: "(1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal decision-making process; and (5) contemporaneous viewpoints expressed by the decisionmakers." *Jackson v. Tarrant Cnty.*, 158 F.4th 571, 587 (5th Cir. 2025) (discussing the factors originally outlined by the Supreme Court in *Arlington Heights*). Under the *Arlington Heights* framework, disparate impact is the threshold determination, which means that Plaintiffs must establish that Defendants' land use decisions have disproportionately affected black residents of St. James Parish.

The extensive history of land use decisions that Plaintiffs recount in their thoroughly researched complaint, when taken as true, may very well represent one of those rare cases in which "a clear pattern, unexplainable on grounds other than race," provides sufficient evidence of discriminatory intent. If not, though, Plaintiffs have presented a long list of specific examples from which the Court could infer a discriminatory intent in Defendants' zoning and siting decisions. Plaintiffs describe the Land Use Plan and its effects as a "racial cleansing plan" (Rec. Doc. 104, at 77),

and throughout the second amended complaint, they attempt to demonstrate how current land use practices in St. James Parish are directly traceable to those that were established and entrenched under slavery.

They have also alleged an extensive historical practice, which they claim the "2014 Plan codified and distilled into an ordinance," of "steering industry to predominantly black parts of the Parish and protecting predominantly white parts . . . ." *Id.* at ¶ 283. To support this allegation, Plaintiffs offer multiple facts, but one which stands out is that of the eleven (11) facilities currently operating in St. James Parish that are required to report their emissions to the EPA's Toxic Release Inventory, nine (9) are located in the 4th and 5th Districts, both of which are historically and predominantly black. *Id.* at ¶ 268. Moreover, Plaintiffs contend that St. James Parish has made land use decisions that have a disparate impact on black residents even after a 2003 EPA Report gave the Parish notice that cancer and mortality rates, which have been linked to pollutants released by heavy industrial plants, were significantly higher for black residents in the Parish. *Id.* at ¶ 269. The disproportionate number of petrochemical and heavy industrial facilities in majority-black parts of the Parish constitutes clear evidence of the disparate impact of Defendants' land use decisions and also allows the Court to infer discriminatory intent.

Further, Plaintiffs painstakingly show that Defendants have made land use and siting decisions which negatively impact the majority-black 4th and 5th Districts, while simultaneously extending protections to predominantly white areas of the

Parish. For example, the Land Use Plan that the Parish adopted in 2014 changed the zoning of "large swaths of property in the 4th and 5th Districts" from agricultural use to industrial, and "[m]ost glaringly, the 2014 Plan also provided for two-mile buffer zones separating an industrial site from tourist plantations, schools, and Catholic churches—with most of the concentric buffers concentrated in the majority white part of the Parish." *Id.* at ¶ 285. However, the Land Use Plan did not extend the same protections to the "predominantly Black churches and active schools within the 4th and 5th Districts." *Id.* at ¶ 286. More recently, the St. James Parish Council approved a moratorium on solar farms that was requested by white Parish residents, while simultaneously denying a request for a moratorium on the siting of new petrochemical facilities that has been urged by black residents since 2019. In the second amended complaint, Plaintiffs have amply alleged disparate and discriminatory impact of Defendants' land use decisions.

Next, the Supreme Court explained in *Arlington Heights* that one factor to consider in determining discriminatory intent is the historical background of the challenged decision. Here, however, we are dealing not with a single discrete decision but with what the Fifth Circuit acknowledged is a "longstanding pattern and practice of racially discriminatory land use decisions." *Inclusive Louisiana*, 134 F.4th at 305. Because Plaintiffs' second amended complaint focuses on this pattern and practice, the Court must consider the historical background of land use decisions in St. James Parish more generally, while also focusing on more recent actions taken by Defendants.

