UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| INCLUSIVE LOUISIANA, BY AND THROUGH THEIR MEMBERS; MOUNT TRIUMPH BAPTIST CHURCH, BY AND THROUGH THEIR MEMBERS; AND RISE ST. JAMES, BY AND THROUGH THEIR MEMBERS;<br><br>Plaintiffs,<br><br>VERSUS<br><br>ST. JAMES PARISH, ST. JAMES PARISH COUNCIL, ST. JAMES PARISH PLANNING COMMISSION,<br><br>Defendants. | 23-CV-00987<br><br>JUDGE CARL J BARBIER<br><br>MAGISTRATE JUDGE JANIS VAN MEERVELD |

**ORDER AND REASONS**

The plaintiffs in this action allege that the defendants have violated their constitutional and statutory civil rights by directing hazardous industrial facility development towards majority-Black districts and Black churches, where plaintiffs' members and congregants live. The following discovery motions are presently before the Court:

1. Plaintiffs' Motion to Compel Discovery Responses (Rec. Doc. 151), seeking information about parish redistricting.
2. Defendants' Motion to Compel Responses to First Set of Discovery (Rec. Doc. 148), seeking the identity of the plaintiff organizations' members and information about the members' property and medical conditions.
3. Defendants' Motion to Compel Responses to Second Set of Discovery (Rec. Doc. 150), seeking plaintiffs' financial statements and tax records.

Oral argument was held on October 28, 2026, at which time the Court ordered the parties to negotiate a deadline for plaintiffs to identify the individuals upon whose property devaluation and health conditions they intend to rely on, the scope of medical records to be produced for the identified individuals with health conditions, and a stipulation limiting plaintiffs' ability to reference or present evidence concerning the health issues of unidentified individuals. The remaining issues raised by the motions were taken under submission, and the Court now resolves them as follows:

- The defendants will not be compelled to produce redistricting information because this information is not relevant or proportional to the needs of the case. Plaintiffs' Motion to Compel Discovery Responses (Rec. Doc. 151) is DENIED.
- As to the remaining issue raised by defendants' Motion to Compel Responses to First Set of Discovery (Rec. Doc. 148), the Motion is DENIED. Plaintiffs will not be required to identify other members with property in the relevant area because this information is not proportional to the needs of the case.
- The parties must negotiate a deadline by which plaintiffs will identify public records they may rely on to show generalized diminution of property value.
- Defendants' Motion to Compel Responses to Second Set of Discovery (Rec. Doc. 150) is GRANTED in part and DENIED in part because the requested financial records are only relevant to the value of Inclusive Louisiana's property. Accordingly, Mount Triumph Baptist Church and RISE St. James will not be required to produce any financial statements or tax returns. Plaintiff Inclusive Louisiana must produce its financial statements that bear on the value of its real property (such as a balance sheet or equivalent reflecting book value and any liabilities associated with the property, an income statement or equivalent reflecting income and operating expenses associated with the property, etc.), provided that any portion of such statements that identifies donors will be redacted, the budget shall not be subject to production, and any other internal strategy may be redacted provided it does not obscure property value information. Further, the financial

statements shall be marked confidential and subject to a protective order as further provided herein. Production of tax returns shall not be required at this time.

## Background

The plaintiffs in this lawsuit are a church and two environmental justice organizations: Mount Triumph Baptist Church, Inclusive Louisiana, and RISE St. James. They allege that "[t]he Black population makes up a total of 50% of St. James Parish as a whole, while the 4th and 5th Districts of St. James Parish – where petrochemical sites are most concentrated – are overwhelmingly majority Black districts: the 5th District is 89% Black population and the 4th District is 52% Black." Rec. Doc. 104, at 12. Plaintiffs initiated this civil rights action on March 21, 2023, against St. James Parish, the St. James Parish Council, and the St. James Parish Planning Commission (collectively, the "Parish"), to challenge the allegedly discriminatory siting of industrial facilities in the majority Black 4th and 5th Districts. Rec. Doc. 1. Plaintiffs filed their First Amended Complaint in July 2023. Rec. Doc. 29.

In November 2023, the District Court dismissed Plaintiffs' claims under the "substantial burden" provision of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and under the Louisiana Constitution, Article XII, Section 4, which recognizes "the right of the people to preserve, foster, and promote their respective historic linguistic and cultural origins" for lack of standing. The Court also dismissed as prescribed Plaintiffs' remaining claims under the Thirteenth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1982, and the RLUIPA's religious discrimination provision.

The Fifth Circuit Court of Appeals reversed, finding that the Plaintiffs had alleged discriminatory acts that fell within the applicable limitations period and that the Plaintiffs have standing because they have pleaded cognizable property injuries traceable to the conduct of the Parish and stigmatic injury sufficient for Article III adjudication. Inclusive Louisiana v. St. James

Par., 134 F.4th 297 (5th Cir. 2025). The Fifth Circuit recognized four alleged acts occurring within the relevant limitations periods (one year for §1983 and four years for RLUIPA):

1. The Parish's rejection of Plaintiffs' request for a moratorium on "polluting industry" in their majority-black communities on August 17, 2022.
2. The simultaneous adoption of a parish-wide moratorium on solar facilities, as requested by White residents.
3. The Parish Council's approval of the Syngas Energy Holding, LLC's methanol production project on March 25, 2019
4. Approval of the Wanhua Chemical US Operations polyurethane manufacturing facility project on May 20, 2019. Id. at 306.

Further, the Fifth Circuit found that the Plaintiffs' allegations did not *all* stem from the 2014 Land Use Plan as the district court had found. Id. Although some challenged actions were consistent with the Land Use Plan, other allegations predated the plan, still others were contrary to the Plan, and still others were independent of the Plan. Id. at 308. The court of appeals also found that even if all acts alleged by the Plaintiffs flowed from the 2014 Land Use Plan, individual land use applications still require district approval or rejection and can, if timely, be challenged. Id.