Broadly, Plaintiffs have traced the Parish's current land use patterns directly to slavery and the plantation system; by doing so, they have explained how some districts ended up with a majority-white population, while others were populated by a majority of black residents. In the nineteenth century, St. James Parish was home to multiple sugarcane plantations along the Mississippi River, and the wealthy white owners of these plantations enslaved thousands of men, women, and children. (Rec. Doc. 104, at ¶¶ 32–33). The federal government confiscated roughly 96,000 acres of former plantations in Louisiana and planned to apportion and redistribute the land under the Freedmen's Bureau, but when Lincoln was assassinated, Andrew Johnson became President and returned most of this land to its former owners. *Id.* at ¶¶ 70–84.

However, Plaintiffs point out that in 1872, "a group of formerly enslaved people managed to pool their resources and purchase property on the West Bank of the Mississippi River where they established the settlement of Freetown." *Id.* at ¶ 84. In similar ways, emancipated people in St. James Parish established several settlements—among them Welcome, Burton Lane, and Chatman Town—that were located near the former plantations where they had been enslaved. Plaintiffs allege that this "piecing off of small strips of property, or leasing cabins and houses on the plantations, was due in no small part to the fact that the plantation owners needed a nearby labor supply." *Id.* at ¶ 165. The white residents who had owned plantations and slaves prior to the Civil War generally retained their land, and their political power, after the War, and

> For the next 93 years, the local government in St. James Parish, still controlled by the white political establishment who in many cases had direct ties and allegiance to large plantation owners, chose to exercise its constitutional power by not enacting zoning or land use rules to classify areas for industrial use, so as not to limit or constrain the Parish's large landowners in the use of their property.

*Id.* at ¶ 180. In this way, Plaintiffs describe a land use pattern that quite literally originated in slavery.

Plaintiffs have also detailed the specific sequence of events leading up to multiple challenged actions, but the Court will focus on one example in particular: the adoption of the Land Use Plan in 2014. Plaintiffs claim that St. James Parish only decided to adopt a Land Use Plan, after not having one for most of its history, to prevent industrial facilities from locating in majority-white districts of the Parish, or as they put it, "to protect the interests of white residents." *Id.* at ¶ 280. Specifically, Wolverine Terminals Corporation and Petroplex International both sought to build oil storage facilities in majority-white parts of St. James Parish. Plaintiffs allege that Defendants hurriedly adopted the 2014 Land Use Plan and used it to deny these companies' land use applications. Further, this Land Use Plan codified the practice of directing heavy industry to the majority-black 4th and 5th Districts, as both of the districts were the only ones that included a zoning designation for "Residential/Future Industrial" property.[2]

---

[2] In oral argument, counsel for Defendants claimed that the Planning Commission chose to zone the 4th and 5th Districts as "future industrial" because the residential populations in these districts was declining and because of these districts' river frontage. Conversely, Plaintiffs pointed out that the majority-white 3rd District was also located along the Mississippi River until the Parish was redistricted a couple of years ago.

Addressing another *Arlington* factor, Plaintiffs also allege that Defendants have departed from their normal procedural sequence, i.e., the Land Use Plan, in that the "Parish Council granted every single request from companies seeking to locate in majority Black parts of the Parish, at times violating its own Land Use Ordinance to do so." *Id.* at ¶ 373. Plaintiffs allege that Defendants have, on more than one occasion, overlooked deficiencies and omissions in applications filed by facilities seeking to build in the 4th and 5th Districts. Plaintiffs also point specifically to procedural deviations in the Parish's handling of South Louisiana Methanol's plan to construct a plant "between two historic Black communities—Welcome and Freetown—in the Parish's 5th District, under a mile away from Mount Triumph Baptist Church, and on the site of several former plantations: St. Amelie, St. Claire, St. Prisca, and J.S. Webre," particularly when compared to the Council's treatment of Wolverine's application to locate in a majority-white district of the Parish. *Id.* at ¶¶ 375, 385.