The case was remanded to this Court on May 28, 2025. On November 4, 2025, the Court granted plaintiffs leave to supplement their complaint. The Second Amended Complaint for Declaratory and Injunctive Relief incorporated new allegations concerning events that occurred after or as to which information was obtained after the filing of the First Amended Complaint. These new allegations concern the Parish's approval of Koch Methanol's proposal to expand its facility, the Parish's approval of Acadian Gas Pipeline's request to construct a natural gas pipeline to the Koch Methanol plant, the Parish's approval of Occidental Chemical Corporation's proposal

to build two new chlorine and ethylene dichloride pipelines, the Parish's approval of Air Liquide Large Industries' request to construct an oxygen pipeline and a nitrogen pipeline, and the Parish's approval of a request by Nucor Steel to build a carbon dioxide compression unit. Rec. Doc. 104.

The operative complaint raises the following claims:

1. "The Discriminatory Land Use Practice in St. James Parish Violates the Thirteenth Amendment as a Present-Day Badge or Incident of the Slavery System." Id., at 158.
2. "The Discriminatory Land Use Practice in St. James Parish Violates the Equal Protection Clause of the Fourteenth Amendment." Id. at 160.
3. "The Discriminatory Land Use System Violates the Right to Bodily Safety and Integrity" in violation of the Fourteenth Amendment. Id. at 162.
4. "The Discriminatory Land Use Practice in St. James Parish Violates the Rights of Black Residents to Inherit, Purchase, Lease, Sell, Hold, and Convey Real Property on Equal Terms as White Citizens" in violation of 42 U.S.C. § 1982. Id. at 163.
5. "The Land Use System in St. James Parish Places a Substantial Burden on the Exercise of Religion" in violation of RLUIPA. Id. at 165.
6. "The Land Use System Discriminates on the Basis of Religion" in violation of RLUIPA. Id. at 166.
7. "The Discriminatory Land Use Practice in St. James Parish Violates the Rights of Black Residents to Preserve, Foster, and Promote Their Historic and Cultural Origins" in violation of the Louisiana Constitution. Id. at 168.

The matter is set for a jury trial on October 18, 2027.[1] The deadline to complete discovery is February 23, 2027. Presently before the Court are three discovery motions. Plaintiffs' motion concerns redistricting information. Their Request for Production 65 seeks "all documents and communications related to the decision to re-district Districts 3 and 4 in the Parish's 2020 Re-Districting Plan." Resp. to Discov., Rec. Doc. 151-3, at 31. Factually, this refers to a redistricting plan passed by the Parish Council on February 1, 2023,[2] that resulted in a portion of former District 3 (which had a comparatively higher population) being reassigned to the adjacent District 4, resulting in all districts having more similar population numbers. See Opp., Rec. Doc. 167, at 4-5.

The Parish's first motion concerns information about plaintiffs' members and their property and alleged health conditions, along with the health conditions of individuals referenced in the complaint. Its second motion seeks plaintiffs' financial statements and tax returns.

All three motions turn primarily on relevance, though burden of production and privacy interests are also implicated, as further discussed below.

## Law and Analysis

### 1. *Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id.

"[I]information is relevant if it 'bears on, or that reasonably could lead to other matters that could bear on, any issue related to the claim or defense of any party.'" Leonard v. Martin, 38 F.4th

[1] Plaintiffs have sought to strike the Parish's jury demand, arguing that they seek solely equitable relief that is not triable by jury without the consent of the parties. The district judge denied the motion without prejudice pending discovery.
[2] It is sometimes referred to as 2020 redistricting because it arose out of the 2020 census data.

481, 489 (5th Cir. 2022) (quoting Coughlin v. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991)). "The threshold for relevance at the discovery stage is lower than the threshold for relevance of admissibility of evidence at the trial stage." Tate v. DG Louisiana LLC, 653 F. Supp. 3d 316, 319–20 (E.D. La. 2023).

Relevant information falls within the scope of discovery only if it is proportional to the needs of the case. Rule 26 requires consideration of the following factors in assessing proportionality: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Proc. 26(b)(1).

2. *Plaintiff's Motion to Compel Redistricting Information*

a. *Relevance – Arlington Height Factors*

During oral argument, the plaintiffs invoked the Arlington Heights factors to argue that the discovery they seek is relevant to their Equal Protection claim. To prove an Equal Protection violation, plaintiffs must show a "racially discriminatory intent or purpose." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). Of course, this can be difficult, and discriminatory impact alone is rarely sufficient. See id. at 266. In Arlington Heights, the Supreme Court offered a non-exclusive list of factors courts should consider in addition to the discriminatory impact: "historical background of the decision", "specific sequence of events leading up to the challenged decision", "[d]epartures from the normal procedural sequence", "[s]ubstantive departures", and "legislative or administrative history." Id. at 267.

Plaintiffs across the country have only successfully used these factors to establish an Equal Protection violation in a handful of cases.[3] See Dora Acherman, Discrimination by any Other Name: Alternatives to Proving Deliberate Intent in Environmental Racism Claims, 4 FIU L. Rev. 255, at 264 (2008). In Miller v. City of Dallas, a district court in Texas denied summary judgment in favor of the defendants, holding that plaintiffs had raised genuine issues of material fact.[4] The plaintiffs contended the "City intentionally discriminated against them based on their African–American race and ethnicity in providing municipal services related to flood protection, zoning, protection from industrial nuisances, landfill practices, streets and drainage, and federal funding for housing and community development." No. CIV.A.3:98-CV-2955-D, 2002 WL 230834, at *2 (N.D. Tex. Feb. 14, 2002). With regard to industrial nuisances and zoning, the court found substantial evidence of discriminatory effects, including that African Americans constituted 47.25% of city residents living in or near an industrial-zoned district, despite making up only 28.89% of the population city-wide. Id. at 7. The specific neighborhood at issue was (according to the City's consultant) "home to two lead smelters whose emissions expose residents to hazardous levels of lead, both in the soil and in neighborhood landfills." Id.