Lastly, Plaintiffs discuss the legislative history surrounding both the adoption of the 2014 Land Use Plan and other siting decisions at length. In their opposition to the instant motion, they focused primarily on a 2022 amendment to the Land Use Plan to enact a moratorium on solar farms. In 2021, two solar power companies expressed interest in building solar farms in St. James Parish's 6th District. Plaintiffs acknowledge that like the 4th and 5th Districts, the 6th District is majority black, but they distinguish the 6th District by explaining that it is "surrounded by majority white populations" and therefore benefits from protections extended to these communities. *Id.* at ¶ 336. The two solar power companies wanted to bring clean

energy production to St. James Parish, but according to Plaintiffs, white residents objected and shared their concerns with the Parish Council. The residents suggested that the Parish conduct studies concerning the "economic and environmental impacts of solar in St. James Parish" before allowing the construction of solar farms *Id.* at ¶ 339.

The Council later repealed the moratorium in November of 2023 but still voted to deny SJ Louisiana Solar's application to build a solar farm in Vacherie. Plaintiffs explain that the Council voted 4-3 to reject the project despite the fact that, according to Plaintiffs, residents who supported the project far outnumbered those who opposed it, and Plaintiffs allege that the decision was made because a majority-white area of the Parish would have been affected. The Council stated that one reason they rejected the solar farm application was that it would displace valuable farmland. Council Member Vondra Etienne-Steib pointed to what she saw as a double-standard because displacing valuable farmland had not been a concern when heavy industries sought to locate in the 4th and 5th Districts. Toward the end of this Council meeting, and after the vote on SJ Louisiana Solar's application had been conducted, Council Member Courtney Long said that the decision not to approve the application "came down to the area that it's in." He went on to mention that the Parish was divided and speculated that had SJ Louisiana Solar attempted to locate "around the predominantly Black community," the application would have been approved. It is also important to note that Plaintiffs discuss the Council's reaction to solar farms to emphasize that black residents' requests for a moratorium on hazardous industry in

majority-black districts has largely fallen on deaf ears, while white residents' concerns about clean energy have influenced the Council's decisions.

In seeking to have Plaintiffs' claims dismissed, Defendants emphasize what the Supreme Court has held concerning equal protection claims based on disparate impact. Defendants rely on *Arlington Heights* and *City of Memphis v. Greene* for the proposition that proof of a "racially motivated discriminatory intent is a necessity for an equal protection claim." (Rec. Doc. 108-1, at 15). Defendants are correct. However, the instant case is distinguishable from both *Arlington Heights* and *City of Memphis*. *Arlington Heights* involved a land use application to build low- and moderate-income housing in a suburb of Chicago, which would have required the Village of Arlington Heights to rezone the parcel of land. *Arlington Heights*, 429 U.S. at 254. The Court found that the denial of the rezoning request did not violate the Fourteenth Amendment's guarantee of equal protection for several reasons. First, while the Court acknowledged that the land use decision likely had a disparate impact on racial minorities, the parcel of land at issue had always been zoned for single-family homes, so there was "little about the sequence of events leading up to the decision that would spark suspicion." *Id.* at 269. Next, the Village had followed its normal procedures in making the land use decision, and the Court mentioned the fact that the commission held two additional hearings regarding the land use proposal. *Id.* at 269–70. Finally, the Court concluded that the legislative history of the decision "focused almost exclusively" on zoning considerations, leading to a finding that the decision had not been motivated by a discriminatory purpose. *Id.* at 270.

Unlike the instant case in which Plaintiffs challenge a longstanding practice and policy of land use decisions, *Arlington Heights* dealt with a single land use application which would have required the Village to rezone a parcel of land. Here, on the other hand, Plaintiffs challenge land use decisions made before and after the Land Use Plan was enacted, in addition to challenging the enactment and amendments to the Land Use Plan itself. Plaintiffs have not simply alleged a few facts to support an inference that Defendants have made these decisions with a discriminatory purpose, but instead, they have filled 739 paragraphs and 174 pages with these allegations. *Arlington Heights* is certainly instructive here, but it operates as a counterpoint rather than an analogue.