The historical evidence considered included racial ordinances mandating segregation and other evidence showing the City viewed racial segregation as a legitimate policy goal in the 1940s. The court concluded that "[t]he sordid history of the City's decisionmaking process regarding racially-segregative zoning and related policies, when viewed in conjunction with the

---

[3] Three of them involved street paving and other municipal services. E.g., Dowdell v. City of Apopka, Fla., 698 F.2d 1181 (11th Cir. 1983); Ammons v. Dade City, Fla., 783 F.2d 982, 988 (11th Cir. 1986); Baker v. City of Kissimmee, Fla., 645 F. Supp. 571, 588 (M.D. Fla. 1986).

[4] Thereafter the case settled. Acherman, Discrimination, supra, at 260.

discriminatory effects of zoning decisions, industrial nuisances, and landfill practices, offers substantial circumstantial evidence of discriminatory intent." Id.

As to the specific sequence of events, the court considered the City's expert's summary of the City's methodology used

> to classify its neighborhoods into five different categories on the basis of their physical condition and position in a typical "life cycle" of neighborhoods [which made] use of certain indicators that are highly correlated with the percentage of African–American households living in each area. This could be construed as "automatically" classifying areas with high fractions of African–Americans as areas in advanced decline or advanced decline with abandonment. Since such areas are programmed to receive lower levels of financial assistance than other areas in better condition, this classification could be seen as "race-based" to the disadvantage of African–American residents.

Id. at *8. The court also noted that the lead smelter was built in 1947, during the time the neighborhood was designated as suitable for "Negro Subdivision Development." Id. Additionally, "[i]n 1974 the City Council changed the zoning ordinance to require certain uses, like lead smelters, to have a specific use permit ("SUP") in order to operate legally in a particular area." Id. The court considered evidence presented by the plaintiffs that the SUP was not enforced as to the African-American neighborhood at issue until 1990. Id. The court also considered the City's departure from normal substantive standards in its zoning and related policies, citing both the City's SUP enforcement and a 1991 City policy that was designed to "achieve neighborhood stability through a comprehensive strategy of housing improvement and neighborhood economic development" that the City had never implemented as to the African-American neighborhood at issue. Id. at *8-9. Considering the evidence as a whole, the court found "a genuine issue of material fact whether the City has discriminated against residents of Cadillac Heights on the basis of race in connection with the actions that plaintiffs challenge in this suit." Id. at *9.

*b. Redistricting Information Sought*

Plaintiffs' Motion to Compel concerns their request for "all documents and communications related to the decision to re-district Districts 3 and 4 in the Parish's 2020 Re-Districting Plan." Rec. Doc. 151. Plaintiffs admit that "redistricting" is not an allegation in their complaint and they "do not claim that the redistricting process in general is an independent basis for a cause of action in this case." Reply, Rec. Doc. 168, at 5, 7. They insist, nonetheless, that the information is relevant, although their argument for relevance has evolved.

In their first deficiency letter to the Parish, plaintiffs argued that the information was relevant because "[t]he redistricting of Districts 3 and 4 was addressed during the January 28, 2026, oral argument on the Parish's Re-Submitted Motion to Dismiss in response to an issue that counsel for the Parish raised." Rec. Doc. 151-4, at 4. In seeking a status conference on the issue, they urged that redistricting was relevant because it came up at oral argument when the Parish claimed that riverfront access (and not race) could explain the location of industrial sites. Although plaintiffs mention these statements in recounting the factual background, in their motion, plaintiffs now argue (1) that the information is relevant to establishing a pattern of how the Parish uses demographics in its decision making, (2) that the demographic and geographic data used bears on the Parish's defense that population decline and not race explains its disparate treatment of the Black communities impacted by the industrial development at issue in this lawsuit, and (3) that the requested information is relevant to the Parish's assertion in its Answer that land use decisions were unanimously supported by representatives of all five districts, including representatives of District 4 and 5 and including by Black representatives. The Court finds none of these arguments availing.

*c. Analysis*

Plaintiffs' pattern and practice argument must be rejected because this lawsuit concerns allegedly discriminatory land use decisions, not allegedly discriminatory redistricting decisions. The only "patterns" alleged in the operative complaint concern land use decisions.[5] Had the redistricting decision been part of the discriminatory pattern of decision making alleged in the complaint, plaintiffs could have included those allegations. Indeed, the redistricting plan had already been adopted six weeks before the original complaint was filed, and founding members of plaintiff Inclusive Louisiana were present at the September 2022 public hearing on the redistricting plan. Moreover, plaintiffs have amended their complaint twice in the intervening two and a half years without incorporating any allegations about patterns of decision making in redistricting.[6] This weighs against finding redistricting information relevant to plaintiffs' claims.

Further, the Court finds that plaintiffs' attempt to describe the two types of decisions as "similar" falls flat. Plaintiffs submit that both land use and redistricting decisions are determined

[5] Plaintiffs allege that "[g]iven the history and patterns of industrial development in St. James Parish, it was clear that the pattern and practice of non-zoning did not benefit all property owners equally." Rec. Doc. 104, at 75. They allege that "[t]he 2014 Plan was thus . . . further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish." Id. at 82. They allege that "[d]espite the attempt to tidy up the Plan of its obvious and facially discriminatory elements, the siting pattern and practice of the Parish Council has remained the same." Id. at 84. They allege that "the Parish has continued the same pattern of decision-making as to land use as that set out in the 2014 Plan." Id. They allege that:

> The Parish Council granted every single request from companies seeking to locate in majority Black parts of the Parish, at times violating its own Land Use Ordinance to do so. The image below reveals the result of this pattern: the Parish has not allowed heavy industrial facilities in majority white parts of the Parish in over 46 years, and today, 28 out of the 32 heavy industrial facilities approved by the Parish are located in the majority Black 4th and 5th Districts.

Id. at 98. They claim that "[i]n addition to the impact on Plaintiffs' members' health, well-being, and lives, land use patterns and practices in St. James Parish have also impacted the historic, unmarked cemeteries of Plaintiffs' members' enslaved ancestors in St. James Parish." Id. at 137. They allege that "the Parish's permitting of heavy industry continues the pattern and practice of protecting only predominantly white parts of the Parish, and only institutions that are of historic significance to white communities, such as plantations open for tourism and Catholic churches." Id. at 158. They allege that "[t]he 2018 Land Use Plan has carried out the same discriminatory pattern and practice explicitly endorsed in the 2014 Land Use Plan." Id. at 167. No other allegations concerning patterns of decision making were alleged.