The same is true of *City of Memphis v. Greene*. Like *Arlington Heights*, *City of Memphis* involved a single land use decision. *City of Memphis v. Greene*, 451 U.S. 100, 102 (1981). There, the plaintiffs brought a class action to challenge the city's decision to close a street that ran from a majority-black neighborhood directly through a majority-white neighborhood and provided a direct route to the city center. *Id.* at 102–03. The white residents requested that the city close the street to reduce traffic through the residential area and to preserve the safety and tranquility of the neighborhood. *Id.* at 104. Plaintiffs in that case did not bring a claim under the Fourteenth Amendment but instead claimed that the City of Memphis had violated § 1982 and the Thirteenth Amendment; however, the case did require a determination of discriminatory intent. *Id.* at 102. The Court held that the city was motivated by legitimate, non-discriminatory motives, namely safety and tranquility,

23

*id.* at 119, and that the decision was not a violation of the Thirteenth Amendment, *id.* at 129. Further, the Court determined that the inconvenience faced by residents of the predominantly black area of the city who would lose access to the road was minimal and merely a "routine burden of citizenship" because they could take an alternate route without adding time to the trip. *Id.* Again, in *City of Memphis*, the Court considered a single, discrete land use decision, whereas Plaintiffs in the instant case challenge a policy and practice that they claim has been ongoing for decades. More importantly, however, accepting Plaintiffs' allegations as true, the difference between having to take an alternate route and living in the immediate vicinity of heavy industrial facilities proven to cause deleterious health effects could scarcely be more pronounced.

Plaintiffs' factual allegations of differential treatment, disparate impact, and discriminatory intent concerning St. James Parish's Land Use Plan and Defendants' zoning and citing decisions are far too numerous to recount here, but suffice it to say that the second amended complaint is replete with them. Particularly at the motion to dismiss stage, and accepting Plaintiffs' allegations as true, the Court concludes that Plaintiffs have more than sufficiently pleaded a plausible claim to relief under the Fourteenth Amendment's Equal Protection Clause.

## 2. Substantive Due Process

Plaintiffs also bring a claim against Defendants under the Fourteenth Amendment for violation of substantive due process, for which Plaintiffs seek injunctive relief. Specifically, Plaintiffs allege that by siting heavy industrial facilities

in predominantly black districts of the Parish, Defendants have violated Plaintiffs' "fundamental right to bodily integrity including protection from harms undertaken by private actors that are made possible by state action." (Rec. Doc. 104, at ¶ 698). Defendants rely on a Section H decision, *Petroplex International v. St. James Parish*, in which Judge Milazzo addressed Petroplex's challenge to the Parish's Land Use Plan as arbitrary, capricious, and hence violative of substantive due process. *Petroplex Int'l v. St. James Par.*, 158 F. Supp. 3d 537, 540 (E.D. La. 2016). There, the Court found in favor of the Parish and concluded that the Land Use Plan was rationally related to a legitimate governmental interest. *Id.* at 542.

First, it is important to note that *Petroplex*'s holding is not binding on this Court, but much more importantly, the facts of *Petroplex* are not analogous to the instant case, and therefore, the comparison is inapposite. As explained, Petroplex challenged the Land Use Plan for substantive due process violations on the grounds that the Plan was arbitrary and capricious. *Id.* at 540. In contrast, the Plaintiffs in this case claim that the Land Use Plan violates substantive due process protections by infringing on a fundamental right, namely the right to bodily integrity and freedom from bodily harms that are facilitated by state action, both of which the Fifth Circuit recently recognized as fundamental rights. *Sterling v. City of Jackson, Miss.*, 159 F.4th 361, 373, 386 (5th Cir. 2025) (explaining that "the right to bodily autonomy has long been a cognizable right under the Fourteenth Amendment" and that the court was adopting "state-created danger as a viable theory" in the circuit).