[6] The Second Amended Complaint (Rec. Doc. 104) was 171 pages long and included 739 numbered paragraphs. None talked about redistricting.

by reference to district maps and both involve geographical allocation of resources (political benefits on the one hand or property benefits on the other). Reply, Rec. Doc. 168, at 3-4. Plaintiffs add that both decisions involve the same decision makers. But the land use decisions at issue involve the determination of whether and where industrial facilities will be allowed. The redistricting decision concerned a reallocation of voters to ensure the voting districts had a similar number of voters. These decisions are neither connected nor similar, even if both required the consideration of a map and both had an impact on the residents of the Parish in some way.[7] As the Parish points out, the goals of redistricting are wholly different from land use decisions. A member of the South Central Planning and Development Commission ("SCPDC"), which assisted and advised the Redistricting Committee, described the following redistricting principles:

- **Compliance with all State and Federal Law**, including the Voting Rights Act of 1965 which prohibits plans that intentionally or inadvertently discriminate on the basis of race, which could dilute the minority vote.
- **Compactness:** Having the minimum distance between all the parts of a constituency.
- **Contiguity:** All parts of a district must be connected at some point with the rest of the district.
- **Preservation of Communities of Interest:** Geographical areas, such as neighborhoods, where the residents have a common political interest.
- **Preservation of cores of prior districts:** Maintaining districts as previously drawn to the extent possible.
- **Avoid pairing incumbents.**

Opp., Rec. Doc. 167, at 4. Plaintiffs do not dispute these principles. Instead, at oral argument they insisted they should be allowed to scour all documents and communications to determine if any impermissible considerations came into play. This type of reasoning proposes a quintessential

[7] To describe the redistricting decision as the allocation of political benefits is a stretch. Prior to the redistricting, all districts had a population of 2,649 – 2,940, except for District 3, which had 3,429. Rec. Doc. 167, at 5. To balance the population in each district, the population in District 3 had to be reduced and the population of the others increased. Id.

fishing expedition. It is a search for a needle in a haystack with nothing but a hunch and a hope that a needle may be found.

Plaintiffs also argue that they "know that the redistricting moved a majority-white area far from industrial facilities into the 4th District, potentially diluting the vote of majority-Black areas in that district that are near industrial facilities." Id. at 7. They explained further at oral argument their theory that the Parish did so to ensure that it could continue to steer industry to the existing areas by increasing the number of voters in District 4 who would not be motivated to object.[8] But they have not a shred of evidence for this theory. They do not claim that the new makeup of District 4 resulted in a new pro-industry representative being elected or that it resulted in the existing representative becoming more sympathetic to the pro-industry position.[9] Plaintiffs' theory that Parish officials approved the redistricting plan for the purpose of advancing racially discriminatory land use decisions is wholly speculative.[10] The Court simply cannot find that the redistricting documents and communications could be relevant to plaintiffs' claims of a pattern of discrimination in land use decisions.

In addition to the pattern and practice basis for relevance, plaintiffs argue that the "data" used in redistricting bears on the Parish's defense that it used demographic information (residential population density and changes in population) in making the land use decisions at issue here. They argue that the demographic information used by the Parish in redistricting will show what data the Parish had access to "and how it used that data" will help prove or disprove the Parish's claim that

[8] This, plaintiffs say, is because the new voters are farther from the industrial sites. They did not suggest that the new voters would be motivated by any racial animus.

[9] Admitting they have no evidence that the redistricting impacted any land use decision, the plaintiffs argued at the hearing that the impact of the redistricting remains to be seen because the redistricting came into effect after the original lawsuit was filed and many of the land use decisions they challenge occurred before that time.

[10] The Court notes that if there was some factual basis to conclude that the Parish selected this particular redistricting plan to facilitate discriminatory land use decisions, that might be relevant to plaintiffs' case under the Arlington Heights factors. But an unsupported, unpled theory does not open the doors to discovery of vast internal documents and communications.

it does not label communities "Black" or "white" but instead focuses on areas where population is increasing or decreasing. Plaintiffs also argue that geographic features like riverfront access (which the Parish also claims impacted its land use decisions) have shifted with redistricting over time and that the redistricting documents will help them assess the validity of the Parish's claimed rationales for its land use decisions.

This theory, too, fails to convince the Court the requested documents are relevant. First, as the Parish points out, the "demographic and geographic data" that the Parish had access to are the results of the 2020 census, which are publicly available. Additionally, the South Central Planning and Development Commission, which assisted the Parish's Redistricting Committee, created an entire website that discusses the St. James Parish Redistricting, including the background, baseline plan, and population changes. See Rec. Doc. 167, at 4. Plaintiffs do not deny this. Their focus is on the internal analysis of the data.

With regard to riverfront access, the Parish points out that the riverfront remained the same following the redistricting plan implemented in 2023. Accordingly, the Court cannot find internal analysis of redistricting plans is relevant to the riverfront access defense.

As to the Parish's defense that it does not label communities "Black" or "white" but instead focuses on areas where population is increasing or decreasing in making the land use decisions at issue here, the Court finds this does not make the redistricting analysis relevant.[11] This relevance theory is an extension of plaintiffs' argument that the Parish's redistricting efforts were at least partially motivated by an intent to continue discriminatory siting of industry. As noted above, there

[11] Importantly, there appears to be no dispute that plaintiffs are entitled to the Parish's internal documents and communications related to the land use decisions at issue. These internal documents may shed light on whether the Parish does or does not label communities by race or whether it focuses only on population increase and decrease in making land use decisions.

is no evidence to support it. Digging through internal communications on an unsupported hunch is the kind of fishing expedition that falls outside the scope of discovery.