Defendants specifically argue that the Court should dismiss Plaintiffs' substantive due process claim because Plaintiffs failed to plead that Defendants lack a rational objective for the Land Use Plan. Rational basis review was the proper level of scrutiny to apply to the land use decisions at issue in *Petroplex*. However, Plaintiffs in this case assert a substantive due process violation related to a fundamental right; accordingly, strict scrutiny would apply. Defendants have not presented any other arguments, other than their reliance on *Petroplex*, in support of their motion to dismiss Plaintiffs' substantive due process claim, and therefore, the Court has no basis to dismiss this claim at the pleading stage.

### C. Property Rights of Black Citizens Under 42 U.S.C. § 1982

As with Plaintiffs' Equal Protection claim, Defendants seek to dismiss the claim under 42 U.S.C. § 1982 because they claim that "[a]t best, the Complaint suggests an adverse impact on Black residents in Districts 4 and 5 (which is denied) but does not establish or allege a 'racially discriminatory motive on the part of the [Parish] Council.'" (Rec. Doc. 108-1, at 22). The Court disagrees with this assertion, and as discussed more thoroughly in regard to Plaintiffs' Equal Protection claim, the Court finds that Plaintiffs have alleged sufficient facts related to Defendants' discriminatory intent, and therefore, have stated a claim under § 1982 that is plausible on its face.

### D. Preservation of Cultural Origins Under the Louisiana Constitution

The Louisiana Constitution recognizes the "right of the people to preserve,

foster, and promote their respective historic linguistic and cultural origins." La. Const. art. XII, § 4. Plaintiffs allege that Defendants have violated their constitutional right to cultural preservation through a "policy, practice, and/or custom of land use . . . that has already resulted in the destruction and desecration of cemeteries and burial sites of people once enslaved on the plantations in St. James Parish." (Rec. Doc. 104, at ¶ 734). Further, Plaintiffs argue that the land use system has negatively impacted "other sites with enormous historic and cultural value to Black communities like churches, schools, homes, and neighborhoods, and continues to threaten such places." *Id.* at ¶ 736.

Defendants seek to have this claim dismissed for the following reasons: (1) the claim has prescribed based on a one-year prescriptive period; (2) Plaintiffs do not have a valid property right on which to base their claim; (3) Plaintiffs' claim concerns "burial sites that are located on the property of third-parties (Formosa), *not land owned by the Parish*"; and (4) the constitutional provision focuses primarily on cultural preservation vis-à-vis language rights. (Rec. Doc. 108-1, at 24). In their opposition, Plaintiffs have responded to each of these arguments.

First, Plaintiffs point out that they are seeking injunctive relief, specifically to enjoin the Parish from developing the land where burial sites are located, so that the one-year prescriptive period Defendants assign to this claim would not apply. Next, Plaintiffs assert that they do have a valid property interest on which to base their claim, an argument that will be dealt with fully in the next section. Third, because Plaintiffs seek injunctive relief concerning future harm traceable to the Land Use

27

Plan and zoning/siting decisions, the ownership of the property where the burial sites are located is not an issue. Finally, Defendants cite sources that explain the legislative intent behind Article XII, Section 4 of the Louisiana Constitution, which was to preserve and protect Acadian French culture. *Id.* at 22–23. Plaintiffs respond by saying, "the interpretation the Parish proposes [for this constitutional provision] is itself discriminatory as it would violate the basic constitutional requirements of equal protection and non-discrimination." (Rec. Doc. 110, at 29).

Plaintiffs' arguments concerning their claim under the Louisiana Constitution are ultimately more persuasive, and the Court concludes that Plaintiffs have alleged sufficient facts to state a claim for relief that is plausible on its face.