Finally, plaintiffs argue that the treatment of Black communities under the redistricting plan is relevant to whether these communities had adequate political representation in the Parish's land use decisions. They submit that the Parish has placed political representation at issue by noting that certain land use decisions were passed unanimously, including by the Black representatives of Districts 4 and 5 (and other districts). They insist they are entitled to challenge the Parish's assertion that "the political representation of majority-Black communities near industrial facilities in District 4 is actually representative of those communities' interests." Reply, Rec. Doc. 168, at 7.

Again, the Court cannot find the connection between the 2023 redistricting decision and the claims and defenses in this lawsuit. As the Parish points out, inadequate political representation is outside the claims pled. As to defenses, the Court agrees that plaintiffs are entitled to challenge the Parish's claim that land use decisions were made unanimously and/or with the support of the Black representatives of Districts 4 and 5. Plaintiffs can also question the Parish's apparent argument that this political support indicates the land use decisions were not discriminatory. As discussed above, nothing indicates the redistricting has had any impact on who was elected or how they voted on the land use decisions at issue. But even if the decision to add part of District 3 to District 4 is relevant to challenging the Parish's claim that the plaintiffs and their members are adequately represented by their respective councilmembers, this does not mean that the Parish's motivations in deciding to do so are relevant to whether or not the change diluted the political representation of plaintiffs' members. To the contrary, the Court finds these motivations are irrelevant.

The Court finds that the internal redistricting documents and communications are irrelevant to the claims and defenses in this action.

Moreover, even if the Court could agree that all documents and communications related to the redistricting decision might yield evidence that bears on the claims and defenses in this matter, the importance of the information does not outweigh the burden of production. There are seven Parish councilmembers who participated in the redistricting decision. At a minimum, their emails (and potentially text messages) and their documents would have to be searched. Other custodians might be implicated as well. The redistricting decision was considered between 2022 and 2023. Over this year or more, the Parish would have to locate all documents and communications related to redistricting through electronic searches and attorney review. [12] The Parish was unable to estimate the precise volume of documents implicated because even making this determination requires time and resources by the Parish's information technology team. Counsel reported at oral argument that the Parish is still processing requests for information responsive to plaintiffs' other document requests and could not make an estimate for the redistricting request without delaying that process. The Parish has been reviewing 250,000 documents yielded by plaintiffs' first Requests for Production.

And while this lawsuit may raise important issues, the discovery sought is, at best, hypothetically relevant to the claims and defenses. The Court finds that the redistricting information is not relevant, and even if it was, production of the requested information is disproportionate to the needs of the case.

[12] At oral argument, plaintiffs refused to offer any limitation, insisting that the "redistricting" subject matter was sufficiently narrow.

*3. The Parish's Motions to Compel*

The Parish's motions to compel concern member identity, member property value, member health, the health of certain neighbors and relatives of the members, and financial records of the plaintiffs.

*a. First Amendment and Discovery*

Among other things, plaintiffs argue that the discovery sought by the Parish is barred by the First Amendment. Compelled disclosure of membership information "can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Hastings v. N. E. Indep. Sch. Dist., 615 F.2d 628, 631 (5th Cir. 1980) (quoting Buckley v. Valeo, 424 U.S. 1, 64 (1976)). Thus, when "constitutionally protected rights are infringed by the disclosure order, the party seeking discovery must demonstrate 'an interest in obtaining the disclosures . . . which is sufficient to justify the deterrent effect which . . . these disclosures may well have.'" Id. (quoting Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 463 (1958)).

The Ninth Circuit Court of Appeals has adopted a two-part framework for assessing a claim of First Amendment privilege.[13] Perry v. Schwarzenegger, 591 F.3d 1147, 1160 (9th Cir. 2010). First, the party asserting the privilege must make a "prima facie showing of arguable first amendment infringement." Id. (quoting Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO, 860 F.2d 346, 349 (9th Cir. 1988)). This means the party must "demonstrate that [compelled disclosure] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." Brock, 860 F.2d at 350 (quoting O'Neal v. United States, 601 F.

[13] District Courts in the Fifth Circuit have used this test, noting that the Fifth Circuit in Hastings, cited above, indicated a balancing test would be appropriate. E.g., NetChoice v. Murrill, No. CV 25-231-JWD-RLB, 2025 WL 2656063, at *10 (M.D. La. Sept. 16, 2025).

Supp. 874, 878 (N.D. Ind. 1985)). If a prima facie showing is made, "the evidentiary burden will then shift to the government ... [to] demonstrate that the information sought through the [discovery] is rationally related to a compelling governmental interest ... [and] the 'least restrictive means' of obtaining the desired information." Perry, 591 F.3d at 1161 (quoting Brock, 860 F.2d at 350).

*b. Membership and Property Ownership Information*

The Parish's first motion implicates numerous interrogatories and requests for production. In summary, these requests seek information about (1) the identity of the plaintiff organizations' members, (2) the property owned by these members, including the diminished value of the properties, and (3) the medical conditions suffered by these members and their friends and neighbors as alleged in the complaint.

As to identity of the members and the property they own, the Parish argued in its briefing that the information is relevant to determining whether the plaintiffs actually have standing. At oral argument, though, they conceded that plaintiffs can establish standing via just one injured member. See Ass'n of Am. Phys. & Surgeons, Inc. v. Tex. Med. Bd., 627 F.3d 547, 553 (5th Cir. 2010) (holding the plaintiff association had established associational standing on behalf of its members by alleging injury to a sampling of members). Instead, the Parish argues that the identity of the members and the property they own in Districts 4 and 5 is relevant to challenging plaintiffs' plan to rely on evidence of general decrease in property values near the industrial sites. In other words, it submits that if certain members buck the trends that will purportedly be revealed by plaintiffs' general property value studies,[14] the Parish should be allowed to present evidence that some members of plaintiffs' organizations experienced property value increases.

---

[14] The issue of whether such general property value information will be admissible at trial is one for the District Judge to decide.