### E. Religious Land Use and Institutionalized Persons Act

In 1993, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") with the goal to provide "religious exercise [with] heightened protection from government-imposed burdens." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005) (discussing the history of Congress's attempts to enhance the protection of religious exercise, in line with Supreme Court precedents, which culminated in the passage of the RLUIPA). RLUIPA, 42 U.S.C. §§ 2000cc *et seq.*, creates a cause of action whereby a plaintiff may bring a claim against a state or other "governmental entity created under the authority of a State" when that entity substantially burdens religious exercise. 42 U.S.C.A. §§ 2000cc-2 (creating a cause of action), 2000cc-5 (defining "government"). Relevant to the instant suit, the statute specifically targets any land use regulation imposed by a state or one of its political subdivisions "that

imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the land use regulation can survive strict scrutiny. § 2000cc(a) ("Substantial Burden" clause). Furthermore, RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution" or that "discriminates against any assembly or institution on the basis of religion or religious denomination." § 2000cc(b)(1)–(2) ("Discrimination and Exclusion" clause).

RLUIPA provides that a plaintiff must first establish a *prima facie* case for the government's violation of the Free Exercise Clause or RLUIPA, § 2000cc-2(b), and then the burden shifts to the government to demonstrate that the challenged land use regulation serves a compelling governmental interest and that it is the least restrictive means of doing so, *id.* (outlining burden of persuasion), 2000cc(a)(1) (describing government's burden under strict scrutiny). Congress also specified that RLUIPA's provisions "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g). Plaintiffs in this case have brought claims under both the "Substantial Burden" and the "Discrimination and Exclusion" clauses of RLUIPA, so the Court will deal with each of these claims in turn.

## 1. RLUIPA Substantial Burden Claim

First, all Plaintiffs in the case allege that Defendants "have implemented land use regulations in a manner that imposes a substantial burden on Plaintiffs' religious

exercise." (Rec. Doc. 104, at ¶ 714). In their opposition to Defendants' motion to dismiss, and in their second amended complaint, Plaintiffs explain that under the *Code Noir* in Louisiana, "plantation owners were legally required to set aside land for burying the people they enslaved." (Rec. Doc. 110, at 27; *see also* Rec. Doc. 104, at ¶¶ 53, 594–605). Plaintiffs specifically designate three of Defendants' acts that "have burdened Plaintiffs' members' ability to pray upon the unmarked cemeteries of enslaved ancestors by permitting the construction of industrial facilities upon these cemeteries." (Rec. Doc. 104, at ¶ 714). Plaintiffs first point to Defendants' adoption and implementation of the 2014 Land Use Plan, which was amended in 2018 and again in 2022, because this Plan created industrial zones in Districts 4 and 5 of St. James Parish, which are districts "that contain unmarked cemeteries of enslaved people." *Id*. Next, Plaintiffs allege that the Planning Commission's and Parish Council's permission for Formosa to build a petrochemical plant on at least three specific unmarked burial grounds imposed a substantial burden on Plaintiffs' religious exercise. Finally, Plaintiffs contend that the St. James Planning Commission's "land use approval of South Louisiana Methanol" also imposed a substantial burden by siting the plant "upon areas that are likely to contain several unmarked cemeteries." *Id*.

In their motion to dismiss, Defendants rely on RLUIPA's definitions of "land use regulation" and "claimant" to challenge Plaintiffs' Substantial Burden claim. RLUIPA defines a "land use regulation" as follows:

> [A] zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land . . . if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5(5). Defendants contend that Plaintiffs do not meet the definition of "claimants" under the statute because they have not alleged an ownership or other property interest in the land at issue in the case.