First, the Court notes that such a challenge by the Parish would be irrelevant to the standing question.[15] The Parish has presented no case law to support finding that whether an association has standing is based on the net harm to members of the organization.[16] Thus, even if the Parish is right that some of the plaintiffs' members have experienced property value increases and plaintiffs have "cherry picked" the injured members, this would not preclude finding standing based on those identified members that have suffered injury. Moreover, standing is not an issue of degree. Either plaintiffs can establish standing or they cannot.

Second, the Court finds that evidence of other members' property values is of minimal importance to the Parish's defense to evidence of general property value decrease near the industrial sites. If plaintiffs present evidence that primarily black property owners near the industrial sites have experienced diminution of their property value, the Parish can present contrary expert evidence analyzing those same properties, a subset of those properties, a larger group of properties in the area, specific outliers, property of black owners elsewhere in the Parish, etc. It is unclear why the Parish would want to respond to general property value information with member-specific property valuation. There is certainly no requirement they do so. Moreover, the Parish will have a better chance of finding properties that have increased in value when it is not limited to plaintiffs' members.

---

[15] Plaintiffs have agreed that if other members later agree to share their identity and property information, they will only use that information after disclosing it to the Parish. To avoid prejudice to the Parish by late disclosed information, the Court has required the parties to negotiate a deadline for the plaintiffs to identify any members upon whose property injury they will rely.

[16] In Reply, the Parish cites an unpublished case from the Northern District of New York where the court observed the associational plaintiff could not use standing as a sword and a shield. Sherwin-Williams Co. v. Spitzer, No. 1:04CV185(DNH/RFT), 2005 WL 2128938, at *10 (N.D.N.Y. Aug. 24, 2005). That observation is irrelevant to the discovery dispute here. The sword/shield commentary in Sherwin Williams did not concern a relevance dispute. Id. at *6-10. Instead, it arose out of the plaintiff association's insistence that discovery must be sought directly from the members and not through the association. Id. The court held that if plaintiff insisted that defendants use subpoenas to the members and then demanded a copy of the records produced, plaintiff would be required to pay for the copy (thereby precluding the plaintiff and its members from using "discovery as a sword and a shield."). Id. at *10. As to the Sherwin-Williams court's order that the association provide a list of members—that is something the association had agreed to do. Id.

Critically, the First Amendment concerns raised by the plaintiffs outweigh the value of the information sought. First, the court finds the plaintiffs have made a prima facie showing of an arguable First Amendment infringement. Plaintiffs have presented evidence of disparaging yard signs paid for by an organization called Industry Makes placed near the home of RISE founder Sharon Lavigne, along with harassing messages by Industry Makes about Lavigne on social media. See Rec. Doc. 165-1. Although Ms. Lavigne may have invited a response by Industry Makes by publicizing her opinions, other members of the plaintiff organizations have not done so. There is reason to believe if their identities were known, they would experience similar targeting. And while Industry Makes is not the Parish, plaintiffs also present evidence of the participation of the St. James Parish president in Industry Makes meetings that indicates a connection. Id. The Court finds that disclosure of the identity of plaintiffs' members would be likely to chill their associational rights.

The Parish must then show that the discovery is rationally related to a compelling government interest and the least restrictive means of obtaining the desired information. As discussed above, while the information sought by the Parish is not entirely irrelevant, its importance to the case is minimal. On balance, the Court finds the member identity and property information is disproportionate with the needs of the case. For the same reasons, the Court finds that the Parish cannot meet the First Amendment standard to obtain the membership information.

Finally, the Court addresses an issue that arose at oral argument concerning the Parish's ability to challenge plaintiffs' evidence of a general decrease in property value. Rather than identifying the documents upon which they will rely, plaintiffs have informed the Parish that they will only use documents (e.g., property assessments) in the public record.[17] But the Parish reports

[17] It appears this response was made informally. Plaintiffs raised prematurity objections to the interrogatories asking them to identify facts and evidence upon which their experts' opinions are based.

that if it only learns which documents plaintiffs are relying on when plaintiffs disclose their expert reports in accordance with the scheduling order deadlines, the Parish will be prejudiced in its ability to prepare its defense. Plaintiffs were open to providing this information earlier, subject to a caveat that once their expert is engaged and working on the report, they may learn that other documents will be used. Although this issue was not raised in the briefing, the Court will now require the parties to meet and confer to negotiate a deadline in advance of the expert disclosure deadline for the plaintiffs to identify public record documents upon which their experts may rely, subject to a right to later supplement. An earlier disclosure will assist both sides in preparing for trial. If the parties reach an impasse, they may contact the undersigned for a status conference.

*c. Health Information of Plaintiffs' Members and Others*

The Parish argues that it is entitled to information about the plaintiffs' members' health conditions because the plaintiffs allege that their members have been exposed to pollution from industry steered into their districts and that heavy industry in their communities causes severe disease. The Parish's interrogatories are tied to specific allegations in the Second Amended Complaint that:

- RISE members were exposed to heightened levels of carcinogens. Rec. Doc. 104, ¶25.
- "Ms. Lavigne of Plaintiff RISE St. James, speaks of many friends and neighbors with cancer, and who have died of cancer, and has been to many funerals of people who lived in the area and died from cancer." Id. ¶ 587.
- "Ms. Washington, founding member of Plaintiff Inclusive Louisiana . . . has counted at least 50 people she knows who died of cancer, including her sister who died in 2012 at age 57. Three of her high school classmates were diagnosed with

cancer, one of whom died in 2023. In approximately 2015, five of her neighbors died from cancer." Id. ¶ 585.

- "Ms. Felton, cofounder and former member of Plaintiff Inclusive Louisiana . . . lost three members of her immediate family to cancer, and one – her husband – to respiratory problems in the span of three months in 2014." Id. ¶583.
- "Ms. Felton and Ms. Washington, who live just a couple of hundred feet from each other, have experienced respiratory ailments. Both Ms. Felton and Ms. Washington have lost members of their immediate families to cancer." Id. ¶ 263.
- "Ms. Felton and Ms. Washington, are consistently exposed to and experience the health and other impacts of Nucor's emissions." Id. ¶ 251.
- "All founding members [of Inclusive Louisiana] have been exposed to heightened levels of carcinogens and other harmful pollutants and a dramatically increased risk of cancer and other diseases attendant to the heavy industrial sitings in those Districts, as a result of Defendants' discriminatory land use decisions. All members have lost loved ones to cancer and other diseases as a result of Defendants' discriminatory land use decisions. One founding member, Gail LeBoeuf, has been diagnosed with cancer." Id. ¶23.
- "Inclusive Louisiana founding member Gail LeBoeuf herself has cancer." Id. ¶10.
- "Ms. Washington . . . suffers from a chronic cough and requires the frequent use of an inhaler to aid in breathing." Id. ¶585.
- "Pastor Harry Joseph of Plaintiff Mount Triumph Baptist Church witnesses cancer and other pollution-related illnesses plague residents and visitors of Mount Triumph Baptist Church." Id. ¶586.

- "Some of [Mount Triumph's] congregants reside in St. James Parish including in the 5th District, where they have been exposed to heightened levels of carcinogens and other harmful pollutants, and a dramatically increased risk of cancer and other diseases attendant to the heavy industrial sitings in those Districts." Id. ¶24.
- "Mount Triumph Pastor Harry Joseph reports that in 2017 he buried five cancer victims within a six-month period alone." Id. ¶10.

Based on these allegations, the Parish seeks the identity of all members exposed to heightened levels of carcinogens, all the "many friends and neighbors with cancer," the immediate family members with cancer, the people Ms. Washington knows who died of cancer, and the cancer victims buried by Pastor Joseph. They also seek all health diagnoses of members allegedly resulting from heightened levels of carcinogens and other harmful pollutants along with those members' medical files. They seek Ms. LeBoeuf's medical file establishing her cancer and the medical files of Ms. Washington related to her respiratory ailments.

Plaintiffs insist that they intend to establish standing to assert their health-related claims by showing an increased risk of cancer or other illnesses resulting from exposure to toxins. They do not rely on individual illnesses. And, they say they have already identified the specific members with particularized exposure.

As with the property value information, the Court finds that identification of other members is not necessary for standing purposes. However, plaintiffs cannot expand the members upon whom they rely to establish standing for their health-related claims late in the discovery period without prejudicing the defendants. Accordingly, at oral argument, the parties were ordered to negotiate a deadline for plaintiffs' identification of members or others upon whose health issues the plaintiffs rely.

Additionally, to the extent plaintiffs rely on health issues of their members, they must produce relevant medical records. If they do not, the medical records are not subject to disclosure. Accordingly, at oral argument, the parties were ordered to negotiate the scope of such document production. Further, the Court now clarifies that to the extent the plaintiffs rely on a particular member only for exposure claims and not for actual health issues suffered by the member, production of medical records will not be required.

Finally, the allegations in plaintiffs' complaint concerning numerous unidentified individuals that are purportedly known to have cancer and respiratory issues caused by pollution raise further risks of prejudice. Plaintiffs cannot fairly present evidence regarding these individuals at trial, including testimony about them or even an offhand remark or mention, without defendants having had the chance to investigate the purported illness of the individuals and the purported cause. Accordingly, the parties were ordered to negotiate a stipulation limiting plaintiffs' ability to present evidence, elicit testimony, or reference health issues of friends, family, neighbors, parishioners, and other members that have not been identified by plaintiffs in accordance with the negotiated deadline.[18]

The parties have been instructed to contact the chambers of the undersigned for a status conference to resolve any impasse in the negotiations ordered.

*d. Plaintiffs' Financial Records*

The Parish seeks to compel financial statements and tax statements for each of the plaintiff entities. Originally, the discovery requests were served when the plaintiffs were seeking a preliminary injunction and argued that they should not be required to post bond because they had

[18] The admissibility of such evidence and testimony is ultimately an issue for the District Judge at trial or via a motion in limine.

limited financial resources.[19] Importantly, though, the Court denied the request for an injunction and plaintiffs no longer seek such preliminary relief. Because the issuance of an injunction without a bond is no longer on the horizon, the Court finds this cannot serve as a basis for relevance.

The Court also rejects the Parish's argument that its request for an attorneys' fee award puts plaintiffs' financial statements and tax returns at issue. If defendants prevail, plaintiffs will only be liable for attorneys' fees "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n, 434 U.S. 412, 421 (1978). Even if that standard is met, determination of a fee award requires consideration of the hours reasonably expended, the prevailing hourly rate in the community, and the so-called Johnson factors, which include things like the skill required to perform the work, the undesirability of the case, and the amount involved and results obtained. See Matter of Fender, 12 F.3d 480, 487 (5th Cir. 1994). The obligor's financial condition is not one of those factors, and it is unclear that the plaintiffs' financial condition would come into play. In any event, to the extent plaintiffs' financial condition is later put at issue—perhaps as a defense to an attorneys' fee award—the Court can revisit the relevance of plaintiffs' financial records for this purpose.

Beyond these reasons the Court has now rejected, the Parish argues that the financial information is relevant to the plaintiffs' claim that they were subjected to "economic exploitation" and that their political and economic empowerment was suppressed. The Court agrees with the plaintiffs, however, that proof of economic exploitation is not relevant to any of their claims.

---

[19] According to the Parish's memorandum in support of the present motion, the discovery requests were issued to uncover facts regarding the plaintiffs' purported limited resources in light of news articles uncovered by the Parish indicating that plaintiffs have received substantial funds from out of state entities. Rec. Doc. 150, at 8.

Instead, this section of their complaint concerns the systemic and historic exploitation of the Black community of St. James.

The Parish also argues that the financial information is relevant to bias of the witnesses. Specifically, the Parish argues that the plaintiff organizations are financed by "a press-owning billionaire" (Bloomberg) to wage a "war on plastics." It argues it is entitled to financial records to determine if there is such a connection and to explore how such a connection is driving this litigation.

The Court must also reject the Parish's bias argument. First, the Parish has not shown how the financial motivation (if any) of the plaintiff organizations in pursuing this lawsuit could be relevant to the claims and defenses in this lawsuit. And, while the bias of witnesses who testify at trial could be relevant as impeachment, the Court is not convinced that the financial condition of the plaintiff organizations or the identity of their donors bears on the bias of any witness. To the extent a corporate witness might be impeached because funding sources of an organization reflect an ulterior motive or bias of the organization itself (and therefore the representative speaking on the organization's behalf), the Parish has failed to offer any reason to believe it would find such information here. The Parish argues that plaintiffs and their donors are aligned against the plastic industry. But such alignment does not suggest biased testimony, even if the organization also claims the siting of the industry is racially discriminatory. The fact that donors may reside in other states may carry weight in social media attacks, but it is unclear how this could possibly impeach a corporate representative's testimony. The Parish's request for all of plaintiffs' financial statements and tax returns is an overly broad demand for sensitive financial information that is not likely to be probative of witness bias.

Finally, the Parish argues that financial statements are relevant to the claim of Inclusive Louisiana that it owns property that has been devalued. Here, the Court finds some merit. [20] Indeed, plaintiffs reported at oral argument that the public conveyance records reflect a $10 value at the time of transfer. This obviously does not reflect the value of the property, which plaintiffs described as a two-bedroom house that has been converted into a community center. Inclusive Louisiana's balance sheet may reflect the book value of the property and its income statement may reflect expenses and income associated with it. All this information may be relevant to the property's value. To the extent any such information is reflected in Inclusive Louisiana's balance sheets and income statements, they are relevant. It does not appear that requested profit and loss statements, statements of cash flows, annual reports, audit reports, and budgets will contain relevant information about the value of the real property. Nonetheless, Inclusive Louisiana must review those financial statements to determine whether they contain relevant information regarding property value. Further, subject to the First Amendment privilege discussion below, the Court finds production of the foregoing records proportional with the needs of the case. However, the Court finds that production of tax returns is, at best, cumulative of the foregoing and plaintiffs will not be required to produce them.

Turning to the privilege issues raised by the plaintiffs, the Court finds plaintiffs have raised valid First Amendment concerns. Plaintiffs argue that disclosure of their donors and their internal strategy implicates their First Amendment rights. Indeed, the Supreme Court has held that "demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" First Choice Women's Res. Centers, Inc. v. Davenport, 608 U.S. 174, 175, (2026) (quoting Buckley v. Valeo, 424 U.S. 1, at 65 (1976). Courts have also

[20] The other plaintiffs do not claim to own property in the area. Their financial records are not relevant and not subject to production.

protected internal deliberations. E.g., Whole Woman's Health v. Smith, 896 F.3d 362, 372 (5th Cir. 2018), as revised (July 17, 2018). Considering the evidence of harassment discussed above, the Court finds plaintiffs have shown that disclosure of their donors and budgets reflecting internal strategy would chill their associational rights. And, given that the Court has found only information about the value of Inclusive Louisiana property is relevant, there is no compelling need for donor information and budgets.

Accordingly, the Court finds that certain redactions and exclusions are required. To the extent that donor information is reflected in any of the financial statements containing information about the value of Inclusive Louisiana's real property, Inclusive Louisiana shall redact it. Additionally, Inclusive Louisiana's budgets shall not be subject to production at all. To the extent plaintiffs contend that any of the other financial statements reflect their internal strategy, plaintiffs shall propose redactions of such information, provided they do not obscure property value information. The parties shall confer if defendants do not accept the redactions. Further, the financial statements produced (to the extent they are not public or otherwise non-confidential) shall be marked "Confidential" and subject to the following Protective Order: The financial statements may only be used by the defendants for the purpose of this litigation and may not be used for any other purpose, such as publicity. Defendants shall maintain the documents confidentially and shall only disclose them as needed for the purpose of this litigation. To the extent the documents are relevant to the merits or any other dispute that comes before the Court in this proceeding, defendants shall not file them into the record or introduce them into evidence without first discussing with plaintiffs whether the plaintiffs wish to seek to have the documents filed under seal, in accordance with Local Rule 5.6 and applicable legal standards.

## Conclusion

For the foregoing reasons,

- The Parish will not be compelled to produce redistricting information because this information is not relevant or proportional to the needs of the case. Plaintiffs' Motion to Compel Discovery Responses (Rec. Doc. 151) is DENIED.
- As to the remaining issue raised by the Parish's Motion to Compel Responses to First Set of Discovery (Rec. Doc. 148), the Motion is DENIED. Plaintiffs will not be required to identify other members with property in the relevant area because this information is not proportional to the needs of the case.
- The parties must negotiate a deadline by which plaintiffs will identify public records they may rely on to show generalized diminution of property value.
- The Parish's Motion to Compel Responses to Second Set of Discovery (Rec. Doc. 150) is GRANTED in part and DENIED in part because the financial records are only relevant to the value of Inclusive Louisiana's property. Accordingly, Mount Triumph and RISE will not be required to produce any financial statements or tax returns. Plaintiff Inclusive Louisiana must produce its financial statements that bear on the value of its real property (such as a balance sheet or equivalent reflecting book value and any liabilities associated with the property, an income statement or equivalent reflecting income and operating expenses associated with the property, etc.), provided that any portion of such statements that identifies donors will be redacted, the budget shall not be subject to production, and any other internal strategy may be redacted provided it does not obscure property value information. Production of tax returns shall not be required at this time. Further, the financial records produced shall be (to the extent they are not public or otherwise non-confidential) subject to the following Protective Order restricting disclosure:
    - The financial statements may only be used by the defendants for the purpose of this litigation and may not be used for any other purpose, such as publicity. Defendants shall maintain the documents confidentially and shall only disclose them as needed for the purpose of this litigation. To the extent the documents are relevant to the merits or any other dispute that comes

before the Court in this proceeding, defendants shall not file them into the record or introduce them into evidence without first discussing with plaintiffs whether the plaintiffs wish to seek to have the documents filed under seal, in accordance with Local Rule 5.6 and applicable legal standards.

New Orleans, Louisiana, this 18th day of November, 2026.

Janis van Meerveld
United States Magistrate Judge