Conversely, Plaintiffs assert that only two properties are actually at issue in the case: the Formosa and South Louisiana Methanol ("SLM") properties. Furthermore, Plaintiffs claim that in their second amended complaint, they have sufficiently alleged a valid property interest in the Formosa and SLM properties. Specifically, Plaintiffs claim a type of property interest that has been recognized by Louisiana courts. For example, Plaintiffs cite to the Louisiana Supreme Court's decision in *Humphreys v. Bennett Oil Corp.*, in which the plaintiffs sued the defendant for emotional distress after the defendant drilled oil wells on property where the plaintiffs had buried their family members, thereby desecrating the cemetery. *Humphreys v. Bennett Oil Corp.*, 197 So. 222, 223 (La. 1940). The Louisiana Supreme Court concluded that "once real estate is set apart and used for a final resting place of the dead, the owner cannot thereafter make another use of it inconsistent with that to which it was devoted." *Id.* at 228. Throughout the opinion, the court emphasized the sacred nature of land where people are buried and stated that "[r]egardless of the laws and rules relating to the ownership and control of real property, when a plot of

ground is set apart for cemetery purposes, and burials are made in the land, the ground changes its character in the minds and feelings of the community." *Id.* at 229.

The court also pointed out that through the defendant's activities on the plot of land it leased, the "consecrated ground, which was destined for the peaceful slumber of the dead, was transformed into an industrial site, to be exploited for material gain." *Id.* at 228. Ultimately, the court held that the plaintiffs had "another species of interest or form of title . . . not within the recognition of the [Civil] Code," *id.*, thereby allowing them to recover not only for damages to their particular family members' burial sites, but for damages to the cemetery plot as a whole, *id.* ("These plaintiffs have an interest not only in the particular spots where their relatives are buried, but also a sentimental interest, at least, in the cemetery as a whole . . . .").

On the other hand, Defendants rely on *Humphreys* to support their proposition that only when "a plot has been 'dedicated' for cemetery purposes at some point in time" does it take on the nature of "an irrevocable covenant running with the land." (Rec. Doc. 108-1, at 26 (citing *Humphreys*, 197 So. at 226)). In *Humphreys*, the court responded to the defendant's argument that the plaintiffs had no right of action because the land "was never dedicated by the owner of the land to use for cemetery purposes, according to the forms and requisites prescribed by law" by looking to specific pieces of evidence. *Id.* at 538–39. However, rather than discussing all of the cases cited by the defendant, the court stated, "It suffices to say that it is settled in this state and at common law that the vital principle underlying dedication is the

intention to dedicate, and, so far as the owner is concerned, the dedication is made when such intent on his part is unequivocally manifested." *Id.* at 226.

In the instant case, Plaintiffs allege that "plantation owners were legally required to set aside land for burying the people they enslaved, . . . that graves were often marked by trees to identify them for loved ones and descendant communities, and preserved by laborers and farmers." (Rec. Doc. 110, at 27). These allegations are more than sufficient to create a plausible claim that these pieces of land were "dedicated" as cemeteries for their ancestors, cemeteries which have since "been transformed into an industrial site, to be exploited for material gain." However, even absent these specific and well-researched allegations, the fact that the plantation owners buried the bodies of the people whom they enslaved on these plots of land seems sufficient to constitute an intention to dedicate. Therefore, the Court agrees that Plaintiffs have a property interest in the plots of land at issue—the unmarked cemeteries of enslaved people on the Formosa and SLM plots—to assert a plausible claim under the RLUIPA's Substantial Burden clause.

## 2. RLUIPA Discrimination and Exclusion Clause

The second claim under RLUIPA has been brought against Defendants by only one Plaintiff, Mount Triumph Baptist Church. Specifically, Mount Triumph alleges that Defendants have implemented land use regulations that protect Catholic and majority-white churches from industrial development through required buffer zones, but that also permit such development in the immediate vicinity of majority-black churches with no such protection. Because Defendants have not specifically moved to

dismiss this claim, the Court does not feel the need to discuss this claim, other than to say that Mount Triumph has alleged sufficient facts to state a claim for relief that is plausible on its face.

<u>**RECOMMENDATION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Re-Submitted Rule 12(b)(6) Motion to Dismiss Claims* **(Rec. Doc. 108)** is **DENIED**.

New Orleans, Louisiana, this 9th day of February, 2026.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE